COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS. (BLS)

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT

EDMUND EDWARD WARD,

Plaintiff,

v.

BRUCE AUERBACH, ERNST J. SCHAEFER,
M.D., ROBERT D. SHAMBUREK, M.D.,
ALAN T. REMALEY, M.D., ALPHACORE
PHARMA, LLC, ASTRAZENECA
BIOPHARMACEUTICALS, INC., and
MEDIMMUNE, LLC,

Defendants.



## COMPLAINT AND JURY DEMAND

### PARTIES

1.      Plaintiff Edmund Edward Ward ("Mr. Ward") is a natural person residing in Weston, Middlesex County, Massachusetts.

2.      Defendant Bruce Auerbach ("Mr. Auerbach") is a natural person who, at all relevant times, was an officer and principal of Defendant AlphaCore Pharma, LLC, in Ann Arbor, Michigan.

3.      Defendant Ernst J. Schaefer, M.D. ("Dr. Schaefer") is a natural person and physician who, at all relevant times, worked for Tufts University School of Medicine and Boston Heart Diagnostics as Chief Medical Officer, in Medford and Framingham, Massachusetts, respectively.

4.      Defendant Robert D. Shamburek, M.D. ("Dr. Shamburek") is a natural person and physician who, at all relevant times, worked for the United States,

Department of Health and Human Services, National Institute of Health, National Heart, Lung and Blood Institute, Bethesda, Maryland.

5.      Defendant Alan T. Remaley, M.D. ("Dr. Remaley") is a natural person and physician who, at all relevant times, worked for the United States, Department of Health and Human Services, National Institute of Health, National Heart Lung and Blood Institute, Bethesda, Maryland (Mr. Auerbach and Drs. Schaefer, Shamburek, and Remaley will be referred to, collectively, as "the individual Defendants.")

6.      Defendant AlphaCore Pharma, LLC ("ACP") is a business entity with a usual place of business in Ann Arbor, Michigan.

7.      Defendant Astra Zeneca Biopharmaceuticals, Inc. ("AZ") is a corporation with a usual place of business in Wilmington, Delaware.

8.      Defendant MedImmune, LLC is a division or subsidiary of AZ with a usual place of business in Gaithersburg, Maryland (ACP, AZ, and MedImmune will be refereed to, collectively, as "the corporate Defendants.")

## FACTS

9.      Mr. Ward was born with an extremely rare genetic deficiency of a bloodstream enzyme, lecithin-cholesterol acyltransferase (LCAT).  Among other health conditions, Mr. Ward is and has been in stage 5 kidney failure and now receives regular dialysis three times a week.  With LCAT deficiency, Mr. Ward produces virtually no cholesterol in his body.

10.     As of 2013, there were only 125 known cases of familial LCAT deficiency world-wide.

2

11.     LCAT is a plasma enzyme secreted by the liver and associated with high-density lipoprotein cholesterol ("HDL-C"), the so-called "good cholesterol." LCAT is a component in the reverse cholesterol transport system, the process by which cholesterol in the arterial wall is transported to the liver for excretion from the body, and as of 2012, it was considered to be critical in the management of HDL-C levels.

12.     LCAT esterifies cholesterol and raises HDL-C levels.

13.     As of 2012, when the individual Defendants first met or communicated with Mr. Ward, ACP was a privately owned company in which Mr. Auerbach was an executive officer and shareholder. Upon information and belief, ACP was the sole patent licensee of a recombinant human LCAT ("rhLCAT") called ACP-501, with the hope that the product would prevent or treat cardiovascular disease by effectively increasing HDL-C.

14.     Upon information and belief, the United States of America, as assignee and represented by the Department of Health and Human Services, owns US patent No. 6,635,614 B1, issued on October 21, 2003 from the Inventors who are or were employees of the United States. This patent, concerning the "Use of Lecithin-Cholesterol Acytransferase (LCAT) to Reduce Accumulation of Cholesterol," was and continues to be licensed to ACP. To obtain the patent, the inventors provided results of ACP-501 on animals, not humans, and specifically transgenic rabbits. None of the claims of the '614 patent, or the scientific literature supporting the application, provided evidence that ACP-501 was efficacious in reversing kidney disease in humans. Rather the claims of the '614 patent speak to a "method for decreasing

3

accumulation of cholesterol in arteries in a human subject not suffering from a . . .

LCAT . . . deficiency syndrome . . . ."

15.     In collaboration with the National Heart, Lung and Blood Institute

("NHLB") of the National Institutes of Health ("NIH"), ACP conducted a clinical trial

in 2012 to determine the safety and tolerability of a single injection of ACP-501 in

16-18 subjects with stable coronary artery disease.

16.     The principal investigator at NHLB, Defendant Dr. Shamburek, along

with his colleague Defendant Dr. Remaley, collaborating with and previously known

to Defendant Mr. Auerbach, reported no adverse events in this limited study

concluded in 2012.  In other words, a single injection of ACP-501 was perceived and

reported by the individual Defendants to be safe and tolerated by the sixteen

subjects. This study did not measure or study the efficacy of ACP-501.

17.     Results of the study were not posted on the website of NIH clinical

trials.

18.     Along with Drs. Shamburek and Remaley, Mr. Auerbach was

introduced to the ideal research subject, Mr. Ward, by one of his treating physicians

in Massachusetts, Ernst Schaefer, M.D. Mr. Ward was potentially an ideal research

subject for ACP-501 because he produces virtually no cholesterol in his body due to

his LCAT deficiency.

19.     As Dr. Shamburek later described the research scenario, albeit with a

false premise (because ACP-501 had not been shown to work in any human before

Mr. Ward, including in the 2012 NIH/NHLB study): "If this [ACP-501] is working in

4

low HDL patients with [coronary artery disease], what about a patient with *no* HDL?"

20.     Armed with a *sui generis* patient and potential research subject, Mr. Ward, and based on his prospective participation ACP was granted an "orphan drug" designation for ACP-501, and a "compassionate use" protocol was approved in short order.

21.     As a result of his familial LCAT deficiency, Mr. Ward had minimal HDL-C (<5mg/dL) and suffered from corneal opacity, anemia, an enlarged spleen, atrial arrhythmias, and advanced, stage 5, kidney disease. In 2012 Mr. Ward was considered by his physicians to be in kidney failure, and a fistula was inserted in Mr. Ward's arm in anticipation of regular kidney dialysis. As of January 2, 2013, Mr. Ward's nephrologist, Valerie Price, M.D., diagnosed Mr. Ward with "Unspecified Anemia, Chronic Kidney Disease Stage V, Other Disorders of Lipoid Metabolism, and Unspecified Essential Hypertension."

22.     In 2012 and 2013, while acting in concert, the individual Defendants and ACP fraudulently induced Mr. Ward to participate as the lone subject (indeed, the ideal research subject because of his unique genetic condition) in a trial of ACP-501, by assuring him that the drug would be an effective therapy to reverse his advanced kidney disease caused by the LCAT deficiency. ACP donated the ACP-501 to the NIH run experimentation. Drs. Schaefer and Remaley even drafted a letter for Mr. Ward to Senator John Kerry, and copying the Food and Drug Administration, urging the approval of rhLCAT "therapy that should help prevent my kidneys from failing."

23. Instead, the individual Defendants and ACP used Mr. Ward to test the effect of ACP-501 on the production of HDL-C, hoping the drug would be considered a potential breakthrough in the prevention and treatment of cardiovascular disease, thereby leading to the sale of ACP to a pharmaceutical conglomerate such as AZ.

24. Acting in concert, the individual Defendants and ACP intentionally withheld from Mr. Ward any information regarding their institutional, professional, and personal financial interests and conflicts, reasonably believing that if they disclosed such information, they might lose the rarest of research subjects with genetic LCAT deficiency, Mr. Ward, or be forced to compensate him for his instrumental role in their venture.

25. The experiments began in January 2013, after Mr. Auerbach told Mr. Ward that ACP-501 was "most certainly the solution" to reverse his kidney disease. Dr. Shamburek echoed Mr. Auerbach's certainty and reassured Mr. Ward. Similarly, when Dr. Remaley asked Mr. Ward why he was at NIH, Mr. Ward responded, "To save my kidneys." Dr. Remaley replied, "And we will."

26. The individual Defendants and ACP all knew at the time that kidney disease was the major cause of morbidity and mortality in familial LCAT deficiency, likely leading to kidney failure once the afflicted person reached the age of 40. Mr. Ward was 53 years of age in 2013. The individual Defendant and ACP all knew or should have known that Mr. Ward's renal condition was irreversible.

27. Beginning in January 2013, Mr. Ward traveled alone from Massachusetts to NIH in Maryland to begin the experimental trial, in reliance on the false promises (and other misrepresentations and omissions) by the individual

6

Defendants and ACP that ACP-501 would effectively reverse his advanced kidney disease. Defendant Auerbach met with Mr. Ward at the outset of the experimentation at NIH, and he told Mr. Ward that the ACP-501 process of reversing his kidney failure would take a long time, and he urged Mr. Ward to remain in the experimentation for the full course because "you [Mr. Ward] will get out of it what you put into it."

28.     The regimen Mr. Ward endured began on January 6, 2013, when NIH admitted him. The regimen was painful, grueling, and confining. For example, from January 24 to February 27, 2013, Mr. Ward remained in one room for twenty-four hours each day, with two intravenous lines continuously inserted, one to administer ACP for one hour in the morning, the other to draw blood as many as 32 times in one day. Mr. Ward experienced many adverse infusion-related events and trauma. Mr. Ward also suffered a serious and life-threatening cardiac arrest episode, including arterial fibrillation, which lasted three days while he was at NIH in February. Mr. Ward, who has yet to receive his medical records of the care he received by Dr. Richard Cannon at NIH, was administered large doses of IV Amiodarone and by pill, along with IV Heparin and Lovenox for over a month.

29.     It was not until January 24, 2013, that Mr. Ward received and signed the NIH's Consent to Participate in a Clinical Research Study ("Consent"). Mr. Ward does not recall the circumstances of signing the Consent. At this point, Mr. Ward had already been subject to the rigors of the study for at least five days, from January 6 to January 10, 2013.

30.    The NIH's Institutional Review Board ("IRB") initially approved the Consent on December 18, 2012, but the IRB did not finally approve the Consent, as amended, until January 16, 2013, after Mr. Ward was admitted.

31.    The Consent reads, in part, that, because Familial LCAT Deficiency ("FLD") results in a biochemical defect, "we hypothesize that the clinical problems in FLD can be prevented *or even reversed* by replacing the defective enzyme." As a result, the Consent continues: "LCAT has been artificially made so that it can be directly infused into the body, in the hope that it will increase HDL and *reverse the corneal opacities, anemia, and protein in the urine and/or kidney dysfunction.*" (emphasis supplied).

32.    The Consent also reads, in part, that the possible side effects of the administration of ACP-501 are numerous, and include "arrhythmia (irregular heart rate), fever, chills, and nausea." But the "[s]ide effects after multiple doses of ACP-501 are not known *because this is the first time multiple doses will be given to [a] human[].*" (emphasis supplied).

33.    The Consent, with regard to the study's prospective benefits to Mr. Ward, revealed none of the so-called possible therapeutic benefits promised: "You may not receive any direct benefit from participating in this study. However, the information obtained from the study will yield knowledge about the use of ACP-501 for future subjects. The information gained will provide direct insights into the safety and dose of ACP-501 that can be used for people that lack LCAT."

34.     As far as "compensation," Mr. Ward "will not be compensated for your participation in this study," but "you will be offered continued treatment with the [ACP-501] drug in an extension study."

35.     As for financial or other conflicts of interest, the Consent had only this to say: "The National Institutes of Health reviews NIH staff researchers at least yearly for conflicts of interest. .... You may ask your research team for additional information or a copy of the Protocol Review Guide. " It further states that the "National Institutes of Health and the research team for this study are using ACP-501 developed by AlphaCore Pharma through a joint study with your researchers and the company. This means that it is possible that the results of this study could lead to payments to NIH scientists and to the NIH. By law, government scientists are required to receive such payments for their inventions. However, none of the researchers on this protocol will receive any compensation. You will not receive any money from the development of recombinant human LCAT." The Consent nowhere reveals the institutional conflict that the United States through its Department of Health and Human Services is the owner of the '614 patent, licensed exclusively to ACP, and NIH not only was the principal site for the study, but it also employed the principal investigator, Dr. Schamburek. The Shareholders of ACP were never revealed in the Consent (nor were they ever revealed publicly), nor did the Consent reveal the financial and other terms of the ACP-NIH '614 Patent License.

36.     The United States Department of Health and Human Services, National Institutes of Health, and the National Heart Lung and Blood Institute released its Clinical Protocol for ACP-501 titled "Expanded access use of intravenous ACP-501 in

one subject with Familial (lecithin:cholesterol acyltransferease [rhLCAT] Deficiency"

(the "Protocol"). The Protocol revealed that:

    a. "No human experience has been obtained specifically with ACP-501 in LCAT deficient subjects;"

    b. "The primary objective is to assess the safety and tolerability of ACP-501" and the "[s]econdary objectives [were] to assess the effects of ACP-501 on markers of reverse cholesterol transport, including HDL-C elevation," and "biomarkers of renal function," along with the "pharmacokinectics (PK) of ACP-501;"

    c. The experimentation's rationale was to replace Mr. Ward's "defective enzyme [to] restore the normal level of plasma cholesterol esters (LCAT product) and prevent the formation of the abnormal Lp-X lipoprotein which is implicated in renal failure in this population";

    d. In other words, rhLCAT enzyme replacement therapy was designed not to reverse kidney failure but rather to demonstrate "the potential to protect FLD patients from kidney failure . . . .";

    e. Indeed, the Protocol reads that "ERT with rhLCAT, on the other hand, has the potential to *protect* FLD patients from kidney failure, in part, because it can eliminate Lp-X as seen in a mouse model of FLD and in ex vivo addition of rhLCAT to plasma from an FLD patient;" (emphasis supplied)

    f. Robert Shamburek, M.D., was the Principal Investigator, Alan Remaley, M.D., Ph.D., was an investigator who served as the Safety Review Investigator, and Ernst Schaefer, M.D., served as a Medical Monitor;

    g. An "Adverse Event" was "defined by the international Conference on Harmonization (ICH) E2A [as] "any untoward medical occurrence in a subject or clinical investigation subject administered a pharmaceutical product and which does not necessarily have to have a causal relationship with this treatment. An [Adverse Event] can therefore be any unfavorable and unintended sign, symptom, or disease temporally associated with the use of a medicinal product, whether or not considered related to the medicinal product";

    h. Dr. Robert D. Shamburek and Dr. Marcelo J. Amar were responsible for leading the discussion and to obtain informed consent."

37.    The Protocol does not have as its primary or secondary objective to determine whether treatment would "reverse" Mr. Ward's Stage 5 renal failure and "kidney dysfunction."

38.     From February 27 to June 28, 2013, Mr. Ward flew from

Massachusetts to NIH every Tuesday.  Each week during that period, he checked

into a hospital room where Dr. Shamburek administered ACP-501 on Wednesday

morning and drew blood six times Wednesday and six times Thursday.

39.     In the first half of 2013, Mr. Ward was told that he was the first person

in history to have HDL-C raised by a factor of 10.  Dr. Schaefer later reported that the

data regarding the effect of ACP-501 on Mr. Ward's kidneys were at best ambiguous

or indicative of modest functional improvement as of June 2013.  There was no

reported "reversal" of his kidney failure throughout the experimentation.

40.     In contrast, Drs. Shamburek and Remaley both told Mr. Ward

continually that ACP-501 was materially improving his kidney function.

41.     In early-Fall 2013, Mr. Ward learned that the only effect of the ACP-

501 experimentation on his kidney condition was to delay, for many months, critical

dialysis treatment.  In other words, Mr. Ward never received kidney dialysis

treatment while under the care of the individual Defendants and the NIH from

January to July 2013.

42.     Mr. Ward previously had been reported to be the first person in

history to show a ten-fold increase in HDL-C.  The results of Mr. Ward's testing were

instrumental in bringing about the sale of Defendant ACP to Defendant MedImmune,

a division of Defendant AZ.

43.     Unbeknownst and undisclosed to Mr. Ward, MedImmune purchased

ACP for $20,000,000 in April 2013, based principally on Mr. Ward's HDL-C results.

Dr. Remaley reported in 2014, "Based on these results [of tests on Mr. Ward] and a

promising Phase I study done at the NIH,[1] showing the safety of recombinant LCAT,

AlphaCore Pharma, the original licensee of the NIH patent on recombinant LCAT,

was acquired by AstraZeneca."

44.     Until the time of its acquisition, ACP was a private company. None of

its shareholders, whether private entities or individuals, have ever been made

public. The purchase price was also not announced publicly, as it was "immaterial"

to AZ's balance sheet.

45.     Dr. Schaefer, however, provided the sales price to Mr. Ward. Upon

information and belief, the individual Defendants, acting in concert, were ACP

shareholders, owned ACP options or warrants, or otherwise benefitted materially

from the sale of ACP to AZ in secret.

46.     The non-therapeutic experimentation on Mr. Ward saved the

corporate Defendants substantial amounts of money and time in the process of

seeking approval of the drug and made the patent, owned by the United States and

licensed exclusively to ACP, more valuable. Indeed, Dr. Remaley reported to Dr.

Schaefer in 2012 about the status of rhLCAT as follows: "We hope to start our first

cardiovascular disease patient in about 2 weeks. If you recall the FDA wanted us to

have long term safety data before we treat LCAT deficient patients because they

would presumably be on it for a lifetime. The first study that they approved was for

cardiovascular disease patients and we showed after 10 treatments in monkeys that

it was safe but *they want 6 month safety data for LCAT deficiency*. We are getting

---

[1] The "promising Phase I study" was the *single rhLCAT dose* study of 16-18 subjects
wherein there were "no significant adverse events and the recombinant LCAT
behaved like expected based on animal studies in regard to its ability to modulate
HDL metabolism."

ready to do the study in LCAT KO mice but probably will not complete it until the end of the year. In the meantime, I talked with the Office of Rare Diseases and if the first patients that we treat with LCAT do well, I may try to apply for some sort of exemption to do just 1 treatment in LCAT Deficient patients to see if we get the same sort of favorable changes we saw in LCAT deficient mice. *If so I think we can perhaps use this to go faster with the FDA in doing a long term treatment in LCAT Deficient patients.* I did get a grant approved from the SMART program and *they are now making enough recombinant enzyme to treat about 20 LCAT deficient patients for 2 years, which we will use once we get the FDA approval.*" (emphasis supplied).

47. Prior to the sale of ACP to AZ, the Defendants had chosen not to tell Mr. Ward the principal purpose behind the experimentation: the desire to demonstrate increased HDL-C to interest potential purchasers of ACP and its ACP-501 assets as a treatment for or prevention of coronary artery disease. Had Mr. Ward known the true purpose of the experimentation, he never would have agreed to participate. Indeed, in reporting on the results of the Phase I study, ACP makes no mention of the potential of ACP-501 to reverse kidney failure. Instead, as reported by ACP, the Phase I "data from this study support ongoing clinical development of ACP-501 in patients with high-risk atherosclerosis, including acute coronary syndromes."

48. The Protocol and experimentation on Mr. Ward was therefore non-therapeutic because it was the first repeated, human administration of ACP-501 and included the study of Mr. Ward and his bodily functions with the intent of

13

developing new knowledge and which was not in following of accepted or established medical practice. In other words, Mr. Ward was falsely informed by the individual Defendants, and Mr. Ward understood and believed, that he was to benefit medically from the Protocol when in fact he was a human research subject only.

49.     Mr. Ward was not otherwise made aware of the sale and the price that ACP garnered based on its experiment on him until 2014, almost a year after he had withdrawn from the trial due to a dearth of the promised renal benefit and the urgent need for dialysis.

50.     After April 2013, Dr. Shamburek stopped sharing blood test data with Mr. Ward's physician in Massachusetts, Dr. Schaefer, and otherwise stopped communicating with him. Mr. Ward's nephrologist in Massachusetts, Dr. Valerie Price, told Mr. Ward in this April-May time period that he could no longer continue to delay dialysis. Drs. Shamburek and Remaley consistently counseled Mr. Ward against dialysis

51.     On June 4, 2013, Defendant Dr. Shamburek announced at the European Atherosclerosis Society: "Enzyme replacement therapy with ACP-501 ... increased HDL ... in a 53-year old patient [Mr. Ward] with ... LCAT deficiency ..." In his white paper, Dr. Shamburek acknowledged the non-therapeutic nature of the experimentation on Mr. Ward, indicating that ACP-501 likely would not reverse Mr. Ward's renal failure, but nevertheless obtained a compassionate use protocol for him. In addition, Dr. Shamburek reported that Mr. Ward had "no infusion-related

adverse events and no infusion-site reactions but did have recurrent arterial fibrillation that was deemed unrelated to treatment."

52.     ACP was allegedly running low on its stock of ACP-501 at NIH in June 2013. Defendants Drs. Shamburek and Remaley nonetheless induced Mr. Ward to continue the trial on a lower dose, even though it was later disclosed that the higher dose had done virtually nothing to reverse Mr. Ward's kidney disease.

53.     The lower dose of ACP-501 caused Mr. Ward's HDL-C to plummet, so Mr. Ward expressed his desire to drop out of the trial if he could not continue receiving the higher dose.

54.     In response to Mr. Ward's reticence, Dr. Shamburek convinced him to continue in the trial by telling him that, though its focus would shift to esterification, this shift was consistent with the goal of ultimately reversing his kidney failure. This representation too was false.

55.     Dr. Shamburek did not tell Mr. Ward that, given the failed state of his kidneys, the lower dose of ACP-501 would not only not reverse his kidney disease but it also would not improve kidney function.

56.     Drs. Shamburek and Remaley also falsely induced Mr. Ward to remain in the trial, by assuring him that ACP was preparing a new batch of ACP-501 and that he would be given the higher dose as soon as it arrived. They warned Mr. Ward that if he did not continue on the lower dose in the interim, he would relinquish his "rights" to the higher dose and lose all hope of ever reversing his kidney failure.

57.     The individual Defendants fraudulently induced Mr. Ward to remain in the trial until the Fall of 2013, thus ensuring that the individual Defendants would

15

obtain the six months of data needed for the accelerated next steps with the FDA. There was no new batch or higher-dose of ACP-501 provided to Mr. Ward, as they had promised.

58.     From July to September 2013, Mr. Ward flew from Boston to Washington, D.C. every other Tuesday to check into a hospital room at NIH. Each Wednesday morning Dr. Shamburek administered the lower dose of ACP-501 and drew blood from Mr. Ward six times, during a twelve-hour period from 8:00 a.m. to 8:00 p.m. Each Thursday, Mr. Ward was again confined to his room the entire day, with six more blood draws. He flew back to Boston every other Friday.

59.     Predictably, Mr. Ward's kidney function deteriorated on the lower dose to the point that his nephrologist in Massachusetts ordered him placed him on dialysis. After several more low-dose ACP-501 treatments, Mr. Ward and Dr. Schaefer, the referring physician, decided to discontinue the lower dose as not worth Mr. Ward's time, effort, and ordeal, and because it interfered with now even more critical dialysis.

60.     Dr. Shamburek was persistent in the face of Mr. Ward's decision to terminate. He left a voicemail for Mr. Ward, saying he had "interesting new information" for Dr. Schaefer and him that had not been previously communicated. Dr. Shamburek tried to convince Mr. Ward that the lower dose of ACP-501 was actually working to improve kidney function, and that it was the optimal dose.

61.     Finally, in or about September 2013, Dr. Schaefer advised that Mr. Ward stop participating in the experimentation, and Mr. Ward dropped out of the study. In October 2013, Dr. Shamburek left a voicemail marked "urgent" on Mr.

Ward's phone, in which Dr. Shamburek yelled, "You can't just leave the program! If you try to leave the program, then you will be required to file a lot of paperwork. You have to come back to the NIH!" A year later, in September 2014, Mr. Ward first heard that ACP had been sold for $20,000,000.00 to AstraZeneca's MedImmune unit in 2013, based principally on the extensive data derived from his rare blood as ACP-501 was processed in his body. Mr. Ward was shocked and felt used, deceived, and betrayed.

62.     At some point after the completion of the experimentation, Dr. Remaley published a paper for the Lipoprotein Metabolism Section of the Cardiopulmonary Branch of the NIH, titled "HDL Review: Translating new findings on LCAT into novel therapies." The slide deck provided a summary of the relevant biological science, the pre-clinical findings from animal models, the "Phase 1" single injection of rhLCAT findings, and the findings associated with the experimentation on Mr. Ward, including:

> a.  "One rLCAT treatment every two weeks significantly raised HDL-C above baseline and maintained cholesterol esters above threshold which should prevent LpX formation;"
> b.  "rLCAT treatment appeared to modestly improve renal function;"
> c.  "rLCAT . . . significantly improves anemia by decreasing cholesterol content on RBCs"; and
> d.  "No serious adverse events."

63.     From January 2014 to March 2015, Dr. Schaefer "employed" Mr. Ward to meet once a month at a salary of $500 per month, for a period of one to three hours. Mr. Ward did not have specific duties, but he and Dr. Schaefer would often have lunch, discuss Ed's private life, emotions, hobbies, reading, and the experimentation and its adverse effects. Dr. Schaefer discussed his attempts to

publish a paper on how ACP-501 raised Mr. Ward's HDL ten fold. Mr. Ward stopped

appearing after March 2015, but the monthly checks continued until September

2015.

64.    Later, in March 2016, Dr. Schaefer admitted to Mr. Ward in a letter

that possible ACP-501 treatment for the reversal of kidney decline was five years

away, a revelation never before disclosed to Mr. Ward. Dr. Schaefer also wrote that,

if Mr. Ward brought suit against Alpha Core, he would testify against Mr. Ward.

65.    Mr. Ward had suffered harm and damages and the corporate and the

individual Defendants have profited and benefited as a direct and proximate result

of the Defendants' fraudulently inducing Mr. Ward to participate and remain in the

experiment, using his body and rare condition for unlawful human experimentation.

### VICARIOUS AND SUCCESSOR LIABILITY

66.    ACP sponsored the experimental drug trial in which Mr. Ward

participated.

67.    At all relevant times, Defendant Mr. Auerbach acted as a principal,

agent, and employee of ACP, thereby rendering ACP vicariously responsible for his

conduct under the doctrine of *respondeat superior.*

68.    As the patent licensee and the sponsor of the experimental drug trial

in which Mr. Ward participated, ACP is and was also legally responsible for the

conduct of Defendant Drs. Schaefer, Shamburek, and Remaley.

69.    By virtue of its purchase of ACP's assets, including its ACP-501 assets

and the ACP-NIH '614 Patent License, Defendant MedImmune, LLC succeeded to the

liabilities of ACP arising out of the experimental drug trial in which Mr. Ward participated.

72. As the parent company and owner of MedImmune, LLC, Defendant AZ is and was legally responsible for the liabilities of its subsidiary or division arising out of the experimental drug trial in which Mr. Ward participated.

**COUNT I**
**Fraud in the Inducement/Deceit/Intentional Misrepresentation**

71. The Plaintiff repeats and incorporates herein the allegations in paragraphs 1 through 70.

72. In and after January 2013, the individual Defendants, for whose conduct the corporate Defendants are legally responsible and liable, fraudulently induced Mr. Ward to participate and remain in the experimental study of ACP-01, by, among other conduct:

    a. Representing that ACP-501 would effectively reverse his advanced kidney disease;

    b. Representing, when the existing stock of ACP-501 was allegedly dwindling, that a lower dose of ACP-501 was the optimal dose, and that ACP would produce more of the product to enable Mr. Ward to remain in the study at a higher dose;

    c. Failing to explain and describe the study as a non-therapeutic "human experiment," and instead representing it to be therapeutic in nature;

19

    d. Failing to disclose the financial and professional motives, and the clear conflicts of interest, for the experimental study, *viz.* to speed up to market ACP-501 to prevent and treat coronary artery disease and, consequently, to sell ACP, the sole exclusive licensee of the '614 patent, to a pharmaceutical conglomerate such as AZ.

73. Mr. Ward reasonably reasonably relied on one or more of the above-referenced fraudulent misrepresentations or omissions in deciding to participate in the experimental drug trial.

74. Had the Defendants not made the above-referenced fraudulent misrepresentations, or had they disclosed material facts that they fraudulently omitted, Mr. Ward would not have participated in the experimental drug trial, nor would a reasonable person in his position.

75. The above conduct constitutes intentional misrepresentation, fraud in the inducement, and deceit by the individual Defendants, for whose conduct the corporate Defendants are legally responsible or liable.

76. As a direct and proximate result of the intentional misrepresentation, fraud in the inducement, and deceit by the Defendants, Mr. Ward was caused to suffer serious and permanent injury, deteriorating health, diminished life expectancy, bodily pain, and mental anguish.

WHEREFORE, Plaintiff Edmund Ward demands judgment in his favor and against all Defendants, in a sum to be determined at trial, plus interest and costs.

## COUNT II
### Breach or Lack of Informed Consent

77.     The Plaintiff repeats and incorporates herein the allegations in
paragraphs 1 through 60.

78.     Before initiating the experimental drug trial, the individual
Defendants owed a duty to Mr. Ward to disclose and explain, in a reasonable
manner, all significant medical, non-medical, financial, and other information that
the Defendants possessed or reasonably should have possessed, that was material
to an intelligent decision by Mr. Ward whether to participate in the trial.

79.     The individual Defendants' duty included a duty to disclose all
material risks and potential complications of the drug trial, a duty to disclose the
unproven nature and effectiveness of the treatment, and a duty to disclose that ACP-
501 was being researched and developed as a treatment for cardiovascular disease,
not kidney disease.

80.     The individual Defendants' duty also included a duty to inform Mr.
Ward of the Defendants' financial and professional interests and conflicts of interest
in the testing, development, and sale of ACP-501, to inform Mr. Ward of the unique
nature of his blood and tissue, and to inform Mr. Ward that, without the use and
benefit of his unique blood and tissue, the Defendants would be unable to prove the
effectiveness of ACP-501 and would be unable to market and sell the product. E.g.,
45 C.F.R. Part 46, Subpart A & Subpart D, §§ 46.116 & 46.117, 21 C.F.R. §§ 50.20 &
50.25.

21

81.     The individual Defendants breached their duty to Mr. Ward, by failing reasonably and adequately to disclose and explain the risks and potential complications of the experimental drug trial, the unproven nature and effectiveness of the treatment, their financial and professional interests and conflicts in the development and sale of ACP-501, the unique nature of his blood and tissue, and the Defendants' inability to prove the effectiveness of ACP-501 without the use and benefit of his unique blood and tissue.

82.     Had the individual Defendants complied with or satisfied their duty to disclose, Mr. Ward would not have consented to participate in the experimental drug trial.

83.     As a direct and proximate result of the individual Defendants' breach or the lack of informed consent, for which the corporate Defendants also are liable, Mr. Ward was caused to suffer serious and permanent injury, deteriorating health, diminished life expectancy, bodily pain, and mental anguish.

WHEREFORE, Plaintiff Edmund Ward demands judgment in his favor and against all Defendants, in a sum to be determined at trial, plus interest and costs.

## COUNT III
### Unjust Enrichment

84.     The Plaintiff repeats and incorporates herein the allegations in paragraphs 1 through 82.

85.     The Plaintiff's participation in the Protocol and its results conferred a significant benefit on ACP and the individual Defendants, who had knowledge of the benefit.

86.     The individual Defendants and ACP (and its successors, MedImmune
and AZ) voluntarily accepted and retained the benefit unjustly, refusing to
compensate the Plaintiff.

87.     Under the circumstances, it would be inequitable for the individual
Defendants and ACP (and its successors, MedImmune and AZ) to retain the benefit
without paying for it, against the fundamental principles of justice, equity, and good
conscience.

88.     As a direct and proximate result of the Defendants' unjust
enrichment, Mr. Ward suffered damages and an unjust detriment.

WHEREFORE, Plaintiff Edmund Ward demands judgment in his favor and against all
Defendants, in a sum to be determined at trial, plus interest and costs, and a
constructive trust.

### COUNT IV
### Violations of the Due Process Clause of the United States Constitution, the Nuremberg Code, and the Due Process Clause of the Constitution and Declaration of Rights of the Commonwealth of Massachusetts

89.     The Plaintiff repeats and incorporates herein the allegations in
paragraphs 1 through 88.

90.     The United States Constitution and its Bill of Rights, by themselves
and through the principles articulated in the Nuremberg Code, guarantees Mr. Ward
due process of law against the unlawful deprivation of his liberty interest, his right
to bodily integrity, and the freedom to care for one's health and person.

91.     The Constitution and Declaration of Rights of the Commonwealth of
Massachusetts guarantees Mr. Ward due process of law against the unlawful

deprivation of his liberty interest, his right to bodily integrity, and the freedom to care for one's health and person.

92. The above referenced and pleaded conduct of the individual Defendants and ACP, acting in concert and by express or implied agreement, for which all of the corporate Defendants are also liable, was intentional, extreme, outrageous, and shocks the conscience.

WHEREFORE, Plaintiff Edmund Ward demands judgment in his favor and against all Defendants, in a sum to be determined at trial, plus interest and costs.

## COUNT V
### Violation of the Massachusetts Civil Rights Act

93. The Plaintiff repeats and incorporates herein the allegations in paragraphs 1 through 92.

94. By their above referenced and pleaded conduct, for which the corporate Defendants also are liable, the individual Defendants, three of whom were physicians, interfered by threats, intimidation, and coercion, and attempted to do so repeatedly, with Mr. Ward's exercise and enjoyment of his due process rights secured by the United States Constitution and the Constitution of the Commonwealth of Massachusetts.

95. As a direct and proximate result of the Defendants' conduct, Mr. Ward suffered damages.

WHEREFORE, Plaintiff Edmund Ward demands judgment in his favor and against all Defendants, in a sum to be determined at trial, plus interest, attorney's fees, and costs.

24

## COUNT VI
### Civil Conspiracy

96.    The Plaintiff repeats and incorporates herein the allegations in paragraphs 1 through 94.

97.    The individual Defendants and ACP combined to accomplish a lawful objective through unlawful means, described in detail above, through their peculiar power of coercion over Mr. Ward, as his physicians, and ACP and its principal, had in enrolling him in the Protocol.

98.    The individual Defendants and ACP in combination held a peculiar power of coercion over Mr. Ward due to his medical condition, which, individually, they would not have had.

99.    As a direct and proximate result of the Defendants' conspiracy and their acts in furtherance of it, Mr. Ward suffered damages.

WHEREFORE, Plaintiff Edmund Ward demands judgment in his favor and against all Defendants, in a sum to be determined at trial, plus interest, attorney's fees, and costs.

### JURY DEMAND

Plaintiff Edmund Ward demands a trial by jury on all Counts of the Complaint.

Edmund Edward Ward, Pro Se
21 Overlook Drive
Weston, Massachusetts 02480