COMMONWEALTH OF MASSACHUSETTS
TRIAL COURT

SUFFOLK, SS

SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO. 16-CV-02364

| | |
|---|---|
| EDMUND EDWARD WARD,<br>Plaintiff, | )<br>)<br>) |
| | ) |
| v. | )<br>) |
| BRUCE AUERBACH,<br>ERNST J. SCHAEFER, M.D.,<br>ROBERT D. SHAMBUREK, M.D.,<br>ALAN T. REMALEY, M.D.,<br>ALPHACORE PHARMA, LLC,<br>ASTRAZENECA<br>BIOPHARMACEUTICALS, INC., and<br>MEDIMMUNE, LLC, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

### AFFIDAVIT OF BRUCE J. AUERBACH IN SUPPORT OF
### MOTION TO DISMISS PURSUANT TO MASS. R. CIV. P. 12(b)(2)
### OF DEFENDANTS BRUCE AUERBACH AND ALPHACORE PHARMA, LLC

I, Bruce J. Auerbach, upon oath, do depose and state as follows:

### History of ACP Prior to Sale

1.      I co-founded AlphaCore Pharma LLC ("ACP") along with Reyn Homan and

Brian Krause, two scientist colleagues.  ACP was formed on or about June 20, 2007, as a

Michigan limited liability company for the purpose of conducting pharmaceutical research.

ACP's headquarters and sole office were located in Ann Arbor, Michigan from its formation

until shortly after all of the memberships interests in ACP were sold on March 27, 2013, to

Zeneca, Inc., a Delaware corporation.  I was made the President of ACP when ACP was formed.

The statements in this affidavit are made on personal knowledge except for any statements that are made on the basis of information and belief.

2.      I am a Michigan resident and have never resided in Massachusetts.  The same is true for Mr. Homan and Mr. Krause.  From the inception of ACP until the membership sale on March 27, 2013, ACP in total retained two additional scientific colleagues with clinical and manufacturing expertise and a third individual who was involved in efforts to sell ACP.  All of these individuals became members of ACP and all of these individuals lived in Michigan and to my knowledge have never resided in Massachusetts.

3.      As set forth in more detail below, ACP did not transact business in Massachusetts in any manner giving rise to the allegations in the Complaint and is not registered to do business in Massachusetts.  All of the treatment that forms the basis for Mr. Ward's allegations occurred in Bethesda, Maryland.  Nor did I either individually or on behalf of ACP make any statements to Mr. Ward in Massachusetts.

4.      ACP's Articles of Organization describe the purpose of the business of ACP as follows:

> The business of Alpha Core Pharma, LLC  . . . is pharmaceutical research.  [ACP] will investigate materials for their potential as medicines ("pharmaceuticals") to treat human diseases.  The laboratory research will be conducted by established research companies contracted by [ACP] in a laboratory operated by [ACP].  It is not anticipated that the laboratory research will involve human subjects.  Information on pharmaceutical candidates obtained from the laboratory research will be submitted to the Food and Drug Administration ("FDA") for approval for clinical testing.  Upon FDA approval, [ACP] will contract with one or more clinical research companies to conduct FDA-approved clinical trials for [ACP's] pharmaceutical candidates.

5.      Effective August 19, 2008, ACP became the exclusive licensee of a patent held by the National Institute of Health ("NIH") relating to the use of lecithin cholesterol acyltransferase ("LCAT") in the treatment of atherosclerosis ("Cardio Patent").

6.      LCAT is a naturally occurring enzyme in the bloodstream which is a central component of the reverse cholesterol transport system ("RCT"). The RCT system is believed to play a major role in removing cholesterol from the body and may be critical to managing levels of high-density lipoprotein. LCAT is referred to as "recombinant" when it is manufactured in a lab as opposed to being produced naturally in the body. As of the date of this affidavit, recombinant LCAT remains in the development stages and, accordingly, there have not been any commercial sales of recombinant LCAT.

7.      On or about September 24, 2008, ACP's operating agreement was amended to add financial investor members. None of the financial investor members (or any scientific working members of ACP) live or reside in Massachusetts. None of the individual Defendants (excluding myself) sued in the Complaint – Dr. Ernst J. Schaefer ("Dr. Schaefer"), Dr. Robert M. Shamburek ("Dr. Shamburek"), and Dr. Alan T. Remaley ("Dr. Remaley") – ever were members of ACP or, to my knowledge, ever had a personal financial interest in the successful development of recombinant LCAT. The NIH has a right, as the patent licensor, to royalty payments under the Cardio Patent only, primarily based on commercial sales milestones of recombinant LCAT, which to date has not occurred.

8.      Recombinant LCAT, which ACP designated as ACP-501, was initially to be manufactured for ACP in Florida by Goodwin Biotechnology. Due to production delays, manufacturing was transferred to Cytovance Biologics in Oklahoma in August 2009. The

investigational product was being developed and manufactured primarily for investigational use in cardiovascular clinical studies.

9.      From April 2011 through September 2012, ACP submitted an Investigational New Drug ("IND") application for use of ACP-501 in cardiovascular disease to the United States Food and Drug Administration ("FDA").  ACP had its related Phase 1 clinical protocol approved by the NIH and then conducted a five month Phase I clinical trial of ACP-501 (April 2012-August 2012) in patients with stable coronary artery disease at the NIH facilities in Bethesda, Maryland.  The trial demonstrated that a range of doses of ACP-501 were safe and tolerable and demonstrated substantial HDL increase at moderate LCAT dose levels.  None of this work occurred in Massachusetts.

10.     In 2010-2011, ACP filed patents on LCAT for treatment of anemia and adrenal insufficiency.  Additionally, ACP filed another IND application for use of ACP-501 in a multi-patient treatment of familial LCAT deficiency ("FLD").  The IND submitted to the FDA was for the use of ACP-501 to treat FLD patients with mild kidney disease.  None of this occurred in Massachusetts.

11.     FLD is a rare, hereditary disease in which the natural LCAT enzyme is absent in a person's body.  On or about August 4, 2010, ACP requested orphan-drug designation for ACP-501 for treatment of LCAT deficiency syndromes from the FDA.  The FDA granted ACP's request on or about September 2, 2010.  ACP received orphan-drug designation for ACP-501 in Europe on or about October 10, 2012.  None of this occurred in Massachusetts.

**Communications Related to the NIH Sponsored Single Patient Expanded Access IND and Compassionate Use FLD Treatment with ACP-501**

12.     To the best of my recollection, in or about late 2010, I received a phone call from Dr. Schaefer while I was traveling through La Guardia Airport in New York.  I had known Dr.

Schaefer for many years as a leading authority in the cardiovascular field with expertise related to FLD. Dr. Schaefer told me that Mr. Edmund Ward ("Mr. Ward") was in the same room as Dr. Schaefer at the time of the call. Dr. Schaefer explained that Mr. Ward was an FLD patient of Dr. Schaefer's and that Mr. Ward was a lawyer. Dr. Schaefer then asked me about the availability of recombinant LCAT from ACP for treatment of Mr. Ward. I explained to Dr. Schaefer that development of recombinant LCAT was in the very early stages. I did not speak to Mr. Ward; I spoke only with Dr. Schaefer, during that call.

13.     A few years passed without any further contacts by Dr. Schaefer related to Mr. Ward. On information and belief, beginning in approximately October 2012, Dr. Schaefer and Mr. Ward began to seek relief from the FDA to permit single patient Expanded Access ("compassionate use") of ACP-501 for Mr. Ward, as his kidney disease had deteriorated to stage 5, the point where preparations for dialysis had begun.

14.     In or around October 2012, I was contacted by Dr. Remaley and Dr. Shamburek of the NIH regarding whether ACP would donate ACP-501 to the NIH for an NIH-sponsored compassionate use FLD treatment of Dr. Schaefer's FLD patient, Mr. Ward. The NIH set up a telephone call on October 22, 2012, among ACP scientific personnel in Michigan, NIH medical personnel in Bethesda, Maryland, and Dr. Schaefer in Massachusetts as Mr. Ward's treating and referring physician. On that call, issues related to the proposed compassionate use of ACP-501 by the NIH to treat Dr. Schaefer's FLD patient, Mr. Ward, were discussed, including the proposed timing of Mr. Ward's treatment, the proposed location of treatment, whether the proposed compassionate use of ACP-501 by the NIH to treat Mr. Ward would impact ACP's separately proposed 2013 multi-patient IND using ACP-501 for FLD patients, and whether there were any other implications to ACP from donating ACP-501 to the NIH for Mr. Ward's

proposed compassionate use (single patient) treatment for his FLD.  In addition to ACP's specific issues summarized above, the ultimate purpose of the telephone call was to discuss whether the compassionate use of ACP-501 to treat Mr. Ward by the NIH would meet the specific FDA criteria for a single patient Expanded Access IND.

15.     Dr. Shamburek and Dr. Remaley, both of the NIH in Bethesda, Maryland, thereafter submitted a single patient Expanded Access IND application to the FDA for the treatment of Mr. Ward.  ACP was involved in helping the NIH prepare the IND.

16.     As explained in the FDA's Guidance for Industry regarding Expanded Access to Investigational Drugs for Treatment Use, "[e]xpanded access refers to the use of an investigational drug when the primary purpose is to diagnose, monitor, or treat a patient rather than to obtain the kind of information about the drug that is generally derived from clinical trials. FDA has a long history of facilitating access to investigational drugs for treatment use for patients with serious or immediately life-threatening diseases or conditions who lack therapeutic alternatives."

17.     After the NIH submitted the single patient Expanded Access IND for Mr. Ward's FLD treatment on or about November 21, 2012, the FDA responded to the NIH with additional questions.  The NIH, with ACP's assistance, worked on revising the single patient Expanded Access IND based on input from the FDA and the NIH IRB (internal review board).  On or about December 21, 2012, the NIH received notice from the FDA indicating final approval of the single patient Expanded Access IND for Mr. Ward's FLD treatment.  The NIH (Drs. Shamburek and Remaley), Dr. Schaefer (Mr. Ward's treating physician), and ACP personnel communicated in late 2012 primarily by email regarding the development of the single patient Expanded Access IND and its related FLD treatment protocol (a sub-section of the IND).  No meetings with ACP

took place in Massachusetts.  When the FLD treatment protocol was finalized, Mr. Ward's

treatment was planned to take place at the NIH facilities in Bethesda, Maryland.  Neither I nor

anyone at ACP discussed the planned treatment protocol with Mr. Ward or initiated any contact

with Mr. Ward.  Mr. Ward's treatment under the single patient Expanded Access IND was to be

administered by the NIH in its Bethesda, Maryland facility in consultation with his treating

physician, Dr. Schaefer.  ACP was not a sponsor of the single patient Expanded Access IND for

Mr. Ward's FLD treatment.  Indeed, the FDA communicated its decision on this single patient

Expanded Access IND to the NIH.

18.     In connection with the FDA approved single patient Expanded Access IND for

the compassionate use FLD treatment by the NIH of Mr. Ward, ACP donated ACP-501 to the

NIH.  On or about January 21, 2013, a supply of ACP-501 was shipped from Cytovance in

Oklahoma City, Oklahoma to the NIH in Bethesda, Maryland.

### NIH Administered Compassionate Use FLD Treatment of Mr. Ward at the NIH Facility in Bethesda, Maryland

19.     On information and belief, Mr. Ward went to the NIH accompanied by Dr.

Schaefer for pre-admission testing for his compassionate use FLD treatment in January, 2013.

20.     On information and belief, on January 24, 2013, Mr. Ward signed an NIH consent

form to authorize the compassionate use of ACP-501 as a treatment for his FLD, four days

before he began receiving his first doses of ACP-501 at the NIH.  Neither I nor anyone at ACP

was involved in obtaining the NIH consent from Mr. Ward.  Attached as **Exhibit A** is an

unsigned copy of the NIH consent form that Mr. Ward signed on January 24, 2013, at the NIH in

Bethesda, Maryland.  This unsigned copy of the NIH consent form that Mr. Ward executed was

given to me in 2014 by the NIH.  To the best of my recollection, I was advised that the NIH was

prohibited from externally circulating the signed consent form.

21.     On or about January 28, 2013, Mr. Ward began receiving his first doses of ACP-501, administered by the NIH, at its facility in Bethesda, Maryland.  On that same day, Rebecca Bakker-Arkema ("Ms. Bakker-Arkema") of ACP and I traveled to the NIH facility in Bethesda, Maryland to observe that the ACP-501 used in Mr. Ward's compassionate use FLD treatment by the NIH was being properly handled and stored at the NIH.  When we arrived at the NIH, we were told that Mr. Ward had requested a meeting with ACP representatives so that he could thank them personally for the donation of ACP-501 to his compassionate use FLD treatment which was being sponsored and administered by the NIH.

22.     On January 28, 2013, I briefly met Mr. Ward in the hallway at the NIH after he had undergone his initial treatment.  Ms. Bakker-Arkema and I simply introduced ourselves to Mr. Ward.  We had no substantive discussion with Mr. Ward at that time.

23.     On January 29, 2013, again at Mr. Ward's request, Ms. Bakker-Arkema and I met Mr. Ward and his sister in his hospital room, where he and his sister expressed their gratitude to ACP for providing the ACP-501 for his compassionate use FLD treatment.

24.     These meetings with Mr. Ward at the NIH in Bethesda, Maryland on January 28 and 29, 2013, were the only times I met with and/or spoke to Mr. Ward between 2007 and 2013.  I had no other discussions with Mr. Ward in this period.  I deny making the statements alleged to have been made by me in the Complaint.

25.     On information and belief, all of Mr. Ward's compassionate use FLD treatment occurred in Bethesda, Maryland at the NIH facility.

### Sale of the Membership Interests in ACP

26.     On or about December 11, 2012, Bill Brinkerhoff ("Mr. Brinkerhoff") became a member of ACP and the President of ACP.  I stepped down as President and assumed the role of Chief Operating Officer.

27.    Beginning in January 2013, ACP, led by Mr. Brinkerhoff, kicked off an effort to sell or partner ACP's business by the end of March 2013.

28.    On March 27, 2013, Zeneca, Inc. acquired all of the membership interests in ACP. At that time, I ceased to be an officer, member, or employee of ACP.

### Post-Sale Communications from Dr. Schaefer

29.    I am not aware of any communications involving Mr. Ward after the sale of ACP membership interests to Zeneca, Inc. until September 2014. On September 23, 2014, Dr. Schaefer sent an email to me and others, with a copy to Mr. Ward and his sister (who was identified within the email as a lawyer), in which Dr. Schaefer asked if ACP would be willing to compensate Mr. Ward for "his efforts on helping them with their product." Dr. Schaefer further wrote that, "[i]n reviewing the situation the patient and the family went to great efforts with Alan Remaley's and my help to put pressure on the FDA to allow him to receive therapy (compassionate use). At that time it was through the officers [sic] of Senator Kerry (now Secretary of State) and Congressman Edward Markey (now US Senator). This pressure succeeded and allowed for the patient to get treatment which did stabilize his condition for some time."

30.    I did not respond to Dr. Schaefer's email dated September 23, 2014. Instead, I turned the email over to counsel. Sometime after this e-mail was sent by Dr. Schaefer, Mr. Ward called me directly. I refused to talk with Mr. Ward. I was in Michigan, not Massachusetts, when I received Mr. Ward's call.

### Lack of Contacts with Massachusetts

31.    During the period from ACP's founding in 2007 through the sale to Zeneca, Inc. in March 2013, ACP did not (a) transact any business in Massachusetts; (b) contract to supply services or things, including, but not limited to, ACP-501, in Massachusetts; (c) regularly do or

solicit business in Massachusetts; (d) engage in any persistent course of conduct in Massachusetts, including, but not limited to, conducting any clinical trials in Massachusetts; or (e) sell ACP-501 or any other product in Massachusetts (or anywhere) and therefore did not derive substantial revenue from goods used or consumed or services rendered in Massachusetts.

32.     During this same period, ACP did not (a) have an interest in, use, own, or lease real property in Massachusetts; (b) have any bank accounts in Massachusetts; (c) advertise in Massachusetts; (d) maintain offices in Massachusetts; (e) have any employees in Massachusetts; or (f) have a resident agent in Massachusetts.

33.     During the same period, I, on a personal basis, did not (a) transact any business in Massachusetts; (b) contract to supply services or things, including, but not limited to, ACP-501, in Massachusetts; (c) regularly do or solicit business in Massachusetts; (d) engage in any persistent course of conduct in Massachusetts, including, but not limited to, conducting any clinical trials in Massachusetts; or (e) sell ACP-501 or any other product in Massachusetts (or anywhere) and therefore did not derive substantial revenue from goods used or consumed or services rendered in Massachusetts.

34.     During the same period, I, on a personal basis, did not (a) have an interest in, own, or lease real property in Massachusetts; (b) have any bank accounts in Massachusetts; (c) solicit business or advertise in Massachusetts; or (d) maintain an office in Massachusetts.

35.     Indeed, I never met Mr. Ward in Massachusetts.  I only met him twice in Bethesda, Maryland at the NIH during his compassionate use FLD treatment.  I never spoke to Mr. Ward by phone except on the one occasion in September 2014 that Mr. Ward called me, when I promptly refused to speak to him and I was not present in Massachusetts when I received that call.

36.     Mr. Ward's compassionate use FLD treatment pursuant to the single patient Expanded Access IND was sponsored and administered by the NIH at its facility in Bethesda, Maryland.  I had no direct communication with Mr. Ward from 2007 through 2013 other than the brief introductions at the NIH facility in Bethesda, Maryland on January 28 and 29, 2013.  The only direct communication that I otherwise had with Mr. Ward was his brief phone call to me in September 2014 when I was in Michigan.  I am also unaware of any direct communications any other representative of ACP had with Mr. Ward from 2007 through March 27, 2013, the date of the sale, other than the brief introductions at the NIH facility in Bethesda, Maryland on January 28 and 29, 2013.

37.     As I stated above, I ceased to be an officer, member, or employee of ACP when Zeneca, Inc. acquired all of the membership interests in ACP on March 27, 2013.


Signed under the pains and penalties of perjury this ___9___ day of December, 2016.

_____
Bruce J. Auerbach

EXHIBIT A

| MEDICAL RECORD | CONSENT TO PARTICIPATE IN A CLINICAL RESEARCH STUDY |
|---|---|
| | • Adult Patient or   • Parent, for Minor Patient |

INSTITUTE: National Heart, Lung, and Blood Institute

STUDY NUMBER: 13-H-0060          PRINCIPAL INVESTIGATOR: Robert D. Shamburek, M.D.

STUDY TITLE: Expanded Access Use of Intravenous ACP-501 (Human Recombinant Lecithin: Cholesterol Acyltransferase [rhLCAT]) in One Subject with Familial LCAT Deficiency

Initial Review Approved by the IRB on 12/18/12          Date Posted to Web:  01/08/13

Standard

## INTRODUCTION

We invite you to take part in a research study at the National Institutes of Health (NIH).

First, we want you to know that:

Taking part in NIH research is entirely voluntary.

You may choose not to take part, or you may withdraw from the study at any time.  In either case, you will not lose any benefits to which you are otherwise entitled.  However, to receive care at the NIH, you must be taking part in a study or be under evaluation for study participation.

You may receive no benefit from taking part.  The research may give us knowledge that may help people in the future.

Second, some people have personal, religious or ethical beliefs that may limit the kinds of medical or research treatments they would want to receive (such as blood transfusions).  If you have such beliefs, please discuss them with your NIH doctors or research team before you agree to the study.

Now we will describe this research study.  Before you decide to take part, please take as much time as you need to ask any questions and discuss this study with anyone at NIH, or with family, friends or your personal physician or other health professional.

**1.      Why is this study being done?**

High density lipoprotein (HDL) is known as the "good" cholesterol because it transports or moves cholesterol from the artery walls back to the liver.   Lecithin:choesterol acyltransferase (LCAT) is an enzyme in the blood that maintains HDL-cholesterol levels and helps it to remove excess cholesterol from the body.  Familial LCAT deficiency (FLD) is a genetic disease that results in low levels or total absence of LCAT.  Patients with FLD have very low levels of HDL-cholesterol (HDL-C), corneal opacities, a mild anemia, protein in the urine and/or kidney dysfunction.  Kidney disease is the major cause of morbidity and mortality in FLD and may ultimately lead to kidney failure in the fourth or fifth decade of life.

| MEDICAL RECORD | CONTINUATION SHEET for either:<br>NIH 2514-1, Consent to Participate in A Clinical Research Study<br>NIH 2514-2, Minor Patient's Assent to Participate In A Clinical Research Study |
|---|---|

STUDY NUMBER:       13-H-0060                                    CONTINUATION: page 2 of 11 pages

Because the biochemical defect is known in this disorder, we hypothesize that the clinical problems in FLD can be prevented or even reversed by replacing the defective enzyme. This same approach has been used with existing drugs that treat other diseases with low or absent enzymes.

There are no drugs that increase LCAT. Because of this, LCAT has been artificially made so that it can be directly infused into the body, in the hope that it will increase HDL and reverse the corneal opacities, anemia, and protein in the urine and/or kidney dysfunction. The artificially made LCAT is called recombinant human LCAT or rhLCAT. The rh means that the drug is prepared for humans so it will have the best chance of working. AlphaCore Pharma has produced the rhLCAT (ACP-501) and provided it for use in this study. The process of making the recombinant LCAT in cells has been used to make other drugs for humans that work well.

This study will provide expanded use ACP-501 to one subject with FLD and declining renal function. This study is the second time ACP-501 will be given to humans and the first time it will be given to a human with FLD. It will help determine the ability of this drug to affect the consequences of FLD.

The purpose of this study is to determine a dose for you that is safe and tolerable with optimal effects on high-density lipoprotein cholesterol (HDL-C) and parameters of renal function. The study is comprised of two periods. Your "optimal" dose will be determined during the initial 2 -3 weeks of the study (Period 1), thereafter you will receive maintenance infusions of ACP-501 every 1 – 2 weeks (Period 2). We will study up to four different dose levels of ACP-501 to determine the "optimal" dose for maintenance therapy. In order to determine whether you qualify for the study and the status of your FLD, you will need to have your disorder assessed at the NIH (blood work and physical examination) prior to receiving the drug.

You will sign informed consent, be screened for the study and then enter Period 1 which includes a baseline phase (approximately 24 hours) followed by a dose titration phase (8 – 22 days) in the NIH hospital. On the first day of the study (Day 1) you will need to stay in the NIH hospital for at least 24 hours after receiving the drug so we can watch you and make sure you remain well. You will have the option of staying at the NIH hospital or coming back for daily clinic visits until you receive your next dose of study medication or an "optimal" dose has been determined. You will receive a 2nd dose on either Day 4 or Day 8. The timing of the dose and the dose level (either decrease, the same, or increase) will be determined by safety, tolerance, and biomarker (HDL-C) effects. If an optimal dose has not yet been identified, a 3rd dose will be administered to you 7 days following the 2nd dose. Once again this dose and dosing interval will be determined by safety, tolerance, and biomarker (HDL-C) effects. You will then be allowed to go home but must return to the NIH for ACP-501 infusions and safety and biomarker assessments every 2 weeks (or every week, if necessary). You will receive full clinic assessments every 3 months.

You will experience up to a 6-month drug hiatus during the study due to a delay in the availability of ACP-501 drug supply. During this interval you will continue to be observed at your home physician every 2 weeks. Once drug is again available you will return to the NIH for an infusion of your "optimal" dose and a comprehensive (at least 24 hour) assessment of safety and biomarkers. Dose adjustment decisions and dosing interval will be informed by a review of safety (vital signs, electrocardiograms, clinical laboratory tests, and adverse event data) and markers of effect (HDL-C and renal function tests) as you progress through the study.

## 2.       Why are you being invited to participate?

You are being invited to participate in this protocol because you have an inherited disease called FLD.

---

| PATIENT IDENTIFICATION | CONTINUATION SHEET for either:<br>NIH-2514-1 (10-84)<br>NIH-2514-2 (10-84)<br>P.A.: 09-25-0099 |
|---|---|

| **MEDICAL RECORD** | **CONTINUATION SHEET for either:**<br>NIH 2514-1, Consent to Participate in A Clinical Research Study<br>NIH 2514-2, Minor Patient's Assent to Participate In A Clinical Research Study |
|---|---|

STUDY NUMBER:       13-H-0060                    CONTINUATION: page 3 of 11 pages

**3.       How many people will take part in this research study?**

We plan to give the study drug (ACP-501) to only one subject with FLD.

**4.       How long will you take part in this study?**

There will be a screening visit to determine whether you have any reason you would not be eligible to ACP-501. If you are eligible, you will come back within the next 4 weeks for about a day to evaluate your disease before ACP-501 administration. During the 2-3 week period at the NIH, you will have the opportunity to remain in the hospital for the duration or for the 24 hours following each ACP-501 administration with daily clinic visits thereafter. You will then be allowed to go home but must return to the NIH for ACP-501 infusions and safety and biomarker assessments every 2 weeks (or every week, if necessary). You will receive full clinic assessments every 3 months.   If the benefit to risk ratio remains positive, you may be administered ACP-501 infusion for 1 year in this study.

**5.       What do we do to decide if you are eligible for this study?**

Before you can participate in this study, the study doctor or staff will ask you some questions and perform some tests to make sure you are eligible to enroll in the study.  This is called "screening", and the screening procedures are listed below.

- Vital signs (blood pressure, pulse, temperature, and breathing rate)
- Medical history and physical examination
- Eye examinations (either at screening or baseline visit)
- Blood tests (blood counts, liver and kidney function, lipid profile and research blood)
- Urinalysis (analyze your urine for proteins, cells, a variety of chemicals)
- Tests of renal function (spot urine measures)
- 12-lead ECG (this is a simple test of your heart)

You may be eligible if you meet the following requirements:

- $\geq$ age 18 years at screening;
- Confirmed FLD diagnosis through genotype confirmation of  a LCAT mutation, as documented at screening or from previous testing;
- History of HDL-C <  15 mg/dL over the past year;
- Serum creatinine > 3 mg/dL;
- Increasing renal dysfunction resulting in end stage renal disease;
- Your chronic medications must be stable for at least 2 weeks prior to screening (for example, lipid-altering drugs and/or ACE-inhibitors used for the treatment of FLD);
- You are willing and able to comply with scheduled study visits and able to tolerate study procedures, including weekly to bi-weekly infusions over 1 year;

**PATIENT IDENTIFICATION**

**CONTINUATION SHEET for either:**
NIH-2514-1 (10-84)
NIH-2514-2 (10-84)
P.A.: 09-25-0099

| MEDICAL RECORD | CONTINUATION SHEET for either:<br>NIH 2514-1, Consent to Participate in A Clinical Research Study<br>NIH 2514-2, Minor Patient's Assent to Participate In A Clinical Research Study |
|---|---|

STUDY NUMBER:        13-H-0060                    CONTINUATION: page 4 of 11 pages

- You must be able to provide a personally-signed and dated informed consent document indicating that you have been informed of all pertinent aspects of the study.
- Currently on dialysis or require dialysis during study

You are not eligible if you have meet one or more of the of the following:

- History of febrile illness within 5 days prior to dosing;
- Active non-basal cell cutaneous malignancy requiring surgery, chemotherapy, and/or radiation in the past 12 months;
- Current documented drug or alcohol abuse that would interfere with your compliance with study procedures;
- Treatment with an investigational drug within 28 days prior to dosing.
- Known hypersensitivity to heparin or IV infusion equipment, plastics, adhesive or silicone or known history of hypotension or infusion site reactions with IV administration.
- Other severe acute or chronic medical or psychiatric condition or laboratory abnormality that may increase the risk associated with trial participation or investigational product administration or may interfere with the interpretation of trial results and, in the judgment of the investigator, would make you inappropriate for entry into this trial or compromise your ability to continue with the procedures of the trial.

**6.      What procedures or tests are involved in this study?**

**6a.    Evaluations done during Screening Visit up to 4 weeks prior to infusion of study medication**

We will determine if you are eligible for this study during the screening period listed above.  It is important for you to be very honest with the research staff because it will help us reduce potential safety side effects that might harm you.

**6b.    Evaluations During Baseline (Period 1)**

If the screening tests show that you are eligible to participate in the study, you will be asked to come to the NIH Clinical Center hospital one day before you would receive the study drug.  You will be admitted to the hospital at least 24 hours prior to the investigational drug infusion start time in order to assess entry criteria and determine your baseline measures.

- Intravenous catheter placed for drug infusion and blood draws
- Vital signs (blood pressure, heart rate, temperature and breathing rate )
- Blood tests: blood counts, liver and kidney function, lipid profile, LCAT antibodies, research blood
- Urinalysis (analyze your urine for proteins, cells, a variety of chemicals)

| PATIENT IDENTIFICATION | CONTINUATION SHEET for either:<br>NIH-2514-1 (10-84)<br>NIH-2514-2 (10-84)<br>P.A.: 09-25-0099 |
|---|---|

| MEDICAL RECORD | CONTINUATION SHEET for either: |
|---|---|
| | NIH 2514-1, Consent to Participate in A Clinical Research Study |
| | NIH 2514-2, Minor Patient's Assent to Participate In A Clinical Research Study |

STUDY NUMBER:        13-H-0060                      CONTINUATION: page 5 of 11 pages

- Tests of renal function (urine to be collected over 24 hours)
- Eye examinations (to determine status of lens opacities) - if not performed at screening
- 12-lead ECG (this is a simple test of your heart)

### 6c.    Evaluations During the Dose Optimization Phase (Period 1)

If you meet entry criteria you will receive investigational drug infusion the next morning.  The ACP-501 in this study will be given through an intravenous catheter (a small plastic tube that is put into a vein) over about 60 minutes. The doctors and nurses will watch you closely before, during, and for at least 24 hours after the start of the infusion, taking your vital signs (blood pressure, heart rate, temperature and breathing rate) and routine clinical blood tests. Any side effects will be treated and the ACP-501 infusion may be slowed or stopped until you feel better.  If an infusion reaction occurs, you could be treated with standard medications that could include diphenhydramine (also called Benadryl®) and acetaminophen (also called Tylenol®).  You may be asked to take diphenhydramine before your infusion to decrease the possibility of an infusion site reaction.  Please see the "Risks" section for more details.

ACP-501 will be administered 2 - 3 times in order to determine your optimal dose.  These ACP-501 infusions may be administered on Days 1, 4 or 8, and 11 or 15.  The amount of drug you will be given (0.3 – 9.0 mg/kg) at each infusion and the time between doses will be determined by your safety and laboratory information.  The following activities will be conducted each time you receive ACP-501.

- ACP-501 is infused intravenously over 1 hour
- Vital signs:        15, 30, 60, 90 min and 2, 4, 6, 8, 12, and 24 hours
- Blood tests:       drawn at 0, 15 minutes, 30 minutes, 1, 1.5, 2, 4, 6, 12, 24 hours
- 12-lead ECG:      24 hour (or at any time indicated by a change in your vital signs)
- Renal function tests:    Urine will be collected over 24 hours
- Observed in hospital for at least 24 hours following the start of the infusion
- Physical examination through the full 1 hour infusion

You may stay in the NIH hospital for the full duration of of the dose "optimization" phase (Period 1) or you may choose to remain in the hospital for the initial 24 hours and then return to the NIH for daily clinic visits (morning) up through your 5th day post-dose.  At these visits, the staff will take your vital signs and obtain routine and research blood tests.  On the last visit you will also be asked to do a urinalysis and 12-lead ECG.

During each visit you will be asked about any side effect or changes in medications.  You are expected to avoid changes in your diet, exercise routine or amount of alcohol you drink unless requested as part of the study.

The blood tests at each visit may include standard clinical labs for safety to check for chemical changes in your kidney and liver and changes in your blood count.  Additional blood will be collected for special research testing, such the amount of LCAT, lipids, lipid subfractions, and red blood cell lipids.  We will also store a tube of blood in case we find out there is a test that would be needed in the future to help in understating the results of this study.

---

**PATIENT IDENTIFICATION**

CONTINUATION SHEET for either:
NIH-2514-1 (10-84)
NIH-2514-2 (10-84)
P.A.: 09-25-0099

| MEDICAL RECORD | **CONTINUATION SHEET for either:**<br>NIH 2514-1, Consent to Participate in A Clinical Research Study<br>NIH 2514-2, Minor Patient's Assent to Participate In A Clinical Research Study |
|---|---|

STUDY NUMBER:      13-H-0060                    CONTINUATION: page 6 of 11 pages

**6d.      Evaluations During the Maintenance Phase (Period 2)**

Once your "optimal" dose and dosing interval has been established at the NIH, you will go home and then return to the NIH every 2 weeks (or 1 week, if necessary) to receive this "optimal" dose of ACP-501. The activities conducted at this visit include:

- ACP-501 is infused intravenously over 1 hour
- Vital signs:      15, 30, 60, 90 min and 2 and 4 hours
- Blood tests:      Drawn at 0 and 4 hours
- Observed in clinic for 4 hours following the start of the infusion

**6e.      Evaluations During the Maintenance Phase (Period 2)**

Once every 3 months you will have a more comprehensive evaluation at the NIH which will allow for an evaluation of your "optimal" dose and increase up or down or a change in dosing interval, if necessary. The activities conducted at this visit include:

- Intravenous catheter may be placed for drug infusion and blood draws
- ACP-501 is infused intravenously over 1 hour
- Vital signs:      15, 30, 60, 90 min and 2, 4, 6, 8, 12, and 24 hours
- Blood tests:      drawn at 0, 15 minutes, 30 minutes, 1, 1.5, 2, 4, 6, 12, 24 hours
- 12-lead ECG:      24 hour (or at any time indicated by a change in your vital signs)
- Renal function tests:  Urine will be collected over 24 hours
- Observed in hospital for at least 24 hours following the start of the infusion
- Physical examination through the full 1 hour infusion
- Eye examinations (to determine status of lens opacities)

**7.      What are the risks and discomforts of this study?**

**Related to blood draw or intravenous catheter**
The study involves blood removal by intravenous puncture with a needle or by intravenous (IV) catheter. Minor complications including bleeding, pain, and bruise formation at the where the blood was taken.  Some people feel light-headed, fainting and get nauseated; and local infection.  An IV catheter will be placed in your arm for the one-hour infusion of the ACP-501 and then removed.  You will be given the option to have a second IV catheter in the other arm in order to collect the  blood samples after the infusion.   Your participation in the dose optimization phase (Period 1) at the NIH will require in total approximately one-half to one cup of blood.

| **MEDICAL RECORD** | **CONTINUATION SHEET for either:**<br>NIH 2514-1, Consent to Participate in A Clinical Research Study<br>NIH 2514-2, Minor Patient's Assent to Participate In A Clinical Research Study |
| --- | --- |

STUDY NUMBER:    13-H-0060                    CONTINUATION:  page 7  of 11  pages

### Related to the Recombinant LCAT (ACP-501)

The possible side effects from the first infusion of ACP-501 could include a mild rash but could be as severe as an anaphylactic reaction or death.  Side effects after multiple doses of ACP-501 are not known because this is the first time multiple doses will be given to humans.  ACP-501 falls under the category of a recombinant protein because it is artificially produced.  ACP-501 is made to replace the normal LCAT that is found circulating in the blood on HDL.  Other recombinant proteins that have been approved for humans replace proteins that are normally found inside cells.  These proteins found inside cells may be more likely to cause an allergic type reaction because they are proteins not normally exposed to the blood.  These recombinant proteins have caused infusion and allergic reactions especially when given as repeated doses.

Unexpected side effects if they occur will likely happen during the one hour infusion so you will be closely monitored.  Infusions of ACP-501 in animal models tested did not cause any allergic or infusion reactions even after several doses.

A local infusion reaction could consist of any of the following at the area of the infusion:
- localized redness or rash
- pain (tenderness)
- swelling
- increased warmth

More serious side effects include:
- severe allergic reaction
    shortness of breath
    closing of your throat
    difficulty breathing
    swelling of your lips, face, or tongue
    hives (raised bumps on your skin)
- nervous system problems, such as a burning, pricking, or tingling feeling, or twitching.
- severe skin rash and itching

A severe allergic reaction could include:
- arrhythmia (irregular heart rate)
- high blood pressure
- low blood pressure
- fever
- chills
- sweating
- rash
- nausea
- vomiting
- depressed level of consciousness
- seizures
- abdominal pain
- headache

---

**PATIENT IDENTIFICATION**                **CONTINUATION SHEET for either:**
                                          NIH-2514-1 (10-84)
                                          NIH-2514-2 (10-84)
                                          P.A.: 09-25-0099

| **MEDICAL RECORD** | **CONTINUATION SHEET for either:**<br>NIH 2514-1, Consent to Participate in A Clinical Research Study<br>NIH 2514-2, Minor Patient's Assent to Participate In A Clinical Research Study |
| --- | --- |

STUDY NUMBER:        13-H-0060                        CONTINUATION: page 8 of 11 pages

Anytime a new investigational infusion is being tested for the first time there could be side effects that we have not thought about, that did not show up in earlier testing or that developed due to repeated administration of the experimental infusion.  These can be minor side effects but could be very severe.  The experimental infusion could contribute to your death.

If an infusion reaction occurs, decreasing the infusion rate, temporarily stopping the infusion, and/or administrating antipyretics (acetaminophen), antihistamines (diphenhydramine), and/or corticocosteroids may take care of the symptoms.  Although not anticipated, if a severe reaction does occur it could be managed additionally by the administration of epinephrine, IV fluids and/or oxygen as clinically indicated.  These are all standard treatments for infusion and allergic reactions.

There will be resuscitation equipment and trained staff available in the event of a cardio-pulmonary arrest.  If you have a severe allergic reaction you might have to be hospitalized for a longer period of time for further monitoring. You also might have to be hospitalized between infusions at home for further monitoring if you develop a severe allergic reaction between infusions.

You have very low levels of LCAT with the clinical problems associated with these low levels. There is the theoretical possibility that anti-LCAT antibodies may form which at its extreme may result in the destruction of your remaining LCAT and the clinical problems you currently experience. Your blood will be analyzed for antibodies at the end of this study.

**8.        Are there any benefits to you if you take part in this study?**

You may not receive any direct benefit from participating in this study.   However, the information obtained from the study will yield knowledge about the use of ACP-501 for future subjects.  The information gained will provide direct insights into the safety and dose of ACP-501 that can be used for people that lack LCAT.

**9.        What other choices do you have?**

You do not need to participate in this study.

**10.        Are there reasons that your participation may end early?**

You may choose to end your participation at any time without giving a reason.  If you do not return for a scheduled visit, every effort will be made to contact you.

If you decide to end your participation in the study it is important that you return for a final visit and follow-up with your doctor regarding any unresolved adverse events.
Assessments at this final visit may include:
- Physical examination;
- BP and HR measurements;
- Blood and urine specimens will be obtained for safety laboratory tests;
- Blood for pharmacokinetic and pharmacodynamic analysis;
- Eye examinations
- Blood for anti-LCAT antibody testing.

The doctors may decide to stop the study for safety reasons or for any reason that they feel in the interest of safety.

---

**PATIENT IDENTIFICATION**

**CONTINUATION SHEET for either:**
NIH-2514-1 (10-84)
NIH-2514-2 (10-84)
P.A.: 09-25-0099

| MEDICAL RECORD | **CONTINUATION SHEET for either:**<br>**NIH 2514-1, Consent to Participate in A Clinical Research Study**<br>**NIH 2514-2, Minor Patient's Assent to Participate In A Clinical Research Study** |
|---|---|

STUDY NUMBER:        13-H-0060              CONTINUATION: page 9 of 11 pages

**11.    What will happen when the research study is over?**

You will be finished with this study after the last study visit (which will be 14 to 20 months following your first infusion of ACP-501).  If you have shown benefit with ACP-501 with no safety concerns, you will be offered continued treatment with the drug in an extension study.  The results of this study may be published, but you will not be identified in the publication.

**12.    Will your clinical and test results be shared with you?**

The results of your clinical evaluation and clinical laboratory tests will be communicated to you and your primary care provider if you wish.

**13.    Will the results of this research study be shared with you?**

Yes.  The investigators will provide you on an ongoing basis with the results of any research data or results.

We would be happy to provide you with an overview of the study results after the study have been completed and the data analyzed.  A description of this clinical trial will be available on http://www.ClinicalTrials.gov, as required by U.S. Law. This website will not include information that can identify you.  At most, the website will include a summary of the results. You can search this website at any time.'

By agreeing to participate in this study, you do not waive any rights that you may have regarding access to and disclosure of your records. For further information on those rights, please contact Dr. R. Shamburek.

**14.    Will any of your blood, tissue or other samples be stored and used for research in the future?**

Research blood will be stored in our laboratory, under the care and supervision of the investigators on this protocol.   The samples will be assigned a unique code known only to the investigator, which will serve as a link to you and the confidential clinical information collected as part of this research protocol. The code for your personal information will be kept in a locked file and only the investigator or his research team on this study will have access to that code.  In some cases, coded samples could be sent to an outside laboratory to do further analysis.   Coded samples will not have any personal identifying information, meaning an outside investigator could not trace them to you.  If the investigator is from outside the NHLBI, the Institute Review Board (IRB) will be notified before your sample is sent, and the outside investigator will be required to sign an agreement detailing the tests allowed to be conducted on the sample.  Any new tests will also need to be approved by the IRB.

The results of these tests will be entered into an NIH authorized and controlled research database. In the future they may be used for research purposes. This would occur only after appropriate institutional approval to assure that your rights and welfare are protected. Any such research would either protect or remove any personally identifiable information about you.

| **PATIENT IDENTIFICATION** | **CONTINUATION SHEET for either:**<br>NIH-2514-1 (10-84)<br>NIH-2514-2 (10-84)<br>P.A.: 09-25-0099 |
|---|---|

| **MEDICAL RECORD** | **CONTINUATION SHEET for either:**<br>**NIH 2514-1, Consent to Participate in A Clinical Research Study**<br>**NIH 2514-2, Minor Patient's Assent to Participate In A Clinical Research Study** |
| --- | --- |

STUDY NUMBER:          13-H-0060                          CONTINUATION:  page 10  of 11  pages

**15.     Will you receive any compensation (money or other) for taking part in this research study?**

You will not be compensated for your participation in this study.

**16.     Do any of the researchers or the NIH have a financial interest related to this study?**

The National Institutes of Health reviews NIH staff researchers at least yearly for conflicts of interest. The following link contains details on this process http://ethics.od.nih.gov/forms/Protocol-Review-Guide.pdf. You may ask your research team for additional information or a copy of the Protocol Review Guide.

The National Institutes of Health and the research team for this study are using ACP-501 developed by AlphaCore Pharma through a joint study with your researchers and the company. This means it is possible that the results of this study could lead to payments to NIH scientists and to the NIH. By law, government scientists are required to receive such payments for their inventions.  However, none of the researchers on this protocol will receive any compensation.  You will not receive any money from the development of recombinant human LCAT.

**17.  Confidentiality**

All efforts will be made to keep your study-related information confidential.  However, there may be circumstances where this information must be released.  For example, personal information regarding your participation in this study may be disclosed if required by state law.  Also, your records may be reviewed by the following groups (as applicable to the research):

- Office for Human Research Protections or other federal or state regulatory agencies;
- U.S. Food and Drug Administration; and
- AlphaCore Pharma who makes the ACP-501, their agents, or study monitors.

Additional information about confidentiality is described on the next page.

---

| **PATIENT IDENTIFICATION** | **CONTINUATION SHEET for either:**<br>NIH-2514-1 (10-84)<br>NIH-2514-2 (10-84)<br>P.A.: 09-25-0099 |
| --- | --- |

| MEDICAL RECORD | CONSENT TO PARTICIPATE IN A CLINICAL RESEARCH STUDY • Adult Patient or • Parent, for Minor Patient |
|---|---|

STUDY NUMBER:        13-H-0060                          CONTINUATION:  page  11 of 11 pages

### OTHER PERTINENT INFORMATION

**1.  Confidentiality.**  When results of an NIH research study are reported in medical journals or at scientific meetings, the people who take part are not named and identified.  In most cases, the NIH will not release any information about your research involvement without your written permission.  However, if you sign a release of information form, for example, for an insurance company, the NIH will give the insurance company information from your medical record.  This information might affect (either favorably or unfavorably) the willingness of the insurance company to sell you insurance.

The Federal Privacy Act protects the confidentiality of your NIH medical records.  However, you should know that the Act allows release of some information from your medical record without your permission, for example, if it is required by the Food and Drug Administration (FDA), members of Congress, law enforcement officials, or authorized hospital accreditation organizations.

**2.  Policy Regarding Research-Related Injuries.**  The Clinical Center will provide short-term medical care for any injury resulting from your participation in research here.  In general, no long-term medical care or financial compensation for research-related injuries will be provided by the National Institutes of Health, the Clinical Center, or the Federal Government.  However, you have the right to pursue legal remedy if you believe that your injury justifies such action.

**3.  Payments.**  The amount of payment to research volunteers is guided by the National Institutes of Health policies.  In general, patients are not paid for taking part in research studies at the National Institutes of Health.  Reimbursement of travel and subsistence will be offered consistent with NIH guidelines.

**4.  Problems or Questions.**  If you have any problems or questions about this study, or about your rights as a research participant, or about any research-related injury contact the Principal Investigator, Robert D. Shamburek, M.D.; Building 10, Room 8N202, Telephone: 301-496-3460. You may also call the Clinical Center Patient Representative at 301-496-2626.

**5.  Consent Document.**  Please keep a copy of this document in case you want to read it again.

| COMPLETE APPROPRIATE ITEM(S) BELOW: | |
|---|---|
| **A.  Adult Patient's Consent**<br>I have read the explanation about this study and have been given the opportunity to discuss it and to ask questions.  I hereby consent to take part in this study. | **B.   Parent's Permission for Minor Patient.**<br>I have read the explanation about this study and have been given the opportunity to discuss it and to ask questions.  I hereby give permission for my child to take part in this study.<br>(Attach NIH 2514-2, Minor's Assent, if applicable.) |
| _____   _____<br>Signature of Adult Patient/Legal Representative      Date | _____   _____<br>Signature of Parent(s)/Guardian                      Date |
| _____<br>Print Name | _____<br>Print Name |

**C.  Child's Verbal Assent (If Applicable)**
The information in the above consent was described to my child and my child agrees to participate in the study.

_____   _____     _____
Signature of Parent(s)/Guardian                      Date          Print Name

| THIS CONSENT DOCUMENT HAS BEEN APPROVED FOR USE<br>FROM DECEMBER 18, 2012 THROUGH DECEMBER 17, 2013. | |
|---|---|
| _____   _____<br>Signature of Investigator                      Date | _____   _____<br>Signature of Witness                      Date |
| _____<br>Print Name | _____<br>Print Name |

---

**PATIENT IDENTIFICATION**

**CONSENT TO PARTICIPATE IN A CLINICAL RESEARCH STUDY (Continuation Sheet)**
• Adult Patient or  • Parent, for Minor Patient
NIH-2514-1 (07-09)
P.A.: 09-25-0099
File in Section 4:  Protocol Consent