

ALL COMMUNICATIONS SHOULD BE ADDRESSED TO THE CLERK

# Commonwealth of Massachusetts

SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT
FOR CIVIL BUSINESS
SUFFOLK COUNTY COURTHOUSE, 12TH FLOOR
THREE PEMBERTON SQUARE
BOSTON, MASSACHUSETTS 02108

MICHAEL JOSEPH DONOVAN
Clerk/Magistrate

*Clerk's Office*
SUFFOLK COUNTY

BOSTON, Jan. 5, 2017

Robert M. Farrell, Clerk
United States District
Court for District of Massachusetts
United States Courthouse
1 Courthouse Way, Suite 2300
Boston, MA. 02210

Re: Edmund Edward Ward vs. Bruce Auerbach et al

Civil Action No. 1684CV02364

Dear Clerk Farrell:

Enclosed please find certified copies of the Petition for Removal, docket sheet and pleadings.

The following original pleadings are missing from our case file

P#7: Service Returned for Defendant Schaefer, M.D., Ernst J: Service made at last and usual

P#8: Summons, returned SERVED

P#9: Affidavit of Patrick T. Clendenen Re: Service of Process by certified mail

If you have any question please do not hesitate to call at (617) 788-7612.

Very Truly Yours,

*Bei Liang*

Bei Liang

Case Specialist I

CRTR2709-CR

### COMMONWEALTH OF MASSACHUSETTS
### SUFFOLK COUNTY CIVIL
#### Docket Report

### 1684CV02364
### Ward, Edmund Edward  vs.  Auerbach, Bruce  et al

| | | |
|---|---|---|
| **CASE TYPE:** | Contract / Business Cases | **FILE DATE:** 07/28/2016 |
| **ACTION CODE:** | BC1 | **CASE TRACK:** |
| **DESCRIPTION:** | Mergers, Consolidations, Sales of Assests, Issuance of Debt, Equity, etc. | |
| **CASE DISPOSITION DATE** 12/27/2016 | | **CASE STATUS :** Closed |
| **CASE DISPOSITION:** | Transferred to another Court | **STATUS DATE :** 12/27/2016 |
| **CASE JUDGE:** | | **CASE SESSION:** Civil C |

| LINKED CASE |
|---|

| PARTIES | |
|---|---|
| | **PROPER** |
| **Plaintiff**<br>Ward,  Edmund Edward<br>21 Overlook Drive<br>Weston, MA 02193 | Massachusetts Bar<br><br>Added Date: 07/28/2016 |
| **Defendant**<br>AlphaCore Pharma LLC | **541240**<br>William A Zucker<br>McCarter & English LLP<br>McCarter & English LLP<br>265 Franklin Street<br>Boston, MA 02110<br>Work Phone (617) 449-6516<br>Added Date: 11/04/2016 |
| | **673081**<br>John MacAulay Allen<br>McCarter & English<br>McCarter & English<br>265 Franklin Street<br>15th Floor<br>Boston, MA 02110<br>Work Phone (617) 449-6547<br>Added Date: 12/09/2016 |
| **Defendant**<br>Astra Zeneca Biopharmaceuticals Inc | **541240**<br>William A Zucker<br>McCarter & English LLP<br>McCarter & English LLP<br>265 Franklin Street<br>Boston, MA 02110<br>Work Phone (617) 449-6516<br>Added Date: 11/04/2016 |

CRTR2709-CR

COMMONWEALTH OF MASSACHUSETTS
SUFFOLK COUNTY CIVIL
Docket Report

| | |
|---|---|
| **Defendant**<br>Auerbach, Bruce | 181680<br>Mark S Furman<br>Tarlow, Breed, Hart & Rodgers, P.C.<br>Tarlow, Breed, Hart & Rodgers, P.C.<br>101 Huntington Avenue<br>Suite 500<br>Boston, MA 02199<br>Work Phone (617) 218-2000<br>Fax Number (617) 261-7673<br>Added Date: 12/09/2016 |
| | 643456<br>Emily Clair Shanahan<br>Tarlow, Breed, Hart & Rodgers, P.C.<br>Tarlow, Breed, Hart & Rodgers, P.C.<br>101 Huntington Avenue<br>Prudential Center<br>Boston, MA 02199<br>Work Phone (617) 218-2058<br>Added Date: 12/09/2016 |
| **Defendant**<br>MedImmune LLC | 541240<br>William A Zucker<br>McCarter & English LLP<br>McCarter & English LLP<br>265 Franklin Street<br>Boston, MA 02110<br>Work Phone (617) 449-6516<br>Added Date: 11/04/2016 |
| | 673081<br>John MacAulay Allen<br>McCarter & English<br>McCarter & English<br>265 Franklin Street<br>15th Floor<br>Boston, MA 02110<br>Work Phone (617) 449-6547<br>Added Date: 12/09/2016 |
| **Defendant**<br>Remaley, M.D., Alan T | 565581<br>Susan M Poswistilo<br>U.S. Attorney's Office<br>U.S. Attorney's Office<br>Moakley Federal Courthouse<br>Suite 9200, 1 Courthouse Way<br>Boston, MA 02210<br>Work Phone (617) 748-3103<br>Added Date: 12/22/2016 |

**COMMONWEALTH OF MASSACHUSETTS**
**SUFFOLK COUNTY CIVIL**
Docket Report

---

| | |
|---|---|
| **Defendant**<br>Schaefer, M.D., Ernst J | 543136<br>Ellen Epstein Cohen<br>Adler Cohen Harvey Wakeman<br>Adler Cohen Harvey Wakeman<br>& Guekguezian LLP<br>75 Federal Street<br>Boston, MA 02110<br>Work Phone (617) 423-6674<br>Added Date: 11/17/2016 |
| | 693659<br>Sarah Doucett<br>PricewaterhouseCoopers LLP<br>PricewaterhouseCoopers LLP<br>101 Seaport Boulevard<br>Boston, MA 02210<br>Work Phone (617) 530-4908<br>Added Date: 11/17/2016 |
| **Defendant**<br>Shamburek, M.D., Robert D | 565581<br>Susan M Poswistilo<br>U.S. Attorney's Office<br>U.S. Attorney's Office<br>Moakley Federal Courthouse<br>Suite 9200, 1 Courthouse Way<br>Boston, MA 02210<br>Work Phone (617) 748-3103<br>Added Date: 12/22/2016 |

CRTR2709-CR



COMMONWEALTH OF MASSACHUSETTS
SUFFOLK COUNTY CIVIL
Docket Report

| | | INFORMATIONAL DOCKET ENTRIES | |
|---|---|---|---|
| Date | Ref | Description | Judge |
| 07/28/2016 | | Attorney appearance<br>On this date Pro Se added for Plaintiff Edmund Edward Ward | |
| 07/28/2016 | 1 | Complaint (Business) | |
| 07/28/2016 | 2 | Civil action cover sheet filed. | |
| 07/28/2016 | | Demand for jury trial entered. | |
| 08/02/2016 | 3 | General correspondence regarding Notice of Denial of Acceptance into Business Litigation Session<br>After review, acceptance into Business Litigation Session is Deniedl. This case is referred to the Clerk's Office for reassignment (dated 8/1/16) notice sent 8/2/16 | Sanders |
| 08/03/2016 | | Civil action cover sheet mailed re: complaint | |
| 08/08/2016 | 4 | Plaintiff Edmund E Ward's   Motion for<br>Reconsideration for  acceptance  into the  Business  Litigation Session (w/o  opposition) | |
| 08/17/2016 | | Endorsement on Motion for Motion for reconsideration to be admitted to the BLS (#4.0): DENIED<br>(entered 8/16/16) notices mailed 8/16/16 | Sanders |
| 11/04/2016 | 5 | Defendants AlphaCore Pharma LLC , Astra Zeneca Biopharmaceuticals Inc, MedImmune LLC's EMERGENCY  Motion to file a response of pleading to the complaint to & including 12/9/16 | |
| 11/04/2016 | | Attorney appearance<br>On this date William A Zucker , Esq. added for Defendant AlphaCore Pharma LLC | |
| 11/04/2016 | | Attorney appearance<br>On this date William A Zucker , Esq. added for Defendant Astra Zeneca Biopharmaceuticals Inc | |
| 11/04/2016 | | Attorney appearance<br>On this date William A Zucker , Esq. added for Defendant MedImmune LLC | |
| 11/14/2016 | | Endorsement on Motion for (#5.0): ALLOWED<br>extension  of time  to December 9, 2016  Notice  sent  11.15.16 | Lauriat |
| 11/16/2016 | | Attorney appearance<br>On this date Sarah Doucett, Esq. added for Defendant Ernst J Schaefer, M.D. | |
| 11/16/2016 | 6 | Received from<br>Defendant Schaefer, M.D., Ernst J: Answer with claim for trial by jury; | |
| 11/16/2016 | | Attorney appearance<br>On this date Ellen Epstein Cohen, Esq. added for Defendant Ernst J Schaefer, M.D. | |
| 11/25/2016 | 7 | Service Returned for<br>Defendant Schaefer, M.D., Ernst J: Service made at last and usual; | |
| 11/25/2016 | 8 | Summons, returned SERVED<br><br>Applies To: Schaefer, M.D., Ernst J (Defendant) | |

COMMONWEALTH OF MASSACHUSETTS
SUFFOLK COUNTY CIVIL
Docket Report

| 11/25/2016 | 9 | Affidavit of Patrick T. Clendenen Re: Service of Process by certified mail |
| | | Applies To: Auerbach, Bruce (Defendant); Astra Zeneca Biopharmaceuticals Inc (Defendant); MedImmune LLC (Defendant) |
| 12/09/2016 | 10 | Defendant's Notice of intent to file motion to dismiss for lack of personal jurisdiction |
| | | Applies To: Auerbach, Bruce (Defendant); AlphaCore Pharma LLC (Defendant) |
| 12/09/2016 | | Attorney appearance<br>On this date John MacAulay Allen, Esq. added for Defendant AlphaCore Pharma LLC |
| 12/09/2016 | | Attorney appearance<br>On this date Mark S Furman, Esq. added for Defendant Bruce Auerbach |
| 12/09/2016 | | Attorney appearance<br>On this date Emily Clair Shanahan, Esq. added for Defendant Bruce Auerbach |
| 12/09/2016 | 11 | Defendant's Notice of intent to file motion dismiss for failure to state a claim |
| | | Applies To: Astra Zeneca Biopharmaceuticals Inc (Defendant); MedImmune LLC (Defendant) |
| 12/09/2016 | | Attorney appearance<br>On this date John MacAulay Allen, Esq. added for Defendant MedImmune LLC |
| 12/13/2016 | 12 | Affidavit of Patrick T. Clendenen Regarding Service of Process upon defendants Robert D. Shamburek, MD, Health, Alan T. Remanley MD, (Second Affidavit) |
| 12/21/2016 | 13 | Notice of Removal to the United States District Court filed by |
| | | Defendants Robert D. Shamburak, M.D. and Alan T. Remsley, M.D (US Dist # 16-cv-12543) |
| | | Applies To: Shamburek, M.D., Robert D (Defendant); Remaley, M.D., Alan T (Defendant) |
| | | Certified |
| 12/22/2016 | | Attorney appearance<br>On this date Susan M Poswistilo, Esq. added for Defendant Robert D Shamburek, M.D. |
| 12/22/2016 | | Attorney appearance<br>On this date Susan M Poswistilo, Esq. added for Defendant Alan T Remaley, M.D. |
| 12/27/2016 | | REMOVED to the U.S. District Court of Massachusetts |
| 12/27/2016 | | Case transferred to another court. |

I HEREBY ATTEST AND CERTIFY ON

Dec. 30, 2016 , THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: _____

Asst. Clerk

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS. (BLS)

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT

16-2364-C

EDMUND EDWARD WARD,

    Plaintiff,

v.

BRUCE AUERBACH, ERNST J. SCHAEFER,
M.D., ROBERT D. SHAMBUREK, M.D.,
ALAN T. REMALEY, M.D., ALPHACORE
PHARMA, LLC, ASTRAZENECA
BIOPHARMACEUTICALS, INC., and
MEDIMMUNE, LLC,

    Defendants.



## COMPLAINT AND JURY DEMAND

### PARTIES

1.    Plaintiff Edmund Edward Ward ("Mr. Ward") is a natural person

residing in Weston, Middlesex County, Massachusetts.

2.    Defendant Bruce Auerbach ("Mr. Auerbach") is a natural person who,

at all relevant times, was an officer and principal of Defendant AlphaCore Pharma,

LLC, in Ann Arbor, Michigan.

3.    Defendant Ernst J. Schaefer, M.D. ("Dr. Schaefer") is a natural person

and physician who, at all relevant times, worked for Tufts University School of

Medicine and Boston Heart Diagnostics as Chief Medical Officer, in Medford and

Framingham, Massachusetts, respectively.

4.    Defendant Robert D. Shamburek, M.D. ("Dr. Shamburek") is a natural

person and physician who, at all relevant times, worked for the United States,

Department of Health and Human Services, National Institute of Health, National Heart, Lung and Blood Institute, Bethesda, Maryland.

5.     Defendant Alan T. Remaley, M.D. ("Dr. Remaley") is a natural person and physician who, at all relevant times, worked for the United States, Department of Health and Human Services, National Institute of Health, National Heart Lung and Blood Institute, Bethesda, Maryland (Mr. Auerbach and Drs. Schaefer, Shamburek, and Remaley will be referred to, collectively, as "the individual Defendants.")

6.     Defendant AlphaCore Pharma, LLC ("ACP") is a business entity with a usual place of business in Ann Arbor, Michigan.

7.     Defendant Astra Zeneca Biopharmaceuticals, Inc. ("AZ") is a corporation with a usual place of business in Wilmington, Delaware.

8.     Defendant MedImmune, LLC is a division or subsidiary of AZ with a usual place of business in Gaithersburg, Maryland (ACP, AZ, and MedImmune will be refereed to, collectively, as "the corporate Defendants.")

## FACTS

9.     Mr. Ward was born with an extremely rare genetic deficiency of a bloodstream enzyme, lecithin-cholesterol acyltransferase (LCAT).  Among other health conditions, Mr. Ward is and has been in stage 5 kidney failure and now receives regular dialysis three times a week.  With LCAT deficiency, Mr. Ward produces virtually no cholesterol in his body.

10.    As of 2013, there were only 125 known cases of familial LCAT deficiency world-wide.

2

11.     LCAT is a plasma enzyme secreted by the liver and associated with high-density lipoprotein cholesterol ("HDL-C"), the so-called "good cholesterol." LCAT is a component in the reverse cholesterol transport system, the process by which cholesterol in the arterial wall is transported to the liver for excretion from the body, and as of 2012, it was considered to be critical in the management of HDL-C levels.

12.     LCAT esterifies cholesterol and raises HDL-C levels.

13.     As of 2012, when the individual Defendants first met or communicated with Mr. Ward, ACP was a privately owned company in which Mr. Auerbach was an executive officer and shareholder. Upon information and belief, ACP was the sole patent licensee of a recombinant human LCAT ("rhLCAT") called ACP-501, with the hope that the product would prevent or treat cardiovascular disease by effectively increasing HDL-C.

14.     Upon information and belief, the United States of America, as assignee and represented by the Department of Health and Human Services, owns US patent No. 6,635,614 B1, issued on October 21, 2003 from the Inventors who are or were employees of the United States.  This patent, concerning the "Use of Lecithin-Cholesterol Acytransferase (LCAT) to Reduce Accumulation of Cholesterol," was and continues to be licensed to ACP.  To obtain the patent, the inventors provided results of ACP-501 on animals, not humans, and specifically transgenic rabbits.  None of the claims of the '614 patent, or the scientific literature supporting the application, provided evidence that ACP-501 was efficacious in reversing kidney disease in humans. Rather the claims of the '614 patent speak to a "method for decreasing

accumulation of cholesterol in arteries in a human subject not suffering from a . . .

LCAT . . . deficiency syndrome . . . ."

15.     In collaboration with the National Heart, Lung and Blood Institute

("NHLB") of the National Institutes of Health ("NIH"), ACP conducted a clinical trial

in 2012 to determine the safety and tolerability of a single injection of ACP-501 in

16-18 subjects with stable coronary artery disease.

16.     The principal investigator at NHLB, Defendant Dr. Shamburek, along

with his colleague Defendant Dr. Remaley, collaborating with and previously known

to Defendant Mr. Auerbach, reported no adverse events in this limited study

concluded in 2012.  In other words, a single injection of ACP-501 was perceived and

reported by the individual Defendants to be safe and tolerated by the sixteen

subjects. This study did not measure or study the efficacy of ACP-501.

17.     Results of the study were not posted on the website of NIH clinical

trials.

18.     Along with Drs. Shamburek and Remaley, Mr. Auerbach was

introduced to the ideal research subject, Mr. Ward, by one of his treating physicians

in Massachusetts, Ernst Schaefer, M.D. Mr. Ward was potentially an ideal research

subject for ACP-501 because he produces virtually no cholesterol in his body due to

his LCAT deficiency.

19.     As Dr. Shamburek later described the research scenario, albeit with a

false premise (because ACP-501 had not been shown to work in any human before

Mr. Ward, including in the 2012 NIH/NHLB study): "If this [ACP-501] is working in

low HDL patients with [coronary artery disease], what about a patient with *no* HDL?"

20. Armed with a *sui generis* patient and potential research subject, Mr. Ward, and based on his prospective participation ACP was granted an "orphan drug" designation for ACP-501, and a "compassionate use" protocol was approved in short order.

21. As a result of his familial LCAT deficiency, Mr. Ward had minimal HDL-C (<5mg/dL) and suffered from corneal opacity, anemia, an enlarged spleen, atrial arrhythmias, and advanced, stage 5, kidney disease. In 2012 Mr. Ward was considered by his physicians to be in kidney failure, and a fistula was inserted in Mr. Ward's arm in anticipation of regular kidney dialysis. As of January 2, 2013, Mr. Ward's nephrologist, Valerie Price, M.D., diagnosed Mr. Ward with "Unspecified Anemia, Chronic Kidney Disease Stage V, Other Disorders of Lipoid Metabolism, and Unspecified Essential Hypertension."

22. In 2012 and 2013, while acting in concert, the individual Defendants and ACP fraudulently induced Mr. Ward to participate as the lone subject (indeed, the ideal research subject because of his unique genetic condition) in a trial of ACP-501, by assuring him that the drug would be an effective therapy to reverse his advanced kidney disease caused by the LCAT deficiency. ACP donated the ACP-501 to the NIH run experimentation. Drs. Schaefer and Remaley even drafted a letter for Mr. Ward to Senator John Kerry, and copying the Food and Drug Administration, urging the approval of rhLCAT "therapy that should help prevent my kidneys from failing."

23.     Instead, the individual Defendants and ACP used Mr. Ward to test the

effect of ACP-501 on the production of HDL-C, hoping the drug would be considered

a potential breakthrough in the prevention and treatment of cardiovascular disease,

thereby leading to the sale of ACP to a pharmaceutical conglomerate such as AZ.

24.     Acting in concert, the individual Defendants and ACP intentionally

withheld from Mr. Ward any information regarding their institutional, professional,

and personal financial interests and conflicts, reasonably believing that if they

disclosed such information, they might lose the rarest of research subjects with

genetic LCAT deficiency, Mr. Ward, or be forced to compensate him for his

instrumental role in their venture.

25.     The experiments began in January 2013, after Mr. Auerbach told Mr.

Ward that ACP-501 was "most certainly the solution" to reverse his kidney disease.

Dr. Shamburek echoed Mr. Auerbach's certainty and reassured Mr. Ward. Similarly,

when Dr. Remaley asked Mr. Ward why he was at NIH, Mr. Ward responded, "To

save my kidneys." Dr. Remaley replied, "And we will."

26.     The individual Defendants and ACP all knew at the time that kidney

disease was the major cause of morbidity and mortality in familial LCAT deficiency,

likely leading to kidney failure once the afflicted person reached the age of 40. Mr.

Ward was 53 years of age in 2013. The individual Defendant and ACP all knew or

should have known that Mr. Ward's renal condition was irreversible.

27.     Beginning in January 2013, Mr. Ward traveled alone from

Massachusetts to NIH in Maryland to begin the experimental trial, in reliance on the

false promises (and other misrepresentations and omissions) by the individual

6

Defendants and ACP that ACP-501 would effectively reverse his advanced kidney disease. Defendant Auerbach met with Mr. Ward at the outset of the experimentation at NIH, and he told Mr. Ward that the ACP-501 process of reversing his kidney failure would take a long time, and he urged Mr. Ward to remain in the experimentation for the full course because "you [Mr. Ward] will get out of it what you put into it."

28.     The regimen Mr. Ward endured began on January 6, 2013, when NIH admitted him. The regimen was painful, grueling, and confining. For example, from January 24 to February 27, 2013, Mr. Ward remained in one room for twenty-four hours each day, with two intravenous lines continuously inserted, one to administer ACP for one hour in the morning, the other to draw blood as many as 32 times in one day. Mr. Ward experienced many adverse infusion-related events and trauma. Mr. Ward also suffered a serious and life-threatening cardiac arrest episode, including arterial fibrillation, which lasted three days while he was at NIH in February. Mr. Ward, who has yet to receive his medical records of the care he received by Dr. Richard Cannon at NIH, was administered large doses of IV Amiodarone and by pill, along with IV Heparin and Lovenox for over a month.

29.     It was not until January 24, 2013, that Mr. Ward received and signed the NIH's Consent to Participate in a Clinical Research Study ("Consent"). Mr. Ward does not recall the circumstances of signing the Consent. At this point, Mr. Ward had already been subject to the rigors of the study for at least five days, from January 6 to January 10, 2013.

30.     The NIH's Institutional Review Board ("IRB") initially approved the Consent on December 18, 2012, but the IRB did not finally approve the Consent, as amended, until January 16, 2013, after Mr. Ward was admitted.

31.     The Consent reads, in part, that, because Familial LCAT Deficiency ("FLD") results in a biochemical defect, "we hypothesize that the clinical problems in FLD can be prevented *or even reversed* by replacing the defective enzyme." As a result, the Consent continues: "LCAT has been artificially made so that it can be directly infused into the body, in the hope that it will increase HDL and *reverse the corneal opacities, anemia, and protein in the urine and/or kidney dysfunction."* (emphasis supplied).

32.     The Consent also reads, in part, that the possible side effects of the administration of ACP-501 are numerous, and include "arrhythmia (irregular heart rate), fever, chills, and nausea." But the "[s]ide effects after multiple doses of ACP-501 are not known *because this is the first time multiple doses will be given to [a] human[]."* (emphasis supplied).

33.     The Consent, with regard to the study's prospective benefits to Mr. Ward, revealed none of the so-called possible therapeutic benefits promised: "You may not receive any direct benefit from participating in this study.  However, the information obtained from the study will yield knowledge about the use of ACP-501 for future subjects.  The information gained will provide direct insights into the safety and dose of ACP-501 that can be used for people that lack LCAT."

34.    As far as "compensation," Mr. Ward "will not be compensated for your participation in this study," but "you will be offered continued treatment with the [ACP-501] drug in an extension study."

35.    As for financial or other conflicts of interest, the Consent had only this to say: "The National Institutes of Health reviews NIH staff researchers at least yearly for conflicts of interest. .... You may ask your research team for additional information or a copy of the Protocol Review Guide. " It further states that the "National Institutes of Health and the research team for this study are using ACP-501 developed by AlphaCore Pharma through a joint study with your researchers and the company. This means that it is possible that the results of this study could lead to payments to NIH scientists and to the NIH. By law, government scientists are required to receive such payments for their inventions. However, none of the researchers on this protocol will receive any compensation. You will not receive any money from the development of recombinant human LCAT." The Consent nowhere reveals the institutional conflict that the United States through its Department of Health and Human Services is the owner of the '614 patent, licensed exclusively to ACP, and NIH not only was the principal site for the study, but it also employed the principal investigator, Dr. Schamburek. The Shareholders of ACP were never revealed in the Consent (nor were they ever revealed publicly), nor did the Consent reveal the financial and other terms of the ACP-NIH '614 Patent License.

36.    The United States Department of Health and Human Services, National Institutes of Health, and the National Heart Lung and Blood Institute released its Clinical Protocol for ACP-501 titled "Expanded access use of intravenous ACP-501 in

9

one subject with Familial (lecithin:cholesterol acyltransferease [rhLCAT] Deficiency"

(the "Protocol"). The Protocol revealed that:

    a. "No human experience has been obtained specifically with ACP-501 in LCAT deficient subjects;"

    b. "The primary objective is to assess the safety and tolerability of ACP-501" and the "[s]econdary objectives [were] to assess the effects of ACP-501 on markers of reverse cholesterol transport, including HDL-C elevation," and "biomarkers of renal function," along with the "pharmacokinectics (PK) of ACP-501;"

    c. The experimentation's rationale was to replace Mr. Ward's "defective enzyme [to] restore the normal level of plasma cholesterol esters (LCAT product) and prevent the formation of the abnormal Lp-X lipoprotein which is implicated in renal failure in this population";

    d. In other words, rhLCAT enzyme replacement therapy was designed not to reverse kidney failure but rather to demonstrate "the potential to protect FLD patients from kidney failure . . . .";

    e. Indeed, the Protocol reads that "ERT with rhLCAT, on the other hand, has the potential to *protect* FLD patients from kidney failure, in part, because it can eliminate Lp-X as seen in a mouse model of FLD and in ex vivo addition of rhLCAT to plasma from an FLD patient;" (emphasis supplied)

    f. Robert Shamburek, M.D., was the Principal Investigator, Alan Remaley, M.D., Ph.D. , was an investigator who served as the Safety Review Investigator, and Ernst Schaefer, M.D., served as a Medical Monitor;

    g. An "Adverse Event" was "defined by the international Conference on Harmonization (ICH) E2A [as] "any untoward medical occurrence in a subject or clinical investigation subject administered a pharmaceutical product and which does not necessarily have to have a causal relationship with this treatment. An [Adverse Event] can therefore be any unfavorable and unintended sign, symptom, or disease temporally associated with the use of a medicinal product, whether or not considered related to the medicinal product";

    h. Dr. Robert D. Shamburek and Dr. Marcelo J. Amar were responsible for leading the discussion and to obtain informed consent."

    37.    The Protocol does not have as its primary or secondary objective to determine whether treatment would "reverse" Mr. Ward's Stage 5 renal failure and "kidney dysfunction."

38.    From February 27 to June 28, 2013, Mr. Ward flew from
Massachusetts to NIH every Tuesday. Each week during that period, he checked
into a hospital room where Dr. Shamburek administered ACP-501 on Wednesday
morning and drew blood six times Wednesday and six times Thursday.

39.    In the first half of 2013, Mr. Ward was told that he was the first person
in history to have HDL-C raised by a factor of 10. Dr. Schaefer later reported that the
data regarding the effect of ACP-501 on Mr. Ward's kidneys were at best ambiguous
or indicative of modest functional improvement as of June 2013. There was no
reported "reversal" of his kidney failure throughout the experimentation.

40.    In contrast, Drs. Shamburek and Remaley both told Mr. Ward
continually that ACP-501 was materially improving his kidney function.

41.    In early-Fall 2013, Mr. Ward learned that the only effect of the ACP-
501 experimentation on his kidney condition was to delay, for many months, critical
dialysis treatment. In other words, Mr. Ward never received kidney dialysis
treatment while under the care of the individual Defendants and the NIH from
January to July 2013.

42.    Mr. Ward previously had been reported to be the first person in
history to show a ten-fold increase in HDL-C. The results of Mr. Ward's testing were
instrumental in bringing about the sale of Defendant ACP to Defendant MedImmune,
a division of Defendant AZ.

43.    Unbeknownst and undisclosed to Mr. Ward, MedImmune purchased
ACP for $20,000,000 in April 2013, based principally on Mr. Ward's HDL-C results.
Dr. Remaley reported in 2014, "Based on these results [of tests on Mr. Ward] and a

11

promising Phase I study done at the NIH,[1] showing the safety of recombinant LCAT, AlphaCore Pharma, the original licensee of the NIH patent on recombinant LCAT, was acquired by AstraZeneca."

44.     Until the time of its acquisition, ACP was a private company.  None of its shareholders, whether private entities or individuals, have ever been made public.  The purchase price was also not announced publicly, as it was "immaterial" to AZ's balance sheet.

45.     Dr. Schaefer, however, provided the sales price to Mr. Ward.  Upon information and belief, the individual Defendants, acting in concert, were ACP shareholders, owned ACP options or warrants, or otherwise benefitted materially from the sale of ACP to AZ in secret.

46.     The non-therapeutic experimentation on Mr. Ward saved the corporate Defendants substantial amounts of money and time in the process of seeking approval of the drug and made the patent, owned by the United States and licensed exclusively to ACP, more valuable.  Indeed, Dr. Remaley reported to Dr. Schaefer in 2012 about the status of rhLCAT as follows: "We hope to start our first cardiovascular disease patient in about 2 weeks.  If you recall the FDA wanted us to have long term safety data before we treat LCAT deficient patients because they would presumably be on it for a lifetime.  The first study that they approved was for cardiovascular disease patients and we showed after 10 treatments in monkeys that it was safe but *they want 6 month safety data for LCAT deficiency*.  We are getting

---

[1] The "promising Phase I study" was the *single rhLCAT dose* study of 16-18 subjects wherein there were "no significant adverse events and the recombinant LCAT behaved like expected based on animal studies in regard to its ability to modulate HDL metabolism."

ready to do the study in LCAT KO mice but probably will not complete it until the end of the year.  In the meantime, I talked with the Office of Rare Diseases and if the first patients that we treat with LCAT do well, I may try to apply for some sort of exemption to do just 1 treatment in LCAT Deficient patients to see if we get the same sort of favorable changes we saw in LCAT deficient mice. *If so I think we can perhaps use this to go faster with the FDA in doing a long term treatment in LCAT Deficient patients.*  I did get a grant approved from the SMART program and *they are now making enough recombinant enzyme to treat about 20 LCAT deficient patients for 2 years, which we will use once we get the FDA approval.*" (emphasis supplied).

47.     Prior to the sale of ACP to AZ, the Defendants had chosen not to tell Mr. Ward the principal purpose behind the experimentation: the desire to demonstrate increased HDL-C to interest potential purchasers of ACP and its ACP-501 assets as a treatment for or prevention of coronary artery disease.  Had Mr. Ward known the true purpose of the experimentation, he never would have agreed to participate.  Indeed, in reporting on the results of the Phase I study, ACP makes no mention of the potential of ACP-501 to reverse kidney failure. Instead, as reported by ACP, the Phase I "data from this study support ongoing clinical development of ACP-501 in patients with high-risk atherosclerosis, including acute coronary syndromes."

48.     The Protocol and experimentation on Mr. Ward was therefore non-therapeutic because it was the first repeated, human administration of ACP-501 and included the study of Mr. Ward and his bodily functions with the intent of

developing new knowledge and which was not in following of accepted or established medical practice. In other words, Mr. Ward was falsely informed by the individual Defendants, and Mr. Ward understood and believed, that he was to benefit medically from the Protocol when in fact he was a human research subject only.

49.     Mr. Ward was not otherwise made aware of the sale and the price that ACP garnered based on its experiment on him until 2014, almost a year after he had withdrawn from the trial due to a dearth of the promised renal benefit and the urgent need for dialysis.

50.     After April 2013, Dr. Shamburek stopped sharing blood test data with Mr. Ward's physician in Massachusetts, Dr. Schaefer, and otherwise stopped communicating with him. Mr. Ward's nephrologist in Massachusetts, Dr. Valerie Price, told Mr. Ward in this April-May time period that he could no longer continue to delay dialysis. Drs. Shamburek and Remaley consistently counseled Mr. Ward against dialysis

51.     On June 4, 2013, Defendant Dr. Shamburek announced at the European Atherosclerosis Society: "Enzyme replacement therapy with ACP-501 ... increased HDL ... in a 53-year old patient [Mr. Ward] with ... LCAT deficiency ..." In his white paper, Dr. Shamburek acknowledged the non-therapeutic nature of the experimentation on Mr. Ward, indicating that ACP-501 likely would not reverse Mr. Ward's renal failure, but nevertheless obtained a compassionate use protocol for him. In addition, Dr. Shamburek reported that Mr. Ward had "no infusion-related

adverse events and no infusion-site reactions but did have recurrent arterial fibrillation that was deemed unrelated to treatment."

52.    ACP was allegedly running low on its stock of ACP-501 at NIH in June 2013. Defendants Drs. Shamburek and Remaley nonetheless induced Mr. Ward to continue the trial on a lower dose, even though it was later disclosed that the higher dose had done virtually nothing to reverse Mr. Ward's kidney disease.

53.    The lower dose of ACP-501 caused Mr. Ward's HDL-C to plummet, so Mr. Ward expressed his desire to drop out of the trial if he could not continue receiving the higher dose.

54.    In response to Mr. Ward's reticence, Dr. Shamburek convinced him to continue in the trial by telling him that, though its focus would shift to esterification, this shift was consistent with the goal of ultimately reversing his kidney failure. This representation too was false.

55.    Dr. Shamburek did not tell Mr. Ward that, given the failed state of his kidneys, the lower dose of ACP-501 would not only not reverse his kidney disease but it also would not improve kidney function.

56.    Drs. Shamburek and Remaley also falsely induced Mr. Ward to remain in the trial, by assuring him that ACP was preparing a new batch of ACP-501 and that he would be given the higher dose as soon as it arrived.  They warned Mr. Ward that if he did not continue on the lower dose in the interim, he would relinquish his "rights" to the higher dose and lose all hope of ever reversing his kidney failure.

57.    The individual Defendants fraudulently induced Mr. Ward to remain in the trial until the Fall of 2013, thus ensuring that the individual Defendants would