UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

EDMUND EDWARD WARD,

Plaintiff,

v.

BRUCE AUERBACH, ERNST J. SCHAEFER, M.D., ROBERT D. SHAMBUREK, M.D., ALAN T. REMALEY, M.D., ALPHACORE PHARMA, LLC, ASTRAZENECA BIOPHARMACEUTICALS, INC.; and MEDIMMUNE, LLC,

Defendants.

Civil Action No.: 1:16-CV-12543

**Plaintiff Edmund Edward Ward's Surreply Memorandum in Opposition to the Government's Motion to Substitute the United States of America for Defendants Robert D. Shamburek, M.D. and Alan T. Remaley, M.D.**

**Introduction**

The Plaintiff, Edmund Edward Ward's, Complaint states detailed allegations against Drs. Shamburek and Remaley ("Defendants"), for violations of his liberty rights under the Due Process Clause of the United States Constitution. *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971). In its reply memorandum, the Government wrongly mischaracterizes Mr. Ward's claims as common law, run-of-the-hospital tort or "special relationship" contract claims in order to escape both public scrutiny and liability behind the fortress of the Federal Tort Claims Act ("FTCA"). But, as described in painful detail throughout the

Complaint and in shocking bluntness in their own communications, Drs. Shamburek and Remaley, alone and in concert with their co-defendants, plainly and plausibly violated Mr. Ward's federal constitutional rights by experimenting on him unlawfully, which deprived him of his liberty and caused him substantial harm and damage. The FTCA simply does not apply.

The Government does not challenge the legal sufficiency of the pleaded claims against Drs. Shamburek and Remaley. The United States is not a named party to this litigation. The question whether the United States of America is liable under the Complaint is irrelevant. The question whether the United States of America waived its sovereign immunity is also irrelevant.

## Argument

### A. The Motion to Substitute should be denied because Mr. Ward's Complaint states detailed factual allegations of federal constitutional violations by the Defendants.

The Government's Motion to Substitute should be denied because the Plaintiff's Complaint properly, sufficiently, and plausibly alleges federal constitutional violations against Dr. Shamburek and Remaley, which are expressly excepted from the scope of the FTCA. 28 U.S.C. § 2679(b)(2)(A).[1] Judge Young made this distinction clear in *Donahue v. Connolly*, 890 F. Supp.2d 173, 178 (D. Mass. 2012) when he ruled that the "exception permits plaintiffs to bring both an FTCA claim and a *Bivens* claim against the individual defendants, and courts often

[1] "Unlike under the FTCA and the Westfall Act, no scope-of-employment certification process is available for *Bivens* claims against individual federal officials." *Harbury v. Hayden*, 522 F.3d 413, 418 n.2 (D.C. Cir. 2008), *cert. denied*, 555 U.S. 881 (2008).

bifurcate the proceedings to address the FTCA claim first." Here, there is no FTCA claim.

Mr. Ward's Complaint alleges far more significant wrongs than the wrongs of medical negligence and lack of informed consent or the breach of a "special relationship" contract. Mr. Ward's Complaint as a whole, including extensive, detailed factual allegations, amply supports his *Bivens* action for federal constitutional violations of his due process liberty interests. Mr. Ward suffers from "an extremely rare genetic deficiency of a bloodstream enzyme, lecithin-cholesterol acyltransferase (LCAT)... and has been in stage 5 kidney failure and now receives regular dialysis... ." (Compl. ¶ 9). In 2012 Mr. Ward had a fistula inserted into his arm in anticipation of regular dialysis to treat his failing kidney. *Id.* ¶ 21. The Defendants, in concert with their co-defendants, fraudulently induced Mr. Ward into participating in a single person, first-in-human experiment by promising him repeatedly that his "compassionate use" treatment would reverse his kidney failure, thus delaying his recommended and medically-accepted dialysis treatment. *Id.* ¶¶ 22, 25. The Defendants intentionally withheld material information concerning their personal, professional, institutional, and financial conflicts of interest in the experiment and lied repeatedly to Mr. Ward about the primary purpose of the experiment and Mr. Ward's treatment. *Id.* ¶¶ 24,37,47.

In early-Fall 2013, Mr. Ward learned for the first time "that the only effect of the ACP-501 experiment on his kidney condition was to delay, for many months, critical dialysis treatment..." *Id.* ¶ 41. Mr. Ward was, however, the recipient of a

serious and life-threatening cardiac arrest during the experimentation, which required significant and sustained medical and drug intervention, plus hospitalization, yet he was convinced thereafter wrongfully to remain in his "compassionate use" treatment by the defendants, including Drs. Shamburek and Remaley. *Id.* ¶ 28. Thus, while Dr. Shamburek was figuratively sipping *Beaujolais Nouveau* and being fêted by the international medical community in Lyon, France about the dramatic, 80% increase in plasma HDL cholesterol reported "after the seventh infusion" of ACP-501, he also had the gall publicly to report that, "[i]mportantly, there were no safety issues with this treatment" and "[t]here were no infusion-related reactions." Ex. A. But every version of the so-called protocol prepared jointly by the defendants, however, made clear that an "Adverse Event" means

> any untoward medical occurrence in a subject or clinical investigation subject administered a pharmaceutical product and which does not necessarily have to have a causal relationship with this treatment. An [Adverse Event] can therefore be any unfavorable and unintended sign, symptom, or disease temporarily associated with the use of a medicinal product, whether or not considered related to the medicinal product.
>
> [Dkt. 36-8 at 43].*see also* [Dkt. 30-1 at 43]; [Dkt. 25-2 at 43]; [Dkt. 21-5 at 44].

Further, "Serious [Adverse Events]" includes "any event that results in any of the following outcomes:" "Life-threatening," or "Requires in-subject hospitalization." *Id.* at 45, 46, 46, & 47 respectively.

From January 5-11 and January 24 to February 27, 2013, Mr. Ward was the subject of painful and grueling "treatment" such that he was confined in one room at the National Institute of Health, twenty-four hours-a-day, and where, among other things, blood was drawn as many as 32 times in one day. (Compl. ¶ 28). On a lesser, but no less significant scale, Mr. Ward continued unwittingly with the experimentation, dosing, and testing of ACP-501 through the fall of 2013. In April-May of 2013, Mr. Ward's nephrologist told him "that he could no longer continue to delay dialysis." *Id.* ¶ 50. Astonishingly, "Drs. Shamburek and Remaley consistently counseled Mr. Ward against dialysis" to keep him in their experiment. *Id.* Even at this point the Defendants continued to lie to Mr. Ward about the benefits of their experimentation in order to obtain the six months of required data. *Id.* ¶ 52-57. These wrongful acts and lies prevented Mr. Ward from undergoing the lifesaving dialysis treatment that he was about to start in 2012. Had Mr. Ward known the truth about the primary purpose of the Defendants' experimentation and its lack of efficacy, he would have begun the dialysis treatment, recommended by his nephrologist in 2012, much sooner. These allegations, in the context of the allegations of the Complaint as a whole, set forth a *Bivens* claim against the Defendants for violating of Mr. Ward's constitutionally protected liberty interests.

The Defendants attempt to cast Mr. Ward's reference in the Complaint to the Nuremburg Code as proof that his claims against the Defendants are common-law tort, or even contract "special-relationship," claims is unfounded. Mr. Ward does not allege that the Nuremburg Code supplies a separate and distinct cause of



816407.1

action. Rather, as the Justices of the United States Supreme Court have noted, the Nuremburg Code provides a barometer against which violations of the Due Process Clause can and should be measured. *E.g., Washington v. Harper*, 494 U.S. 210, 237 n.2 (1990) (Stevens, J., dissenting) ("[T]he Constitution's promise of due process of law [therefore] guarantees at least compensation for violations of the principle stated by the Nuremberg Military Tribunals 'that the voluntary consent of the human subject is absolutely essential...to satisfy moral, ethical and legal concepts.'"). Mr. Ward alleges that the Nuremburg Code provides a non-exclusive measuring stick that should be deployed by the Court to examine the defendants' unconstitutional actions depriving Mr. Ward of his due process liberty rights.

The Government's citation to, and reliance upon, *Grimes v. Kennedy Krieger Inst., Inc.*, 366 Md. 29 (2001), for the proposition that Mr. Ward's well- recognized federal constitutional claims under *Bivens* are somehow relegated to the realm of state contract and tort law is wrong. Mr. Ward has not pleaded state law "special relationship" contract and tort claims against the Defendants, and the *Grimes* case and its holdings were expressly limited to those areas of the law, notwithstanding the court's extensive historical treatment of clinical research programs and its discussion of the Nuremberg Code. *Id.* at 113-14. The Government's further attempts to recast Mr. Ward's Complaint, which he alone controls, into something it isn't, solely to evade both scrutiny and liability for the Defendants' unconscionable behavior, should be rejected. Accordingly, the Defendants' Motion to Substitute the United States should be denied because Mr. Ward's Complaint sets forth plausible

factual allegations of constitutional violations by the Defendants, which are not subject to the FTCA, the Westfall Act, or some other body of law other than the Constitution of the United States.

**B. If the Court Finds the FTCA or Westfall Act are potentially applicable, then the Court should allow pre-hearing discovery on the Acting Attorney General's certification that the Defendants were acting within the scope of their employment.**

The Attorney General's scope-of-employment-certification under the Westfall Act is not conclusive for the substitution of the United States as the defendant, and it is reviewable by this Court. *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 420 (1995).[2] In order to obtain discovery and review of the Attorney General's certification under 28 U.S.C. § 2679(d)(1),[3] a plaintiff "need only have alleged sufficient facts that, taken as true, would establish that the defendants' actions exceeded the scope of their employment.'" *Stokes v. Cross*, 327 F.3d 1210, 1215 (D.C. Cir. 2003). The court will consider "more than the allegations in the complaint" and look to "subsequent filing[s]" to make this determination. *Jacobs v. Vrobel*, 724 F.3d 217, 220 (D.C. Cir. 2013). As set forth by the entire record of the proceedings in this litigation to date, Mr. Ward has demonstrated that the Defendants acted outside the scope of their employment. Therefore, if the Court finds 28 U.S.C. § 2679(d) applies, the Court should grant discovery and hold a

[2] To conclude otherwise would, among other things, render "Article III judges in the role of petty functionaries, persons required to enter as a court judgment an executive officer's decision, but stripped of capacity to evaluate independently whether the executive's decision is correct." *Gutierrez de Martinez v. Lamagno*, 515 U.S. at 426.

[3] The statutory certification language in 42 U.S.C. § 233(a) is similarly limited to federal employees acting within the scope of employment and is similarly reviewable by this Court.

hearing to determine whether the Defendants were acting within the scope of their employment.

The question is not whether the Defendants were employees of the National Institute of Health ("NIH"), as the Defendants put it. [Dkt. 41 at 4]. Rather, the question is whether they were acting within the scope of their employment when conducting this unconstitutional experimentation, as pleaded, on Mr. Ward. The allegations in Mr. Ward's Complaint establish that the Defendants' actions in relation to the "compassionate-use," expanded-use application and protocol submitted to the Federal Drug Administration ("FDA"), and subsequent experimentation, were *ultra vires* and in their own personal, professional, and financial interests, and thus, outside the scope of their employment.

Prior to introducing a new drug to the market, a drug manufacturer must submit a New Drug Approval ("NDA") application to the FDA. 21 U.S.C. § 355(a). A party must go through three phases of investigation prior to submitting a completed NDA application to the FDA to ensure that the new drug is efficacious and safe for use in humans. 21 U.S.C. § 355(b)(1); 21 C.F.R. 312.21. This process is extremely expensive and time consuming, and the FDA has found that "a new medical compound entering Phase 1 testing, often representing the culmination of upwards of a decade of preclinical screening and evaluation, is estimated to have only an 8 percent chance of reaching the market." Food and Drug Administration, *Innovation or Stagnation: Challenge and Opportunity on the Critical Path to New Medical Products* (March 2004).

The Defendants were in Phase 1 of this process with ACP-501 prior to their experimentation on Mr. Ward, but only as it concerned subjects (and mice and monkeys) with cardiovascular disease, not LCAT deficiency. (Compl. ¶¶ 43, 46). In order to expedite the long FDA approval process and advance the defendants' own interests, they duped Mr. Ward, an ideal subject for experimentation, and then fraudulently applied for expanded access or "compassionate use" protocol under 21 U.S.C. § 360bbb(b) and 21 C.F.R. 312.305. *Id.* ¶ 20.

The expanded access to unapproved, prospective therapies by the FDA is appropriate only "when *the primary purpose is to diagnose, monitor, or treat a patient* rather than to obtain the kind of information about the drug that is generally derived from clinical trials." Food and Drug Administration, *Expanded Access to Investigation Drugs for Treatment Use- Questions and Answers Guidance for Industry*, 2 (June 2016) (emphasis supplied). The FDA will grant expanded access "for patients with serious or immediately life-threatening diseases or conditions who lack therapeutic alternatives." *Id.*; 21 U.S.C. § 360bbb(b)(1); 21 C.F.R. 312.305(a)(1). When submitting an expanded access application, the party must include an expanded access protocol amendment to an existing Investigational New Drug Application. 21 C.F.R. 312.305. In this case, no Investigational New Drug Application for expanded access to ACP-501 for LCAT-deficient patients had been filed. Indeed, the "study in LCAT KO mice" had not even been completed. (Compl. ¶ 46).

As alleged, the Defendants' primary purpose to obtain this expanded use protocol was for their own personal, professional, and financial benefit in speeding up the FDA process of ACP-501's review, saving substantial time and money in the process by experimenting on Mr. Ward. (Compl. ¶ 46). The defendants achieved this result by, among other things, lying to Mr. Ward, then-Senator Kerry and then-Congressman Markey, and likely others at the NIH and the FDA during the expanded-access-application process. Therefore, because these actions were blatantly fraudulent and accomplished to advance their own personal, professional, and financial interests, they were outside the scope of their employment.

Mr. Ward pleads, among others, the following facts to support this point further. The patent for ACP-501, owned by the United States of America and licensed exclusively to AlphaCore Pharma, LLC, claimed that it was a "method for decreasing accumulation of cholesterol in arteries in a human subject not suffering from a … LCAT … deficiency syndrome…" (Compl. ¶ 14). The Defendants were granted an expanded access protocol based upon false and misleading information given to the Mr. Ward, the FDA, and then-Senator Kerry. *Id.* ¶ 20. Mr. Ward's kidney failure, and the false, concocted promise of ACP-501's treatment to reverse it, was the condition that apparently satisfied the FDA's requirement for expanded access. *Id.* ¶ 21. It is presently unknown how the Defendants and the FDA managed and addressed the complete absence of an Investigational New Drug Application for LCAT-deficient patients and the complete absence of testing ACP-501 on LCAT-deficient animal species for safety or, for that matter, efficacy in

reversing kidney failure. The Defendants drafted the misleading letter sent to then-Senator Kerry and the FDA. *Id.* ¶ 22. The Defendants pursued this experimentation on Mr. Ward for *ultra vires* reasons and effects, *e.g.,* (Compl. ¶ 23): the trial and ACP-501 did nothing for him medically and in fact caused him substantial harm. Mr. Ward's physician had recommended dialysis, inserted a fistula into Mr. Ward's arm, and Mr. Ward was about to start dialysis, a proven therapeutic alternative recommended by his nephrologist, prior to the Defendants' unconstitutional acts. (Compl. ¶ 21). The expanded access protocol did not list as its primary or even secondary endpoint or goal to reverse Mr. Ward's stage 5 renal failure. *Id.* ¶¶ 36-37.

Prior to the experimentation on Mr. Ward, Dr. Remaley stated that the "FDA wanted us to have long term safety data before we treat LCAT deficient patients ... The first study they approved was for cardiovascular disease patients and we showed after 10 treatments in monkeys that it was safe but they want 6 month safety data for LCAT deficiency." *Id.* ¶ 46. The experimentation on Mr. Ward provided that data, which Dr. Ramely hoped to use "to go faster with the FDA in doing long term treatment in LCAT deficient patients." *Id.* At the time, however, Drs. Shamburek and Remaley had not even experimented with ACP-501 on "LCAT KO" mice, or even "LCAT KO" monkeys. But not one of the defendants, or any of the brilliant scientific and medical minds comprising them, thought it wrongful, much less imprudent, to subject Mr. Ward, an "LCAT KO" human being, to many

months of ACP-501 experimentation when they had not yet even experimented on LCAT KO mice or monkeys.

The Defendants actions following the approval of the expanded access protocol also show that they were acting in their own personal, professional, and financial interests and outside the scope of their employment. Dr. Shamburek acknowledged the non-therapeutic nature of the experimentation on Mr. Ward. *Id.* ¶ 51. After the Defendants ran low on the supply of ACP-501, they convinced Mr. Ward to stay on a lower dose even though the higher dose had done nothing to reverse his kidney failure. *Id.* ¶¶ 52-57. This was for the sole purpose of obtaining the six months (or more) of data required by the FDA and for the fame and fortune of publication, professional advancement, and international professional accolades. *Id.* Dr. Shamburek continued to try and convince Mr. Ward to return to the experiment even after defendant Dr. Schafer admitted that ACP-501 had no effect in reversing Mr. Ward's kidney failure. *Id.* ¶ 60-61. All in all, this shameful recitation of plausible and well-supported facts, supplemented by the record developed in this litigation, demonstrate that the Government's motion should be denied.



816407.1

## Conclusion

Defendants' Motion to Substitute should be denied because Mr. Ward's Complaint alleges concerted, atrocious, and shocking behavior that comprise federal constitutional violations of significant magnitude, which are not subject to the FTCA. If the Court finds the FTCA or Westfall Act do potentially apply, the Plaintiff requests the Court allow pre-hearing discovery and a hearing on all communications concerning the expanded access or "compassionate use" application, treatment, and protocol submitted to the FDA, and maintained by the NIH and the Defendants, to determine whether the Defendants were acting within the scope of their employment under 28 U.S.C. § 2679(d)(1) and 42 U.S.C. § 233(a).

Respectfully Submitted,
EDMUND EDWARD WARD,
By his attorneys,

/s/ Patrick T. Clendenen
Patrick T. Clendenen, 564165
DAVIS MALM & D'AGOSTINE, P.C.
One Boston Place, 37th Floor
Boston, MA 02108
(617) 367-2500
pclendenen@davismalm.com

## CERTIFICATE OF SERVICE AND CERTIFICATE UNDER D. MASS. L.R. 7.1(b)(3)

I hereby certify that the Court has granted leave to file this document, filed through the ECF system, which will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF). Paper copies will be sent to those indicated as non-registered participants on April 5, 2017.

/s/ Patrick T. Clendenen
Patrick T. Clendenen