|  |  |
|---|---|
| EDMUND EDWARD WARD,  ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. |
| v. ) | 16-12543-FDS |
| ) | |
| ERNST J. SCHAEFER, M.D.; ROBERT D. ) | |
| SHAMBUREK, M.D.; ALAN T. ) | |
| REMALEY, M.D.; and ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendants. ) | |

# MEMORANDUM AND ORDER ON DEFENDANT'S MOTIONS TO TRANSFER AND COMPEL AND PLAINTIFF'S MOTIONS TO AMEND AND TAKE DEPOSITION

**SAYLOR, J.**

This is an action arising out of the use of a drug in a compassionate-use protocol. Plaintiff Edmund Edward Ward suffers from a rare genetic deficiency that has resulted in, among other things, severe kidney disease. He alleges that he was fraudulently induced to participate in what he contends was a non-therapeutic, experimental drug trial. He further contends that he was led to believe that the drug, ACP-501, would reverse his kidney disease, but that defendants' true purpose in treating him was to gain data that would be beneficial in selling the company that produced the drug.

Ward has filed suit against the doctors involved in his treatment, including Dr. Ernst Schaefer, Dr. Robert Shamburek, and Dr. Alan Remaley. The United States has been substituted as defendant as to certain claims against Dr. Shamburek and Dr. Remaley pursuant to the Westfall Act, 28 U.S.C. § 2679(d).

Defendant Schaefer has moved to transfer the claims against him to a Massachusetts medical malpractice tribunal and to compel plaintiff to make an offer of proof in connection with that tribunal. Plaintiff has moved to amend the complaint and to have his deposition taken in light of his medical condition.

## I.  Background

### A.  Factual Background

#### 1.  The Parties

Edmund Edward Ward is a Massachusetts resident and a lawyer. (Compl. ¶ 1; 2d Auerbach Aff. Ex. A at 498). Ward was born with an extremely rare genetic deficiency of a bloodstream enzyme, called lecithin-cholesterol acyltransferase ("LCAT"). (*Id.* ¶ 9). LCAT is associated with high-density lipoprotein cholesterol ("HDL-C"), often referred to as the "good cholesterol." (*Id.* ¶ 11). As a result of his deficiency, referred to as "familial LCAT deficiency" or "FLD," Ward produces virtually no cholesterol. (*Id.* ¶ 9). Ward also suffers from other associated health conditions, including kidney disease. (*Id.*). He is in stage 5 kidney failure, and receives dialysis treatment three times a week. (*Id.*).

Ernst Schaefer, M.D., is a Massachusetts resident. He is a physician at the Tufts University School of Medicine and Boston Heart Diagnostics. (*Id.* ¶ 3). Dr. Schaefer is one of Ward's regular treating physicians. (*Id.* ¶ 18).

Robert Shamburek, M.D., and Alan Remaley, M.D., are physicians employed by the United States Department of Health and Human Services, National Institutes of Health ("NIH"), in Bethesda, Maryland. (*Id.* ¶ 4).

#### 2.  ACP-501

The claims of the patent for ACP-501 involve "a method for decreasing accumulation of

2

cholesterol in arteries in a human subject not suffering from . . . LCAT . . . deficiency syndrome." (*Id.* ¶ 14). In 2011, Dr. Schaefer and several other physicians published a paper in the Journal of Clinical Lipidology about LCAT deficiency. (2d Auerbach Aff. Ex. A at 498).[1] The paper concluded that "[i]n the future, the use of recombinant LCAT may be of value in patients who develop significant renal impairment."

In 2012, in collaboration with the NIH, AlphaCore (the company that originally produced the drug) conducted a clinical trial of ACP-501 to determine the safety and tolerability of a single injection of the drug in 16 to 18 patients with stable coronary artery disease. (Compl. ¶ 15). Dr. Shamburek and Dr. Remaley collaborated with Bruce Auerbach, an officer at AlphaCore, in running the trial, and reported that a single injection of ACP-501 was safe and tolerated by the subjects. (*Id.* ¶ 16).

### 3. The Proposal to Ward

According to the complaint, sometime in 2012, Ward was introduced to Dr. Shamburek, Dr. Remaley, and Auerbach by his treating physician, Dr. Schaefer, as a potential "ideal research subject for ACP-501." (*Id.* ¶ 18).

The complaint alleges that the four individuals induced Ward to participate as the only subject in a long-term trial of ACP-501 by misrepresenting that the drug would reverse his advanced kidney disease. (*Id.* ¶¶ 22, 46).[2] According to the complaint, they withheld their true motivation for the study, which was to test the effect of ACP-501 on the production of HDL-C in an LCAT-deficient patient, "hoping the drug would be considered a potential breakthrough in the

---

[1] Ward is listed as a co-author of the paper. (2d Auerbach Aff. Ex. A at 498).

[2] Ward also brought suit against Auerbach, but the claims against him and AlphaCore have been dismissed for lack of personal jurisdiction.

3

prevention of cardiovascular disease," as well as to acquire long-term safety data, in order to accelerate the sale of AlphaCore to MedImmune, LLC, an affiliate of AstraZeneca Biopharmaceuticals, Inc., a large pharmaceutical company. (*Id.* ¶¶ 23, 46-47).[3]

AlphaCore was granted an "orphan drug" designation for ACP-501 and a "compassionate use" protocol was approved. (*Id.* ¶ 20). AlphaCore donated to the NIH the ACP-501 needed for the trial. (*Id.* ¶ 22).

In January 2013, Ward travelled from Massachusetts to the NIH in Maryland to begin treatment. (*Id.* ¶ 27). At the outset of the trial, Auerbach met with Ward and allegedly told him that the process of using ACP-501 to reverse his kidney failure would take a long time, and that he should remain in the trial for the full course of treatment because he would "get out of it what [he puts] into it." (*Id.*).

As of the beginning of 2013, Ward "was considered by his physicians to be in kidney failure," and he was about to receive regular dialysis. (*Id.* ¶ 21). Ward postponed dialysis in order to participate in the trial. (*Id.* ¶¶ 21, 41).

### 4. The Protocol

At some point (the complaint does not specify when), the NIH created a clinical protocol for Ward's treatment. The protocol was titled "Expanded access use of intravenous ACP-501 in one subject with Familial lecithin:cholesterol acyltransferase [rhLCAT] Deficiency." (*Id.* ¶ 36). It appears that AlphaCore and Auerbach played some role in the creation of the protocol, although the details of their roles are unclear. (*See* Pl. Ex. G). Under the protocol, Dr. Shamburek was the principal investigator, Dr. Remaley was the safety-review investigator, and Dr. Schaefer was the medical monitor. (*Id.* ¶ 36(f)).

---

[3] The claims against MedImmune and AstraZeneca have been dismissed for failure to state a claim.

A draft of the protocol provided for two study sites: one at the NIH facility in Maryland, and another in Massachusetts where Ward would be treated by his regular physician, Dr. Schaefer. (Pl. Ex. E at 23). Under that draft of the protocol, Ward would receive an initial phase of treatment at NIH in Maryland; later, during the second phase, he would receive treatments every few weeks in Massachusetts with additional treatments at NIH every few months. (*Id.* at 26-27).

The parties dispute whether that draft became the final operative protocol or whether a later draft, which provided for only one test site in Maryland, was in fact the final approved protocol. (*See* 2d Auerbach Aff. Ex. B at 21; Pl. Surreply at 6-7). It is undisputed that the protocol, whichever version was adopted, did call for Dr. Schaefer to monitor Ward while he was home in Massachusetts. (2d Auerbach Aff. Ex. B at 21 (stating that Dr. Schaefer would "monitor and treat [Ward's] renal dysfunction and other disorders associated with his FLD" while in Massachusetts); Pl Ex. E at 21 (stating that Dr. Schaefer would monitor Ward)).

It appears that in June and July 2013 there was some discussion between Dr. Schaefer and Dr. Remaley concerning the possibility of having ACP-501 sent to Massachusetts so that Ward could be treated there. (Pl. Ex. H). However, it does not appear that any ACP-501 treatments took place in Massachusetts.

### 5. **The Trial**

Ward was admitted to the NIH facility in Maryland on January 6, 2013. (*Id.* ¶ 28). According to the complaint, Ward did not receive and sign the NIH's Consent to Participate in a Clinical Research Study until January 24, after he had already been subjected to several days of study. (*Id.* ¶ 29). The complaint further alleges that the consent form was inadequate, because it failed to fully disclose defendants' financial interests in ACP-501. (*Id.* ¶ 35).

5

The regimen which Ward underwent was "painful, grueling, and confining." (*Id.* ¶ 28). For example, from January 24 to February 27, 2013, Ward remained in one NIH hospital room for 24 hours a day. (*Id.*). He had two intravenous lines continuously inserted, one to administer ACP-501 for one hour in the morning, and the other to draw blood as many as 32 times per day. (*Id.*). From February 27 to June 28, Ward travelled from Massachusetts to Maryland every Tuesday. At NIH, he would check into a hospital room, and Dr. Shamburek would administer ACP-501 on Wednesday morning and then draw his blood six times on Wednesday and another six times on Thursday. (*Id.* ¶ 38).

According to the complaint, Drs. Shamburek and Remaley both told Ward that the ACP-501 was materially improving his kidney function, even though the data as to the drug's effects was at best ambiguous. (*Id.* ¶¶ 39-40). Throughout the trial, at the counseling of Drs. Shamburek and Remaley, Ward did not receive dialysis. (*Id.* ¶ 41).

In April or May 2013, Ward's nephrologist, Dr. Valerie Price, told him that he could no longer go without dialysis. (*Id.* ¶ 50). Nonetheless, he continued with the regimen.

In June 2013, the supply of ACP-501 at NIH was running low. (*Id.* ¶ 52). Drs. Shamburek and Remaley convinced Ward to continue the trial at a lower dose. (*Id.*). That lower dose caused Ward's HDL-C to plummet. (*Id.* ¶ 53). He expressed a desire to drop out of the trial if he could not continue to receive the higher dose. (*Id.*). According to the complaint, Drs. Shamburek and Remaley induced him to remain in the trial with false promises of a new shipment of ACP-501, meaning a return to the higher dose, and reversing his kidney disease. (*Id.* ¶¶ 54, 56).

From July to September 2013, Ward again travelled from Massachusetts to Maryland every Tuesday for treatment with the lower dose of ACP-501. (*Id.* ¶ 58). According to the

complaint, his kidney function deteriorated on the lower dose.  (*Id.* ¶ 59).  In September, at the urging of Drs. Price and Schaefer, Ward decided to withdraw from the trial in order to receive needed dialysis.  (*Id.* ¶¶ 59, 61).  The complaint alleges that Dr. Shamburek then tried to convince Ward to remain in the trial by telling him he had "interesting new information" and that the lower dose was working to improve kidney function.  (*Id.* ¶ 60).  In October, Dr. Shamburek allegedly called Ward and told him that he could not "just leave the program" and that he had to "come back to the NIH."  (*Id.* ¶ 61).  According to the complaint, in early fall 2013, Ward "learned that the only effect of the ACP-501 experimentation on his kidney condition was to delay, for many months, critical dialysis treatment."  (*Id.* ¶ 41).

### B. Procedural Background

Ward filed the complaint in this action in July 2016, in Massachusetts state court.  The complaint alleged claims for fraud (Count One); lack of informed consent (Count Two); unjust enrichment (Count Three); violations of the Due Process Clause of the United States Constitution, the Massachusetts Declaration of Rights, and the Nuremberg Code (Count Four); violation of the Massachusetts Civil Rights Act (Count Five); and civil conspiracy (Count Six) against all defendants.

Defendants Shamburek and Remaley removed the action to this court on the basis of 28 U.S.C. § 2679(d)(2).  The Court granted the motion of defendants MedImmune and AstraZeneca to dismiss the claims against them under Fed. R. Civ. P. 12(b)(6) for failure to state a claim.  The Court also granted the motion of defendants AlphaCore and Auerbach to dismiss the claims against them under Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction.

Pending before this Court are four motions.  Defendant Schaefer has moved to transfer this case to Superior Court to convene a medical malpractice tribunal and to compel plaintiff's

7

offer of proof. Plaintiff has moved to amend the complaint and take his own deposition.

## II. Motion to Transfer to Superior Court

Defendant Schaefer has moved to transfer this case to the Superior Court for the limited purpose of convening a medical malpractice tribunal pursuant to Mass. Gen. Laws ch. 231, § 60B. That statute requires that "[e]very action for malpractice, error or mistake against a provider of health care shall be heard by a tribunal," where "the plaintiff shall present an offer of proof and said tribunal shall determine if the evidence presented if properly substantiated is sufficient to raise a legitimate question of liability appropriate for judicial inquiry or whether the plaintiff's case is merely an unfortunate medical result." *Id.*

"If a finding is made for the defendant[s] . . . the plaintiff may pursue the claim through the usual judicial process only upon filing bond in the amount of six thousand dollars." *Id.* "If a plaintiff declines to make an offer of proof, then the judge may assume that the plaintiff's claims are entirely frivolous." *Denton v. Beth Israel Hosp.*, 392 Mass. 277, 280 (1984). Although this does not necessarily require a dismissal of the medical malpractice claims, "a plaintiff may, in effect, 'waive' the tribunal by declining to present an offer of proof," and thus "assume[ ] voluntarily the financial burden of the bond." *Id.* at 279-81 & n. 4.

The purpose of the tribunal requirement is "to separate malpractice claims into two groups: (1) those appropriate for judicial evaluation; and (2) those involving merely an unfortunate medical result." *Leininger v. Franklin Med. Ctr*, 404 Mass. 245, 247 (1989) (citing *Champagne v. Mass. Nurses Assoc.*, 403 Mass. 754, 756 (1989)). In enacting the statute, the legislature sought to discourage frivolous medical malpractice claims and lower malpractice-insurance premiums for medical providers. *Vasa v. Compass Med., P.C.*, 456 Mass. 175, 178 (2010). To that end, cases alleging any cause of action grounded in medical malpractice must be

8

referred to a malpractice tribunal. *See Little v. Rosenthal*, 376 Mass. 573, 576 (1978) (finding claims under Mass. Gen. Laws ch. 93A against nursing home and doctor properly referred to tribunal); *Ruggiero v. Giamarco*, 73 Mass. App. Ct. 743, 744 (2009) ("The tribunal requirement applies to all treatment related claims, whether in tort, in contract, or under [Mass. Gen. Laws ch.] 93A.").

Not all claims arising in the medical context, however, must be referred to a medical malpractice tribunal. For example, claims for violations of the Massachusetts Civil Rights Act are not malpractice claims where the plaintiff does not allege that the violations directly implicated the professional judgment or competence of a medical provider. *Leininger*, 404 Mass. at 248 (finding complaint against medical center and psychiatrist alleging civil rights and tort claims arising from illegal involuntary commitment improperly referred to tribunal). *See also Koltin v. Beth Israel Deaconess Med. Ctr*, 62 Mass. App. Ct. 920, 920 (2004) (involving question of whether decision to terminate care was breach of contract).

All of plaintiff's claims here, in substance, allege that the physicians made improper medical decisions, and indeed deliberately experimented on him, in order to obtain data that would be beneficial in selling the company that produced the drug. Allegedly, the physicians tricked plaintiff into consenting to a treatment regimen that they knew would not cure or reverse his kidney failure, and did so for personal profit or for other reasons not based on their professional medical judgments. Thus, this matter cannot be resolved without resolving the issue of whether the physicians made appropriate medical decisions, including appropriate disclosures to plaintiff. Although the claim is framed in large part as a claim of fraud, "[t]here can be no recovery for fraud unless someone provided improper medical care." *Cook v. Iacono*, 2014 WL 8772072, at *1 (Mass. Sup. Ct. July 24, 2014). Accordingly, this matter involves malpractice

9

claims that should be screened by a tribunal.

Plaintiff has opposed the motion on the ground that defendant Schaefer waived his right to a tribunal. In his answer filed on November 16, 2016, defendant Schaefer "requested that a medical tribunal be convened within 15 days . . . ." (Ans. of Def. Schaefer at 10).[4] Section 60B requires that a tribunal be held "within 15 days after the defendant's answer has been filed." But approximately ten months then elapsed before defendant Schaefer took any additional steps to seek a tribunal. Because of that delay, plaintiff contends that the motion is a dilatory tactical maneuver "designed . . . to increase litigation costs and litigation burden." (Pl.'s Opp'n at 2-3).

That delay is, at a minimum, troublesome. Defendant Schaefer did not ignore the issue entirely; instead, he requested a tribunal in his first responsive pleading. But he then did nothing to actively seek a tribunal for another ten months. The referral to a tribunal will unquestionably result in additional, and possibly lengthy, delays.[5]

Nevertheless, plaintiff fails to cite any statutory provision or case law in support of the assertion that the statutory tribunal requirement can be waived simply by failing to file a motion after making a timely demand. Under the circumstances, the Court will not deem the delay to have constituted a waiver, and the matter will be referred to the Superior Court for the convening of a tribunal.

Nonetheless, the potential prejudice resulting from the delay remains an issue. Normally, when a matter is referred to a malpractice tribunal, the litigation is stayed pending the outcome

---

[4] Plaintiff contends that defendant Schaefer filed a "'Request for Medical Tribunal Pursuant to . . . § 60B' in the Superior Court on November 14, 2017 [sic].'" (Pl.'s Opp'n at 2). However, there is no entry on the state court docket for November 14, 2016.

[5] The Superior Court has recognized the "practical impossibility of complying with both the 15-day mandate and the required composition of the tribunal in almost all cases." (Proposed New Superior Court Rule 73, at 1). It has proposed a new rule providing specifically that "[a]ny defendant's failure to file a timely demand for tribunal shall waive that defendant's right to a tribunal." (Proposed New Superior Court Rule 73, at 2).

of the tribunal. However, where there has been substantial delay in convening a medical malpractice tribunal, it is not an abuse of discretion to let some discovery go forward. *See O'Leary v. Nepomuceno*, 44 Mass. App. Ct. 683, 685-86 (1998) (finding a two-year interval between plaintiffs' filing their complaint and the convening of the tribunal warranted an interim order for discovery to proceed). *See also Heintz v. Amaral*, 2004 WL 1690389, at *1 (Mass. Sup. Ct. July 15, 2004) ("[T]here is nothing contained in the tribunal statute that relieves [a party] from the obligation to provide discovery prior to a tribunal hearing."). That is not, however, a hard and fast requirement.

Under the circumstances presented here, the Court will not stay this proceeding in its entirety, or completely preclude discovery from going forward.[6] The extent to which discovery may be permitted will be addressed at a future point in this proceeding. For present purposes, it is sufficient to rule that discovery will not be stayed.

### III. Motion to Compel Offer of Proof

Defendant Schaefer has also moved to compel plaintiff to provide an offer of proof. Under § 60B, in medical malpractice tribunal proceedings "the plaintiff shall present an offer of proof." The offer is used to determine if there is a legitimate question of "whether the medical result obtained is consistent with the medical result allegedly promised by the health care provider." *Salem Orthopedic Surgeons, Inc. v. Quinn*, 377 Mass. 514, 521 (1979). An offer of proof is a requirement of the tribunal, not this Court, and the motion accordingly will be denied, without prejudice to its renewal in the Superior Court.

---

[6] Normally, a motion seeking discovery in federal court is premature where the plaintiff is first required to present an offer of proof to a medical malpractice tribunal. *Taylor v. Radiology Assocs. of Norwood, Inc.*, 101 F.R.D. 345, 346 (D. Mass. 1984).

11

## IV. Motion to Amend the Complaint

As noted, the claims against defendants AlphaCore and Auerbach have been dismissed for lack of personal jurisdiction, and the claims against MedImmune and AstraZeneca have been dismissed for failure to state a claim upon which relief can be granted. Plaintiff has now moved to amend the complaint to attempt to reinstate those claims, ostensibly to correct the deficiencies identified by the Court. The Court issued its ruling on those two motions on June 23, 2017, and plaintiff moved to amend the complaint on July 21, 2017. He did not provide a proposed amended complaint with the motion. The putative reinstated defendants (AlphaCore, Auerbach, MedImmune, and AstraZeneca) all oppose the motion to amend on the grounds of futility and undue delay.

### A. Legal Standard

Under Rule 15(a), a party may amend a "pleading" without leave of court in certain relatively narrow circumstances. Fed. R. Civ. P. 15(a).[7] "In all other cases, a party may amend its pleadings only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Nonetheless, amendments may be denied on the basis of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962). In determining whether to grant a motion to amend, the court must examine the totality of the circumstances and "exercise its informed discretion in constructing a balance of pertinent considerations." *Palmer v. Champion*

---

[7] A party may amend a pleading once as a matter of course within "21 days after serving it," or "if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Fed. R. Civ. P. 15(a)(1).

*Mortg.*, 465 F.3d 24, 30-31 (1st Cir. 2006).

   B.   **Analysis**

As noted, plaintiff has moved to amend his complaint to correct the deficiencies identified by the Court in its memorandum and order granting the motions to dismiss. He has not, however, provided a proposed amended complaint with his motion to amend. Nor has he proffered any new facts in his motion to support his assertions concerning the issues of successor liability and personal jurisdiction. It appears that he simply rehashes one of his previous arguments, that AlphaCore ceased to exist and that defendants AstraZeneca and MedImmune are AlphaCore's successors.

This Court already found that argument wanting, as plaintiff simply alleged a legal conclusion without supporting factual allegations. Defendants filed extensive briefing on the motions to dismiss, and the Court undertook the work of reaching a decision on that motion. Having lost that motion, plaintiff now seeks another chance to try to rectify the deficiencies.

The practice of waiting to amend a complaint until after the Court has ruled on a motion to dismiss is troublesome, to say the least. As the First Circuit noted in *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 57 (1st Cir. 2008):

> The plaintiffs argue that in the end, they were entitled to wait and see if their amended complaint was rejected by the district court before being put to the costs of filing a second amended complaint. They claim this would promote efficiency in the judicial system. Plaintiffs have it exactly backwards—their methodology would lead to delays, inefficiencies, and wasted work. The plaintiffs do not get leisurely repeated bites at the apple, forcing a district judge to decide whether each successive complaint was adequate . . . . Plaintiffs may not, having the needed information, deliberately wait in the wings for a year and a half with another amendment to a complaint should the court hold the first amended complaint was insufficient. Such an approach would impose unnecessary costs and inefficiencies on both the courts and party opponents. This court expressly disapproved a similar tactic in *James* [*v. Watt*, 716 F.2d 71 (1st Cir. 1983)], and we do so again. *See id.* at 78 ("Such a practice would dramatically undermine the ordinary rules governing the finality of judicial decisions, and should not be

sanctioned in the absence of compelling circumstances." (citing 6 Wright & Miller, Federal Practice and Procedure § 1489 (1971))).

Here, plaintiff was "put on notice of the deficiencies in the complaint by the motion to dismiss. If [he] had something relevant to add, [he] should have moved to add it then." *Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*, 778 F.3d 228, 247 (1st Cir. 2015). Under the circumstances, plaintiff has not provided a valid reason for his neglect and delay. Accordingly, the motion to amend will be denied.

## V. **Motion to Take Deposition**

Finally, plaintiff seeks leave of the Court to take his deposition under Fed. R. Civ. P. 26. Plaintiff suffers from a serious health condition, deficiency of the LCAT enzyme. (Pl.'s Mot. to Take Deposition at 2). In addition, he has stage 5 kidney failure, which necessitates dialysis treatments three times per week. (*Id.*). He contends that a "deposition under controlled circumstances" is needed "to preserve his testimony before he loses the strength and ability to testify." (*Id.*).

The First Circuit has stated that "[u]nder Rule 26, the trial court is required to balance the burden of proposed discovery against the likely benefit." *Gill v. Gulfstream Park Racing Ass'n*, 399 F.3d 391, 400 (1st Cir. 2005). The Court has little doubt that plaintiff is seriously ill (although plaintiff has not provided an affidavit from a treating physician or medical records to substantiate the assertion that a deposition must be taken immediately). Preserving his testimony by means of a deposition is likely desirable; the only real issue is whether it is premature. At this time, however, little discovery has occurred.[8] Permitting plaintiff to undertake his deposition now may prejudice the physician defendants, who without the benefit of completed discovery

---

[8] It appears that some discovery has occurred, as both plaintiff and defendant Schaefer acknowledge that part of plaintiff's medical records have been disclosed.

14

may be unable to effectively cross-examine plaintiff.

Accordingly, the motion to take plaintiff's deposition appears to be premature and will be denied without prejudice, subject to renewal upon changed circumstances, such as (for example) a further decline in plaintiff's health or the completion of sufficient discovery to permit effective cross-examination.

## VI. Conclusion

For the foregoing reasons,

1. Defendant Schaefer's motion to transfer this case to Superior Court to convene a medical malpractice tribunal is GRANTED in part.

This matter is hereby referred to the Massachusetts Superior Court Department of the Trial Court for the limited purpose of conducting a medical malpractice tribunal pursuant to Mass. Gen. Laws ch. 231, § 60B. Defendant Schaefer is hereby directed to take immediate action to ensure that the medical malpractice tribunal is scheduled as promptly as possible. The original file in this court will not be transferred to the Superior Court. Instead, the defendant is responsible for the filing of the relevant pleadings in the Superior Court. Discovery in this proceeding shall not, however, be stayed, subject to such further orders of the Court as may be appropriate under the circumstances. Upon completion of all proceedings before the medical malpractice tribunal, the parties shall file a status report with this Court with proposals for further proceedings in this case.

2. Defendant Schaefer's motion to compel an offer of proof is DENIED.

3. Plaintiff's motion to amend the complaint is DENIED.

4. Plaintiff's motion to take his own deposition is DENIED without prejudice.

**So Ordered.**

|  |  |
|---|---|
|  | /s/ F. Dennis Saylor |
|  | F. Dennis Saylor IV |
| Dated: November 16, 2017 | United States District Judge |