| | |
|---|---|
| EDMUND EDWARD WARD, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. |
| | ) 16-12543-FDS |
| ERNST J. SCHAEFER, M.D.; ROBERT D. SHAMBUREK, M.D.; ALAN T. REMALEY, M.D.; and UNITED STATES OF AMERICA, | ) |
| Defendants. | ) |

# MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS

**SAYLOR, J.**

This is an action arising out of the use of a drug in a compassionate-use protocol. Plaintiff Edmund Edward Ward suffers from a rare genetic deficiency that has resulted in, among other things, severe kidney disease. He alleges that he was fraudulently induced to participate in what he contends was a non-therapeutic, experimental drug trial. He further contends that he was led to believe that the drug, ACP-501, would reverse his kidney disease, but that defendants' true purpose in treating him was to gain data that would be beneficial in selling the company that produced the drug.

Ward has filed suit against the doctors involved in his treatment, including Dr. Ernst Schaefer, Dr. Robert Shamburek, and Dr. Alan Remaley. The United States has been substituted as defendant as to certain claims against Dr. Shamburek and Dr. Remaley pursuant to the Westfall Act, 28 U.S.C. § 2679(d).

The United States and Drs. Shamburek and Remaley (collectively, the "government

defendants") have moved to dismiss the complaint for lack of subject-matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) and for failure to state a claim under Fed. R. Civ. P. 12(b)(6). For the foregoing reasons, the motion will be granted.

**I.      Background**

    **A.      Factual Background**

        **1.      The Parties**

Edmund Edward Ward is a Massachusetts resident and a lawyer. (Compl. ¶ 1; 2d Auerbach Aff. Ex. A at 498). Ward was born with an extremely rare genetic deficiency of a bloodstream enzyme, called lecithin-cholesterol acyltransferase ("LCAT"). (*Id.* ¶ 9). LCAT is associated with high-density lipoprotein cholesterol ("HDL-C"), often referred to as the "good cholesterol." (*Id.* ¶ 11). As a result of his deficiency, referred to as "familial LCAT deficiency" or "FLD," Ward produces virtually no cholesterol. (*Id.* ¶ 9). Ward also suffers from other associated health conditions, including kidney disease. (*Id.*). He is in stage 5 kidney failure, and receives dialysis treatment three times a week. (*Id.*).

Ernst Schaefer, M.D., is a Massachusetts resident. He is a physician at the Tufts University School of Medicine and Boston Heart Diagnostics. (*Id.* ¶ 3). Dr. Schaefer is one of Ward's regular treating physicians. (*Id.* ¶ 18).

Robert Shamburek, M.D., and Alan Remaley, M.D., are physicians employed by the United States Department of Health and Human Services, National Institutes of Health ("NIH"), in Bethesda, Maryland. (*Id.* ¶ 4).

        **2.      ACP-501**

The claims of the patent for ACP-501 involve "a method for decreasing accumulation of cholesterol in arteries in a human subject not suffering from . . . LCAT . . . deficiency

syndrome." (*Id.* ¶ 14). In 2011, Dr. Schaefer and several other physicians published a paper in the Journal of Clinical Lipidology about LCAT deficiency. (2d Auerbach Aff. Ex. A at 498).[1] The paper concluded that "[i]n the future, the use of recombinant LCAT may be of value in patients who develop significant renal impairment."

In 2012, in collaboration with the NIH, AlphaCore (the company that originally produced the drug) conducted a clinical trial of ACP-501 to determine the safety and tolerability of a single injection of the drug in 16 to 18 patients with stable coronary artery disease. (Compl. ¶ 15). Dr. Shamburek and Dr. Remaley collaborated with Bruce Auerbach, an officer at AlphaCore, in running the trial, and reported that a single injection of ACP-501 was safe and tolerated by the subjects. (*Id.* ¶ 16).

### 3. The Proposal to Ward

According to the complaint, sometime in 2012, Ward was introduced to Dr. Shamburek, Dr. Remaley, and Auerbach by his treating physician, Dr. Schaefer, as a potential "ideal research subject for ACP-501." (*Id.* ¶ 18).

The complaint alleges that the four individuals induced Ward to participate as the only subject in a long-term trial of ACP-501 by misrepresenting that the drug would reverse his advanced kidney disease. (*Id.* ¶¶ 22, 46).[2] According to the complaint, they withheld their true motivation for the study, which was to test the effect of ACP-501 on the production of HDL-C in an LCAT-deficient patient, "hoping the drug would be considered a potential breakthrough in the prevention of cardiovascular disease," as well as to acquire long-term safety data, in order to

---

[1] Ward is listed as a co-author of the paper. (2d Auerbach Aff. Ex. A at 498).

[2] Ward also brought suit against Auerbach, but the claims against him and AlphaCore have been dismissed for lack of personal jurisdiction.

3

accelerate the sale of AlphaCore to MedImmune, LLC, an affiliate of AstraZeneca Biopharmaceuticals, Inc., a large pharmaceutical company. (*Id.* ¶¶ 23, 46-47).[3]

AlphaCore was granted an "orphan drug" designation for ACP-501 and a "compassionate use" protocol was approved. (*Id.* ¶ 20). AlphaCore donated to the NIH the ACP-501 needed for the trial. (*Id.* ¶ 22).

In January 2013, Ward travelled from Massachusetts to the NIH in Maryland to begin treatment. (*Id.* ¶ 27). At the outset of the trial, Auerbach met with Ward and allegedly told him that the process of using ACP-501 to reverse his kidney failure would take a long time, and that he should remain in the trial for the full course of treatment because he would "get out of it what [he puts] into it." (*Id.*).

As of the beginning of 2013, Ward "was considered by his physicians to be in kidney failure," and he was about to receive regular dialysis. (*Id.* ¶ 21). Ward postponed dialysis in order to participate in the trial. (*Id.* ¶¶ 21, 41).

### 4. The Protocol

At some point (the complaint does not specify when), the NIH created a clinical protocol for Ward's treatment. The protocol was titled "Expanded access use of intravenous ACP-501 in one subject with Familial lecithin:cholesterol acyltransferase [rhLCAT] Deficiency." (*Id.* ¶ 36). It appears that AlphaCore and Auerbach played some role in the creation of the protocol, although the details of their roles are unclear. (*See* Pl. Ex. G). Under the protocol, Dr. Shamburek was the principal investigator, Dr. Remaley was the safety-review investigator, and Dr. Schaefer was the medical monitor. (*Id.* ¶ 36(f)).

A draft of the protocol provided for two study sites: one at the NIH facility in Maryland,

---

[3] The claims against MedImmune and AstraZeneca have been dismissed for failure to state a claim.

4

and another in Massachusetts where Ward would be treated by his regular physician, Dr. Schaefer. (Pl. Ex. E at 23). Under that draft of the protocol, Ward would receive an initial phase of treatment at NIH in Maryland; later, during the second phase, he would receive treatments every few weeks in Massachusetts with additional treatments at NIH every few months. (*Id.* at 26-27).

The parties dispute whether that draft became the final operative protocol or whether a later draft, which provided for only one test site in Maryland, was in fact the final approved protocol. (*See* 2d Auerbach Aff. Ex. B at 21; Pl. Surreply at 6-7). It is undisputed that the protocol, whichever version was adopted, did call for Dr. Schaefer to monitor Ward while he was home in Massachusetts. (2d Auerbach Aff. Ex. B at 21 (stating that Dr. Schaefer would "monitor and treat [Ward's] renal dysfunction and other disorders associated with his FLD" while in Massachusetts); Pl Ex. E at 21 (stating that Dr. Schaefer would monitor Ward)).

It appears that in June and July 2013 there was some discussion between Dr. Schaefer and Dr. Remaley concerning the possibility of having ACP-501 sent to Massachusetts so that Ward could be treated there. (Pl. Ex. H). However, it does not appear that any ACP-501 treatments took place in Massachusetts.

### 5. **The Trial**

Ward was admitted to the NIH facility in Maryland on January 6, 2013. (*Id.* ¶ 28). According to the complaint, Ward did not receive and sign the NIH's Consent to Participate in a Clinical Research Study until January 24, after he had already been subjected to several days of study. (*Id.* ¶ 29). The complaint further alleges that the consent form was inadequate, because it failed to fully disclose defendants' financial interests in ACP-501. (*Id.* ¶ 35).

The regimen which Ward underwent was "painful, grueling, and confining." (*Id.* ¶ 28).

For example, from January 24 to February 27, 2013, Ward remained in one NIH hospital room for 24 hours a day. (*Id.*). He had two intravenous lines continuously inserted, one to administer ACP-501 for one hour in the morning, and the other to draw blood as many as 32 times per day. (*Id.*). From February 27 to June 28, Ward travelled from Massachusetts to Maryland every Tuesday. At NIH, he would check into a hospital room, and Dr. Shamburek would administer ACP-501 on Wednesday morning and then draw his blood six times on Wednesday and another six times on Thursday. (*Id.* ¶ 38).

According to the complaint, Drs. Shamburek and Remaley both told Ward that the ACP-501 was materially improving his kidney function, even though the data as to the drug's effects was at best ambiguous. (*Id.* ¶¶ 39-40). Throughout the trial, at the counseling of Drs. Shamburek and Remaley, Ward did not receive dialysis. (*Id.* ¶ 41).

In April or May 2013, Ward's nephrologist, Dr. Valerie Price, told him that he could no longer go without dialysis. (*Id.* ¶ 50). Nonetheless, he continued with the regimen.

In June 2013, the supply of ACP-501 at NIH was running low. (*Id.* ¶ 52). Drs. Shamburek and Remaley convinced Ward to continue the trial at a lower dose. (*Id.*). That lower dose caused Ward's HDL-C to plummet. (*Id.* ¶ 53). He expressed a desire to drop out of the trial if he could not continue to receive the higher dose. (*Id.*). According to the complaint, Drs. Shamburek and Remaley induced him to remain in the trial with false promises of a new shipment of ACP-501, meaning a return to the higher dose, and reversing his kidney disease. (*Id.* ¶¶ 54, 56).

From July to September 2013, Ward again travelled from Massachusetts to Maryland every Tuesday for treatment with the lower dose of ACP-501. (*Id.* ¶ 58). According to the complaint, his kidney function deteriorated on the lower dose. (*Id.* ¶ 59). In September, at the

urging of Drs. Price and Schaefer, Ward decided to withdraw from the trial in order to receive needed dialysis. (*Id.* ¶¶ 59, 61). The complaint alleges that Dr. Shamburek then tried to convince Ward to remain in the trial by telling him he had "interesting new information" and that the lower dose was working to improve kidney function. (*Id.* ¶ 60). In October, Dr. Shamburek allegedly called Ward and told him that he could not "just leave the program" and that he had to "come back to the NIH." (*Id.* ¶ 61). According to the complaint, in early fall 2013, Ward "learned that the only effect of the ACP-501 experimentation on his kidney condition was to delay, for many months, critical dialysis treatment." (*Id.* ¶ 41).

B. **Procedural Background**

Ward filed the complaint in this action in July 2016, in Massachusetts state court. The complaint alleged claims for fraud (Count One); lack of informed consent (Count Two); unjust enrichment (Count Three); violations of the Due Process Clause of the United States Constitution, the Massachusetts Declaration of Rights, and the Nuremberg Code (Count Four); violation of the Massachusetts Civil Rights Act (Count Five); and civil conspiracy (Count Six) against all defendants.

Defendants Shamburek and Remaley removed the action to this court on the basis of 28 U.S.C. § 2679(d)(2). On June 23, 2017, the Court granted the motion of defendants MedImmune and AstraZeneca to dismiss the claims against them under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. The Court also granted the motion of defendants AlphaCore and Auerbach to dismiss the claims against them under Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction. On July 10, 2017, the Court granted in part and denied in part a motion by Drs. Shamburek and Remaley to substitute the United States as defendant as to all claims against them.

On November 16, 2017, the Court referred this case to the Superior Court to convene a

medical malpractice tribunal, but did not stay discovery. In addition, the Court denied defendant Schaefer's motion to compel an offer of proof, and plaintiff Ward's motions to amend the complaint and to take his own deposition. The government defendants have now moved to dismiss for lack of subject-matter jurisdiction and for failure to state a claim.

## II. Legal Standard

On a motion to dismiss, the court "must assume the truth of all well-plead[ed] facts and give . . . plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). To survive a motion to dismiss, the complaint must state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In other words, the "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

## III. Analysis

### A. Federal Tort Claims Act and Sovereign Immunity

The doctrine of sovereign immunity bars suits for money damages against the federal government, its agencies, and federal agents acting in their official capacities. *McCloskey v.*

*Mueller*, 446 F.3d 262, 272 (1st Cir. 2006); *Tapia–Tapia v. Potter*, 322 F.3d 742, 745-46 (1st Cir. 2003). A plaintiff bears the "burden of proving [that] sovereign immunity has been waived." *Mahon v. United States*, 742 F.3d 11, 14 (1st Cir. 2014).

The Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680, operates as a limited waiver of sovereign immunity. Under the FTCA, "the United States [may be liable for] . . . injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee . . . while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

However, 28 U.S.C. § 2675 specifies that a tort action against the United States may not proceed "unless the claimant shall have first presented the claim to the appropriate Federal agency . . . ." The government defendants first contend that counts one (fraud) and two (lack of informed consent) must be dismissed because these claims fall within the FTCA and plaintiff has not complied with the FTCA's administrative claim requirement. It is undisputed that plaintiff did not present an administrative claim to the Department of Health and Human Services ("HHS"), under which the NIH operates. (Hawkins Decl. ¶ 5).

Plaintiff contends that because the United States was not a named defendant in the original complaint, he was "relieved of the obligation both to undergo the FTCA's administrative claim requirements and to obtain a waiver of sovereign immunity." (Pl. Mem. in Opp. at 2). But a plaintiff cannot evade the administrative claim requirement simply by electing to sue the individual federal employees who committed the allegedly tortious acts. *See Freeze v. United States*, 343 F. Supp. 2d 477, 480-81 (M.D.N.C. 2004) (stating that plaintiff was not excused from

FTCA administrative claim exhaustion requirement after government's substitution under the Westfall Act). *See also Kasparian v. United States*, 2017 WL 1843690, at *3 (D. Mass. May 8, 2017) (dismissing complaint for failure to file administrative claim after the United States was substituted as proper defendant). Because plaintiff failed to present an administrative claim, the first two counts of the complaint against the government defendants are barred by sovereign immunity.

In addition, the government defendants contend that plaintiff's remaining claims for monetary damages against them must be dismissed because the United States has not waived sovereign immunity as to those types of claims.[4] Because plaintiff has not shown a waiver of sovereign immunity, his claims against the government defendants in Counts Three through Six must also be dismissed, with the exception of the *Bivens* claims in Count Four discussed below.[5]

### B. Absolute Immunity

In Count Four, plaintiff has brought *Bivens* claims against Drs. Shamburek and Remaley, alleging violations of the Due Process Clause of the Fifth Amendment. Absent explicit statutory authorization, a *Bivens* action provides the sole path for plaintiffs who seek damages from federal officials for alleged constitutional violations. *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 389 (1971); *Tapia–Tapia*, 322 F.3d at 746 (holding that no *Bivens* remedy is available against the United States, federal agencies, or federal officers in their official capacities).

The government defendants contend that the *Bivens* claims must be dismissed because Drs. Shamburek and Remaley enjoy absolute immunity. The Public Health Service Act

---

[4] The remaining claims are unjust enrichment (Count Three), violations of the state and federal Constitutions and the Nuremberg Code (Count Four), violation of the Massachusetts Civil Rights Act (Count Five), and civil conspiracy (Count Six).

[5] In any event, there is no viable claim for violations of the Nuremberg Code. *See Heinrich ex rel. Heinrich v. Sweet*, 49 F. Supp. 2d 27, 42 (D. Mass. 1999) (noting that there is no private right of action under the Nuremberg Code).

10

provides:

> The remedy against the United States provided by [the FTCA], or by alternative benefits provided by the United States where the availability of such benefits precludes a remedy under [the FTCA], for damage for personal injury, including death, resulting from the performance of medical, surgical, dental, or related functions, *including the conduct of clinical studies or investigation, by any commissioned officer or employee of the Public Health Service while acting within the scope of his office or employment*, shall be exclusive of any other civil action or proceeding by reason of the same subject-matter against the officer or employee (or his estate) whose act or omission gave rise to the claim.

42 U.S.C. § 233(a) (emphasis added). It is undisputed that the National Institutes of Health operates under the Public Health Service ("PHS"). The Supreme Court has stated that "Section 233(a) grants absolute immunity to PHS officers and employees for actions arising out of the performance of medical or related functions within the scope of their employment by barring all actions against them for such conduct." *Hui v. Castaneda*, 559 U.S. 799, 806 (2010). Thus, Section 233(a) precludes all *Bivens* actions against PHS officers and employees, provided the alleged constitutional violation arose within the scope of their employment. *See id.*

Plaintiff makes two counterarguments. First, he contends that absolute immunity under Section 233(a) is an affirmative "defense that the defendants must plead and ultimately prove." (Mem. in Opp. at 4). He contends that the government defendants "failed to answer or otherwise respond to the complaint in the required period of time under the Federal Rules [of Civil Procedure]." (*Id.* at 4-5). However, in its October 16, 2017 order denying plaintiff's motion for entry of default, this Court specified that the government defendants would have until October 25, 2017, to file a responsive pleading. (Docket No. 73). The pending motion to dismiss was filed that day. Accordingly, the invocation of absolute immunity is not untimely.

11

Second, plaintiff contends that defendants have not established that Drs. Shamburek and Remaley were acting within the scope of their employment to justify invocation of Section 233(a). (Mem. in Opp. at 5-6). The United States Attorney has certified that Drs. Shamburek and Remaley were acting within the scope of their employment at all times relevant to this suit. (Docket No. 33, Ex. 1). Plaintiff relies on the Supreme Court's statement in *Hui* that "immunity is contingent upon the alleged misconduct having occurred in the course of the PHS defendant's duties, but a defendant may make that proof pursuant to the ordinary rules of evidence and procedure." *Hui*, 559 U.S. at 811. However, plaintiff ignores the next sentence, which states "proof of scope [] in most § 233(a) cases [is] established by a declaration affirming that the defendant was a PHS official during the relevant time period." *Id.* Indeed, the Supreme Court agreed that "scope certification" is "a convenient mechanism for establishing that the alleged misconduct occurred within the scope of the employee's duties." *Id.* "Because § 233(a) plainly precludes a *Bivens* action" against Drs. Shamburek and Remaley where the U.S. Attorney has certified that they acted within the scope of their employment, the *Bivens* claims against them will be dismissed. *Id.* at 813.

## IV. Conclusion

For the foregoing reasons, defendants' motion to dismiss is GRANTED.

**So Ordered.**

Dated: February 27, 2018

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge