UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

EDMUND EDWARD WARD,

        Plaintiff,                                             Civil Action No. 16-12543-FDS

        v.

ERNST J. SCHAEFER, M.D.,

        Defendant.

REPORT AND RECOMMENDATION
ON PLAINTIFF'S RENEWED MOTION FOR SANCTIONS (#151).

I. Introduction.

Plaintiff moves under Fed. R. Civ. P. 37(e) for the court to enter a default judgment, alleging that defendant deliberately destroyed emails relevant to the case. (#151 at 1.) In the alternative, plaintiff requests an adverse inference instruction to the jury at trial. *Id*. For the reasons set out below, the court finds that the extreme sanction of the entry of a default judgment is not warranted, and recommends the motion be denied. The motion for an adverse inference instruction should be decided by the trial judge, so the court recommends that motion be denied without prejudice.

The underlying facts of this case are set out in detail in Judge Saylor's Order on defendants' motion to dismiss (#49) and will be repeated here only to the extent necessary.[1] Plaintiff was born with a rare genetic deficiency of a bloodstream enzyme, called lecithin-cholesterol acyltransferase

---

[1] Plaintiff brought this suit against Dr. Schaefer, and also against Bruce Auerbach, an officer of AlphaCore Pharma, LLC; Dr. Robert Shamburek; Dr. Alan T. Remaley; AlphaCore Pharma, LLC; AstraZeneca Biopharmaceuticals, Inc.; and MedImmune, LLC. (#1-1.) All defendants other than Dr. Schaefer moved to dismiss, and Judge Saylor allowed the motion (#49), leaving Dr. Schaefer as the sole defendant.

(LCAT). (#1-1 at 2.) As a result of the deficiency, he produces no cholesterol. *Id*. The condition causes life-threatening complications, including kidney disease, and at the time of the filing of the complaint in July 2016, Mr. Ward was in stage 5 kidney failure. *Id*.

Dr. Schaefer is a physician at the Tufts University School of Medicine and is Chief Medical Officer at Boston Heart Diagnostics. *Id*. at 1. Dr. Schaefer began treating Mr. Ward for his LCAT deficiency in 2010. (#120-1 at 5.)

In this tort action,[2] Mr. Ward alleges that Dr. Schaefer fraudulently induced him to participate in an experimental drug trial, by misleading him into believing that the drug would reverse his advanced kidney disease, when in fact the true purpose of the trial was to test the drug's efficacy in treating cardiovascular disease, and thereby bolster the value of the company that licensed the patent of the drug.

## II. Procedural History.

The somewhat tortuous history of this matter[3] began with a motion to compel discovery of Dr. Schaefer's email correspondence, filed by Mr. Ward in June 2018. (#100.) Mr. Ward had asked for "all documents concerning communications by [Dr. Schaefer] or any person concerning, supporting or refuting any of the allegations in the Complaint," and had named forty-two individuals or entities, including the dismissed defendants, numerous physicians, the United States

---

[2] The complaint alleges Fraud in the Inducement/Deceit/Intentional Misrepresentation (Count I); Breach or Lack of Informed Consent (Count II); Unjust Enrichment (Count III); Violations of State and Federal Due Process and the Nuremberg Code (Count IV); Violation of the Massachusetts Civil Rights Act (Count V); and Civil Conspiracy (Count VI). (#1-1.)

[3] The court will not detail every filing by the parties over more than a year of legal skirmishing over this issue but will only summarize the history of the litigation. For a list of the specific filings of the parties and the court's orders as of May 2019, *see* #156.

Food and Drug Administration, and others, whose communications with Dr. Schaefer he sought. (#102-1 at 5-6.)

Dr. Schaefer opposed the motion, explaining that he already had produced responsive emails, and that he had no other emails to produce, because it was his practice to delete emails that did not pertain to his patients. (#102 at 2, 4.) Plaintiff responded that Dr. Schaefer was in violation of Fed. R. Civ. P. 37(e), which deals with the failure to preserve electronically stored information (ESI), and demanded that Dr. Schaefer explain when he deleted emails, what reasonable steps he took to preserve them, and whether they could be restored. (#105 at 1-2.)

Dr. Schafer responded in an affidavit that he uses two email accounts, one at Boston Heart Diagnostics and one at Tufts University. (#109-1 at 2.) He averred that it is his "custom and practice to review [his] emails" in the two accounts and to delete them either weekly (Boston Heart Diagnostics) or monthly (Tufts). *Id.* He had "no knowledge or understanding of whether or how deleted emails from either of these two email addresses could be recovered at this time." *Id.* Finally, he had no idea "prior to 2016, when [he] received the Summons and Complaint in this matter," that he "would be involved in litigation brought by Edmund Ward." *Id.*

At a hearing, at which defendant maintained that the emails plaintiff sought were no longer in his possession and he did not have to produce them, the court ordered plaintiff to issue subpoenas to Boston Heart Diagnostics and Tufts University to see if they still had Dr. Schaefer's deleted emails on their servers. Defendant did not object. (#111.) Plaintiff then issued subpoenas seeking emails between Dr. Schaefer and twenty-three named persons from January 1, 2010 to December 16, 2016.[4] (#114-5.)

---

[4] The court presumes that the date range on plaintiff's subpoena signifies that defendant provided plaintiff with emails from December 2016 forward. At any rate, as discussed *infra*, plaintiff made clear that he was looking for emails generated while Mr. Ward's participation in the study was

In response to the subpoenas, Boston Heart Diagnostics produced 1,124 emails dated from January 4, 2016 to October 17, 2018, and Tufts University produced seventy-one pages of correspondence dated from May 17, 2016 to October 13, 2016. (#120 at 4.) It is not clear to the court whether the emails consisted only of deleted emails. At the oral argument, in response to the court's questions about precisely what emails had been recovered, plaintiff's counsel stated that "some of the e[]mails that were produced were not recovered from a deleted e[]mail account," but never explained this further. (#171 at 5-6.) The court also does not know why the earliest emails were from 2016, rather than 2010, as the subpoena requested. At oral argument, the court asked plaintiff's counsel whether, since the subpoenas were issued in September 2018, one could infer that the institutions kept emails on the servers for only two years. *Id*. at 6-7. This question has never been answered. For purposes of this order, the court will assume that emails were only preserved for a period going back two years from the date of a request for them.

It is also relevant to the court's analysis that in April 2019 plaintiff tried to obtain emails between Dr. Schaefer and three of the dismissed defendants, Dr. Remaley, Dr. Shamburek, and Mr. Auerbach, by subpoenaing the National Institutes of Health (NIH). (#151 at 4.) According to plaintiff, this subpoena yielded "a limited amount of correspondence by Dr. Schaefer" and the other three individuals. *Id*. At oral argument, plaintiff's counsel stated that he had subpoenaed "all emails and documents that concern the initiation, the crafting, the implementation and the subsequent treatment under the protocol of my client, and so that's in essence, what we asked, I

---

being planned, through the time that Mr. Ward participated in the study. At oral argument plaintiff stated that "this important time period" was from 2010 "all the way up through [Mr. Ward's] treatment," which took place from January to September 2013. (#171 at 23.) Thus, whether more recent emails are recoverable is not at issue here.

think, the NIH to produce." (#171 at 12.) The court does not know the date range requested. The earliest date of the NIH correspondence was April 29, 2013. *Id.*[5]

Shortly after plaintiff subpoenaed the emails from Tufts University and Boston Heart Diagnostics, defendant filed an emergency motion for a protective order, because plaintiff had notified him that Boston Heart Diagnostics had sent plaintiff more emails than the subpoena had requested, including emails that were protected by the attorney-client privilege. (#114 at 1, 5.) After a hearing, the court ordered defendant to go through the emails, provide any relevant emails to plaintiff, and generate a privilege log. (#122.) The court ordered plaintiff not to review further the emails received from Boston Heart Diagnostics. *Id.*

Plaintiff moved for sanctions against defendant under Fed. R. Civ. P. 37(e) for deleting emails. (#117 at 1.) The court found that plaintiff's argument that Dr. Shaefer reasonably foresaw litigation and deliberately destroyed his emails was premature and held that plaintiff could raise the issue again if further facts were developed. (#122.) In the following months, in response to filings by the parties, the court reviewed, *in camera*, emails that defendant claimed were privileged, made findings concerning the relevance of certain other emails (#126), reviewed, *in camera*, additional emails that defendant claimed were privileged (#149), and ordered that certain emails be turned over to plaintiff. (#154.)

Plaintiff renewed his motion for sanctions. (#151 at 1.) The court held a final hearing on this matter on July 16, 2019 (#166), after which the parties filed memoranda. (##167, 168.)

---

[5] Plaintiff filed a memorandum that includes a chart setting out the emails he has in his possession, which shows that other than the emails he provided, he does not have any emails from the NIH, Tufts University, or Boston Heart Diagnostics dated before 2013. (#162 at 3-5.)

III. <u>Facts</u>.

A. <u>Mr. Ward participates in the drug trial</u>.

One of the dismissed defendants in this case, Bruce Auerbach, was an officer and principal of another dismissed defendant, AlphaCore Pharma, LLC. (#1-1 at 1.) In 2012, AlphaCore was the sole patent licensee of the experimental drug that Mr. Ward was given, a recombinant human LCAT called ACP-501. *Id.* at 3.[6] Former defendants Robert Shamburek and Alan Remaley are physicians employed by the United States Department of Health and Human Services, at the NIH in Bethesda, Maryland. *Id.* at 1-2. These two doctors conducted a limited study of ACP-501 in 2012, in which they determined that a single injection of ACP-501 in 16-18 human subjects was safe. *Id.* at 4.

Dr. Schaefer first saw plaintiff for his LCAT deficiency in July 2010, and he met with him monthly through 2012 "to explore treatment options." (#120-1 at 5; #120-5 at 8.) According to the complaint, sometime in 2012, Dr. Schaefer introduced Mr. Ward to Dr. Remaley, Dr. Shamburek, and Mr. Auerbach of AlphaCore, as an "ideal research subject for ACP-501." (#1-1 at 4.)

AlphaCore was granted an orphan drug designation for ACP-501 and a compassionate use protocol was approved so that Mr. Ward could take the drug. *Id.* at 5. The complaint alleges that Dr. Schaefer, Dr. Remaley, Dr. Shamburek and Mr. Auerbach together fraudulently induced him to participate in the trial, by assuring him that the drug would reverse his advanced kidney disease, when in fact, they knew that its real value was as a potential breakthrough for the treatment of

---

[6] LCAT is a plasma enzyme secreted by the liver and associated with high density lipoprotein cholesterol (HDL-D), the so-called "good cholesterol." (#1-1 at 3.) LCAT is a component in the reverse cholesterol transport system, the process by which cholesterol in the arterial wall is transported to the liver for excretion from the body, and as of 2012, it was considered to be critical in the management of HDL-C levels. *Id.*

cardiovascular disease. *Id*. Mr. Ward alleges that they hoped that by experimenting on him to his detriment, they could accumulate favorable data that would help them sell AlphaCore to a "pharmaceutical conglomerate." *Id*. at 5-6.[7]

Although the record is not completely clear concerning the role of Dr. Schaefer in Mr. Ward's treatment at the NIH, it appears that the Clinical Protocol for Mr. Ward's treatment designated Dr. Shamburek as the principal investigator, Dr. Remaley as the safety-review investigator, and Dr. Schaefer as the medical monitor. (#1-1 at 10.)[8]

Mr. Ward began the trial at the NIH in Maryland in January 2013 and stopped participating in September 2013. *Id*. at 6, 14. The trial was "painful, grueling, and confining." *Id*. at 7. Mr. Ward had to stay in a closed room for twenty-four hours at a time; he had his blood drawn as many as thirty-two times in one day; and he suffered serious, life-threatening side effects as a result of the treatment. *Id*.

---

[7] Although plaintiff alleges that the only purpose of the treatment he was given was to establish the efficacy of ACP-501 as a treatment for cardiovascular disease, in 2011, two years prior to Mr. Ward's participation in the trial, Dr. Schaefer and several other physicians published a paper, (with Mr. Ward listed as a co-author), about LCAT deficiency, in the Journal of Clinical Lipidology. (#30-1 at 2, 7.) The paper concluded that "[i]n the future, the use of recombinant LCAT may be of value in patients who develop significant renal impairment." *Id*. at 2. With regard to whether the experimental treatment had any effect on Mr. Ward's kidney disease, in a letter from Dr. Schaefer dated April 21, 2015, to Dr. Michael Sack of the NIH, (in which Dr. Schaefer complains about Dr. Shamburek's refusal to give Dr. Schaefer information about the results of Mr. Ward's treatment), Dr. Schaefer states that initially, the treatment seemed to go well, but that Mr. Ward deteriorated in the latter part of the study when his dosage of LACT therapy was reduced. (#151-3 at 4-5.)

[8] In the letter Dr. Schaefer wrote to Dr. Sack of the NIH, he complained about Dr. Shamburek's actions with regard to the study in which Mr. Ward participated. Dr. Schaefer stated that even though he was the "referring physician," and he felt "it was [his] right" to evaluate Mr. Ward "during the therapy he got at NIH," in fact he "never received any feedback or data from Dr. Shamburek about the results of his investigations." (#151-3 at 5.)

The complaint alleges that the only effect the trial had on Mr. Ward was to worsen his kidney disease, because while he was participating in the trial, Mr. Ward was not able to be on much-needed dialysis. *Id*. at 11. According to the complaint, Dr. Shamburek and Dr. Remaley both falsely told him that the trial was improving his kidney function, and they counseled him to remain in the trial and not have dialysis. *Id*. After April 2013, according to the complaint, Dr. Shamburek stopped sharing blood test data with Dr. Schaefer and "otherwise stopped communicating with [Dr. Schaefer]." *Id.* at 14.

In September 2013, Mr. Ward's nephrologist, Dr. Valerie Price, and Dr. Schaefer told Mr. Ward that he would have to stop the treatment and have dialysis. *Id*. Dr. Schaefer told Mr. Ward that the treatment "wasn't working and so [Mr. Ward] should drop out." (#120-5 at 19.) After he dropped out, Dr. Shamburek left an angry voicemail on Mr. Ward's telephone, yelling at him for stopping the treatment. (#1-1 at 16-17.)

In April 2013 a company called MedImmune purchased AlphaCore for $20 million. *Id*. at 12.[9] Mr. Ward alleges that the sale price was based principally on the results of the trial in which Mr. Ward alone was participating. *Id*. The complaint alleges that AlphaCore was "a private company," and "[n]one of its shareholders, whether private entities or individuals, have ever been made public." *Id*. at 12. The purchase price, according to Mr. Ward, was also never made public, although Dr. Schaefer knew what the sale price was, because he eventually told Mr. Ward about it. *Id*. Plaintiff alleges that Dr. Schaefer and the other defendants, "acting in concert," were owners of AlphaCore or "otherwise benefitted materially from the sale" of AlphaCore "in secret." *Id*.

---

[9] MedImmune, LLC is a subsidiary of AstraZeneca. (#1-1 at 2.)

B. <u>The meetings in September and October 2014, and Dr. Schaefer's emails pertaining to the meetings.</u>

Dr. Schaefer and Mr. Ward had a close relationship: Mr. Ward describes Dr. Schaefer as taking him "under his wing," and being a "father figure" to him. (#120-5 at 20.) In 2010, soon after Mr. Ward began seeing Dr. Schaefer for his LCAT deficiency, Mr. Ward sent Dr. Schaefer an email asking him to consider him for employment. *Id*. Dr. Schaefer paid Mr. Ward $500 per month for one to three hours of work a week, although Mr. Ward said he did not have any specific duties. *Id*.[10] He continued working for Dr. Schaefer until 2015. (#120-4 at 167, 182.)

Mr. Ward testified at his deposition that on September 11, 2014, he was having his monthly meeting with Dr. Schaefer, when, with a "scowl, [an] ugly look on his face," Dr. Schaefer told him that "based on [Mr. Ward's] records," AlphaCore had been sold to a pharmaceutical conglomerate for $20 million. (#120-5 at 17.) Dr. Schaefer told Mr. Ward that his "participation was worth at least 10% or $2 million, and [Dr. Schaefer] said to call Bruce Auerbach, talk to him about it[,] and appeal to his conscience [to be compensated] because [Dr. Schaefer] said [Mr. Ward] spent" a lot of time and "went through hell" during the trial. *Id*.

Mr. Ward said he was "totally shocked" at this news and "needed to talk to a lawyer," and so after the meeting on September 11th he contacted his sister, Virginia Ward, who is an attorney. (#117-3 at 5, 7-8.) Mr. Ward met with Dr. Schaefer again, together with his sister, on September 23, 2014. *Id*. at 7. Mr. Ward testified at his deposition that at the meeting, Dr. Schaefer told them that "Bruce Auerbach and the AlphaCore drug company had taken [Mr. Ward's] medical records at the NIH hospital and misused them to make a $20 million sale of the AlphaCore drug to the

---

[10] Mr. Ward has an undergraduate degree from Boston University in electrical engineering as well as "advanced degrees in education and law." (#79-15 at 2.) In his email, he asked Dr. Schaefer for "employment wherever you have need, be it laboratory or administrative work." *Id*.

giant drug company AstraZeneca." *Id*. at 8. When, during the ensuing discussion, Dr. Schaefer explained that Mr. Ward had been treated with a "heart drug" rather than one to address his kidney failure, Mr. Ward's sister became agitated, and Dr. Schaefer, saying "he felt blind-sided," ended the meeting. *Id*. at 10-11.

On September 23, 2014, the same day he met with Mr. Ward and his sister, Dr. Schaefer emailed Mr. Auerbach, copying Mr. Ward and his sister on the email, and told Mr. Auerbach that Mr. Ward and his sister had met with him that day, "and they asked about compensation for [Mr. Ward's] time and efforts" in connection with the trial. (#105-1 at 2.) Dr. Schaefer said that he had told Mr. Ward and his sister that "possibly AlphaCore would" compensate Mr. Ward, and asked Mr. Auerbach to let him know if he would consider doing so. *Id*.

The day after the September 23rd meeting, Virginia Ward emailed Dr Schaefer:

> Sorry for "blindsiding" you and being "aggressive," as you said.
>
> Please know how grateful we all are for the many good things you have done for Ed, not the least of which has been the simple giving of your precious time.
>
> Virginia.

(#117-5.)

According to Mr. Ward, at another meeting, on October 14, 2014, Dr. Schaefer told Mr. Ward that he "didn't need to sue" AlphaCore, and told Mr. Ward, "We'll just talk to Bruce [Auerbach] and appeal to his conscience." (#117-3 at 11.) Later that same day, Dr. Schaefer emailed Mr. Auerbach and Dr. Remaley, copying Mr. Ward and his sister, and reported that he "met today with [Mr. Ward] – and he indicated to me that he and his sister had no plans whatsoever to file suit against AlphaCore." (#109-1 at 20.) Dr. Schaefer wrote that his "position all along has

been" that "the patient does not have rights to intellectual property" because he participated in an "experimental treatment for which [he] signed a consent form." *Id.*

C. Mr. Ward files suit.

Mr. Ward testified at his deposition that he stopped working for Dr. Schaefer in the fall of 2015 because of fatigue. (#158-3 at 12.) On November 25, 2015, Mr. Ward, through an attorney, sent demand letters to Mr. Auerbach, Dr. Shamburek, Dr. Remaley, AlphaCore, MedImmune, and AztraZeneca. *Id.* at 13; #158-4 at 3. He explained at his deposition that he did not send one to Dr. Schaefer because "[a]t the time, [Mr. Ward] trusted him." (#158-3 at 14.)

Dr. Schaefer knew that plaintiff had sent the demand letters to the other defendants soon after they were sent. In an email dated December 14, 2015, Dr. Schaefer emailed Mr. Auerbach "material about the case of Mr. Edmund Ward" and stated, "As I indicated in the letter the case has no merit and I am happy to testify on your behalf." (#151-1 at 2.) The letter that Dr. Schaefer referenced in the email, dated December 15, 2015, is from Dr. Schaefer, addressed to Mr. Auerbach. (#151-1 at 3-4.) It sets out in detail Dr. Schaefer's disagreements with facts asserted in Mr. Ward's November 25, 2015 demand letter. *Id.* In the letter, Dr. Schaefer concluded that he did not feel that "AlphaCore or the NIH took advantage of Mr. Ward [in connection with the treatment]. He was a willing participant in a protocol for which he gave totally informed consent." *Id.* Dr. Schaefer also posited that he thought "the case was primarily brought by the family because of financial hardship and because of Edmund Ward's lack of trust in Dr. Shamburek's honesty." *Id.*

In March 2016, Mr. Ward received a W-2 from Dr. Schaefer for his work during the previous year. (#158-3 at 13.) Attached to the W-2 was a letter from Dr. Schaefer, in which Dr. Schaefer informed Mr. Ward that he would testify against Mr. Ward in his lawsuit against

AlphaCore. *Id*. At his deposition, Mr. Ward said when he received the letter from Dr. Schaefer, he decided to sue him, too. *Id*. He said that "what finally hit it, what brought the whole thing down" was the letter: "When I saw that, he's a coconspirator. Why would he write such a thing? . . . [H]e basically said, I am a fellow defendant, so he was brought in as a defendant." *Id.* at 14.

The suit against all the defendants, including Dr. Schaefer, was filed in Massachusetts state court on July 28, 2016. (#1-1 at 1.) Dr. Schaefer states in an affidavit that prior to receiving the summons and complaint for the lawsuit, he did not anticipate that he would be sued. (#158-1 at 3.)

## IV. The Law Concerning Spoliation.

To support an inference of spoliation, the party urging that spoliation has occurred must show that there is evidence that has been spoiled, as well as "that the opposing party had notice of a potential claim and of the relevance to that claim of the destroyed evidence." *Gomez v. Stop & Shop Supermarket Co.*, 670 F.3d 395, 399 (1st Cir. 2012) (citing *Blinzler v. Marriott Int'l, Inc.*, 81 F.3d 1148, 1158-59 (1st Cir. 1991)); *Testa v. Walmart Stores, Inc.*, 144 F.3d 173, 177 (1st Cir. 1998). Whether a party "reasonably foresaw litigation" is an objective standard, which asks "whether a reasonable party in the same factual circumstances would have reasonably foreseen litigation." *Micron Tech, Inc. v. Rambus Inc.*, 645 F.3d 1311, 1320 (Fed. Cir. 2011) (citation omitted); *Ann Rivera v. Sam's Club Humacao*, Civil No. 16-2307 (ADC), 2018 WL 4705915, at *7 (D.P.R. Sept. 28, 2018).

Fed. R. Civ. P. 37(e), effective as of December 1, 2015, addresses the failure to preserve ESI.[11] It permits the court to impose sanctions "[i]f electronically stored information that should

---

[11] Fed. R. Civ. P. 37(e) provides in full:

Failure to Preserve Electronically Stored Information. If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed

have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery . . . ." *Id.* "Where electronically-stored information is lost due to the negligence or gross negligence of a party, amended Rule 37(e)(1) permits only the imposition of sanctions that are 'no greater than necessary to cure the prejudice.'" *Hefter Impact Techs., LLC v. Sport Maska, Inc.*, Civil No. 15-13290-FDS, 2017 WL 3317413, at *6 n.3 (D. Mass. Aug. 3, 2017) (quoting Fed. R. Civ. P. 37(e)(1)). Where the court finds that a party acted with the intent to deprive another from using ESI in litigation, a court may presume that the lost information is unfavorable to the party, issue an adverse inference instruction, dismiss the action, or enter a default judgment. Fed. R. Civ. P. 37(e)(2).

Rule 37(e) requires that the court find that the loss of the evidence prejudiced the moving party. Fed. R. Civ. P. 37 (e)(1). The court has "discretion to determine how best to assess prejudice in [a] particular case[.]" Fed. R. Civ. P. 37(e) Advisory Committee Notes (2015 Amendment). Rule 37(e)(1) does not "place a burden of proving or disproving prejudice on one party or the other." *Id.* To show prejudice resulting from spoliation, "a party must only 'come forward with plausible, concrete suggestions as to what [the destroyed] evidence might have been.'" *Micron Tech.*, 645 F.3d at 1328 (quoting *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 80 (3d Cir.

---

to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

(1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

(2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

  (A) presume that the lost information was unfavorable to the party;

  (B) instruct the jury that it may or must presume the information was unfavorable to the party; or

  (C) dismiss the action or enter a default judgment.

1994)); *TLS Mgmt. & Mktg. Servs. LLC vs. Rodriguez-Toledo*, Civil No. 15-2121 (BJM), 2017 WL 1155743, at *1 (D.P.R. Mar. 27, 2017).

V. <u>Discussion</u>.

A. <u>The sanction of a default judgment is not warranted</u>.

The court finds that the entry of a default judgment against Dr. Schaefer is not warranted at this time. Plaintiff has not shown that Dr. Schaefer reasonably anticipated litigation at the time he deleted possibly relevant emails or that plaintiff was prejudiced from loss of the information. Fed. R. Civ. P. 37(e). The court notes that the limited facts that have been presented to the court at this stage of the case may be further developed at trial. The trial judge will have discretion to admit evidence of spoliation at trial; it will be up to the trier of fact to decide what inferences to draw from that evidence; and it will be up to the judge then to determine whether an instruction or other sanction is warranted. *See Testa,* 144 F. 3d at 178; *Blinzler*, 81 F.3d at 1158-59.

1. <u>Dr. Schaefer did not reasonably anticipate litigation until 2016</u>.

"When litigation is 'reasonably foreseeable' is a flexible fact-specific standard that allows a district court to exercise the discretion necessary to confront the myriad factual situations inherent in the spoliation inquiry." *Micron Tech.*, 645 F.3d at 1320 (citation omitted). It is an objective standard, that asks "whether a reasonable party in the same factual circumstances would have reasonably foreseen litigation." *Id*. While the mere existence of a potential claim will not trigger a duty to preserve evidence, litigation need not be "imminent" for the duty to preserve to arise. *Id*.

Plaintiff asserts that Dr. Schaefer should have reasonably foreseen that he was going to be a party at least from the date of his September 23, 2014 meeting with him and his sister. (#117 at 5.) He argues that a reasonable person would have anticipated being sued because he brought his

14

sister, an attorney, to the September 23rd meeting; because the meeting was confrontational; because Dr. Schaefer emailed Mr. Auerbach after the meeting asking if AlphaCore would compensate Mr. Ward; and because Dr. Schaefer later emailed Mr. Auerbach, after the second meeting with plaintiff on October 14th, and told him that plaintiff was not going to sue. *Id.* at 5-6.[12]

The facts in their entirety are more complicated. First, according to Mr. Ward, it was Dr. Schaefer who informed him about the sale of AlphaCore, telling him the purchase price and suggesting to him that he should receive compensation. (#120-5 at 17.) These are hardly the actions of someone who feared being sued if Mr. Ward knew about the sale of AlphaCore. Second, the presence of Virginia Ward at the September 23rd meeting was not so unusual as to signal to Dr. Schaefer that he might anticipate being named as a defendant in some future action: as Dr. Schaefer points out, Virginia Ward, who was close to her brother and helped care for him, was present at numerous medical appointments and meetings with her brother and Dr. Schaefer between 2010 and 2014, and even "spent one month at the NIH with [Mr. Ward]." (#120 at 8.) Although the September 23rd meeting apparently became confrontational, Virginia Ward followed it with an apologetic email, expressing her gratitude to Dr. Schaefer for his spending his "precious time" with her brother, another fact that would lead a reasonable person to believe that he was on friendly terms with Mr. Ward. (#117-5.)

Finally, after the second meeting with Mr. Ward on October 14, 2014, Dr. Schaefer emailed Mr. Auerbach, copying Mr. Ward and his sister, and informed him that Mr. Ward "had no plans whatsoever to file suit against AlphaCore." (#109-1 at 20.) He also stated his position in the email

---

[12] Mr. Ward's last argument is implausible, given that the second meeting occurred on October 14th, nearly one month after the first meeting on September 23rd.

that he thought Mr. Ward did not have a legal basis to sue. *Id.* Plaintiff has not argued that Dr. Schaefer misunderstood Mr. Ward's intentions when he stated that Mr. Ward did not intend to file a lawsuit. The court will not find that Dr. Schaefer reasonably would have surmised that because Mr. Ward told him that he did *not* plan to sue AlphaCore, Mr. Ward *was* going to sue AlphaCore, and in addition, that Dr. Schaefer himself would also become a defendant.

Mr. Ward continued to work for Dr. Schaefer for another year, until the fall of 2015, when, as he said, he stopped working due to fatigue, not because of any disagreements with Dr. Schaefer. (#158-3 at 12.) When he did eventually sue the other defendants, months after he left Dr. Schaefer's employ, he did not include Dr. Schaefer in the suit, a fact of which Dr. Schaefer was aware. (##151-1 at 2; 158-3 at 14.) It was only in March 2016, when Mr. Ward received a letter from Dr. Schaefer telling him that Dr. Schaefer would be a witness for the defendants in the lawsuit, that Mr. Ward decided to sue Dr. Schaefer, too. *Id.* at 13. At this time, Dr. Schaefer obviously did not think he was vulnerable to being sued; otherwise he would not have sent Mr. Ward the letter, telling him he was going to be a witness against him in the pending lawsuit. Further, it was reasonable for Dr. Schaefer to believe he would not be sued, as three years had passed since Mr. Ward had been in the study and by Mr. Ward's account, Mr. Ward had never displayed any hostility to Dr. Schaefer, or intimated to him that he was going to be named in the lawsuit.

The court finds that Dr. Schaefer reasonably foresaw litigation and was obligated to preserve his emails at the time he learned he was a defendant, around July 2016. (##1-1 at 1; 158-1 at 3.) This is not a case where a clear duty to preserve evidence arises almost contemporaneously with an event. *See Vargas Alicea v. Cont'l Cas. Co.*, Civil No. 15-1941 (PAD/BMJ), 2018 WL 1441229, at *2 (D.P.R. Mar. 21, 2018) (holding that in connection with an accident at a dialysis

center where a patient fell, 911 was called, and the patient was taken to a hospital, defendant knew there was the potential for litigation the morning after the accident, when the attending nurse filled out an Adverse Event Form and then destroyed her notes which she had written right after the event); *Jimenez-Sanchez v. Caribbean Rests., LLC*, 483 F. Supp.2d 140, 143-44 (D.P.R. 2007) (potential for litigation plain when plaintiff lost the skin of her lips and then went to see a doctor); *Pelletier v. Magnusson*, 195 F. Supp.2d 214, 236 (D. Me. 2002) (holding that prison death made it "almost self-evident" that criminal or civil charges would ensue). Here, a long progression of events unfolded over a period of years, none of which put Dr. Schaefer on notice that he was going to be a defendant. In the end, it seems that the suit against Dr. Schaefer was triggered by his informing Mr. Ward in March 2016 that he would be an adverse witness against him. Even then, there is no evidence that Mr. Ward or anyone else communicated to Dr. Schaefer that Mr. Ward had decided to sue him, until Dr. Schaefer received notice of the suit months later.

If Dr. Schaefer did not reasonably apprehend that he was a defendant in the case until June 2016, then one cannot fault him for failing to preserve the emails that plaintiff seeks. While Mr. Ward's initial discovery request was without any temporal limitation, (*see* #102-1 at 5-6), as this issue developed, Mr. Ward made clear that he sought emails from Dr. Schaefer that preceded Mr. Ward's participation in the study and went through his completion of the study, that is, from 2010 through 2013. (#171 at 8, 23.) Tufts University and Boston Heart Diagnostics seem only to have kept deleted emails going back two years. Therefore, even if Dr. Schaefer had tried to recover his deleted emails from those institutions as soon as he knew he was a party in June 2016, he would only have recovered emails back to 2014, which is outside of the time period in which plaintiff has an interest. Thus, the court finds that given the date on which defendant reasonably was put on notice that he was being sued, he did not destroy potentially relevant emails.

2. Plaintiff has not established prejudice.

Even if the court were to find that Dr. Schaefer reasonably anticipated litigation prior to July 2016, it is still not clear what evidence is missing. Mr. Ward must "come forward with plausible, concrete suggestions as to what [the destroyed] evidence might have been." *Micron Tech.,* 645 F.3d at 1328 (internal citations and quotation marks omitted). This is not a case in which a destroyed item's potential relevance is obvious. *See, e.g.*, *Testa*, 144 F.3d at 177 (holding that relevance established where company destroyed purchase order for delivery on date of plaintiff's injury, and company's "defense from the start was anchored on the premise that it had no reason to anticipate any deliveries on the day in question"); *Blinzler*, 81 F.3d at 1158-59 (finding potential relevance where hotel destroyed log of outgoing phone calls from day of hotel guest's death, when hotel knew of guest's death and of plaintiff spouse's "persistent attempts" to discover when the hotel placed the call for emergency aid).

Here, plaintiff does not point to any specific document that is missing, but argues that Dr. Schaefer's deleted emails "likely included" evidence of the following: Dr. Schaefer's misrepresentations to Mr. Ward regarding the safety, efficacy, and proper uses of the drug that was administered to Mr. Ward; Dr. Schaefer's collusion with the dismissed defendants in inducing Mr. Ward to participate in the study; Dr. Schaefer's financial interests in Mr. Ward's participation in the study and in "the dismissed corporate defendants"; Dr. Schaefer's knowledge of Mr. Ward's advanced kidney disease and the impropriety of prescribing the treatment for Mr. Ward; "the necessity of excluding" Mr. Ward from the study; and "the knowledge that the treatment would hasten Mr. Ward's death." (#117 at 9.) Unfortunately, this list, which reads like a wish list of the evidence that Mr. Ward would like to put forward at trial, does not translate into the kind of "concrete suggestions" that the law requires. It is too speculative. *See Booker v. Mass. Dept. of*

*Pub. Health*, 612 F.3d 34, 47 (1st Cir. 2010) (holding that spoliation instruction not warranted, where plaintiff showed that employees routinely deleted emails, "some of which may have concerned" her, but produced no evidence that defendants destroyed emails with knowledge that they were relevant to claims).

Another problem with plaintiff's argument is that he has never clearly articulated whose communications with Dr. Schaefer he seeks. While some of the names listed on the original discovery request are familiar to the court, such as those of the dismissed codefendants, plaintiff has never elaborated on the identities of many of the persons on that list, and the court does not know how discovery of Dr. Schaefer's emails with these people might assist plaintiff's case. (#102-1 at 5-6.) In September 2019, when plaintiff sent subpoenas to Boston Heart Diagnostics and Tufts University for deleted emails, he narrowed the list to twenty-three persons and entities. (##114-5 at 6-7; 120-3 at 7.) This list not only includes plaintiff, his sister, Virginia Ward, and the dismissed codefendants, but also other persons whose relation to the case has not been explained. (#120-3 at 7.) Since the court does not know the relevance of Dr. Schaefer's correspondence with many of the individuals listed on the subpoena, the court here will address the potential loss of emails to and from plaintiff, his sister, Virginia Ward, and the dismissed codefendants.

The question of what prejudice plaintiff has suffered by the destruction of evidence overlaps with another question that Rule 37(e) requires the court to answer, which is whether lost evidence can be restored or replaced through additional discovery. *See Wai Feng Trading Co. Ltd v. Quick Fitting, Inc.*, Civil No. 13-33-WES, 2019 WL 118412, at *5 (D.R.I. Jan. 7, 2019) ("To trigger the application of Fed. R. Civ. P. 37(e) to a claim of lost ESI, the movant must establish, first, that ESI has been lost and is not available in any other location."). Presumably, emails from Dr. Schaefer to Mr. Ward and his sister, which plaintiff seeks in order to demonstrate "Dr.

Schaefer's misrepresentations to Mr. Ward regarding the safety, efficacy, and proper uses of the drug that was administered to Mr. Ward" (#117 at 9), are in the possession of Mr. Ward and his sister. At oral argument, plaintiff stated that he has never attempted to obtain emails from Mr. Auerbach. (#171 at 16.) Although plaintiff's subpoena to the NIH did not result in the production of emails dated before 2013, the court presumes that plaintiff has deposed Dr. Ramaley and Dr. Shamburek and has learned whether they have email accounts in addition to their accounts at the NIH that might be subpoenaed. Information about Dr. Schaefer's financial interests in the sale of AlphaCore should be available by means of discovery other than emails, including Dr. Schaefer's deposition testimony.

In sum, the court cannot find that under Rule 37(e), Mr. Ward has made the showing necessary to establish that a default judgment is warranted.

B. The motion for an adverse inference instruction is for the trial judge.

As stated above, whether the evidence at trial will warrant the giving of an adverse inference instruction to the jury is a question for the trial judge. *See Booker*, 612 F.3d at 47. That motion should be denied without prejudice.

## VI. Conclusion.

For the reasons stated, the court recommends that plaintiffs' motion for a default judgment, #151, be denied, and that his motion for an adverse inference instruction to the jury be denied without prejudice.

## VII. Review by the District Judge.

The parties are hereby advised that any party who objects to this recommendation must file specific written objections with the Clerk of this Court within fourteen days of service of this Report and Recommendation. The objections must specifically identify the portion of the

recommendation to which objections are made and state the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b), Federal Rules Civil Procedure, shall preclude further appellate review. *See Keating v. Sec'y of Health & Human Servs.*, 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *see also Thomas v. Arn*, 474 U.S. 140 (1985).


                                                 /s/ M. Page Kelley
                                                 M. Page Kelley
September 18, 2019                                  United States Magistrate Judge