UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EDMUND EDWARD WARD, | ) |
| Plaintiff | ) |
| V. | ) CIVIL ACTION NO. |
| | ) 1:16-cv-12543-FDS |
| ERNST J. SCHAEFER, M.D., | ) |
| Defendant. | ) May 4, 2020 |

**PLAINTIFF'S STATEMENT OF DISPUTED MATERIAL FACTS**

Under Local Rule of Civil Procedure 56.1, the Plaintiff, Edmund Edward Ward,

hereby submits this concise statement of the material facts of record as to which there

exists a genuine issue to be tried in opposition to the Motion for Summary Judgment filed

by the Defendant Dr. Schaefer on April 13, 2020, Dkt. 190. For ease of reference, and for

the purposes of this motion only, the Plaintiff responds to the alleged facts as being either

disputed or undisputed.

**RESPONSE TO THE STATEMENT OF MATERIAL FACTS FILED BY DR.
SCHAEFER IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT. DOC.
190-1:**

1.This is an action for alleged intentional misrepresentation, lack of informed

consent, unjust enrichment, violations of the Due Process Clause of the United States

Constitution, the Nuremberg Code, and the Due Process Clause of the Constitution and

Declaration of Rights of the Commonwealth of Massachusetts, violation of the

Massachusetts Civil Rights Act, and civil conspiracy brought by the Plaintiff, Edmund

Ward ("Mr. Ward" or "Plaintiff"), against Dr. Ernst Schaefer ("Dr. Schaefer" or

"Defendant"). *See* Plaintiff's Complaint, attached as Ex. 1.

**RESPONSE:** Undisputed that this is an action for Fraud in the Inducement/

Deceit/Intentional Misrepresentation in Count I of the Complaint; Breach or Lack of

Informed Consent in Count II ; Unjust Enrichment in Count III; Violations of the Due

Process Clause of the United States Constitution, the Nuremberg Code, and the Due

Process Clause of the Constitution and Declaration of Rights of the Commonwealth of Massachusetts in Count IV; Violation of the Massachusetts Civil Rights Act in Count V; and Civil Conspiracy in Count VI. *See* Doc. 190-4.

2. The Plaintiff alleges that Dr. Schaefer fraudulently induced him to participate in a Compassionate Use Protocol (hereinafter "the Protocol") at the National Institutes of Health (NIH) by informing him that, among other things, recombinant LCAT enzyme could reverse his declining kidney function. *See* Affidavit of Edmund Ward (without exhibits), attached as Ex. 2. Mr. Ward alleges that as a result of his participation in the Protocol, he did not experience reversal of his kidney disease (Ex. 2, at ¶ 11), he lost 11 months of dialysis (Ex. 2, at ¶ 12), suffered physical pain and discomfort (Ex. 2, at ¶¶ 13-4 and 16), suffered extensive confinement at the NIH (Ex. 2, at ¶ 15), and suffered severe mental anguish, depression, and stress (Ex 2, at ¶ 17).

**RESPONSE:**        Disputed in part. Plaintiff also alleges that Dr. Schaefer:

> fraudulently induced him to participate and to remain in the experimental study of ACP-501 by, among other conduct:
>
> a.        Representing that ACP-501 would effectively reverse his advanced kidney disease;
>
> b.        Representing, when the existing stock of ACP-501 was allegedly dwindling, that a lower dose of ACP-501 was the optimal dose, and that AlphaCore would produce more of the product to enable Mr. Ward to remain in the study at a higher dose;
>
> c.        Failing to explain and describe the study as a non-therapeutic "human experiment," and instead representing it to be therapeutic in nature;
>
> d.        Failing to disclose the financial and professional motives, and the clear conflicts of interest, for the experimental study, *viz.* to speed up to market ACP-501 to prevent and treat coronary artery disease and, consequently, to sell ACP, the sole exclusive licenses of the '614 patent, to a pharmaceutical conglomerate such as AZ.

Doc. 190-4 at 19-20.

Plaintiff testified: "I enrolled and participated in the compassionate use protocol from January 2013 to October 2013, and my kidney disease was not reversed." Doc. 190-5 at ¶11.

Plaintiff further testified : "As a result of Dr. Schaefer's recommended course of treatment, I lost eleven months of dialysis treatments," "suffered a massive cardiac episode lasting three days at the NIH," "suffered side effects," "suffered an extensive confinement at the NIH," "regularly experienced physical pain and discomfort," and "suffered severe mental anguish, depression, and stress." Doc. 190-5 at ¶¶ 12-17.

3. Dr. Schaefer is a physician licensed to practice medicine in the Commonwealth of Massachusetts. *See* Deposition of Dr. Schaefer, Vol. I, at 21:15, attached as Ex. 3. Dr. Schaefer is Board Certified in Internal Medicine with a subspecialty in lipidology by the National Lipid Association. *See* Ex. 3, at 21:24-22:2.

**RESPONSE:**      Undisputed that Dr. Schaefer is a physician currently licensed in good standing to practice medicine in the Commonwealth of Massachusetts who is Board Certified in Internal Medicine with a subspecialty in lipidology; disputed that Dr. Schaefer was a physician licensed in good standing to practice medicine in the Commonwealth of Massachusetts during the allegations of the Complaint between April 12, 2006 and July 17, 2013 as his license was under probation by the Massachusetts Board of Discipline during that interval for engaging in boundary violations with a patient. *See* Mass. Bd. of Discipline Case No. 2005-019, attached as Ex. 1.

4. From 1975 to 1982, Dr. Schaefer completed his fellowship in Endocrinology at the NIH before becoming an investigator and staff associate. *See* Ex. 3, at 19:1-20:10. Dr. Schaefer has not worked at the NIH since 1982. *See* Ex. 3, at 23:7.

**RESPONSE:**      Disputed that from 1975 to 1982 Dr. Schaefer completed his

fellowship in Endocrinology at the NIH before becoming an investigator and staff associate. Dr. Schaefer testified he "was a staff associate; I did an endocrine fellowship; and I also was a senior investigator" at the National Institutes of Health between 1975 and 1982. Doc. 190-6 at 6, lns. 19:17-23. Dr. Schaefer's curriculum vitae also states that between 1975 and 1982, he was a staff associate, then an endocrinology fellow, then a senior investigator at the NIH. Dr. Schaefer Curriculum Vitae, attached as Ex. 2, at 3.

Disputed that Dr. Schaefer has not worked at the NIH since 1982. Dr. Schaefer testified that, in January 2013, he met at the NIH with Dr. Remaley, Dr. Shamburek, and Mr. Ward during Mr. Ward's evaluation for participation in the Protocol; discussed Mr. Ward's evaluation; and gave a seminar on HDL deficiency. Doc. 190-6 at 31-2, lns: 120:22-123:16. Further, Dr. Schaefer's curriculum vitae states that he worked at the NIH since 1982; he "served on the first and second adult treatment panels of the National Cholesterol Education Program of the National Institutes of Health, on the Nutrition Study Section, the Metabolism Study Section, and the Clinical Research Study Sections of the NIH, and the Nutrition Committee of the American Heart Association." Ex. 2 at 2; *see also id.* at 5 (reciting professional activities at National Institutes of Health between 1986 and 2008) [1]; *id.* at 6 (reciting National Institutes of Health research grants received by Dr. Schaefer between 1985 and 2013).[2]

---

[1] *E.g., "*Member, Parent Committee for Evaluation of National Demonstration and Education Programs in Arteriosclerosis, NHLBI, 1986"; "Member, National Cholesterol Education Program, First Expert Panel on Adult Detection and Treatment (ATP 1), National Heart, Lung and Blood Institute, National Institutes ofHealth,1986-1987."; "Member, Nutrition Study Section, National Institutes of Health, 1986-1990"; "Member, Policy Board, Atherosclerosis Risk in Communities, National Heart, Lung and Blood Institute, 1986-2007"; "Member, National Cholesterol Education Program, Second Expert Panel on Adult Detection and Treatment (ATP II), National Heart Lung and Blood Institute, National Institutes of Health, 1991-1992"; "Member, Metabolism Study Section, National Institutes of Health, 1995-2000; Chairman 1998-2000"; "Member, Clinical Research Review Committee and Study Section, NIH 2005-2008." Ex. 2 at 5.

[2] For five of the NIH research grants listed, Dr. Schaefer is named as the principal investigator of the resulting NIH publication. Ex. 2 at 6.

5. In 1982, Dr. Schaefer began working at Tufts University School of Medicine as an Associate Professor of medicine, the Director of a lipid and heart disease preservation clinic, and Lab Director of the Lipid Metabolism Laboratory. *See* Ex. 3, at 23:7-12; 24:17-18.

**RESPONSE:**     Undisputed.

6. In 2007, Dr. Schaefer co-founded Boston Heart Diagnostics (BHD), a private corporation organized under the laws of the Commonwealth of Massachusetts, with a principal place of business at 175 Crossing Boulevard, Suite 100, Framingham, Massachusetts. *See* Ex. 3, at 26: 15-17. Dr. Schaefer has served as the Chief Medical Officer (CMO) of BHD since 2007. *See* Ex. 3 at 27:1; *see* also Deposition of Dr. Schaefer, Vol. II, at 278:12, attached as Ex. 4.

**RESPONSE:**     Undisputed. Dr. Schaefer is also a shareholder. *See* April 4, 2016 Correspondence attached as Ex. 3.

7. Since 2015, when BHD was sold to Eurofins, Dr. Schaefer has been an employee of BHD, for which he is paid a salary. *Id*. at 26:18-22, 195:22-23.

**RESPONSE:**     Disputed. Dr. Schaefer testified that he has been an employee of Boston Heart Diagnostics since 2012. Doc. 190-7 at 15, ln. 278:12.

8. Mr. Ward was born with a rare genetic disorder, homozygous familial lecithin:cholesterol acyltransferase (LCAT) deficiency; Mr. Ward has Familial LCAT Deficiency (FLD). *See* Roshan, et al, Homozygous lecithin:cholesterol acyltransferase (LCAT) deficiency due to a new loss of function mutation and review of the literature, Journal of Clinical Lipidology, 5, 493-499, 493, 496 (2011), attached as Ex. 5; *see* also Audiovisual Deposition of Edmund Ward, at 19:15-16, attached as Ex. 6.

**RESPONSE:**     Undisputed. Dr. Schaefer presented the article "Homozygous lecithin:cholesterol acyltransferase (LCAT) deficiency due to a new loss of function mutation and review of the literature" reporting his diagnosis of Mr. Ward's FLD.

September 30, 2010 Correspondence, attached as Ex. 4. That article disclosed that Dr.

Schaefer's research is supported by research grants from the National Institutes of Health.

*Id.* When Dr. Schaefer later published that article in December 2011, Mr. Ward was added

as a co-author of the that article when published, although Mr. Ward testified that he had

no role in co-authorship. Doc. 190-8; Doc. 190-9 at 17, lns. 67:7-68:8.

9. Mr. Ward's medical history includes LCAT deficiency, chronic renal insufficiency,

hypertension, hyperthyroidism, atrial fibrillation, gout, warts, anemia and splenomegaly.

*See* Ex. 5, at p. 493.

**RESPONSE:**          Undisputed.

10. The National Institutes of Health (NIH) is a governmental agency that performs

research, provides clinical care and conducts clinical research studies. [FN1: *See* https://

www.nih.gov/.] The NIH is located in Bethesda, Maryland. [FN2: *See* https://www.nih.gov/

about-nih/visitor-information.]

**RESPONSE:**          Undisputed.

11. The plaintiff originally filed suit against two NIH physicians and the NIH was

substituted as a party in the instant matter. *See* Docket No. 50. The NIH was dismissed on

February 27, 2018 after the Court granted its Motion to Dismiss based on lack of subject

matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) and for failure to state a claim under

Fed. R. Civ. P. 12(b)(6). *See* Docket No. 80.

**RESPONSE:**          Undisputed that the Plaintiff filed suit against Dr. Alan

Remaley and Dr. Robert Shamburek, who were alleged to work at the NIH. Doc. 190-4 at

1-2. Undisputed that on July 10, 2017, the motion to substitute filed by the United States

as to Drs. Remaley and Shamburek was granted in part and denied in part. Doc. 50.

Undisputed that the motion to dismiss filed by the United States was granted due to a

ruling of sovereign immunity. *See* Doc. 80 at 10.

12.Alan Remaley, M.D. ("Dr. Remaley") is a senior investigator for the National

Heart, Lung and Blood Institute (NHLB), a division of the NIH. *See* Deposition of Dr.

Remaley, at 15:16-17, attached as Ex. 7. As senior investigator, Dr. Remaley conducts and

oversees research related to lipid and lipoprotein metabolism. *Id*. at 15:21-16:1. From 2010

up to the present, Dr. Remaley has been employed by the NIH. *Id*. at 15:10-14; 162:13-16.

      **RESPONSE:**      Undisputed.

13.The plaintiff originally filed suit against Dr. Remaley, but he was dismissed from

the instant matter on February 27, 2018 when the Court granted his Motion to Dismiss

based on a lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) and for

failure to state a claim under Fed. R. Civ. P. 12(b)(6). *See* Docket No. 80.

      **RESPONSE:**      Undisputed that the Plaintiff filed suit against Dr. Remaley.

Doc. 190-4 at 2. Undisputed that the motion to dismiss filed by Dr. Remaley was granted

due to a finding of absolute immunity. *See* Doc. 80 at 12.

14.Robert Shamburek, M.D. ("Dr. Shamburek") is a senior staff clinician and senior

research clinician for the NHLB. *See* Deposition of Dr. Shamburek, at 28:15, attached as

Ex. 8. Dr. Shamburek provides clinical care to patients in addition to writing, teaching and

performing administrative work. *Id*. at 29:3-8. From 2010 up to the present, Dr. Shamburek

has been an employee of the NIH. *Id*. at 15:1-4, 56:16, and 120:7-10.

      **RESPONSE:**      Undisputed.

15.The plaintiff originally filed suit against Dr. Shamburek but he was dismissed

from the instant matter on February 27, 2018 when the Court granted his Motion to

Dismiss based on lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) and

for failure to state a claim under Fed. R. Civ. P. 12(b)(6). *See* Docket No. 80.

      **RESPONSE:**      Undisputed that the Plaintiff filed suit against Dr. Shamburek.

Doc. 190-4 at 1. Undisputed that the motion to dismiss filed by Dr. Shamburek was granted

due to a finding of absolute immunity. *See* Doc. 80 at 12.

16. In May 2010, Mr. Ward was seen by nephrologist Bijan Roshan, M.D. ("Dr. Roshan") at Beth Israel Deaconess Medical Center (BIDMC). *See* BIDMC Medical Record of Edmund Ward dated 5/13/10, attached as Ex. 9. Dr. Roshan suspected a lipoprotein metabolism disorder, particularly LCAT deficiency, and referred Mr. Ward to Dr. Om Ganda. *Id*.; *see also* Ex. 6, at 17:8-12.

**RESPONSE:** Undisputed that Mr. Ward, at the referral of his primary care physician Dr. Edward Busick, Jr., was seen by Dr. Roshan, who wrote on May 13, 2010 that Mr. Ward's "significant opaque Cornea and extremely low HDL/LDL is suggestive of lipoprotein metabolism particularly LCAT deficiency." Doc. 190-12 at 3. Undisputed that Dr. Roshan referred Mr. Ward to Dr. Om P. Ganda of the Joslin Diabetes Center for a lipid assessment. *See* Patient Medical Record dated May 26, 2010, attached as Ex. 5, at 1.

17. Dr. Ganda, a physician specializing in lipid disorders at the Joslin Diabetes Center, ordered lipid studies at the BHD lab via Dr. Schaefer. *Id*. Dr. Schaefer is a leader in the field of lipidology and has published over 400 articles. *See* Ex. 6, at 173:1-6.

**RESPONSE:** Undisputed that Dr. Om P. Ganda is a physician specializing in lipid disorders and that Dr. Ganda ordered lipid studies at the BHD laboratory via Dr. Schaefer. Ex. 5 at 1, 3. Undisputed that Dr. Schaefer is a lipidologist who has published over 400 articles. *See* Ex. 2 at 6-39. Undisputed that Mr. Ward testified that he understood Dr. Schaefer to be "the world's foremost expert in the condition I have." Doc. 190-9 at 44-5, lns. 172:24-173:1. Mr. Ward further testified that he relied on Dr. Schaefer's expert advice regarding treatment at the NIH. Doc. 190-4 at 15, lns. 56:1-24.

18. DNA sequencing of the LCAT gene ordered by Dr. Schaefer showed a homozygous missense mutation of the LCAT gene, confirming FLD. *See* Ex. 5, at p. 495.

**RESPONSE:** Undisputed.

19. Patients with FLD have very low high-density lipoprotein (HDL), which removes cholesterol from tissues and returns it to the liver. *See* Ex. 3, at 42:10-18. As a result, patient's with FLD develop manifestations of the disorder, including corneal opacities, anemia, and renal disease. *See* Shamburek, et. al., Familial lecithin:cholesterol acyltransferase deficiency: First-in-human treatment with enzyme replacement, Journal of Clinical Lipidology, 10: 356-367 (2016), attached as Ex. 10. There is no effective treatment for end-stage renal disease except for dialysis or renal transplantation. *Id.* at 357; *see also* Ex. 8, at 22:16-22 and 39:20.

**RESPONSE:**          Disputed. LCAT is "a plasma enzyme secreted by the liver" that "helps maintain HDL levels" through a process called cholesterol esterification. Doc. 190-13 at 1-2. During cholesterol esterification, free cholesterol in plasma is formed into cholesterol esters, which accumulate in the core of HDL particles. *Id.* at 2. The resulting cholesterol esters are then removed by the liver directly or transferred other lipoprotein particles and cleared by the liver. *Id.* at 2.

Patients with FLD have a "total loss of LCAT activity," "a marked decrease in HDL cholesterol" and "often develop proteinuria as young adults and then go on to develop nephrotic syndrome and end-stage renal disease typically in their 40s and 50s." *Id.* at 2. "There is no effective treatment except for dialysis or renal transplantation, and the disease can rapidly reoccur in the transplanted kidney." *Id.*

20. There is no known cure for LCAT deficiency. *See* Ex. 5, Ex. 7, Ex 8, and Ex. 10. Patients with LCAT deficiency are usually treated symptomatically, which includes measures to control and/or prevent kidney disease. *See* Ex. 3, at 36:14-18.

**RESPONSE:**          Undisputed.

21. Mr. Ward requested to meet with Dr. Schaefer to discuss therapeutic options for his LCAT deficiency. *See* Email Correspondence from Mr. Ward to Dr. Schaefer, dated

6/18/10, attached as Ex. 11. They first met on July 1, 2010. *See* Ex. 6, at 19:9-13.

**RESPONSE:** Undisputed that Mr. Ward was referred by Dr. Bijan Roshan and Dr. Rose Ganim to Dr. Schaefer concerning a diagnosis of LCAT deficiency. Doc. 190-14. Undisputed that Mr. Ward requested an appointment to discuss therapeutic options. *Id.*

22. The United States has a patent, Patent No. 6,635,614 B1 (hereinafter "Patent"), for the use of Lecithin-Cholesterol Acyltransferase (LCAT) to reduce accumulation of cholesterol, which was assigned to the Department of Health and Human Services (DHHS). [FN3: The National Institutes of Health is part of the DHHS.] *See* Ex. 8, at 43:10-12; *see* Ex. 7, at 19:23. Dr. Schaefer was not involved in obtaining this Patent. *See* Ex. 3, at 207:5-8.

**RESPONSE:** Disputed. The United States holds a patent, Patent No. 6,635,614 B1, for the use of Lecithin-Cholesterol Acyltransferase (LCAT) to reduce "for decreasing accumulation of cholesterol in arteries in a human subject **not suffering from a lecithin:cholesterol acyltransferase ("LCAT") deficiency syndrome**," which was assigned to the Department of Health and Human Services, of which the NIH is a part. *See* Patent No. 6,635,614 B1, attached as Ex. 6 at 1(emphasis added). Undisputed that Drs. Remaley and Shamburek testified that AlphaCore Pharma, LLC licensed, manufactured, and owned the rights to recombinant lecithin acyltransferase enzyme. Docs. 190-11 at 12, lns. 43:6-12; 190-10 at 6, lns. 19:21-23. Undisputed that Dr. Schaefer testified he did not recognize the Patent. Doc. 190-6 at 53, ln. 207:8.

23. In or around 2008 or 2009, Bruce Auerbach and Brian Krause of AlphaCore Pharma (ACP) approached Dr. Remaley because they were interested in licensing the Patent to develop LCAT into a drug. *See* Ex. 7, at 41:9-17, 42:20-24. They established a formal collaboration through a Cooperative Research and Development Agreement (CRADA), that allowed Dr. Remaley, in his official capacity at the NIH, to work with an

outside company to help develop a potential LCAT therapy. *Id*. at 43:13-17.

     **RESPONSE:**       Disputed that in or around 2008 or 2009, Bruce Auerbach and

Brian Krause of AlphaCore Pharma (ACP) approached Dr. Remaley because they were

interested in licensing the Patent to develop LCAT into a drug. On September 7, 2006, the

NIH published a Notice in the Federal Register that Patent No. 6,635,614 B1, for the use of

Lecithin-Cholesterol Acyltransferase (LCAT) to reduce accumulation of cholesterol was

available for exclusive and non-exclusive licensing. *Government-Owned Inventions;*

*Availability for Licensing*, NAT'L INSTITUTES OF HEALTH, 71 FR 52802 (Sept. 7, 2006),

attached as Ex. 7. On September 10, 2007, the NIH published a Notice in the Federal

Register of its Prospective Grant of Exclusive License to that Patent to AlphaCore Pharma,

LLC. *Prospective Grant of Exclusive License: Use of Lecithin-Cholesterol Acyltransferase*

*(LCAT) To Reduce Accumulation of Cholesterol,* NAT'L INSTITUTES OF HEALTH, 72 FR 51652

(Sept. 10, 2007), attached as Ex. 8. In 2008, AlphaCore Pharma LLC received $ 240,129.00

in grants from the NIH to produce the recombinant LCAT enzyme and inject the enzyme in

mice to demonstrate HDL-cholesterol elevation. *See Fact Book—Fiscal Year 2008*, NAT'L

INSTITUTES OF HEALTH, 168 (2008), https://www.nhlbi.nih.gov/files/docs/factbook/

FactBook2008.pdf, attached as Ex. 9[3]; *New Drug Has Potential to Slow Development of*

*Coronary Heart Disease*, NAT'L HEART, LUNG AND BLOOD INST. (Mar. 13, 2017), https://

www.nhlbi.nih.gov/sbir-sttr-resources/sbir-success-stories/new-drug-slow-development-

heart-disease, attached as Ex. 10.

     Undisputed that AlphaCore Pharma, LLC executed a Cooperative Research and

Development Agreement with the NHLBI on the effective date of November 21, 2008. *See*

---

[3] AlphaCore Pharma, LLC additionally received $ 1,022,830.00 and $ 231,470.00 in NIH grants in 2010 and 2011, respectively. *Fact Book—Fiscal Year 2010*, NAT'L INSTITUTES OF HEALTH, 180 (2010), https://www.nhlbi.nih.gov/files/docs/factbook/FactBook2010.pdf, attached as Ex.9 at 209; *Fact Book— Fiscal Year 2011*, NAT'L INSTITUTES OF HEALTH, 174 (2011), https://www.nhlbi.nih.gov/files/docs/ factbook/FactBook2011.pdf, attached as Ex. 9 at 433.

July 16, 2013 Correspondence regarding AstraZeneca CRADA attached as Ex. 11; *see also* July 20, 2018 Correspondence regarding CRADA Amendment, attached as Ex. 12, at 2. The "overall goal of the proposed CRADA between Alpha Core Pharma (ACP) and the Lipoprotein Metabolism Section (LMS) (Principal Investigator-Dr. Alan T. Remaley) of the Translational Medicine Branch of NHLBI is to determine the possible clinical utility of LCAT supplementation or replacement as a treatment for three different disorders." Ex. 11 at 2. These disorders were "Familial LCAT deficiency (FLD), acute coronary syndrome (ACS), and nephrotic syndrome. (NS)." *Id*. The CRADA listed under "Related Patent Applications and Patents": The NIH has a patent on the use of LCAT in the treatment of **atherosclerosis** (US Patent Number 6,635,614 issued Oct 21, 2003) which ACP has licensed." *Id*. at 16. (emphasis added) NLHBI received $ 675,000.00 through 2019 through the CRADA. Ex. 12 at 13.

24.ACP licensed the Patent to produce and manufacture recombinant human LCAT therapy (called ACP-501). *See* Ex. 8, at 43:10-12; *see* Ex. 7, at 19:23.

**RESPONSE:**        Disputed that ACP licensed the Patent to produce and manufacture recombinant human LCAT therapy (called ACP-501). Undisputed that "The NIH has a patent on the use of LCAT in the treatment of atherosclerosis (US Patent Number 6,635,614 issued Oct 21, 2003) which ACP has licensed." Ex. 12 at 16.

Undisputed that Drs. Remaley and Shamburek testified that AlphaCore Pharma, LLC, licensed,  manufactured and owned the rights to recombinant lecithin acyltransferase enzyme. Docs. 190-11 at 12, lns. 43:6-12; 190-10 at 6, lns. 19:21-23.

25.The NIH conducted animal studies showing that when LCAT was restored, this raised HDL and corrected the lipoprotein abnormalities. *See* Ex. 7, at 58:20-23. However, there was no animal data evaluating whether recombinant LCAT would improve, or even stall, kidney disease. *Id*. at 59:15-18.

**RESPONSE:**          Undisputed that the NIH conducted animal studies showing that when LCAT was restored, this raised HDL and corrected the lipoprotein abnormalities. Undisputed that Dr. Remaley testified no animal studies were completed showing the effects of recombinant LCAT on FLD at the time the Protocol began. Doc. 190-10 at 48, lns. 186:12-187:7.

In Dr. Schaefer's case December 2011 report concerning Mr. Ward's diagnosis, published in the Journal of Clinical Lipidology, Dr. Schaefer, citing relevant studies, wrote that newly researched treatments including "use of recombinant LCAT may [] be promising strategies to prevent or reduce the renal insufficiency that can be observed in LCAT deficient patients." Doc. 190-8 at 5.

26. ACP owned the data from the animal and Phase 1 trials as the IND holder. *See* Ex. 7, at 61:14-20. The results of the animal and Phase 1 trials were submitted to the FDA prior to 2013. *Id*. at 60:24-61:3.

**RESPONSE:**          Disputed that ACP owned the data from the animal and Phase 1 trials as the IND holder. The data generated from Dr. Remaley's study of recombinant LCAT enzyme in mice is U.S. Government work not subject to copyright. *See* Remaley, AT, *Effect of Recombinant Human Lecithin Cholesterol Acyltransferase Infusion on Lipoprotein Metabolism in Mice,* 335 J. OF PHARMACOL. AND EXPERIMENTAL THERAPEUTICS 140, (2010), attached as Ex. 13. Dr. Remaley testified that AlphaCore Pharma, as the IND Holder, had the "responsibility to aggregate and collect and to complete all the regulatory paperwork. So, it was a requirement of the FDA to submit all the results of the Phase 1 study to the FDA." Doc. 190-10 at 17, lns. 61:14-20.

Undisputed that Dr. Remaley testified that "we had shared the Phase 1 data that we had with the FDA to show that it was safe prior to, you know, their consideration where we would be able to give it to a patient with LCAT deficiency." Doc. 190-10 at 17, lns. 61:3-8.

Disputed that the submission was consistent with FDA regulations. Professor James O'Reilly, disclosed by the Plaintiff as an expert witness on the nature of any violations of any Food and Drug Administration regulations, National Institutes of Health procedures, and expanded access investigational new drug standards and practices, October 18, 2019, Doc. 179 at 1-3, opined, "There had been no phase I clinical investigation of the ACP enzyme on humans with LCAT deficiency." Report of Professor James O'Reilly, attached as Ex. 14, at 8 *citing* 21 U.S. Code §360bbb–0. As a public health scholar, Professor O'Reilly is qualified to opine on food and drug law. *See FDA v. Brown & Williamson,* 120 S.Ct. 1291, 1320 (2000).

27.Thereafter, the NIH conducted a Phase 1 single-dose escalation study in sixteen patients with coronary artery disease to evaluate safety and tolerability of recombinant human LCAT enzyme (ACP-501). *See* Shamburek, et. al., Safety and Tolerability of ACP-501, a Recombinant Human Lecithin:Cholesterol Acyltransferase, in a Phase 1 Single-Dose Escalation Study, Circulation Research, at p. 73 (2015), attached as Ex. 12. [FN4: A Phase 1 study looks at safety tolerability for specific dosing of a drug. *See* Ex. 8, at 32:20-23. A Phase 2 study is a study to determine whether a drug has a positive effect in a group of patients. *Id*. at 33:1-2. A Phase 3 study is a multi-center study in 40 to 50 sites around the United States. *Id*. at 33:2-5. The NIH does not typically conduct Phase 3 studies, focusing only on Phase 1 and 2 studies. *Id*. ]The study showed that ACP-501 was safe after a single intravenous infusion and favorably altered HDL metabolism, supporting the use of ACP-501 in future clinical trials in patients with coronary heart disease and FLD. *Id*.; *see* also Ex. 7, at 51:7-15, 52:5-8, and 59:12-14.

**RESPONSE:**      Undisputed that the NIH conducted a Phase 1 single-dose escalation study in sixteen patients with coronary artery disease to evaluate safety and tolerability of recombinant human LCAT enzyme. The NIH then conducted a Phase 2

multiple dose ascending trial on patients with cardiovascular disease. Doc. 190-10 at 45, lns. 174:1-17. None of these patients had FLD. *See* Doc. 190-15; R. George et al., *Safety, Pharmacokinetics, and Pharmacodynamics of Single Ascending Doses of Recombinant Human Lecithin-Cholesterol Acyltransferase (MEDI6012) in Subjects With Stable Coronary Heart Disease*, 136 CIRCULATION, A1 4664  June 8,  2018, attached as Ex. 15.

Disputed that the study showed that ACP-601 was safe after a single intravenous infusion. The study authors concluded: "ACP-501 had an acceptable safety profile after a single intravenous infusion. Lipid and lipoprotein changes indicate that recombinant human LCAT favorably alters HDL metabolism and support recombinant human LCAT use in future clinical trials in CHD and familial LCAT deficiency patients." Doc. 190-15 at 1.

Disputed that a Phase 1 study looks at safety tolerability for specific dosing of a drug, a Phase 2 study is a study to determine whether a drug has a positive therapeutic effect in a group of patients. *Id*. at 33:1-2, and a Phase 3 study is a multi-center study in 40 to 50 sites around the United States. Phase 1, 2 and 3 studies are statutory terms

specifically defined in 21 C.F.R. § 312.21, Phases of an investigation.[4]

Undisputed that Dr. Shamburek testified that the "NIH typically just does phase 1 and 2 and then turns it over to the rest of the community to do it." Doc. 190-11 at 10, lns. 33:3-5.

28. In 2010, Dr. Schaefer attended the annual European Atherosclerosis Society Meeting with Dr. Remaley and Mr. Krause. *See* Email Correspondence from Dr. Schaefer to Om Ganda, dated 6/23/10, attached as Ex. 13. Dr. Remaley informed Dr. Schaefer that gene therapy was being tested for LCAT deficiency at the NIH. *Id.*

**RESPONSE:** Undisputed that in June 2010, Dr. Schaefer attended the European Atherosclerosis Society Meeting, where he "did discuss at length with Brian Krause" of AlphaCore Pharma, LLC Mr. Ward's diagnosis of FLD. Doc. 190-17 at 1. On June 23, 2010,

---

[4] "An IND may be submitted for one or more phases of an investigation. The clinical investigation of a previously untested drug is generally divided into three phases. Although in general the phases are conducted sequentially, they may overlap. These three phases of an investigation are as follows:

(a) Phase 1. (1) Phase 1 includes the initial introduction of an investigational new drug into humans. Phase 1 studies are typically closely monitored and may be conducted in patients or normal volunteer subjects. These studies are designed to determine the metabolism and pharmacologic actions of the drug in humans, the side effects associated with increasing doses, and, if possible, to gain early evidence on effectiveness. During Phase 1, sufficient information about the drug's pharmacokinetics and pharmacological effects should be obtained to permit the design of well-controlled, scientifically valid, Phase 2 studies. The total number of subjects and patients included in Phase 1 studies varies with the drug, but is generally in the range of 20 to 80.

(2) Phase 1 studies also include studies of drug metabolism, structure-activity relationships, and mechanism of action in humans, as well as studies in which investigational drugs are used as research tools to explore biological phenomena or disease processes.

(b) Phase 2. Phase 2 includes the controlled clinical studies conducted to evaluate the effectiveness of the drug for a particular indication or indications in patients with the disease or condition under study and to determine the common short-term side effects and risks associated with the drug. Phase 2 studies are typically well controlled, closely monitored, and conducted in a relatively small number of patients, usually involving no more than several hundred subjects.

(c) Phase 3. Phase 3 studies are expanded controlled and uncontrolled trials. They are performed after preliminary evidence suggesting effectiveness of the drug has been obtained, and are intended to gather the additional information about effectiveness and safety that is needed to evaluate the overall benefit-risk relationship of the drug and to provide an adequate basis for physician labeling. Phase 3 studies usually include from several hundred to several thousand subjects." 21 C.F.R. § 312.21.

Dr. Schaefer wrote that he planned to call Dr. Remaley the following week.

Disputed that Dr. Remaley informed Dr. Schaefer that gene therapy was being tested for LCAT deficiency at the NIH. Dr. Remaley replied to Dr. Schaefer: "Please let me know how I can help. As you know we have [a] collaboration with AlphaCore for developing recombinant LCAT as a therapy. We hope to start a clinical trial sometime next year." *Id.*

29.Thereafter, Dr. Schaefer and Mr. Ward spoke with Dr. Remaley via telephone to inquire whether the NIH was planning to treat LCAT deficient patient's with ACP-501. *See* Ex. 7, at 79:4-14. Dr. Remaley informed them of the collaboration with ACP for developing ACP-501 and that they hoped to start a clinical trial the next year. *See* Email Correspondence from Dr. Remaley to Dr. Schaefer, dated 6/23/10, attached as Ex. 14.

**RESPONSE:**      Undisputed that Dr. Remaley wrote ""Please let me know how I can help. As you know we have [a] collaboration with AlphaCore for developing recombinant LCAT as a therapy. We hope to start a clinical trial sometime next year." Doc. 190-17 at 1. Specifically, Mr. Ward testified he was seeking from Dr. Schaefer a treatment or therapy to reverse his advanced kidney disease and associated symptoms. Doc. 190-24 at 16 lns. 58:17-59:19.

30.Dr. Schaefer and Mr. Ward remained in contact with Dr. Remaley from 2010 to 2012 regarding the possibility of Mr. Ward participating in a clinical trial at the NIH. *See* Ex. 3, at 43:9-11.

**RESPONSE:**      Disputed. Dr. Schaefer testified that *he* remained in contact with Dr. Remaley: "Q: So after this email, Exhibit 4, did you have any follow-up conversations with Dr. Remaley as to particular near-term treatments for Mr. Ward? A: Well, there's a long e-mail chain or some e-mails that you have a record of, but I did have discussions with him over time, yes." Doc. 190-6 at 12, lns. 43:-11.

On February 29, 2012, Dr. Schaefer wrote Dr. Remaley that "Edmund Ward and I

are wondering about the status of recombinant LCAT in LCAT deficiency – please advise."
February 29, 2012 Correspondence, attached as Ex. 16. The same day, he wrote Dr.
Remaley, "My patient is interested in participating once you get approval and feel you have
a safe treatment." *Id*.

On March 6, 2012, Dr. Schaefer wrote, "Hi Alan — the LCAT deficient patient has a
calcium score of 90 — at the 85th percentile for his age. He was wondering whether he can
participate as a patient with CHD — please advise." March 13, 2012, Correspondence,
attached as Ex. 17. On March 13, 2012, Dr. Schaefer wrote, "Great – Ed is ready when you
are." *Id*.

On June 12, 2012, Dr. Schaefer wrote, "Hi Alan – thanks for your email - -we
reviewed your great microRNA paper from Nature Cell Biology today – spectacular work –
Ed is here today and is happy to come down for a single dose when it is convenient in
August or September." June 5, 2012 Correspondence, attached as Ex. 18.

On June 28, 2012, Dr. Schaefer wrote, "Hi Alan – I will be away from July 15-30th in
Japan – you had mentioned that the patient might be able to get a single dose in August –
please let me know – I have told him I will come down to Bethesda with him." June 28,
2012 Correspondence, attached as Ex. 19.

On September 25, 2012, Dr. Schaefer wrote Dr. Rose Ganim, Dr. Remaley, and Mr.
Ward, ""**The therapy of choice is enzyme replacement** which hopefully will be
available to him as of January - we have been in touch with Dr. Alan Remaley about this
therapy at NIH." September 25, 2012 Correspondence, attached as Ex. 20 (emphasis
added).

31.Mr. Ward was aware he "may be one of the first to receive" ACP-501 and he
expressed his "desire and willingness" to have ACP-501 administered as soon as possible.
*See* Email Correspondence from Mr. Ward to Dr. Roshan, dated 11/10/11, attached as Ex.

15; *see* Email Correspondence from Mr. Ward to Dr. Remaley, dated 12/1/11, attached as Ex. 16.

**RESPONSE:** Undisputed that Mr. Ward wrote Dr. Roshan that "Dr. Schaefer and I have been in contact with Dr. Alan Remaley at the NIH in Washington D.C. It is possible I may be one of the first to receive an IV injection of the LCAT enzyme." Doc. 190-18. Undisputed that Mr. Ward wrote Dr. Remaley that "for the past year, Dr. Ernst Schaefer and I have been conferring regularly on a number of medical research topics. Thank you for information concerning the progress of the LCAT enzyme. Allow me to reiterate my desire and willingness to have the enzyme administered as soon as feasible. If possible please keep me updated, with the hope that I may receive injections as soon as March or April." Doc. 190-19.

32. On April 10, 2012, Dr. Schaefer followed up with Dr. Remaley, noting that the potential for enzyme replacement therapy for Mr. Ward was urgent as Mr. Ward had had a fistula placed, and he asked to "please let us know when you think the recombinant LCAT therapy will become available for this patient…" *See* Email Correspondence from Dr. Schaefer to Dr. Remaley, dated 4/10/12, attached as Ex. 17. Dr. Schaefer asked Dr. Remaley to, "Please be realistic – I do not want to raise any false hopes." *Id*. Mr. Ward, who was copied on these emails, responded, "due to the extreme rarity of this metabolic disease, nobody is sure what metabolic pathways are going on inside the kidney and whether recombinant LCAT treatment can reverse or alleviate the renal insufficiency." *See* Email Correspondence from Mr. Ward to Dr. Roshan, dated 4/12/12, attached as Ex. 18.

**RESPONSE:** Disputed. On April 10, 2012, Dr. Schaefer wrote that Mr. Ward's "nephrologist Dr. Roshan has recommended the placement of a fistula so that he will be ready for hemodialysis when he needs it - therefor the issue of therapy has now taken on some urgency." April 12, 2012 Correspondence, attached as Ex. 21. Dr. Schaefer

continued, "please let us know **when** you think the recombinant LCAT therapy will become available for this patient. He is ready anytime. Please be realistic - I do not want to raise any false hopes." (emphasis added). Doc. 190-20. Dr. Schaefer was inquiring as to **when** recombinant LCAT would be available, not whether or not he believed it would be effective. Mr. Ward testified that Dr. Schaefer had already represented to him that recombinant LCAT enzyme would effectively reverse his advanced kidney disease. Doc. 190-24 at 18, lns. 69:9-18; Doc. 190-9 at 6, lns 23:13-17; at 8, lns. 30:6-8, 32:3-21.

The same day, in response to this email, Dr. Remaley wrote, I am meeting with the group on AlphaCore Pharma on Friday and we are going to go over and investigator-initiated IND to treat FLD patients with a single dose of LCAT. I should know better by Friday but perhaps sometime this summer we can treat your patient." Ex. 21. Dr. Remaley concluded, "Unless the single treatment does much, which I am not expecting, it may not help him much. It will probably be another year until we get approval from the FDA to start any chronic treatments." *Id.*

Two days later, in response to Dr. Schaefer's email, Dr. Bijan Roshan wrote, "I can only echo Dr. Schafer's note. I think at this point chance of meaningful renal recovery is low." Doc. 190-21 at 1. In response to this email from Dr. Roshan, Mr. Ward wrote, "Due to the extreme rarity of this metabolic disease nobody is exactly sure what metabolic pathways are going on inside the kidney and whether recombinant LCAT treatment can reverse or alleviate the renal insufficiency." *Id.*

33.Following the completion of the Phase 1 study at the NIH, the NIH and ACP had a limited supply of leftover ACP-501 with no plans to use that leftover drug. *See* Ex. 7, at 70:19-23. Dr. Remaley had a discussion with ACP, and they decided that one pathway forward would be to do a single patient IND to treat only Mr. Ward. *Id.* at 71:2-6 and 79:19-22.

**RESPONSE:**        Disputed. Dr. Remaley testified that he did not know if there were plans to use the leftover drug: "So, after a completion of the Phase 1 study [in patients with stable heart disease], we had leftover drug. We had a limited supply. We did not necessarily have plans to use that leftover drug, or at least I didn't know the plans. Maybe AlphaCore had plans." Doc. 190-10 at 19, lns. 70:19-23.

There were initially plans to use the drug in a subsequent study of FLD patients, but the FDA did not approve those plans. Dr. Remaley testified that "The intention for AlphaCore Pharma was to develop LCAT for both cardiovascular disease and LCAT deficiency. After we completed the Phase 1 study, the next step was to investigate the drug in patients with FLD to design a randomized clinical trial." Doc. 190-10 at 44, lns. 171:6-17. Dr. Remaley concluded, "And, so, they submitted -- and maybe that gets back to your earlier question. They submitted -- not granted, but they submitted a request to treat FLD patients, and that was put on hold. And the FDA did not grant the permission to proceed with that study." *Id.*

On September 23, 2014, Rebecca Bakker-Arkema of AlphaCore Pharma, LLC wrote to Dr. Schaefer, "I do know that in order to supply the drug for the FLD study at the NIH, AlphaCore made the decision to pull it from a study planned at the Montreal Heart Institute." September 30, 2014 Correspondence, attached as Ex. 22.

34. Dr. Schaefer, Dr. Shamburek, Dr. Remaley, Mr. Auerbach and Mr. Krause met at the American Heart Association yearly meeting in November 2012 and discussed Mr. Ward's medical situation, including the possibility of getting a compassionate use protocol approved. *See* Ex. 8, at 46:20-47:1; *see* Ex. 3, at 95:13-21.

**RESPONSE:**        Undisputed that Dr. Schaefer wrote Dr. Remaley on November 2, 2012, "Here is my summary of Ed's case for the Protocol – Alan if I do not see you sooner I will see you at 12 noon next Tuesday at the registration area at the LA Convention Center

along with Bruce Auerbach and Brian Krause from Alpha Core." *See* November 2, 2012 Correspondence, attached as Ex. 23.

On September 27, 2012, Dr. Schaefer sent to Dr. Remaley and Mr. Ward copies of two letters. Dr. Schaefer sent the first letter to the Food and Drug Administration, stating "I have referred the patient to Dr. Alan Remaley for treatment with potential enzyme replacement (ACP-501 made by AlphaCore of Ann Arbor, MI)." September 27, 2012 Correspondence, attached as Ex. 24 at 1. Dr. Schaefer stressed, "At this point what is preventing him from getting the enzyme replacement he needs is your agency. I would urge you to approve giving **this very important and potentially life-saving therapy for patients with documented homozygous familial LCAT deficiency**." *Id.* (emphasis added).

Dr. Schaefer sent the second letter to Mr. Ward, for him to send to Senators Kerry and Markey, stating, "My problem has become more urgent since my creatinine level (a measure of kidney function) has increased .... My nephrologist Dr. Valerie Price of Concord, has informed me that I will probably require dialysis in the next 6 – 12 months unless I can get **replacement therapy that should help prevent my kidneys from failing**." *Id.* at 3 (emphasis added).

On October 16, 2012, after Anne A. Pariser from the FDA responded to these and Dr. Remaley's inquiry, Dr. Schaefer wrote Dr. Remaley and Bruce Auerbach and Brian Krause of AlphaCore Pharma, LLC that "as per our conversations - we will talk next Monday at 11AM with Bruce and Brian about getting compassionate use for the patient." October 16, 2012 Correspondence, attached as Ex. 25, at 1.

35.Compassionate use, or expanded access, refers to the use of investigational new drugs (or approved drugs where availability is limited) to diagnose, monitor, or treat patients with serious diseases or conditions when there is no comparable or satisfactory

alternative therapy to diagnose, monitor, or treat the disease or condition. *See* 21 C.F.R.

312, Subpart I, § 21.312.300. The FDA must review the criteria, submission requirements,

safeguards and treatment information set out in § 21.312.305. *See* C.F.R. 312, § 21.312.305.

**RESPONSE:** Undisputed that 21 C.F.R. § 312.300 sets forth the scope of the

regulations governing Expanded Access to Investigational Drugs for Treatment Use and 21

C.F.R. § 312.305 sets forth the Requirements for all expanded access uses.

Disputed that these regulations are exclusive. Professor James O'Reilly opined that

expanded access is also governed by the statutory requirements of 21 U.S. Code §360bbb–0,

and FDA guidances. Ex. 14, at 6-10.

36. Dr. Shamburek, in conjunction with ACP, drafted a Clinical Protocol for

Expanded Access Use of Intravenous ACP-501 in One Subject with Familial LCAT

Deficiency (hereinafter "Clinical Protocol") relating to the intended use of ACP-501 in Mr.

Ward. *See* Ex. 7, at 89:18-19; *see* Ex. 8, at 67:15-17.

**RESPONSE:** Disputed**.** On October 25, 2012, Rebecca Bakker-Arkema of

AlphaCore Pharma, LLC sent Dr. Schaefer and Dr. Remaley a first draft Protocol, stating,

"Please find attached the FLD protocol that we sent to the FDA for study 501-02. I revised

the protocol through page 27 (up to the study activity schedule) to reflect compassionate use

in the one patient." *See* October 29, 2012 Correspondence and First Draft Protocol, attached

as Ex. 26, at 1. Ms. Bakker-Arkeman continued, " If this looks like what you might want

then please let me know and I can quickly revise the remainder of the document. It will

only take me about a day." *Id.*

37. Multiple versions of the Clinical Protocol were drafted by Dr. Shamburek in

conjunction with individuals from ACP. *See* Ex. 7, at 104:2 and 105:14; *see* Ex. 8, at 67, 72

and 74. Earlier versions listed Dr. Schaefer as a Medical Monitor and home physician for

purposes of continuing treatment of Ward in Massachusetts after the initial infusions at

the NIH; these provisions were removed from the Clinical Protocol that ultimately was submitted for approval by the FDA and NIH Institutional Review Board (IRB). *See* Ex. 8, at 78:9-20.

**RESPONSE:**        Disputed. On October 29, 2012, in response to the draft protocol prepared by Rebecca Bakker-Arkeman of AlphaCore Pharma, LLC, Dr. Schaefer replied with revisions, writing, "this looks fine to me - sorry not to respond sooner - please go ahead and revise the remainder of the document. If you need any information. about the patient - please let me know. My cell phone is 781 258 1454. His case description is attached." *See* Ex. 26 at 1.  Dr. Schaefer added that " the only difference is that he now has a creatinine of about 5.5 mg/dL instead of about 2.5 mg/dL. Thank you for all your help - Ernie Schaefer. PS Alan - if you want to make any changes please let Becky know." Dr. Schaefer also sent a copy of that email and the enclosed revisions to the first draft Protocol to Mr. Ward and Bruce Auerbach of AlphaCore Pharma, LLC. *Id.*

The first draft Protocol states that "The protocol will only be administered in one named subject who is currently being treated by Dr. Ernst Schaefer." *Id.* at 18, § 3.4. It continues, "If ACP-501 is determined as both safe and efficacious in this FLD subject during the dose titration Phase at the NIH (Period 1), the subjects will be offered continued treatment at his personal physician's office (Dr. Ernst Schaefer) during Period 2." *Id.* at 18, § 3.5. "If an optimal dose is obtained at either Dose 2 or Dose 3, than [sic] at this point the subject will return home to his personal "home" physician (Dr. Ernst. Schaefer)." *Id.* It further defines the Home Physician Site Organization. *Id.* at 31, § 6.4. It includes "Established chronic kidney disease (CKD) requiring dialysis (Stage 5)" and "Estimated creatinine clearance <15 mg/mL/min at screening" within its Exclusion Criteria. *Id.* at 32, § 7.4.

On November 13, 2012, Rebecca Bakker-Arkeman wrote Dr. Schaefer with follow-up

requests and questions, including listing Dr. Schaefer's clinic as a study site in the Protocol

and Dr. Schaefer as an investigator. *See* November 28, 2012 Correspondence and Second

Draft Protocol, attached as Ex. 27 at 2-3. On November 16, 2012, Bruce Auerbach of

AlphaCore Pharma, LLC wrote Dr. Schaefer to follow-up concerning Ms. Bakker-Arkeman's

outstanding questions, as "we need all of this information to enable the submission to the

FDA." *Id.*at 2. Dr. Schaefer responded with details regarding his clinic, his IRB, his

licensure, and the pharmacy used by his clinic, closing, "I hope this helps - I was hopeful I

could bring him down to the NIH on Monday December 10th - but that may be optimistic."

*Id.*

On November 26, 2012, Rebecca Bakker-Arkeman wrote Dr. Schaefer enclosing the

second draft of the Protocol entitled "Expanded access use of intravenous ACP-501 in one

subject with Familial (lecithin:cholesterol acyltransferase [rhLCAT]) Deficiency." Ex. 27 at

1.  Dr. Schaefer forwarded that Protocol and correspondence to Mr. Ward, "Hi Ed - here is

the protocol for your therapy - it is being submitted this week - hopefully everything will be

approved and you can start therapy after the New Year." *Id.*

The second draft Protocol removes reference to AlphaCore Pharma, LLC as the

Sponsor of the Protocol. *Id.* at 10, § 1. It also inserts reference to Dr. Schaefer as a Medical

Monitor, home physician, and Physician Co-Investigator. *Id.* at 10, § 1; at 12, § 3.5; at 24 §

6.5.1. It inserts the language, ""The Home Physician is responsible for coordinating the

preparation and administration of the ACP-501 infusion at a local infusion center,

capturing and reporting AEs, vital sign assessments, and biomarkers and clinical labs." *Id.*

at 23, § 6.1. The "Anticipated Number of Sites" section was revised to reflect Dr. Schaefer's

participation listing the number of sites as "2 - one coordinating site (NIH) and one " Home"

physician." *Id.* at 13, § 3.5. The exclusion criteria removed "Established chronic kidney

disease (CKD) requiring dialysis (Stage 5); estimated creatinine clearance <15 mg/mL/min

at screening." *Id.* at 25, § 6.7.2.

Disputed that the subsequent third draft of the Protocol deleted reference to Dr. Schaefer as home physician. Dr. James P. Sutton, disclosed by the Plaintiff as an expert witness on the nature of any violations of any Food and Drug Administration regulations, National Institutes of Health procedures, and expanded access investigational new drug standards and practices, October 18, 2019, Doc. 179 at 4-5, opined the Dr. Schaefer was intended to fill the role of the "home physician" based on " the inclusion of Dr. Schaefer's name in version 2 of the protocol as the home physician, the change at that time to his title as co-investigator, the lack of any explanation as to who the "home physician" was in the final version, or what his or her role would be." Report of James P. Sutton, attached as Ex. 28 at 61. As a principal investigator in over 150 clinical trials, Dr. Sutton is qualified to offer opinions on informed consent in the context of a clinical trial. *See Spedale v. Constellation Pharm. Inc.*, 2019 WL 3858901, at *11 (D. Ariz. Aug. 16, 2019) (Tuchi, J.); *see* Exhibit 24 at 1.

Undisputed that the third draft protocol removed provisions listing Dr. Schaefer specifically as a Medical Monitor and as the Physician Co-Investigator administering ACP-501 infusions. However, "It is undisputed that the protocol, whichever version was adopted, did call for Dr. Schaefer to monitor Ward." *Ward v. Schaefer*, 2018 WL 1096829, at *2 (D. Mass. Feb. 27, 2018) (Saylor, C.J.); *see* 190-22. Further, Dr. Schaefer and Dr. Remaley continued to attempt amendment of the Protocol to provide for Dr. Schaefer as a Physician Co-Investigator administering ACP-501 infusion.

On June 28, 2013, Dr. Schaefer wrote "please let me know when you can send me the protocol so that we can submit for approval and begin treating Ed here in Boston once new enzyme becomes available after October 1, 2013." June 28, 2013 Correspondence, attached as Ex. 29, at 1. In a separate email on the same date, Dr. Schaefer wrote, "is there

any way Ed could get more enzyme or is that out of the question - or can AstraZeneca speed

up the process - **otherwise Ed may end up on dialysis**." *Id.* at 3. Dr. Remaley replied,

"Here is the protocol. I will try to arrange a time for us to have a conference call with

AstraZeneca about the future plans of treating Ed in Boston." *Id.* at 2. Dr. Remaley

continued, "Right now we only have a limited supply of enzyme left and Ed is getting all of

it. Unfortunately, if we increase the dose we will not have enough enzyme to keep treating

him until the new batch will be ready, which is still sometime in the fall," though he

proposed discussing the issue with AstraZeneca Pharmaceuticals, LP. *Id.* Dr. Remaley

enclosed with his reply on July 2, 2013 the second draft of the Protocol, that had listed Dr.

Schaefer as the Physician Co-Investigator responsible for infusions and monitoring. *See id.*

Shortly afterwards on July 15, 2013, Dr. Remaley wrote Michael McCarthy of AstraZeneca

Pharmaceuticals, LP and Sotirios Karathanasis of MedImmune, LLC, "Please let me know

when you have a time to have a conference call with Ernie Schaefer about setting up a

protocol so that he can treat his patient in Boston once the new enzyme is available." *Id.* at

2.

On August 20, 2013, Dr. Schaefer sent an email to Dr. Shamburek and Dr. Remaley,

as well as Bruce Auerbach and Brian Krause of AlphaCore Pharma, LLC that Dr. Remaley:

"indicated to me that you were willing to collaborate with us." August 20, 2013

Correspondence, attached as Ex. 30, at 2. Dr. Schaefer explained, "My understanding is

that the patient will continue therapy at the lower dose every two weeks until the enzyme

runs out, and that as soon as new enzyme became available he would be a candidate for the

enzyme **in order to see if we can get him off dialysis**." *Id.* (emphasis added).

Later that day, Dr. Remaley wrote to Dr. Shamburek, "Hi Bob I talked to Ernie

today about the plan to treat his patient. He understood and agreed with our plan. When

you get back from vacation, please touch base with his nephrologist too.." *Id.* at 3.

38. The final version of the Clinical Protocol that Mr. Ward participated in is dated December 3, 2012 and was approved by the FDA and IRB in December 2012. *See* Final Clinical Protocol for Expanded Access Use of Intravenous ACP-501 in One Subject with Familial LCAT Deficiency, dated 12/3/12, attached as Ex. 19, at p. 1; *see* also Ex. 8, at 67:21, 72:13-18, 226:8-10.

**RESPONSE:** Disputed**.** The third draft of the Protocol was initially approved on December 18, 2012 and an amendment thereto was approved on January 16, 2013. Bruce Auerbach testified: "On or about December 7, 2012, Dr. Shamburek submitted to the NIH a revised draft of the protocol." Doc. 30-1 at 4. Dr. Shamburek submitted in his cover letter to the FDA that the draft of the protocol dated November 21, 2012, was revised to provide that Mr. Ward would receive doses of ACP-501 only at the NIH facility in Bethesda, Maryland:, "Initially, I had proposed administering the ACP-501 (rhLCAT) at the National Institutes of Health during the period one dose titration followed by the Home Physician (Dr. Ernest [sic] Schaefer) administering the weekly or bi-weekly doses at his clinic during period two with the 3 month infusion/evaluations back at the [NIH}." *Id.* "That has been revised," Dr. Shamburek explained, "so that now all infusions of ACP-501 (rhLCAT) in period one and two will be done at the NIH and none at the Home Physicians." Bruce Auerbach filed the third draft of the Protocol submitted on or about December 7, 2012 with his affidavit to the Court. *See* Doc. 30-1 at 15; Doc 190-22.

Dr. Shamburek testified that the IRB initially approved the third draft Protocol on December 18, 2012 and approved an amendment of the third draft Protocol on January 16, 2013. Specifically, Dr. Shamburek testified that the IRB would "conditionally review [the Protocol] based on several stipulations. And the stipulation would be to assign a study coordinator, to assign many minor things or it could be major things." Doc. 190-11 at 25, lns. 93:12-17.

Further, Dr. Schaefer was then added to the Protocol, which was amended again. On February 20, 2014, Drs. Remaley and Shamburek obtained an approval from the NHLBI IRB to amend the Protocol to add: "Coded samples from time points will be sent to Dr. Ernst Schaefer and Dr. Bela Asztalos to perform 2D-gel electrophoresis for HDL subfraction analysis quantifying apoA-I in HDL particles." February 20, 2014 Correspondence, attached as Ex. 31.

39. The primary objective stated in the Clinical Protocol was to assess the safety and tolerability of ACP-501, and the secondary objectives were to assess the effects of ACP- 501 on biomarkers of reverse cholesterol transport, including HDL cholesterol elevation, and renal function. *See* Ex. 19, at ¶¶ 3.3.1 and 3.3.2. The purpose of the study was to provide expanded use ACP-501 with the hope of slowing or preventing the progression of renal dysfunction and eliminating the need for dialysis. *Id.* at ¶ 3.3. The Protocol does not contain any statement that Mr. Ward's kidney function would be reversed. *See* Ex. 19.

**RESPONSE:** Disputed. The Secondary Objectives include assessing the pharmacokinetics of ACP-501. Doc. 190-22 at 9, § 3.3.2. While the purpose of the study is to provide expanded use ACP-501 to Mr. Ward with the hope of slowing or preventing the progression of renal dysfunction and eliminating the need for dialysis, the Informed Consent required by the Protocol, *see* Doc. 190-22 at 51, § 12.3, states "There are no drugs that increase LCAT. Because of this, LCAT has been artificially made so that it can be directly infused into the body, **in the hope that it will** increase HDL and **reverse** the corneal opacities, anemia, and protein in the urine and/or **kidney dysfunction**." Doc. 190-23 at 2. That Informed Consent further states: "We hypothesize that **the clinical problems in FLD can be prevented or even reversed** by replacing the defective enzyme. This same approach has been used with existing drugs that treat other diseases with low or absent enzymes." *Id.* Dr. Schaefer testified that the medical and scientific

foundation for that belief was "the natural history of the disease." Doc. 190-6 at 20, lns. 76:3-8.

40.Dr. Remaley was listed as the Safety Review Investigator for the Protocol. *See* Ex. 19, at ¶6.4.2; *see also* Ex. 7, at 16:20-22. Dr. Remaley evaluated whether to do the study and he was accountable for how the NIH's resources were utilized. *See* Ex. 7, at 16:20-22.

**RESPONSE:**      Undisputed that Dr. Remaley was listed as the Safety Review Investigator for the Protocol, who "is a member of the Safety Review Group and is responsible for the ongoing safety monitoring of the subjects." Doc. 190-22 at 21, ¶ 6.4.2.

41.Dr. Shamburek was the Medical Monitor and Principal Investigator of the Protocol. *See* Ex. 19, at p. 7; *see also* Ex. 7, at 15:18-19. Dr. Shamburek, as the Principal Investigator, was in charge of the Protocol. *Id.* at 31:22-23.

**RESPONSE:**      Undisputed that Dr. Shamburek was designated a Medical Monitor and Principal Investigator of the Protocol.

Disputed that Dr. Shamburek was the Medical Monitor and Investigator. Dr. James P. Sutton, opined that Dr. Schaefer "was indeed an investigator, though not named as such. This is clear from the nature of his involvement in this protocol from the onset, as well as his clearly stated role in the second version of the protocol draft." Ex. 28 at 60. Dr. Sutton further cites as examples of this involvement: (1) Dr. Schaefer's role in obtaining samples, (2) his role as the home physician, (3) his conducting research activities. *Id.* at 61.

42.Under the Clinical Protocol, all ACP-501 infusions would occur only at the NIH. *See* Ex. 19, at p. 7.

**RESPONSE:**      Undisputed that third draft Protocol deleted the "Anticipated Number of Sites" section listing the number of sites as "2 - one coordinating site (NIH) and one " Home" physician" and replaced it with "1 site – NIH." *See* Ex. 27 at 13, § 3.5.

43.Dr. Schaefer did not draft the Protocol. *See* Ex. 3, at 87:13; Ex. 8, at 46:1-4.

**RESPONSE:**          Disputed. Dr. Schaefer revised the first draft Protocol on October 29, 2012 and the second draft Protocol on November 13, 2016. Ex. 26 at 1; Ex. 27 at 1-2. Dr. Schaefer was also in regular communication with Drs. Shamburek and Remaley, and Rebecca Bakker-Arkema the drafts of the protocol. *See* ¶¶ 36-38, *supra.*

44.Dr. Schaefer had no role in the final Protocol for monitoring, safety, or any other purpose. *See* Ex. 8, at 46:12-14 and 50:16. 45.

**RESPONSE:**          Disputed. Dr. James P. Sutton, opined that Dr. Schaefer "was indeed an investigator, though not named as such. This is clear from the nature of his involvement in this protocol from the onset, as well as his clearly stated role in the second version of the protocol draft." Ex. 28 at 60. Dr. Sutton further cites as examples of this involvement: (1) Dr. Schaefer's role in obtaining samples, (2) his role as the home physician, (3) his conducting research activities. *Id.* at 61.

Dr. Sutton further opined the Dr. Schaefer was intended to fill the role of the "home physician" based on " the inclusion of Dr. Schaefer's name in version 2 of the protocol as the home physician, the change at that time to his title as co-investigator, the lack of any explanation as to who the "home physician" was in the final version, or what his or her role would be." *Id.*

45.Mr. Ward began a natural history protocol at the NIH on January 6, 2013 to evaluate whether he could participate in the Protocol. *See* Ex. 8, at 150:17-19, 150:24-151:7. Mr. Ward's extensive medical history was reviewed, and relevant labs, imaging and consultations were performed. *See* Ex. 8, at 152:12-18.

**RESPONSE:**          Undisputed that Mr. Ward was first admitted to the NIH on January 6, 2013 and signed a "General Admission Consent" on that date. *See* Doc. 190-23 at 20. Dr. James P. Sutton opined, "Though this document states that the purpose of a "General Admission" is medical research, it is not an informed consent document and lacks

virtually all of the requirements for such a document." Ex. 28 at 56. Dr. Sutton continued,

"Though Mr. Ward's role as a human subject began at this time, no informed consent

document was signed prior to the commencement of study-specific procedures. In actuality,

the screening visit for the study began at this time, without a signed informed consent

document." *Id.*

Dr. Sutton, citing Dr. Shamburek's discharge note dated January 11, 2013, further

opined: "Further evidence that procedures conducted during this admission were in fact

screening procedures can be seen by the statement in Shamburek's discharge note that "We

discussed his next appointment in which he will be coming back to receive expanded access

recombinant human LCAT." Accordingly, "The PI had already decided to proceed with IP

administration before reviewing and attesting to the subject meeting the inclusion and

exclusion criteria." Ex. 28 at 57; *see also* January 11, 2013 Discharge Record, attached as

Ex. 32.

Dr. Sutton concluded that in view of "the amount of data collected during this

admission (prior to signing the study-specific informed consent document) and the small

amount of data collected between the time of singing the study-specify informed consent

document and administration of study drug, there is no doubt that data obtained during

this admission were used" to make the decision to include Mr. Ward in the Protocol. Ex. 28

at 57.

Undisputed that between January 6, 2013 and January 11, 2013, Mr. Ward

underwent, among other procedures, "mineral panels;" " liver panels; a blood count; a

reticular site count; his lipids;" " a urinalysis; a spot urine," "24-hour urines; an abdominal

ultrasound, a carotid ultrasound; a CT of his heart; an eye exam; a cardiology consult; a

dietary consult and an EKG." Doc. 190-11 at 39, lns. 152:12-18.

46. From January 6, 2013 to January 11, 2013, Mr. Ward did not receive ACP-501.

*See* Ex. 8, 152:22-153:1.

**RESPONSE:**        Undisputed from January 6 to January 11, 2013, Mr. Ward was subject to screening procedures and therefore research activity under the Protocol, although he did not receive infusions under the Protocol during that time. *See* Ex. 28 at 56-7; *see also* Ex. 32.

47. During Mr. Ward's initial visit at the NIH, Dr. Shamburek reviewed the Consent to Participate in a Clinical Research Study with Mr. Ward, recommending he take the Consent document home to review it with his family and physicians. *See* Ex. 8, at 82:17-19. Mr. Ward was admitted to the NIH on January 24, 2013. *See* Ex. 8, at 167:15-17. Dr. Shamburek reviewed the consent form with Mr. Ward, including all risks, benefits and uncertainties of the Protocol. *See* Ex. 8, at 82:5, 83:9-14; *see* Consent to Participate in a Clinical Research Study (hereinafter "Informed Consent"), attached as Ex. 20. Dr. Shamburek answered any questions Mr. Ward posed. *See* Ex. 8, at 83:22-23.

**RESPONSE:**        Undisputed Mr. Ward was admitted to the NIH for his first infusion on January 24, 2013.

Disputed that "Dr. Shamburek reviewed the consent form with Mr. Ward, including all risks, benefits and uncertainties of the Protocol ." Mr. Ward testified that he did not recognize the informed consent document, *see* Doc. 190-9 at 26, lns. 99:8-12; he has no memory of who presented him the informed consent document; Doc. 190-9 at 26, lns 101:24-102:4; and has no recollection of Dr. Shamburek leading a discussion of informed consent with him; Doc. 190-9 at 27, lns. 105:24-106:3.

48. The Informed Consent document states, in part:

a.        "Taking part in NIH research is entirely voluntary." *See* Ex. 20, at p. 1.

b.        "You may choose not to take part, or you may withdraw from the study at any time. *Id*.

c.      "This study will provide expanded use ACP-501 to one subject with FLD and declining renal function. This study is the second time ACP-501 will be given to humans and the first time it will be given to a human with FLD. It will help determine the ability of this drug to affect the consequences of FLD." *Id*. at p. 2, ¶ 1.

d.      "You will sign informed consent, be screened for the study and then enter Period 1 which includes a baseline phase followed by a dose titration phase in the NIH hospital." *Id*.

e.      "You will experience up to a 6-month drug hiatus during the study due to a delay in the availability of ACP-501 drug supply." *Id*.

f.      "You may not receive any direct benefit from participating in this study. However, the information obtained from the study will yield knowledge about the use of ACP-501 for future subjects. The information gained will provide direct insights into the safety and dose of ACP-501 that can be used for people that lack LCAT." *Id*. at p. 8, ¶ 8.

g.      "You will not be compensated for your participation in this study." *Id*. at p. 10, ¶ 15.

h.      "The National Institutes of Health and the research team for this study are using ACP-501 developed by [ACP] through a joint study with your researchers and the company…none of the researches on this protocol will receive any compensation. You will not receive any money from the development of recombinant human LCAT." *Id*. at p. 10, ¶ 16.

**RESPONSE:**      Undisputed that the Informed Consent document states, in part, paragraphs (a) through (g). Undisputed that the Informed Consent document further states "The National Institutes of Health and the research team for this study are using ACP-601 developed by AlphaCore Pharma through a joint study with your researchers and

the company. This means it is possible that the results of this study could lead to payments

to NIH scientists and to the NIH. By law, government scientists are required to receive

such payments for their inventions However, none of the researchers on this protocol will

receive any compensation. You will not receive any money from the development of

recombinant human LCAT." Doc. 190-23 at 10.

Disputed that "Taking part in NIH research is entirely voluntary." The Informed

Consent document continues: "However, to receive care at the NIH, you must be taking

part in a study or be under evaluation for study participation." Doc. 190-23 at 1. "Care

contingent on research participation is not "care," it is human subject research." Ex. 18 at

57.

Disputed that "You may choose not to take part, or you may withdraw from the

study at any time." The Informed Consent document continues that a subject who

withdraws "will be asked to return to the NIH clinic for final safety assessments and may

be questioned regarding their reason for withdrawal." Doc. 190-23 at 8. Those assessments

"may include: Physical examination; BP and HR measurements; Blood and urine specimens

will be obtained for safety laboratory tests; Blood for PK and lipid analysis; Blood for anti-

LCAT antibody testing." *Id.*

Disputed "You will not be compensated for your participation in this study." On July

17, 2013, the IRB approved an amendment to the protocol that stated, ""We will reimburse

you for your air flight to and from the NIH." July 17, 2013 Consent to Participate in a

Clinical Research Study, attached as Ex. 33; *see also* Doc. 190-11 at 30, lns. 113:13-18.

Disputed "None of the researchers on this protocol will receive any compensation."

The Lipoprotein Metabolism Section (Principal Investigator-Dr. Alan T. Remaley) of the

Translational Medicine Branch of the NHLBI received $ 675,000.00 from 2008 through

2019 through the CRADA between it and AlphaCore Pharma LLC and later is acquirer

MedImmune LLC. Ex. 11 at 2; Ex. 12 at 13. During that period, Dr. Remaley also disclosed receiving "$5,001–$10,000 from AlphaCore Pharma for a recombinant Lecithin-cholesterol acyltransferase development project–NIH-approved CRADA" in an April 2010 article. *See* Draper DW, Madenspacher JH, Dixon D, King DH, Remaley AT, Fessler MB. *ATP-binding cassette transporter G1 deficiency dysregulates host defense in the lung,* 182 AM J RESPIR CRIT CARE MED. 3, 404, 412 (2010), attached as Ex. 34. During that period, Dr. Remaley was also reported as receiving $ 1,160.83 in payments from MedImmune, LLC the acquirer of AlphaCore Pharma, LLC, and AstraZeneca Pharmaceuticals, LP the parent of MedImmune, LLC. *General payments—Remaley, Alan Thomas*, CENTERS FOR MEDICARE AND MEDICAID—OPEN PAYMENTS DATA (generated April 23, 2020), attached as Ex. 35.

As Dr. Sutton opined, the Protocol "failed on multiple counts to serve the required purpose of human subject protection. Each failure can be enumerated as follows: "Lack of proper IRB approval"; "care contingent on research participation"; "failure to obtain a signed [Informed Consent Form] before beginning study-related procedures"; "false hope and biased language in the ICF and Protocol"; "failure to explain clearly the details of study conduct"; "lack of disclosure re financial conflicts of interest"; "ambiguity regarding compensation"; "false promises and undue influence"; "inadequate discussion of treatment alternatives"; and "inadequate assessment of Mr. Ward's capacity to provide informed consent." Ex. 28 at 57-60.

49.The Informed Consent document states what procedures and tests are involved in the Protocol, including: screening tests, ACP-501 infusions, vital signs, blood tests, ECG, renal function tests, observation in the hospital and physical examinations. *Id*. at p. 4-6, at ¶ 6.

**RESPONSE:**      Undisputed that the Informed Consent states what procedures and tests are involved in the protocol, including: intravenous catheter, vital signs, blood

tests, urinalysis, tests of renal function, eye examinations, electrocardiogram, ACP-501 infusion, observation in the hospital or clinic, and physical examination. Doc. 190-23 at 4-6. The Informed Consent further states that blood draws will be taken either ten times or four times daily, and observation will last between one and twenty four hours, depending on the phase of the Protocol. *Id.* at 5-6.

Disputed that the Informed Consent was inclusive of procedures and tests administered to Mr. Ward during the Protocol, including abdominal ultrasound and echocardiogram. *See* NIH Clinical Center Patient Results attached as Ex. 36 at 5, 30-34.

50. The Informed Consent document also explains the risks and discomforts of participating in the Protocol, including those related to blood draw or intravenous catheter use, and those related to recombinant LCAT (ACP-501). *Id.* at p. 6-8, at ¶ 7.

**RESPONSE:**        Undisputed that the informed consent describes certain risks and discomforts related to an intravenous catheter, including bleeding, pain, bruise formation, light-headedness, fainting, nausea, and local infection. Doc. 190-23 at 6.

Disputed that the Informed Consent explained the risks and discomforts of participating in the Protocol relating to intravenous catheter use to Mr. Ward, who experienced recurrent access failures, stenosis and thromboses in a series of hemodialysis fistulae that required surgical intervention after his participation in the Protocol. *See* Emerson Hospital Records Dated July 22, 2014, January 6, 2015, August 31, 2015, October 22, 2015, June 3, 2016, July 22, 2016, and October 17, 2017, attached as Ex. 37. Dr. Schaefer wrote that during the Protocol, Mr. Ward "began having more and more problems with his veins because of all the venipunctures he had been subjected to at the NIH." April 28, 2015 Correspondence, attached as Ex. 38, at 4. Mr. Ward testified he was subjected to 731 venipunctures during the Protocol. Doc. 190-9 at 13, lns. 51:10-15. Mr. Ward further testified that under the Protocol, he spent 138 days at the NIH, *id.,* at 51:5-9; experienced

painful, extended blood draws interrupted by clotting, *id*. at 10, lns. 37:5-23; experienced

and experiences depression and trauma, *id*. at 18, lns. 71:12-17; as well as the ongoing

medical interventions required to address atrial fibrillation and fistulae failures after his

participation in the Protocol, *id*.  at 19, lns. 74:6-75:21.

51.The Informed Consent document was approved by the FDA and approved by the

IRB on December 18, 2012, with an Amendment approved on January 16, 2013. *See* Ex. 8,

at 94:18-20; *see* Ex. 20.

**RESPONSE:**        Undisputed.

52.Mr. Ward and Dr. Shamburek executed the Consent document on January 24,

2013. *See* Ex. 20, at p. 11. Dr. Shamburek confirmed that Mr. Ward understood the consent

document, the information contained therein, and that his consent was voluntary. *See* Ex.

8, at 84:1-2; 95:22-96:1.

**RESPONSE:**        Undisputed that Mr. Ward executed the Informed Consent

document, which was dated January 24, 2013.

Disputed that Mr. Ward executed the Informed Consent on that date, or that he

understood the consent document or the information contained therein; Mr. Ward testified

that he did not recognize the informed consent document, *see* Doc. 190-9 at 25, lns. 99:8-12;

he has no memory of who presented him the informed consent document; *id*. at 26, lns

101:24-102:4; and has no recollection of Dr. Shamburek leading a discussion of informed

consent with him; *id*. at 27, lns. 105:24-106:3. Further, Dr. Sutton has opined that there

was a lack of informed consent due to the failure of the Protocol and its Investigators to

provide for any evaluation of Mr. Ward's cognitive status at any time during the protocol,

despite his renal failure and its effects on cognitive function  Ex. 28 at 15, 60.

53.Dr. Schaefer did not pressure Mr. Ward to participate in the Protocol. *See*

Deposition of Edmund Ward, attached hereto as Ex. 21, at 74:15. Dr. Schaefer did not

threaten Mr. Ward to participate in the Protocol, either physically or otherwise. *Id.* at 74:12- 15. Mr. Ward never felt intimidated by Dr. Schaefer that he had to participate in the Protocol. *Id.* at 74:21.

**RESPONSE:**        Disputed. Mr. Ward repeatedly testified that Dr. Schaefer told him that "I would be promised the new batch that was coming out in the fall and in the spring and to stick with the program because if, for any reason, I dropped out, I would lose my rights of the new batch of the enzyme." Doc. 190-9 at 29, lns. 112:19-113:10; *see also* Doc. 190-9 at 12, lns. 47:12-48:1.

Further, Dr. Schaefer exerted pressure on Mr. Ward to participate in the Protocol by engaging in boundary violations with him. Dr. Schaefer engaged in boundary violations with Mr. Ward by: [1] co-publishing an article reporting Mr. Ward's FLD diagnosis that Mr. Ward testified he did not co-author; [2] paying Mr. Ward $500.00 a month to assist in publishing a manuscript on corneal opacification; [3] appointing him the director of the Familial Dyslipidemia Foundation, which Dr. Schaefer serves as Medical Consultant and Boston Heart Diagnostics Corporation serves as the Sponsor, and which supports diagnosis and research of dyslipidemias like FLD; [4] inviting him to his home. *See* Ex. 4; Doc. 190-9 at 17, lns. 67:7-68:8; April 17, 2014 Correspondence, attached as Ex. 39; November 14, 2012 Correspondence, attached as Ex. 40.

On October 6, 2015, Dr. Schaefer wrote that because Mr. Ward would no longer come to Dr. Schaefer's offices, Dr. Schaefer would no longer pay him monthly, and further that he intended to "submit the paper that we have written together on the cornea and lipid abnormalities. Your own treatment with LCAT enzyme is now up to Drs. Shamburek and Remaley to Publish." October 6, 2015, Correspondence, attached as Ex. 41.

54.Dr. Shamburek did not make any financial promises to Mr. Ward. *See* Ex. 8, at 84:7, 97:10-15. Dr. Shamburek informed Mr. Ward that he may receive no physical,

medical, economic, or any other type of benefit. *Id*. at 97:5-6.

**RESPONSE:**          Disputed. On July 17, 2013, the IRB (and Dr. Shamburek)

approved an amendment to the protocol that stated, ""We will reimburse you for your air

flight to and from the NIH." Ex. 33; *see also* Doc. 190-11 at 30, lns. 113:13-18.

55. Dr. Schafer was not involved in the drafting, review, or approval of the Informed

Consent document. *See* Ex. 8, at 115:8-12.

**RESPONSE:**          Undisputed that Dr. Shamburek testified in response to the

question of whether "Dr. Schaefer [had] any involvement in the drafting of the informed

consent form?" that, "To the best of my, I can only say I never provided for what Dr.

Schaefer did or got access, didn't but I, I don't believe he had access to it. But he would be

the one who would decide—." Doc. 190-11 at 30, lns:115:4-12,

56. Dr. Schaefer was not involved in, nor was he present for, the review and execution

of Informed Consent document by Mr. Ward at the NIH in January 2013. *See* Ex. 8, at 82:8.

**RESPONSE:**          Disputed. Dr. Schaefer testified that in January 2013, he was

present at the NIH, where he met with Dr. Remaley, Dr. Shamburek and Mr. Ward during

Mr. Ward's evaluation for participation in the Protocol. Doc. 190-6 at 31-2, lns:

120:22-123:16.

57. There is no evidence in the record that Mr. Ward reviewed the Consent document

with Dr. Schaefer before he signed it. *See* Exs. 1-33.

**RESPONSE:**          Disputed. Dr. Schaefer testified during his deposition

repeatedly about the specific content of the Informed Consent without referring to it as an

Exhibit, indicating that he reviewed it prior to his deposition. See Doc. 190-6 at 48, lns.

185:17-23; 51, lns. 197:7-18; 55, lns. 215:15-20.

58. Mr. Ward received the first ACP-501 injection at NIH on January 28, 2013. *See*

NIH Discharge Summary, dated 2/20/13, attached as Ex. 22. Each infusion took one hour,

during which time Dr. Shamburek was present. *See* Ex. 8, at 168:14-15. Mr. Ward underwent a second infusion on January 31, 2013 and a third infusion on February 7, 2013. *See* Ex. 22.

**RESPONSE:**          Undisputed that the February 20, 2013 Discharge Summary reflects that Mr. Ward received his first infusion of ACP-501 on January 28, 2013, during which Dr. Shamburek was present, and received subsequent infusions on January 31, 2013 and February 7, 2013. Disputed that Dr. Shamburek was in fact present throughout infusion. Dr. Sutton identified that all of Dr. Shamburek's written admission notes during the Protocol concerning Mr. Ward contain reviews of systems and physical examinations that are reproduced verbatim or near-verbatim, including identical formatting and punctuation, in all of Mr. Ward's NIH admission notes. Ex. 28 at 51. Either Dr. Shamburek failed to conduct reviews of systems and physical examinations, or he failed to document them.

59. On February 10, 2013, Mr. Ward experienced an episode of atrial fibrillation and was admitted to the ICU at the NIH. *Id*. Mr. Ward underwent a failed cardioversion on February 11, 2013. *Id*. He was given two days of intravenous amiodarone and on February 13, 2013, he was successfully cardioverted to normal sinus rhythm. *Id*. Mr. Ward was discharged home on February 20, 2013. *Id*.

**RESPONSE:**          Undisputed that on January 9, 2013, Mr. Ward was seen by Dr. Douglas R. Rosing, a cardiologist at the NIH Clinical Center, who reviewed Mr. Ward's blood, electrocardiogram, echocardiogram, abdominal ultrasound, and cardiac CT scan, and wrote that "Mr. Ward is due to receive recombinant LCAT replacement which apparently has not been previously administered to someone with LCAT deficiency. He is at risk for developing [atrial fibrillation] during this intervention, and we were asked to familiarize ourselves in case of this eventuality." *See* Ex. 36 at 5-6.

On February 1, 2013, prior to his third infusion of ACP-501, Dr. Rosing confirmed that Mr. Ward's electrocardiogram results were borderline.. *Id.* at 6.

On February 8, 2013, one day after his third infusion of ACP-501, Dr. Richard Cannon at the NIH Clinical Center confirmed that Mr. Ward's electrocardiogram results were abnormal. *Id.* at 5. On February 10 and 11, 2013, Dr. Cannon confirmed that Mr. Ward's electrocardiogram results showed atrial fibrillation. *Id.* at 6, 9. On February 11, 2013, Dr. Cannon confirmed that Mr. Ward's echocardiogram results showed atrial fibrillation. *Id.* at 7.

Dr. Shamburek recorded that Mr. Ward was admitted to the intensive care unit, given intravenous antiarrhythmic drugs, underwent an echocardiogram and a failed cardioversion, given two days of intravenous amiodarone, and cardioverted again, this time successfully. Doc. 190-25 at 2.

Dr. Shamburek characterized this atrial fibrillation as an adverse event, but claimed it was "not attributed to ACP-501." R. Shamburek et al., *Familial Lecithin:Cholesterol Acyltransferase Deficiency: First-in-Human Treatment with Enzyme Replacement*, 10 J. CLIN. LIPIDOL. 2, 356-67 (Apr. 2016), doi:10.1016/j.jacl.2015.12.007, Doc 190-13 at 2. Dr. Shamburek later testified it was a serious adverse event. Doc. 190-11 at 54, lns. 209:19-23. The Protocol defines serious adverse events as those that are life-threatening or require in-subject hospitalization or prolongation of existing hospitalization. *See* Doc. 190-22 at 46. The Protocol further states that the Principal Investigator is to assess the relationship of an adverse event to treatment as definite, probable, possible, not likely, or unrelated. *Id.* at 44-5. Adverse events are only determined to be "unrelated" to treatment only where "There is not a temporal or causal relationship to the investigational product administration." *Id.* Under the Protocol, the atrial fibrillation could not be classified as "unrelated." *Id.* A Severe Adverse Event or CTCAE Grade 3 AE occurs when the adverse event "Interferes

significantly with subject's usual function." Doc. 190-22 at 44.  Mr. Ward was to "stop

receiving ACP-501 and the study will be put on hold if: the subject has a CTCAE Grade 3 or

higher event regardless of whether it is attributed to ACP-501 (unless it is caused by an

accident that could not reasonably be attributable to the drug.)" Doc. 190-22 at 45. On

February 13 and February 17, Dr. Cannon confirmed that Mr. Ward's electrocardiogram

results were abnormal. *Id.* at 10-11. On February 19, 2013, Mr. Ward received his fourth

infusion of LCAT. Doc. 190-25 at 2.

On February 20, 2013, 27 days after his first admission for infusion of ACP-501, Mr.

Ward was discharged. Doc. 190-25 at 2. Dr. Shamburek stated that Mr. Ward "will remain

in close contact with Dr. Price concerning his renal status and anemia." *Id.* Dr. Price did

not see Edmund Ward from the time he began the protocol until June 19, 2013. Docs.

190-31, 32.

On March 4, 2013, Dr. Schaefer referred "my patient" Mr. Ward to cardiologist Dr.

Mark Estes for evaluation of treatment options for his atrial fibrillation. March 4, 2013

Correspondence, attached as Ex. 42. The Protocol was not put on hold.

60. Mr. Ward returned to the NIH for 19 more doses of ACP-501. [FN5: Mr. Ward

received the 19 additional infusions on the following dates: February 28, 2013, March 7,

2013, March 14, 2013, March 21, 2013, March 28, 2013, April 4, 2013, April 11, 2013, April

25, 2013, May 9, 2013, May 23, 2013, May 30, 2013, June 13, 2013, June 27, 2013, July 11,

2013, July 25, 2013, August 8, 2013, August 15, 2013, August 29, 2013, and September 19,

2013.] *See* NIH Discharge Summary of Mr. Ward, dated September 20, 2013 attached as

Ex. 23. No other complications or complaints were documented. *Id.*

**RESPONSE**:          Disputed. Mr. Ward received 19 additional infusions of

ACP-501. Doc. 190-26 at 3. Complications and complaints were documented; Dr.

Shamburek reported three adverse events during the Protocol, including atrial fibrillation,

a mild viral syndrome, and hemodialysis. Doc 190-13 at 2.

As to the viral syndrome, Mr. Ward should have been excluded from the study as a consequence thereof, but he was not. Dr. Shamburek reported, "The subject presented with a viral syndrome consisting of chills and fatigue that started on day 65, the day before dose 10 infusion. He developed a low grade fever prior to the infusion and became febrile to 39.9°C before normalizing in 3 days." Doc 190-13 at 3. This was reported as an adverse event, *id.*, but under the Protocol it was listed under Exclusion Criteria: "Subject will not be included in the study if he presents with any of the following: history of febrile illness within 5 days prior to dosing." Doc. 190-22 at 22.

Undisputed that Mr. Ward received infusions on those dates.

61. Dr. Schaefer was not involved in the administration of the Protocol to Mr. Ward in any capacity, and he did not administer any infusions. *See* Ex. 8, at 45:24-46:14.

**RESPONSE:**          Disputed. Dr. Schaefer was involved in the administration of the Protocol to Mr. Ward. The Protocol required the home physician to monitor Mr. Ward and provide treatment. Doc. 190-22 at 20. Dr. Schaefer is the home physician, because, as Dr. Sutton further concluded, Dr. Schaefer was intended to fill the role of the "home physician" based on "the inclusion of Dr. Schaefer's name in version 2 of the protocol as the home physician, the change at that time to his title as co-investigator, the lack of any explanation as to who the "home physician" was in the final version, or what his or her role would be." Ex. 28 at 61.

Further, as Dr. Sutton concluded, Dr. Schaefer "was indeed an investigator, though not named as such. This is clear from the nature of his involvement in this protocol from the onset, as well as his clearly stated role in the second version of the protocol draft." Ex. 28 at 60. Dr. Sutton further cites as examples of this involvement: (1) Dr. Schaefer's role in obtaining samples, (2) his role as the home physician, (3) his conducting research activities.

Ex. 28 at 61.

Undisputed that Dr. Schaefer did not administer any infusions.

62.Mr. Ward did not pay for the treatment he received at the NIH, and he was reimbursed for all of his travel expenses to and from the NIH for treatment. *See* Ex. 8, at 111:21.

**RESPONSE:**       Disputed that Mr. Ward did not pay for the treatment he received at the NIH. Dr. Schaefer wrote that Mr. Ward provided his data, time and effort to AlphaCore Pharma, LLC. Ex. 22 at 2. Mr. Ward testified that he was reimbursed expenses but was uncertain if all expenses had been reimbursed. Doc. 190-9 at 29, lns. 111:4-9.

63.On September 30, 2012, Dr. Schaefer informed Dr. Remaley and Dr. Shamburek that Mr. Ward decided it was no longer worthwhile to continue receiving ACP-501 infusions at the NIH. *See* Email Correspondence from Dr. Schaefer to Dr. Remaley and Dr. Shamburek, dated 9/30/13, attached as Ex. 24. Mr. Ward never returned to the NIH. *See* Ex. 8, at 270:12.

**RESPONSE:**       Disputed. On September 30, 2013, Dr. Schaefer wrote Drs. Shamburek and Remaley: "After lengthy discussions with the patient and his family, **I have decided** that it is no longer worthwhile that he get any more therapy at NIH." Doc. 190-27 (emphasis added). Dr. Schaefer continued that Mr. Ward "has given a lot of his time and effort to participating in this project - **I do not feel** he gains anything further by continuing." *Id. (*emphasis added)

64.Mr. Ward has been receiving dialysis three times per week since July 2013. *See* Ex. 6, at 216:1-6.

**RESPONSE:**       Disputed. Mr. Ward has required dialysis more than three times per week on an intermittent basis due to hyperalkemia and inadequate clearance since 2014. *See, e.g.* Medical Justification for Hemodialysis Treatments in Excess of Three

Times Weekly Forms dated October 23, 2014 and October 20, 2015, attached as Ex. 43.

65. Mr. Ward testified that after he terminated his participation in the Protocol at NIH, Dr. Shamburek threatened him to continue his participation by yelling at Mr. Ward on the phone. *See* Ex. 21, at 73:23-74:7.

**RESPONSE:** Undisputed that Mr. Ward testified: "Dr. Robert Shamburek threatened me when I wanted to – when Dr. Schaefer finally, in the fall of 2013, recommended that I withdraw from the program, Dr. Shamburek threatened me, yelling on the phone." Doc. 190-9 at 19 lns. 73:23-74:7.

66. From 2010 to 2012, Mr. Ward was counseled by multiple medical providers on renal replacement options given his advancing chronic kidney disease, including dialysis (hemodialysis and peritoneal dialysis) and transplantation. *See* BIDMC Medical Record dated 12/5/11, attached as Ex. 25; *see* BIDMC Medical Record dated 1/4/12, attached as Ex. 26; *see* Lahey Medical Record dated 5/11/12, attached as Ex. 27.

**RESPONSE:** Undisputed that Mr. Ward consulted Nurse Lisa Dumouchel on December 5, 2011, who counseled him on dialysis options, access types, peritoneal dialysis, peritoneal catheter surgery, transplantation, lifelong immunosuppressant medications, post-op risks including rejection, infection, and rare cancer risk. Doc. 190-28 at 2.  Nurse Dumouchel wrote, "At this time he finds the risk of immunosuppression more than he is willing to take."

Mr. Ward consulted with Dr. Roshan on January 4, 2012, who wrote that "he met with Dr. Pavlakis and Noelle Dimitri for transplant evaluation. He remains extremely hesitant to move forward with kidney transplant for fear of the risks associated with immunosuppression." Doc. 190-29 at 1. Dr. Roshan added that Mr. Ward "is also quite adamant about not taking a kidney [from] a sibling whereby he would be putting their lives at risk. He states that transplantation is not an option at the moment." *Id.* Dr. Roshan

continued: "Mr. Ward and his sister watched our option teaching video and he has decided he would do in center hemodialysis when the time comes for dialysis." *Id.* at 3.

Mr. Ward consulted with Dr. Edward Walshe on May 11, 2012. Dr. Walshe noted that Mr. Ward had "met with the transplant services downtown but elected to proceed with dialysis as the alternative for a number of reasons including the fact that he does not wish to have long-term exposure to immunosuppression, he has concerns about post-transplant drug coverage and he does not want a sibling to donate." Dr. Walshe continued, "Furthermore he correctly identifies he is not diabetic he should be able to live reasonably well for more than 10 years while on dialysis." *Id.* Dr. Walshe concluded, "While it is not my role today at the initial visit to convince him to proceed with transplantation I do believe he should reconsider organ dual transplantation, and OLT or an LDALT as definitive care for the enzyme deficit and a renal transplant as definitive care for end-stage renal disease." Dr. Walshe added, "There is also a small amount of clinical data to support this approach in a very small patient population." Doc. 190-30 at 4.

67. In or around April 2012, Mr. Ward had a fistula placed in preparation for dialysis. *See* Emerson Hospital Medical Record dated 12/5/12, attached as Ex. 28; *see* also Ex. 6, at 238-239.

**RESPONSE:**        Undisputed on March 14, 2012, Nurse Dumouchel wrote Mr. Ward, stating that "as we discussed, your creatinine level continues to rise and is now 4.5. It is time to meet with the dialysis access team. I have contacted Louise Riener our dialysis access nurse. You should have heard from her by now with an appointment to meet with her and the surgeon." March 14, 2012 Record, attached as Ex. 44. On April 17, 2012, Dr. Amy Evenson diagnosed Mr. Ward with chronic kidney disease stage 5, preformed the left radiocephalic arteriovenous fistula procedure, and noted that "The patient is a 51-year-old-man with chronic kidney disease who is nearing the need for renal replacement therapy.

Hemodialysis access was advised." April 17, 2012 Record, attached as Ex. 44.

68. On December 5, 2012, Mr. Ward began seeing nephrologist Dr. Valerie Price. *See* Ex. 28. Dr. Price noted that Mr. Ward was hesitant to begin hemodialysis because he was awaiting FDA approval to receiveACP-501. *Id*. She diagnosed Mr. Ward with Stage V chronic kidney disease but did not recommend he start dialysis. *Id*.

**RESPONSE:**    Disputed. On December 5, 2012, Mr. Ward was referred by Dr. Hatton to be evaluated by Dr. Valerie Price, who admitted Mr. Ward to the emergency department for low hematocrit**.** Doc. 190-31 at 1.

Dr. Price noted "he has been hesitant to start HD [hemodialysis] b/c he's awaiting FDA approval of recombinant L-CAT which he hopes will reverse his renal failure; he worries that starting dialysis will render him ineligible for the drug." *Id.* at 1.

Dr. Price wrote that she would recommend hemodialysis if Mr. Ward's renal function declined further, and added that it should start soon: "If BUN > 110 or creat[inine] > 5.5, would rec. starting HD [hemodialysis]. (No rush, he has been uremic x mos). OR if he wants to start HD. Overt uremic sx (N/x) but should start soon." *Id.* at 2; *see also* Ex. 28 at 40.

69. On June 19, 2013, Mr. Ward saw Dr. Price, who noted that while the ACP-501 infusions had increased Mr. Ward's HDL from undetectable levels to about 14, his renal function had not improved dramatically. *See* Pratt Medical Group Medical Record of Mr. Ward, dated 6/19/13, attached as Ex. 29. She also noted that "it is possible that the infusions are helping prevent worsening of renal function, which is helpful in staving off dialysis, but ultimately may not be enough to reverse the damage already done." *Id*. Dr. Price opined that Mr. Ward did not need to start dialysis as of June 19, 2013, but if he began to feel worse, they would initiate dialysis treatments. *Id*.

**RESPONSE:**    Undisputed that Dr. Price wrote on June 19, 2013, that Mr.

Ward's creatinine levels had exceeded what she previously recommended as a guideline for starting hemodialysis: "While the infusions have increased his HDL from undetectable levels to about 14, his renal function has not improved dramatically (BUN went from 140 to 110, creatinine still 6.5 to 6 mg/dl)." Doc. 190-32 at 1. Dr. Price continued, "it is possible that the infusions are helping prevent worsening of renal function, which is helpful in staving off dialysis, but ultimately may not be enough to reverse the damage already done." It was Dr. Price's opinion that "he does not need to start dialysis yet. If he develops nausea or confusion or generally feels worse, we can start hemodialysis." *Id.* at 4. Dr. Price concluded, "Obviously it would be easier for him to stay off dialysis and continue traveling to DC but he could certainly have dialysis there as well if needed." *Id.* Dr. Sutton opined that there was no justification for prolonging dialysis in view of the "that by January of 2013, the chance of rhLCAT reversing his renal failure sufficiently to bring him to a lesser stage of CKD and/or reverse his azotemia was much less than the substantial risks of allowing him to go for months and months in advanced renal failure." Ex. 28 at 62.

70. On July 10, 2013, Dr. Price recommended Mr. Ward begin dialysis. *See* Dialysis Clinic Note dated 7/10/13, attached as Ex. 30. Mr. Ward electively began dialysis on July 18, 2013. *See* NIH Admission History and Physical dated 7/24/13, attached as Ex. 31.

**RESPONSE:** Undisputed that on July 10, 2013 Dr. Price sent a note to the DCI Walden Pond dialysis clinic, stating "pt needs to start next week. Could start Mon or Tues? Ordered hep panels. Gets labs drawn at NIH every other week. Pt needs to travel wed to Fri every other week to DC – off next week." Doc. 190-33. Dr. Price enclosed Mr. Ward's June 10, 2013 record. *See* July 10, 2013 Referral, attached as Ex. 45. On the same date, the DCI Walden Pond dialysis clinic sent a facsimile stating, "This patient was cleared back in December but never started dialysis because he was part of a research project. Now he needs to start dialysis, so you may or may not have him in your records."

*See* July 10, 2013 Request, attached as Ex. 46.

Mr. Ward began "elective" dialysis only insofar as he began dialysis at the recommendation of Dr. Price, who stated that he "needs to start next week." Doc. 190-33. Dr. Schaefer characterized Mr. Ward's dialysis as follows: "In the middle of July 2013 his nephrologist made the decision to place him on dialysis three times per week because his BUN was > 140 mg/dL and his creatinine value exceeded 7.5 mg/dL, and he had increasing fatigue." Ex. 38 at 4.

This is in contrast to "urgent" dialysis, which is the result of hospitalization or other exigency. *See e.g.* J. Buck et al., *Why do patients known to renal services still undergo urgent dialysis initiation? A cross-sectional survey*, 22 NEPHROLOGY DIALYSIS TRANSPLANTATION 11, 3240–3245 (November 2007), https://doi.org/10.1093/ndt/gfm387, attached as Ex. 47; P. Brown et al., *Factors Associated with Unplanned Dialysis Starts in Patients followed by Nephrologists: A Retrospective Cohort Study*, 10 PLOS ONE 6 (2015), https://doi.org/10.1371/journal.pone.0130080, attached as Ex. 48; C.P. Kovesdy et al., *Abrupt Decline in Kidney Function Precipitating Initiation of Chronic Renal Replacement Therapy,* 3 KIDNEY INTERNATIONAL REPORTS 3, 602–609 (2017), https://doi.org/10.1016/j.ekir.2017.12.007, attached as Ex. 49.

Finally, Mr. Ward's hemodialysis was delayed by the Protocol. "Over the 31 months prior to inclusion into this trial, the patient's renal function rapidly declined with the creatinine increasing from 2.5 to 5.6 mg/dL and BUN 67 to 149 mg/dL, necessitating the placement of a fistula in his arm in anticipation of dialysis within weeks. The prior year, a random urine had 29 mg/dL of protein and 2 months ago there was >300 mg/dL of protein and a few rbc's in the urine. There was never any evidence of nephrotic syndrome. **Hemodialysis was delayed pending the trial of rhLCAT."** R. Shamburek et al., *Familial Lecithin:Cholesterol Acyltransferase Deficiency: First-in-Human Treatment with*

*Enzyme Replacement – Supplemental Patient History*, 10 J. Clin. Lipidol. 2 (Apr. 2016),

doi:10.1016/j.jacl.2015.12.007, attached as Ex. 50.

71.Mr. Ward authorized the NIH to release his records to Dr. Valerie Price. *See* Ex.

8, at 201:6-10. Mr. Ward did not authorize the release of his records of treatment at NIH to

Dr. Schaefer. *See* Ex. 8, at 200:22-24, 201:6-10. Dr. Schaefer has never received or reviewed

Mr. Ward's medical records from the NIH. *Id.*

**RESPONSE:**          Disputed. Mr. Ward did not execute the records release

authorization. *See* Doc. Doc. 190-23 at 16.

72.During the course of Mr. Ward's involvement in the NIH Protocol, he would

present to Dr. Schaefer at BHD and have his blood drawn and characterized to evaluate his

kidney function. [FN 6: Mr. Ward had his blood drawn at Boston Heart Diagnostics on the

following dates: November 9, 2012, January 2, 2013, February 21, 2013, March 2, 2013,

March 16, 2013, March 29, 2013, April 26, 2013, June 7, 2013, June 15, 2013, July 22, 2013

and July 29, 2013. See Ex. 42.] *See* Dr. Schaefer's Answers to Plaintiff's Interrogatories, at

Answer No. 12, attached as Ex. 32.

**RESPONSE:**          Undisputed that, consistent with the Protocol, Mr. Ward was

monitored by his home physician, Dr. Schaefer. *See* Doc. 190-22 at 10, 20, 21. The Protocol

required the home physician to monitor and treat Mr. Ward's renal function. Doc. 190-22 at

20. Dr. Schaefer is the home physician, because, as Dr. Sutton further concluded, Dr.

Schaefer was intended to fill the role of the "home physician" based on "the inclusion of Dr.

Schaefer's name in version 2 of the protocol as the home physician, the change at that time

to his title as co-investigator, the lack of any explanation as to who the "home physician"

was in the final version, or what his or her role would be." Ex. 28 at 61.

Undisputed that Dr. Schaefer drew samples of Mr. Ward's blood for research on

those dates. Disputed that those dates are inclusive. Dr. Schaefer drew samples of Mr.

Ward's blood on November 9, 2012, January 2, 2013, February 21, 2013, March 2, 2013,

March 16, 2013, March 29, 2013, April 26, 2013, June 7, 2013, June 15, 2013, July 22, 2013,

July 29, 2013, and **November 13, 2013**. *See* Boston Heart Diagnostics Corporation

Records, attached as Ex. 51, at 4, 9, 16, 20, 25, 30, 35, 39, 44, 49, 54, 59;

*see also* November 14, 2013 Correspondence, attached as Ex. 52. On the order sheet for each

test performed on those samples drawn from Mr. Ward, Dr. Schaefer indicated "Research"

on the header of each order sheet, and in the insurance information and self-pay fields. Ex.

50 at 3, 8, 13-15, 19, 24, 29, 34, 38, 43, 48, 53, 58. Dr. Schaefer wrote of the initial blood

draw results that the treatment had normalized Mr. Ward's HDL and claimed "your

creatinine slowly seems to be coming down."  April 12, 2013 Correspondence, attached as

Ex. 53.  However, the attached results show that Mr. Ward's creatinine and BUN,

measures of kidney function, increased before and after every treatment, while his HDL

increased by a mean of 88 %. *Id.* at 2.  Dr. Schaefer never obtained Mr. Ward's written

consent for these draws, and he had no IRB approval for these draws  *See* Ex. 28 at 60.

 73.The blood draws that occurred at BHD were not part of the Protocol and were not

done at the request of the NIH. *See* Ex. 8, at 204:20-205:4.

 **RESPONSE:**  Disputed. The Protocol required the home physician to monitor

and treat Mr. Ward's renal function. Doc. 190-22 at 20. Dr. Schaefer is the home physician,

because, as Dr. Sutton further concluded, Dr. Schaefer was intended to fill the role of the

"home physician" based on "the inclusion of Dr. Schaefer's name in version 2 of the protocol

as the home physician, the change at that time to his title as co-investigator, the lack of any

explanation as to who the "home physician" was in the final version, or what his or her role

would be." Ex. 28 at 61. Therefore, Dr. Schaefer's blood draws were part of the Protocol.

 74.The results of the Compassionate Use Protocol were published in an article titled

"Safety and Tolerability of ACP-501, a Recombinant Human Lecithin:Cholesterol

Acyltransferase, in a Phase 1 Single-Dose Escalation Study" in 2016. *See* Ex. 12. The publication concludes that Mr. Ward experienced an increase in his HDL from ACP-501. *Id.*

**RESPONSE:** Disputed. The article entitled "Safety and Tolerability of ACP-501, a Recombinant Human Lecithin:Cholesterol Acyltransferase, in a Phase 1 Single-Dose Escalation Study " was published on December 1, 2015 and reported the results of a single infusion of ACP-501 in sixteen individuals with stable chronic heart disease and low HDL-C. Ex. 190-15 at 1.

In April 2016, Drs. Shamburek and Remaley, and Rebecca Bakker-Arkema, Bruce Auerbach, and Brian Krause of AlphaCore Pharma, LLC published an article entitled "Familial Lecithin:Cholesterol Acyltransferase Deficiency: First-in-Human Treatment with Enzyme Replacement." *See* Doc. 190-13 at 1. That article reported that "The study was conducted after FDA review under an Investigational New Drug 117100 as an Expanded Access Protocol." *Id.* at 3. The article concluded, "**After infusion, HDL-C rapidly increased**," and "rhLCAT treatment appeared to slightly improve the subject's renal function or at least stabilized it." *Id.* at 1, 11 (emphasis added).

75.Authors include Dr. Shamburek, Dr. Remaley, and Mr. Auerbach. [FN7: The "Financial Disclosures" states, "Rebecca Bakker-Arkema, Bruce Auerbach, Brian Krause, and Reynold [Homen] were employees of [ACP] (now owned by AstraZeneca PLC). Rebecca Bakker-Arkema is currently employed by MedImmune, LLC, Gaithersburg, MD.] See Ex. 12. *Id.*

**RESPONSE:** Undisputed that the Financial Disclosure to the article entitled Familial Lecithin:Cholesterol Acyltransferase Deficiency: First-in-Human Treatment with Enzyme Replacement." *See* Doc. 190-13 at 11.

76.Dr. Schaefer was not listed as an author on the publication. *See* Ex. 12. Dr. Schaefer is thanked in the Acknowledgements section: "The authors want to thank Dr. E.

Schaefer at Tufts University for advice and referring the patient." *Id.* at p. 366.

    **RESPONSE:**    Undisputed that Dr. Schaefer was not listed as an author in the article entitled "Safety and Tolerability of ACP-501, a Recombinant Human Lecithin:Cholesterol Acyltransferase, in a Phase 1 Single-Dose Escalation Study", despite attempting co-publication with the listed authors repeatedly. This included sending draft journal articles regarding the Protocol and requests to co-publish on March 16, 2013, October 16, 2013, August 20, 2013. *See* Exs. 30, 64, 66.

    Dr. Schaefer objected to his exclusion from publication of the journal article abstract on the Protocol. On December 4, 2013, Dr. Schaefer wrote," Hello Alan - Bela and I were very unhappy to be excluded from the attached abstract - please no longer use any data on the patient that I have provided to you. Please consider any collaboration between us to be over." Dr. Schaefer recited his contributions to the protocol: "We worked with you to get compassionate use by FDA for this patient," "got letters from at the time Senator Kerry and Congressman Markey," "made all the travel arrangement for the patient for the first 14 visits," "provided you with any data that we had on the patient," and "wrote a manuscript about the treatment." Dr. Schaefer concluded, "Clearly by placing your name on this abstract without us you have decided not to include us as co-authors. I find this action unacceptable. I will now file a formal complaint with the NIH. Ernie Schaefer." December 4, 2013 Correspondence, attached as Ex. 54.

    After Dr. Schaefer's objection, he was added to the Protocol for the purpose of the analysis of HDL particle changes over time in a separate paper. On February 20, 2014, Drs. Remaley and Shamburek obtained an approval from the NHLBI IRB to amend the Protocol to add: "Coded samples from time points will be sent to Dr. Ernst Schaefer and Dr. Bela Asztalos to perform 2D-gel electrophoresis for HDL subfraction analysis quantifying apoA-I in HDL particles." Ex. 31 at 2.

On the same date, Dr. Schaefer wrote to Dr. Remaley enclosing the draft journal article regarding the Protocol, proposing, "that you work with Bob to modify the attached and submit to a journal of your choice. If we do get samples from Bob - we will run them as expeditiously as possible to document the time course." *Id*. Dr. Schaefer wrote that these results "possibly could be a separate paper depending on what we find." *Id*.

Dr. Schaefer continued to attempt to co-publish a journal article regarding the Protocol, writing on April 17, 2014, to Dr. Remaley, "with regard to the paper - as you know - a draft is attached - we could incorporate the HDL particle changes before and after treatment over time in a separate paper." April 17, 2014, Correspondence, attached as Ex. 55.

On January 9, 2015, Dr. Remaley wrote, "Ernie-I will try to call you tomorrow to catch up on things. We are submitting this week the paper on the Phase I study and I have now started working on the paper with Becky about Ed. We are using what you wrote already as the first draft." January 20, 2015, Correspondence, attached as Ex. 56.

On January 20, 2015, Dr. Schaefer wrote to Dr. Remaley to inquire the status of the draft journal article regarding the Protocol, which he "last sent to you last summer (July 2014) - about 6 months ago. If Bob does not want to submit - tell us what should be done - do you want to submit it as first author and decide on authorship - please advise about this." *Id*. Dr. Schaefer continued to propose, "With regard to the time points for the infusion - my understanding is that you have now provided the data to Hugh Barrett which is great." Dr. Schaefer offered "to work with you, Bela and Hugh to write up the paper," but warned, "Please let us know how to proceed here. Doing nothing is no longer acceptable to us." *Id*.

On March 15, 2015, Dr. Remaley wrote, "Here is a draft of the paper. I still need to finish the discussion and we have to make the final copy of the figures. Please go ahead and

add back any thing I cut out you think is important to keep or we can use some of the data for another paper." March 15, 2015 Correspondence, attached as Ex. 57.

On April 28, 2015, Dr. Schaefer wrote back with the draft and the final copy of the data:: "Hi Alan - please find attached letter sent to Dr. Sack and revised paper along with table and figure you requested." Ex. 38 at 1.. The letter to Dr. Sack related that he had "contacted Alan [Remaley] about getting compassionate use treatment for my patient" and that "about one month ago I did receive a draft of the manuscript on the treatment of my patient which had been modified." *Id.* at 5. Dr. Schaefer concluded, "Dr. Shamburek is a detriment to the NIH in that he does not serve as a collaborative physician and scientist." *Id.* at 5.

On August 4, 2015, Dr. Remaley wrote Dr. Schaefer, "Here is the latest draft. Please let me know if you and Bella would like to be an author, which is what I would prefer, but it is ok too if you only want to be acknowledged." August 4, 2015 Correspondence, attached as Ex. 58. Dr. Remaley added he was "hoping the IRB problem would be resolved by now but we can't use your 2D-gel data until you are an associate investigator but Lita redid the 2D-gels and they are a better quality now. If you prefer to just be acknowledged see what Bob wrote in the acknowledgment section." *Id.*

On December 15, 2015, Dr. Remaley wrote Dr. Schaefer, informing him that Dr. Shamburek reported him to the NHLBI IRB for sharing the codes with Hugh Barrett. "I explained to the IRB that my intention was not to break any rules but to collaborate with you and Hugh on the project and that Bob was trying to block me from doing this.." December 15, 2015 Correspondence, attached as Ex. 59.

The article was published without Dr. Schaefer as an author on January 8, 2016. Doc. 190-15. On April 7, 2016, Dr. Schaefer wrote, "Hi Alan - saw the paper on LCAT Rx in the J Clin Lipidol - can we now go ahead and analyze the time point data on the particles

with Dr. Barrett." April 15, 2016 Correspondence, attached as Ex. 60.

On April 15, 2016, Dr. Remaley replied, "Hello Ernie and Hugh, I met today with Richard Cannon, the head of our IRB. It was decided by the IRB that my sharing with Hugh the codes so that he could do the analysis was a clear violation of the protocol." Dr. Remaley concluded, "At some point in the future once the OHSR investigation is over, we may be able to revisit the situation but will have to have IRB approval to share the information." *Id.*

The NHBLI IRB concluded, "Stipulation 2: The data specified in the problem report may not be published because they were obtained without IRB approval. Following a meeting with the Chair, Dr. Alan Remaley contacted Drs. E. Schaefer and H. Barrett to inform them of this situation." April 22, 2016 Correspondence, attached as Ex. 61, at 2.

77. The data gathered from the BHD blood draws was not included in the publication. *See* Ex. 8, at 205:21-206:3; *see* also Ex. 12. The data gathered from the BHD blood draws has never been published. *See* Ex. 8, at 170 and 221. *See* Ex. 12.

**RESPONSE:**      Undisputed that the data gathered in the BHD blood draws was not included in the publication "Safety and Tolerability of ACP-501, a Recombinant Human Lecithin:Cholesterol Acyltransferase, in a Phase 1 Single-Dose Escalation Study."

Disputed that the information gathered from the BHD blood draws was never published. Dr. Schaefer testified that he published Mr. Ward's data in the publication E. Schaefer et al., *Genetic and secondary causes of severe HDL deficiency and cardiovascular disease*, 59 J. LIPID RES. 12, 2421–2435 (2018), attached as Ex. 62; Doc. 190-7 at 24, 317:22-319:2.

78. On or about April 3, 2013, approximately halfway through the Protocol, it was announced that MedImmune had acquired ACP. [FN8: MedImmune is the global biologics research and development arm of AstraZeneca. *See* fn. 9.] [FN 9: See https://

www.astrazeneca.com/media-centre/press-releases/2013/astrazeneca-medimmune-alphacorepharma-biologics-03042013.html#. The press release states that "cardiovascular and metabolic disease is a core therapy area for AstraZeneca's small and large molecule research." *Id.*] The financial details of the acquisition were not disclosed at that time.

**RESPONSE:**        Undisputed that on April 3, 2013, AstraZeneca Pharmaceuticals LP announced that its biologics arm, MedImmune LLC had acquired AlphaCore Pharma, LLC for an undisclosed amount. Disputed that it April 3, 2013 was approximately halfway through the Protocol, as the Protocol was scheduled to take place over one full year. *See* Doc. 190-22 at 20, § 6.1.

The NHLBI reported that "In 2013, less than six years after AlphaCore's founding, the company was acquired by AstraZeneca on the strength of rhLCAT's potential as a treatment for CHD." Ex. 10 at 2. Dr. Remaley reported that "In the past year, we completed a protocol treating a single patient with Familial LCAT Deficiency with recombinant LCAT." *NIH Annual Intramural Research Report HL006092-05*, NATIONAL INSTITUTES OF HEALTH (September 30, 2014) attached as Ex. 63.. Dr. Remaley further reported that, "Based on these results and a promising Phase I study done at the NIH, showing the safety of recombinant LCAT, AlphaCore Pharma, the original licensee of the NIH patent on recombinant LCAT, was acquired by AstraZeneca." *Id.* Dr. Remaley knew that AlphaCore Pharma, LLC intended to be acquired by another company. Doc. 190-10 at 17, lns. 62:12-19.

79. By April 3, 2013, Mr. Ward had received 8 out of 22 doses of ACP-501. Supra, at fn 7; *see also* Ex. 5, at 62:13-18.

**RESPONSE:**        Undisputed.

80. Dr. Schaefer never provided any data from the BHD blood draws for Mr. Ward to ACP, MedImmune or AstraZeneca. *See* Ex. 3, at 188:5-9.

**RESPONSE:**        Disputed. Dr. Schaefer provided data from the BHD blood

draws for Mr. Ward to Bruce Auerbach and Brian Krause of AlphaCore Pharma, LLC as well as Dr. Remaley or Dr. Shamburek, on March 16, 2013, April 12, 2013, and August 20, 2013.

On March 16, 2013, Dr. Schaefer sent Mr. Ward's blood draw data and a request for reimbursement of Mr. Ward's travel expenses to Dr. Remaley, Dr. Shamburek, and Bruce Auerbach and Brian Krause of AlphaCore Pharma, LLC, proposing a schedule for further sampling and joint publication and presentation of the data of the data. March 16, 2013 Correspondence, attached as Ex. 64, at 1-2. On April 12, 2013, Dr. Schaefer sent additional blood draw data along with a request for reimbursement of Mr. Ward's travel expenses, to Bruce Auerbach and Brian Krause of AlphaCore Pharma, LLC. April 12, 2013, Correspondence, attached as Ex. 65. On August 20, 2013, Dr. Schaefer sent complete blood draw data along with a draft paper to Dr. Shamburek, Bruce Auerbach and Brian Krause. Ex. 30.

Dr. Schaefer's testimony was equivocal. He testified: "Q: but you never provided Mr. Ward's data to anybody at AlphaCore during the ACP-501 study, did you? A: I provided it to Dr. Remaley. Whether Dr. Remaley provided it to AlphaCore, I don't know." Doc. 190-6 at 48, lns: 188:5-9.

81.Dr. Shamburek and Dr. Remaley did not receive any type of compensation or financial remuneration from the sale of ACP and did not have any financial interest in ACP- 501. *See* Ex. 7, at p. 20:1-4, 66:12-16; 116:5-10; *see* Ex. 8, at p. 56:22-57:1.

**RESPONSE:**          Disputed. The Lipoprotein Metabolism Section (Principal Investigator-Dr. Alan T. Remaley) of the Translational Medicine Branch of the NHLBI received $ 675,000.00 from 2008 through 2019 through the CRADA between it and AlphaCore Pharma LLC and later its acquirer MedImmune LLC. Ex. 11 at 2; Ex. 12 at 13. That CRADA was established so that the Lipoprotein Metabolism Section and Dr. Remaley

could "determine the possible clinical utility of LCAT supplementation or replacement as a treatment for three different disorders, namely Familial LCAT deficiency, (FLD), acute coronary syndrome (ACS), and nephrotic syndrome (NS)." Ex. 11 at 2. Dr. Remaley was reported as receiving $ 1,160.83 in payments from Medimmune, LLC the acquirer of AlphaCore Pharma, LLC, and AstraZeneca Pharmaceuticals, LP the parent of Medimmune, LLC. Ex 48.

82. Dr. Schaefer did not receive any financial incentive, bonus or payment relating to or stemming from the sale of ACP. *See* Ex. 32, at Answer Nos. 7, 9, 10.

**RESPONSE:** Disputed. Relating to and stemming from the sale of AlphaCore Pharma, LLC, Dr. Schaefer: [1] executed a Cooperative Research and Development Agreement with the acquirer in that transaction, MedImmune, LLC, a division of AstraZeneca Pharmaceuticals, LP, that resulted in [2] payments to Boston Heart Diagnostics Corporation, the company co-founded by Dr. Schaefer, and the Tufts University Cardiovascular Nutrition Laboratory, where he is a Senior Scientist.

On October 16, 2013, Dr. Schaefer wrote to Dr. Remaley, "I did mention to Sotirios [Karathanasis] that at Boston Heart Diagnostics out of 53,774 male we have seen 33 with an HDL-C value < 10 mg/dL (for LDL-C > 500 this number was 3) ... Even if 50% of these patients had LCAT deficiency then potentially one would have about 50,000 people in the US who would potentially be eligible." October 16, 2013 Correspondence, attached as Ex. 66. On January 23, 2014, Dr. Schaefer wrote, "Hi Sotirios - hope all is well - any progress on the LCAT enzyme replacement. Please advise – thank you - Ernie Schaefer." *Id.* March 20, 2014, Correspondence, attached as Ex. 67.

On March 20, 2014, Dr. Schaefer wrote to Sotirios Karathanasis of MedImmune, LLC, "What is happening with LCAT enzyme replacement for LCAT deficient patients? – The patient I am following with LCAT deficiency is now on dialysis - but I would like to

work with you to do everything we can for other LCAT deficient patients before they develop kidney failure requiring dialysis." March 20, 2014, Correspondence, attached as Ex. 68.

On April 3, 2014, Dr. Schaefer wrote, "Hi Sotirios, Hope the meeting in Rome was good. Please find attached a proposed screening method for patients with LCAT deficiency, resulting in a potential collaboration between Boston Heart Diagnostics, Medimmune, and the Dyslipidemia Foundation. Let me know your thoughts. Thank you – Ernie." April 3, 2014, Correspondence, attached as Ex. 69.

On May 15, 2014 Sotirios Karathanasis of MedImmune LLC wrote, "Hi Ernie, I am wondering how you are progressing with sending us back your revised proposal. We had a management team meeting today where we discussed and endorsed the initiative to invest in obtaining an accurate estimate of LCAT deficiency in the general population." May 15, 2014, Correspondence, attached as Ex. 70.

On August 14, 2014, Dr. Schaefer wrote, "Hi Sotirios - please find attached an updated proposal for the LCAT screening - now involving 200 subjects as previously proposed but only sequencing LCAT and apoAI to cut costs - costs go from $223,000 to about $118,000.00." Dr. Schaefer also proposed further research on Mr. Ward: "Also we checked the LCAT patient before and after dialysis and his LCAT mass does not change so it is not dialyzed out - this patient had his cholesterol balance studied by Dr. Cuchel at Penn - it would be interesting to study him again after treatment with your new enzyme." He concluded by adding, "PS Also for an extra $50,000 we could sequence LCAT in 500 patients with CHD and low HDL to determine prevalence of LCAT deficiency in this group - let us know." August 14, 2014, Correspondence, attached as Ex. 71.

Sotirios Karathanasis of MedImmune LLC replied, "Thank you Ernie. This looks good. I am now pushing here to include the 500 CHD low HDL patients. I will let you know

in a few days." *Id.* However, he disagreed about further research on Mr. Ward: "About the non-dialysability of LCAT in the LCAT deficient patient, it is interesting, but I am not sure what will be the benefit to treat an LCAT deficient patient who is already in dialysis. I don't think that, at this stage, we will expect kidney disease regression." *Id.*

Dr. Schaefer replied, "What would be interesting as suggested by Alan Remaley is to give him the new preparation and show that it is more effective … If he has a great response we may try to see if **one could improve his kidney disease or have him be dialyzed less frequently**." *Id.* (emphasis added).

On September 07, 2014, Dr. Remaley wrote "I met with Sotirios and he seemed to like the idea of treating Ernie's patient one more time so that you could repeat your flux measurements. You should follow up with him." However, Dr. Remaley cautioned, this research on Mr. Ward would not qualify as expanded access or "compassionate use": "you would still need to probably come up with a new protocol because ours was based on compassionate use." *Id.* September 07, 2014, Correspondence, attached as Ex. 72.

On November 7, 2014, Dr. Schaefer executed a Clinical Research Agreement to "support research exploring homozygous or compound heterozygous lecithin:cholesterol acyltransferase (LCAT) Deficiency in HDL Deficiency." Clinical Research Agreement, attached as Ex. 73, at 1. That Agreement provided that Boston Heart Diagnostics Corporation was due $ 150,000.00 in total milestone payments. *Id.* at 26. It also identified Cardiovascular Nutrition Laboratory at Tufts University as a Subcontractor in the amount of $25,300.00. *Id.* at 27. Dr. Schaefer is a Senior Scientist at the Cardiovascular Nutrition Laboratory at Tufts University. *See* Ex. 2.

On May 24, 2017, Dr. Schaefer provided a meeting agenda to Patrick Noland, CEO of Boston Heart Diagnostics Corporation that summarized his research projects and publication plans. In it, Dr. Schaefer noted the status of the "Progeneca Study: to do genetic

sequencing on 200 patients with HDL-C < 20 mg/dL to define causes of low HDL. All work completed, all analysis done, Abstract presented, manuscript being prepared. Funded by MedImmune, checks to Boston Heart." May 24, 2017 Correspondence attached as Ex. 74, at 3. On April 12, 2018, Dr. Schaefer wrote an annual performance review self-assessment in which he stated one of his principal annual objectives was "To carry out research and to publish on the value of our proprietary testing. In 2017 we had 8 publications that related to the value of our proprietary testing at Boston Heart Diagnostics, particularly with regard to the HDL Map and the Cholesterol Balance testing (done and completed)." April 12, 2018 Correspondence attached as Ex. 75, at 2.

83. Dr. Schaefer has never seen the complete data gathered by the NIH from Mr. Ward's Protocol. *See* Ex. 8, at 254:10.

**RESPONSE**:　　　Disputed. Dr. Schaefer has seen copies of the data that was compiled by the NIH from Mr. Ward's Protocol for submission and publication. *See* Ex. 58.

84. On or about September 23, 2014, Mr. Ward and his sister, attorney Virginia Ward, met with Dr. Schaefer to inquire about possible compensation for Mr. Ward's time and efforts in the Protocol and whether he had any intellectual property in the use of his data. *See* Email Correspondence from Dr. Schaefer to Bruce Auerbach and Rebecca Bakker, dated 9/23/14, attached as Ex. 33. Dr. Schaefer informed Mr. Ward and his sister of the sale of ACP to MedImmune and that the price of the sale was not public information. *Id*. Dr. Schaefer emailed Mr. Auerbach and Ms. Bakker to inquire whether ACP would be willing to compensate Mr. Ward for his time and effort. *Id*. Dr. Schaefer never received a response. *See* Ex. 3, at 187:21-188:4.

**RESPONSE:**　　　Undisputed that on September 23, 2014, Dr. Schaefer wrote, "Today I was visited by the patient and his sister and they asked about any compensation for his time and efforts." Ex. 22 at 2. Dr. Schaefer further wrote that he told Mr. Ward,

"AlphaCore Pharma was sold to the Medimmune Division of AstraZeneca, and that the price of the sale cannot be found in the public domain." *Id.* Finally, Dr. Schaefer inquired "Please let me know if you would consider compensating the patient for his efforts." Mr. Ward further testified that Dr. Schaefer told him the sale price was $20 million and that the sale was based on data collected from Mr. Ward. Doc. 190-9 at 14, lns. 54:20-55:6; Doc. 190-5 at 6-7.

Disputed that Dr. Schaefer never received a response; Rebecca Bakker-Arkeman of AlphaCore Pharma, LLC responded. *See* Ex. 22 at 2.

85. Dr. Schaefer served as a financial consultant for AstraZeneca until approximately 2009. *See* Ex. 3, at p. 134:16-135:2. However, Dr. Schaefer was not a financial consultant for AstraZeneca during the time Mr. Ward participated in the compassionate use Protocol at the NIH or at the time ACP was sold to MedImmune. *Id.* at p. 135:20-136:1.

**RESPONSE:**          Undisputed that Dr. Schaefer testified that "at that point in time – I think that was about 2009 – I stopped doing [pharmaceutical consultancies]." Doc. 190-6 at 35, lns 134:16-135:2.

Undisputed that Dr. Schaefer executed a Clinical Research Agreement with MedImmune, LLC after its acquisition of AlphaCore Pharma, LLC. *See* Ex. 73.

86. Dr. Schaefer does not hold, nor has he ever held, any position of financial interest or employment in any public or private pharmaceutical company. *See* Ex. 32, at Answers No. 7, 9, and 10.

**RESPONSE:**          Undisputed that Dr. Schaefer has served as a consultant to a pharmaceutical company. *See* ¶ 85, *supra*.

87. Dr. Schaefer never received any research support, or money for any reason, from ACP and has never served as a consultant for ACP. *See* Ex. 32, at Answers No. 7 and 10.

**RESPONSE:**          Disputed; Dr. Schaefer received research support from

AlphaCore Pharma LLC's acquirer, MedImmune, LLC. *See* Exhibit 73.

88. Dr. Schaefer never received or reviewed any of Mr. Ward's medical records or lab results from the NIH, as Mr. Ward only provided consent for his records to be shared with his nephrologist, Dr. Price, and his primary care physician. *See* Ex. 8, at 70, 139, 190, and 242.

    **RESPONSE:**        Disputed. Dr. Schaefer received Mr. Ward's lab results from the NIH. compiled by the NIH from Mr. Ward's Protocol for submission and publication. *See* Ex. 58.

Mr. Ward did not execute the records release authorization. *See* Doc. Doc. 190-23 at 16. Dr. Schaefer was also present physically at his admission and initial evaluation at the NIH. Dkt. 190-6 at 31-2, lns: 120:22-123:16.

89. Dr. Schaefer did not receive any financial incentive, bonuses or payments relating to or stemming from Mr. Ward's treatment at the NIH. *See* Ex. 2; *see* also Ex. 32 at Answers No. 7, 9 and 10.

    **RESPONSE:**        Disputed. Relating to and stemming from Mr. Ward's treatment at the NIH, Dr. Schaefer: [1] executed a Cooperative Research and Development Agreement with the MedImmune, LLC, the acquirer of the manufacturer of the drug used in Mr. Ward's treatment at the NIH, that resulted in [2] payments to Boston Heart Diagnostics Corporation, the company co-founded by Dr. Schaefer, and the Tufts University Cardiovascular Nutrition Laboratory, where he is a Senior Scientist. *See* ¶ 82, *supra*.

90. Dr. Schaefer co-developed and patented the HDL Map, which is a test done to examine HDL particles by two-dimensional gel electrophoresis. *See* Ex. 4, at 283:1-6; 305:22-306:4. The HDL map has been used by BHD since at least 2007. *Id*. at 308:12-17. The HDL map does not diagnose LCAT deficiency. *Id*. at 286:13-15. To confirm a diagnosis of LCAT deficiency DNA sequencing is required. *Id*.

**RESPONSE:**        Undisputed that Dr. Schaefer developed the HDL Map, which measures plasma HDL particles. *See* November 10, 2017 Correspondence, attached as Ex. 76.

Disputed that the HDL Map does not diagnose LCAT deficiency. In a memorandum entitled "The Medical Necessity of HDL Map Testing," Dr. Schaefer wrote, "HDL Map™ testing is also extremely useful in diagnosing the various lipoprotein disorders affecting HDL metabolism." *Id.* at 8. One such lipoprotein disorder is "defects in cholesterol esterification due to a defect in the enzyme lecithin:cholesterol acyl transferase or LCAT." *Id.* at 9. "When these patients are tested with the HDL Map™," they present specific HDL particles. *Id.* Accordingly, Dr. Schaefer writes, "The measurement of HDL particles with the HDL MapTM allows for the biochemical diagnosis of patients with marked HDL deficiency." *Id.*

Dr. Schaefer testified, "**Well, there is a very specific HDL pattern that you see in LCAT deficiency that we described in the 2007 paper for the first time and we used that as a biochemical diagnosis of LCAT deficiency**, but, as I stated earlier, you have to verify with genetic analysis." Doc. 190-7 at 22, lns. 308:12-17 (emphasis added).

91.Dr. Schaefer and BHD do not currently offer any type of genetic testing. *Id.* at 284:1; 314:18-19.

**RESPONSE:**        Disputed. Dr. Schaefer and Boston Heart Diagnostics offer multiple varieties of genetic testing, including the 4q25 Atrial Fibrillation Risk Genotype Test, 859p21 CVD Risk Genotype Test, Apolipoprotein E (apoE) Genotype Test, Boston Heart Statin Induced Myopathy (SLCO1B1) Genotype Test, Clopidogrel Response (CYP2C19) Genotype Test, Factor V Leiden Genotype Test, KIF6 Statin Benefit Genotype Test, LPA Aspirin Genotype Test, MTHFR Genotype Test, Prothrombin (Factor II) G20210A Genotype Test. *See Boston Heart Test Menu,* BOSTON HEART DIAGNOSTICS

CORPORATION (last accessed April 25, 2020), https://bostonheartdiagnostics.com/boston-heart-test-menu/, attached as Ex. 77. Dr. Schaefer wrote the Boston Heart Diagnostics Corporation CEO that genetics testing was one of the principal income generators for the company. *See* October 13, 2016 Correspondence, attached as Ex. 78, at 1. The highest income generator is the HDL Map. *Id.*

Dr. Schaefer also developed genetics testing for Boston Heart Diagnostics Corporation, including for familial LCAT deficiency. Dr. Schaefer and Boston Heart Diagnostics developed a genetics panel that tested the LCAT gene. *See* September 24, 2018 Correspondence, attached as Ex. 79. Further, his collaboration with MedImmune, LLC was a part of this development. The article, *Genetic and secondary causes of severe HDL deficiency and cardiovascular disease,* was published by Dr. Schaefer, Sotirios Karathanasis of MedImmune, LLC, and Andrew Geller of Boston Heart Diagnostics Corporation. Ex. 62 at 1. The research was supported by an investigator-initiated grant from MedImmune, LLC. *Id.* When Dr. Schaefer published the article, he wrote Sotirios Karathanasis of MedImmune, LLC, "Hi Sotirios – thanks for funding it – hopefully this and future studies will help to resurrect HDL's image in the field." *See* December 13, 2018 Correspondence, attached as Ex. 80.

92. BHD does not have a screening test offered commercially for diagnosing patients with LCAT deficiency. *See* Ex. 3, at 171:9-12.

**RESPONSE:**　　　　Disputed. The HDL Map test provides a biochemical diagnosis of LCAT deficiency. See Ex. 76 at 10; Doc. 190-7 at 22, lns. 308:12-17.

93. BHD executed a Material Transfer Agreement with the NIH to receive 20 frozen samples of serum from Mr. Ward taken during the Protocol to run BHD's specialized gels. *See* Ex. 4, at 241:7-15, 242:9. Dr. Schaefer was asked to destroy the data by the NIH, and the data was not used in any capacity. *Id.* at 242:15-24; *see* also Ex. 8 at 214:20-21.

**RESPONSE:**        Undisputed.

94. Boston Heart Diagnostics (BHD) and MedImmune entered into a Clinical Research Agreement, effective November 5, 2014, to determine the approximate prevalence of LCAT deficiency in a large population. *See* Ex. 4, at 244:11-245:7. The results were published in 2018 in the Journal of Lipid Research. *Id*. at 249:1.

**RESPONSE:**        Undisputed that on November 7, 2014, Dr. Schaefer as Chief Medical Officer of Boston Heart Diagnostics Corporation executed a Clinical Research Agreement to "support research exploring homozygous or compound heterozygous lecithin:cholesterol acyltransferase (LCAT) Deficiency in HDL Deficiency." Ex. 73 at 1. That Agreement provided that Boston Heart Diagnostics Corporation was due $ 150,000.00 in total milestone payments. *Id*. at 26. It also identified Cardiovascular Nutrition Laboratory at Tufts University as a Subcontractor in the amount of $25,300.00. *Id*. at 27. Dr. Schaefer is a Senior Scientist at the Cardiovascular Nutrition Laboratory at Tufts University. *See* Ex. 2.

Undisputed that the results were published as Schaefer et al., *Genetic and secondary causes of severe HDL deficiency and cardiovascular* disease, 59 J. LIPID RES. 12, 2421–2435 (2018). Exhibit 51.

95. Mr. Ward testified that he did not know whether Dr. Schaefer received any benefit from the Protocol and that "all I can do is infer he did." *See* Ex. 21, at 164.

**RESPONSE:**        Disputed. Mr. Ward testified that he did not know that Dr. Schaefer earned money from the sale of AlphaCore Pharma, LLC. Doc. 190-24 at 42, ln. 164:2-7. Mr. Ward further testified: "Q: What information do you have that's leading you to infer that Dr. Schaefer benefited form that sale? A. All I can – just his – his overall involvement. I guess I don't – I don't know how to – his overall involvement. You know, things you see. His involvement in it. Him, you know, him sending me down to the NIH.

You know, him telling me that it will cure my kidneys. His involvement, you know. The horse trade he made with Dr. Alan Remaley in exchange for a letter – in exchange for a letter of recommendation, Dr. Remaley would receive lifetime employment at the NIH hospital. In exchange for that, I would be sent down to the NIH. You know, just overall behavior." Doc. 190-24 at 42, lns 165:3-18.

Respectfully submitted,

The Plaintiff,
EDMUND EDWARD WARD
By his attorney,

/s/ Patrick Clendenen
Patrick T. Clendenen, BBO #564165
Clendenen & Shea LLC
400 Orange Street
New Haven, CT 06511
(203) 787-1183
ptc@clenlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on the date below I electronically filed this document using the CM/ECF system which will automatically send email notification of such filing to the attorneys of record in this matter as identified on the Notice of Electronic Filing (NEF) May 4, 2020.

/s/ Patrick Clendenen
CLENDENEN & SHEA, LLC