# Exhibit 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EDMUND EDWARD WARD,               ) <br>          Plaintiff         ) <br> V.                             ) <br>                            ) <br> ERNST J. SCHAEFER, M.D.,    ) <br>          Defendant.     ) | CIVIL ACTION NO. <br> 1:16-cv-12543-FDS <br><br><br><br> May 4, 2020 |

**MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

The Defendant, Dr. Ernst J. Schaefer, as his doctor, diagnosed the Plaintiff, Edmund Edward Ward, in Massachusetts with a rare disorder causing chronic kidney disease. He published Mr. Ward's diagnosis.  He misrepresented to Mr. Ward that an experimental enzyme therapy was the "therapy of choice" and would reverse his kidney disease in order to induce him to enroll as a research protocol subject at the National Institutes of Health ("NIH"). Dr. Schaefer lobbied legislators and the Food and Drug Administration ("FDA"), revised the Protocol which included him as a Principal, and booked Mr. Ward's flights. He took research samples of Mr. Ward's blood at his company's laboratory in Massachusetts, and he prepared an article discussing the results of the Protocol for publication. He thereafter contracted to research the prevalence of conditions like Mr. Ward's with the company that made the enzyme, and he published the results of that research.

Mr. Ward's hemodialysis was delayed while his kidney disease, already at stage V, continued to worsen during the Protocol. When he did begin hemodialysis, the repeated venipunctures at the NIH damaged his veins and led to recurrent stenosis, thromboses, and surgeries. Mr. Ward has presented definite, competent evidence of these facts to rebut the Motion for Summary Judgment filed by Dr. Schaefer on April 13, 2020, Doc. 190, and therefore summary judgment is improper. *See Advanced Flexible Circuits, Inc. v. GE Sensing & Inspection Techs. GmbH*, 781 F.3d 510, 516 (1st Cir. 2015).

In his motion, Dr. Schaefer claims he was not involved in the Protocol, owed Mr.

Ward no doctor-patient duty, and received no benefit from Mr. Ward's participation in the Protocol. He further claims that Mr. Ward suffered no harm as a result of his participation in the Protocol. These are genuine issues and disputes of material fact as to each and every one of the Counts pleaded, and summary judgment must therefore be denied.

Summary judgment is only appropriately granted when, with "**all facts in the record,** as well as all reasonable inferences"[5] drawn in favor of the nonmovant, "there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law." *Perry v. Roy*, 782 F.3d 73, 77–78 (1st Cir. 2015) (emphasis added and internal citations omitted).[6] Mr. Ward accordingly objects to the Motion to Summary Judgment filed by Dr. Schaefer as follows:

## I. BACKGROUND

### A. Dr. Schaefer diagnoses Mr. Ward.

---

[5] In addition to the reasonable inferences to be drawn in Mr. Ward's favor, the Court has reserved the issue of an adverse inference jury instruction regarding Dr. Schaefer's admitted destruction of documents and email in this case. Doc. 182. Dr. Schaefer's admitted destruction of evidence further militates in favor of denying his motion.

[6] "The district court's role is limited to assessing whether there exists "evidence [ ] such that a reasonable jury could return a verdict for the nonmoving party. *Showtime Entm't, LLC v. Town of Mendon*, 769 F.3d 61, 69 (1st Cir.2014)." *Perry, supra*, at 78. That is, "[s]ummary judgment is proper only if there can be but one reasonable conclusion as to the verdict and the evidence is so one-sided that one party must prevail as a matter of law." *Cont'l Grain Co. v. Puerto Rico Mar. Shipping Auth.*, 972 F.2d 426, 431 (1st Cir. 1992) (internal quotation marks and citation omitted). "Summary judgment is inappropriate if the evidence is sufficiently open-ended to permit a rational fact finder to resolve the issue in favor of either side." *Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014) (internal quotation marks and citation omitted). "[I]f the credibility of the movant's witnesses is challenged by the opposing party and specific bases for possible impeachment are shown, summary judgment should be denied and the case allowed to proceed to trial." *E.E.O.C. v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico*, 279 F.3d 49, 56 (1st Cir. 2002) (citation omitted). "When, as is the case here, the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." *McGurn v. Bell Microproducts, Inc.*, 284 F.3d 86, 93–94 (1st Cir. 2002), (citing *Coyne v. Taber Partners I*, 53 F.3d 454, 460 (1st Cir.1995); FEDERAL PRACTICE AND PROCEDURE, *supra*, § 2725 at 433–37 ("If the evidence presented on a motion for summary judgment is subject to conflicting interpretations, or reasonable people might differ as to its significance, summary judgment is improper.") (alterations omitted). *See also Goddard v. Kelley,* 629 F.Supp.2d 115 (D. Mass. 2009) (Saylor, C.J.); *Seymore v. Johnson*, 2017 Fair Empl.Prac.Cas. (BNA) 54, 756, 2017 WL 706603, at *2 (D. Mass. Feb. 22, 2017) (Saylor, C.J.).

Mr. Ward was born with familial lecithin:cholesterol acyltransferase ("LCAT") deficiency ("FLD"), a rare genetic disorder under which patients have low high-density lipoprotein cholesterol ("HDL") and suffer from corneal opacity and renal disease. Plaintiff's Statement of Disputed Material Facts, ¶¶ 8, 19 ("Facts"). For patients with FLD,"[t]here is no effective treatment except for dialysis or renal transplantation, and the disease can rapidly reoccur in the transplanted kidney." *Id.*

On September 7, 2007, the National Institutes of Health ("NIH") licensed to AlphaCore Pharma, LLC a patent for the use of the enzyme recombinant LCAT for decreasing the accumulation of cholesterol in arteries in a human subject *not* suffering from FLD. *Id.*, ¶¶ 22, 23 ("Facts"). In 2008 AlphaCore Pharma, LLC executed a Cooperative Research Development Agreement ("CRADA")  with the National Heart, Lung and Blood Institute ("NHLBI") Lipid Metabolism Section, Dr. Alan Remaley, Principal Investigator, to "determine the possible clinical utility of LCAT supplementation or replacement as a treatment" for FLD and acute coronary syndrome. *Id.*, ¶ 23. That year, the NIH provided $ 240,129.00 in grants to AlphaCore Pharma, LLC to produce recombinant LCAT enzyme and inject it in mice to demonstrate HDL cholesterol elevation. *Id.*, ¶ 23.

On May 13, 2010, Mr. Ward's nephrologist, Dr. Bijan Roshan, noted that Mr. Ward had extremely low HDL and corneal opacity, and referred him to Dr. Om P. Ganda of the Joslin Diabetes Center for a lipid assessment. *Id.,* ¶ 16. Dr. Ganda ordered lipid studies at Defendant Dr. Schaefer's Boston Heart Diagnostics Corporation laboratory, which confirmed Mr. Ward's diagnosis of familial LCAT deficiency. *Id.*, ¶¶ 17-18. Dr. Roshan referred Mr. Ward to Defendant Dr. Schaefer concerning a diagnosis of LCAT deficiency and Mr. Ward requested an appointment to discuss therapeutic options. *Id.*, ¶ 21.

**B. Dr. Schaefer discusses recombinant LCAT and publishes a report on Mr. Ward.**

In June 2010 Defendant Dr. Schaefer attended the European

Atherosclerosis Society Meeting, where he discussed Mr. Ward's diagnosis of FLD at length with an AlphaCore Pharma, LLC executive. *Id.,* ¶ 28. On June 23, 2010, Dr. Schaefer wrote that he planned to call Dr. Remaley, and Dr. Remaley replied: "Please let me know how I can help. As you know we have [a] collaboration with AlphaCore for developing recombinant LCAT as a therapy. We hope to start a clinical trial sometime next year." *Id*.

On September 30, 2010, Dr. Schaefer presented a case report he authored concerning his diagnosis of Mr. Ward, and listed Mr. Ward as a co-author when he published the next year, despite Mr. Ward having no role in the article as a "co-author." *Id.,* ¶ 8. Dr. Schaefer further developed a personal relationship with Mr. Ward, including by paying Mr. Ward $ 500.00 monthly as a consultant of Boston Heart Diagnostics Corporation, inviting Mr. Ward repeatedly to his home for events, and appointing him the director of the Familial Dyslipidemia Foundation, which Dr. Schaefer serves as Medical Consultant and Boston Heart Diagnostics Corporation serves as the Sponsor. *Id.,* ¶¶ 53, 82.

**C. Dr. Schaefer lobbies for Mr. Ward to receive recombinant LCAT.**

On February 29, 2012, Dr. Schaefer wrote Dr. Remaley inquiring about the status of recombinant LCAT in LCAT deficiency. *Id.*, ¶ 30. At this point in time, Dr. Remaley's animal studies were not completed showing the effects of recombinant LCAT on FLD at the time the Protocol began or until after it had concluded. *Id.,* ¶ 25. Dr. Schaefer inquired repeatedly about whether Mr. Ward could receive recombinant LCAT on March 6, 2012, April 10, 2012, June 12, 2012, and June 28, 2012. *Id.,* ¶¶ 30, 32.

At the same time, with his renal function worsening, Mr. Ward consulted nephrologists regarding renal replacement, and the creation of a fistula for hemodialysis access was advised. *Id.*, ¶¶ 66-7. On April 17, 2012, Mr. Ward underwent a radiocephalic arteriovenous fistula procedure for hemodialysis access. *Id.,* ¶ 67. On September 25, 2012, Dr. Schaefer wrote Dr. Remaley, Mr. Ward, and Mr. Ward's sister, that "the therapy of

choice is enzyme replacement which hopefully will be available to him in January." *Id.,* ¶ 30. However, for FLD, "[t]here is no effective treatment except for dialysis or renal transplantation, and the disease can rapidly reoccur in the transplanted kidney." *Id.*

On September 27, 2012, Dr. Schaefer sent Dr. Remaley and Mr. Ward two letters. The first was sent to the FDA and urged approval of recombinant LCAT enzyme, a "very important and potentially life-saving therapy for patients with documented [FLD]." *Id.,* ¶ 34. The second was sent to Mr. Ward, for him to send to Senators Kerry and Markey, urging approval of the enzyme, as he would "probably require dialysis in the next 6-12 months unless I can get replacement therapy that should help prevent my kidneys from failing." *Id.* After the FDA responded, Dr. Schaefer wrote that he would coordinate with AlphaCore Pharma, LLC and Dr. Remaley about getting "compassionate use" for Mr. Ward. *Id.* AlphaCore Pharma LLC and the NIH could not proceed with a planned Phase 1 study of recombinant LCAT in FLD patients like Mr. Ward due to a clinical hold placed by the FDA pending further safety data. Facts, ¶ 33.

**D. Dr. Schaefer revises the Protocol drafts.**

On October 25, 2012, Rebecca Bakker-Arkema of AlphaCore Pharma, LLC sent Dr. Schaefer and Dr. Remaley a first draft Protocol for compassionate use of the recombinant LCAT enzyme ACP-501. *Id.,* ¶ 36. That draft Protocol defined Dr. Schaefer as the "home physician" and provided that he would administer infusions to Mr. Ward in Massachusetts. *Id,* ¶ 37. Dr. Schaefer and Rebecca Bakker-Arkeman and Bruce Auerbach of AlphaCore Pharma, LLC corresponded regarding further details of the Protocol, and, on November 26, 2012, Rebecca Bakker-Arkeman of AlphaCore Pharma, LLC sent a second draft Protocol to Dr. Schaefer entitled "Expanded access use of intravenous ACP-501 in one subject with Familial (lecithin:cholesterol acyltransferase [rhLCAT]) Deficiency". *Id.* This draft defined Dr. Schaefer as a Medical Monitor and Physician Co-Investigator, and Dr. Schaefer sent it

to Mr. Ward, noting it was the Protocol that would be submitted to the FDA *Id.*

On December 7, 2012, Dr. Robert Shamburek, designated the Principal Investigator in the Protocol, submitted a revised Protocol to the FDA that removed reference to Dr. Schaefer, but retained references to the "home physician." *Id.,* ¶ 38. The "home physician" was to monitor Mr. Ward, which Dr. Schaefer did, and to provide treatment throughout the Protocol. *Id.,* ¶ 61. Unlike prior drafts, this Protocol was never sent to Mr. Ward.

**E. Mr. Ward enrolls in the Protocol.**

Mr. Ward was admitted to the NIH on January 6, 2013 and signed a "General Admission Consent" on that date, that was not specific to the Protocol. *Id.,* ¶¶ 45, 46. Despite not signing a Protocol-specific informed consent, Mr. Ward was subject to screening procedures under the Protocol between January 6, 2013 and January 11, 2013. *Id.,* ¶¶ 45-6. Dr. Schaefer was present at the NIH during Mr. Ward's evaluation. *Id.,* ¶ 56. Mr. Ward returned to the NIH and executed an Informed Consent document dated January 24, 2013, although he has no recollection of reviewing it or signing it. *Id.,* ¶ 47. That Informed Consent document purported to set forth the procedures, and risks of the Protocol, but because of its failures and deficiencies, it did not protect human subjects. *Id.,* ¶¶ 48-50.

**F. Mr. Ward suffers atrial fibrillation and viral syndrome.**

Mr. Ward was known to be at risk for developing atrial fibrillation during the Protocol. *Id.,* ¶ 59. His electrocardiogram results were borderline six days before he received his third infusion of recombinant LCAT enzyme, but he became abnormal on February 8, 2013, one day after his third infusion . *Id.* Mr. Ward suffered atrial fibrillation, on February 10, 2013, was admitted to the NIH intensive care unit, given intravenous antiarrhythmic drugs, underwent an echocardiogram and a failed cardioversion, given two days of intravenous amiodarone, and cardioverted again, this time successfully. *Id.* Dr. Shamburek acknowledged that this was a serious adverse event, although there is no

evidence of a serious adverse event report having been made to the FDA, much less

whether it was attributable or not attributable to recombinant LCAT enzyme. *Id.* Under

the Protocol, where there is a temporal relationship to the investigational product

administration, a serious adverse event cannot be classified as unrelated. *Id.* If Mr. Ward

were to suffer a severe adverse event, the study was to be put on hold, "regardless of

whether it is attributed to ACP-501 (unless it is caused by an accident that could not

reasonably be attributable to the drug.)." *Id.* Dr. Schaefer referred Mr. Ward to a

cardiologist in Massachusetts for monitoring. *Id.*

On April 4, 2013, when he was admitted for his tenth infusion, he presented febrile

with a viral syndrome, chills, and fatigue. *Id.*, ¶ 60. He was administered the recombinant

LCAT enzyme infusion, even though febrile illness within five days of dosing falls within

the Protocol Exclusion Criteria. *Id.*

**G. Dr. Schaefer draws Mr. Ward's blood and MedImmune purchases AlphaCore.**

Dr. Schaefer drew samples of Mr. Ward's blood at his laboratory at the Boston Heart

Diagnostics Corporation on November 9, 2012, January 2, 2013, February 21, 2013, March

2, 2013, March 16, 2013, March 29, 2013, April 26, 2013, June 7, 2013, June 15, 2013, July

22, 2013, July 29, 2013, and November 13, 2013. *Id.*, ¶ 72. Dr. Schaefer never obtained Mr.

Ward's written consent for these draws, and he had no NIH IRB approval for these draws.

*Id.* On the order sheet for each test performed on those samples drawn from Mr. Ward, Dr.

Schaefer indicated "Research" on the header of each order sheet, and in the insurance

information and self-pay fields. *Id.* Dr, Schaefer's initial blood draw results showed a mean

increase of 88 % HDL and continued worsening of kidney functions. *Id.*

On March 16, 2013, Dr. Schaefer first sent the data from the Boston Heart

Diagnostics Corporation blood draws of Mr. Ward showing these results to Bruce Auerbach

and Brian Krause of AlphaCore Pharma, LLC. Facts, ¶ 80. On April 3, 2013, eighteen days

later, it was announced that MedImmune, LLC, a subsidiary of AstraZeneca

Pharmaceuticals, LP, had purchased AlphaCore Pharma, LLC. *Id.,* ¶ 78. Dr. Remaley

reported that the acquisition took place based in part on the results of the protocol treating

a single patient with FLD with recombinant LCAT. *Id.*

**H. Dr. Schaefer lobbies for a new Protocol.**

Meanwhile, Dr. Schaefer sought to have the Protocol revised to include him as a

Physician Co-Investigator infusing the recombinant LCAT enzyme in his clinic during a

Protocol extension period. On June 28, 2013 Dr. Schaefer asked Dr. Remaley to "send me

the protocol so that we can submit for approval and begin treating Ed here in Boston once

new enzyme becomes available." *Id.,* ¶ 37. Dr. Remaley sent to Dr. Schaefer the second

draft Protocol that had identified Dr. Schaefer as the Physician Co-Investigator. *Id.* Dr.

Remaley also and tried to schedule a conference with AstraZeneca regarding "the future

plans of treating Ed in Boston." *Id.*

**I. Mr. Ward enters dialysis and withdraws from the Protocol.**

On July 10, 2013, Mr. Ward's nephrologist recommended that Mr. Ward needed to

go on dialysis. Dr. Schaefer noted that Mr. Ward's kidney function had continued to decline

and he had increasing fatigue. *Id.,* ¶ 70. His hemodialysis was delayed due to the Protocol.

*Id.* Still seeking to have the Protocol revised to include him as a Physician Co-Investigator,

Dr. Schaefer wrote on August 20, 2013, "My understanding is that the patient will continue

therapy at the lower dose every two weeks until the enzyme runs out, and that as soon as

new enzyme became available he would be a candidate for the enzyme in order to see if we

can get him off dialysis." *Id.,* ¶ 37. However, by September 30, 2013, Dr. Schaefer "decided

that it is no longer worthwhile that [Mr. Ward] get any more therapy at NIH," as "I do not

feel he gains anything further by continuing." *Id.,* ¶ 63.

**J. Dr. Schaefer attempts co-publication and contracts with AstraZeneca**

Pharmaceuticals LP and MedImmune, LLC ("MedImmune, LLC").

Dr. Schaefer proposed to Dr. Remaley co-authorship of an article based on Mr. Ward's blood samples drawn at Boston Heart Diagnostics Corporation after the recombinant enzyme infusions at the NIH, on March 16, 2013, August 20, 2013, October 16, 2013, April 17, 2014, January 20, 2015, and April 28, 2015. *Id.*, ¶ 76.

Dr. Schaefer also proposed a second paper to co-publish with Dr. Remaley, and the Protocol was amended to that proposal to add: "Coded samples from time points will be sent to Dr. Ernst Schaefer." *Id.*, ¶¶ 38, 76. But, the sharing of those samples with a third co-author who was not added to the Protocol was investigated and found to violate the Protocol, and any use of the data by Dr. Schaefer or his co-author was prohibited. *Id.,* ¶ 76.

Dr. Schaefer also developed a contractual relationship with MedImmune, LLC, the acquirer of AlphaCore Pharma LLC, the manufacturer of the recombinant LCAT enzyme with which Mr. Ward was infused. On January 23, 2014, March 20, 2014, and April 3, 2014, Dr. Schaefer wrote Sotirios Karathanasis of MedImmune, LLC to inquire as to the status of LCAT enzyme replacement for LCAT deficient patients and to propose a screening method for patients with LCAT deficiency, "resulting in a potential collaboration between Boston Heart Diagnostics, MedImmune, and the Dyslipidemia Foundation." *Id.,* ¶ 82.

On November 7, 2014, Dr. Schaefer, executed a Clinical Research Agreement with MedImmune, LLC "support research exploring homozygous or compound heterozygous lecithin:cholesterol acyltransferase (LCAT) Deficiency in HDL Deficiency." *Id.*, ¶ 82. That Agreement provided that Boston Heart Diagnostics Corporation was due $ 150,000.00 and the Cardiovascular Nutrition Laboratory at Tufts University, where Dr. Schaefer is a Senior Scientist, was due $ 25,300.00 *Id.* Dr. Schaefer and Sotirios Karathanasis of MedImmune, LLC later published the results of their research into FLD and the causes of other severe HDL deficiencies. *Id.*, ¶ 91.

**K. Mr. Ward suffers recurrent stenosis and brings suit.**

Dr. Schaefer wrote that, during the Protocol, Mr. Ward "began having more and more problems with his veins because of all the venipunctures he had been subjected to at the NIH." *Id.,* ¶ 50. Mr. Ward, who experienced recurrent access failures, stenosis, and thromboses in a series of hemodialysis fistulae that required surgical intervention on July 22, 2014, January 6, 2015, August 31, 2015, October 22, 2015, June 3, 2016, July 22, 2016, and October 17, 2017. *Id.*

On July 28, 2016, Mr. Ward filed suit against Dr. Schaefer, Drs. Remaley and Shamburek, Bruce Auerbach, AlphaCore Pharma, LLC, MedImmune, LLC, and AstraZeneca Pharmaceuticals, LP. Dkt. 27 at 7. Dr. Schaefer moved for a medical malpractice tribunal, which motion was granted. Dkts. 63, 77. The medical malpractice tribunal found that "the evidence presented, if properly substantiated, is sufficient to raise a legitimate question of liability appropriate for judicial inquiry." Dkt. 85.

## II. ARGUMENT

## A. Summary Judgment Must Be Denied on Count I Because There Are Numerous Issues of Material Fact Concerning Dr. Schaefer's Fraud

Mr. Ward alleges in Count I of the Complaint that Dr. Schaefer fraudulently induced him to participate in the ACP-501 Protocol by: representing that ACP-501 would effectively reverse his advanced kidney disease; that a lower dose of ACP-501 was optimal and that the manufacturer would produce more for Mr. Ward to receive a higher dose; failing to explain the Protocol was not therapeutic, but for research; failing to disclose the financial and professional motives and conflicts of the Protocol. Facts, ¶ 2.

To recover for fraud under Massachusetts law, a plaintiff must allege and prove that the Defendant (1) made a false representation of a material fact, (2) with knowledge of its falsity, (3) for the purpose of inducing the plaintiff to act on the representation, (4) that the

plaintiff reasonably relied and (5) acted upon it to his damage and detriment. *Rodi v. S.N.E. Sch. Of Law,* 532 F.3d 11, 15 (1st Cir. 2008). "A failure to disclose material facts may constitute a false representation if a duty to disclose exists." *Rohm & Haas Elec. Materials, LLC v. Electrical Circuit Supplies, Inc.*, 759 F.Supp.2d 110, 119 (D. Mass. 2010) (Tauro, J.).

Under Massachusetts law, a "physician owes to his patient the duty to disclose in a reasonable manner all significant medical information that physician possesses or reasonably should possess that is material to an intelligent decision by the patient whether to undergo a proposed procedure." *Harnish v. Children's Hospital Medical Center*, 387 Mass. 152, 155 (1982). "[A] party who discloses partial information that may be misleading has a duty to reveal all the material facts he knows in order to avoid deceiving the other party." *V.S.H. Realty, Inc. v. Texaco, Inc.*, 757 F.2d 411, 414 (1st Cir. 1985).

Examples of disputed issues of material fact concerning Count I include: whether Dr. Schaefer's repeated representations to Mr. Ward prior to and during the Protocol about ACP-501, *see* Facts, ¶¶ 25, 30, 32, 34, were false, known to be false by Dr. Schaefer, and made to induce Mr. Ward to enroll in the Protocol to receive infusions of ACP-501, or for some other purpose; and whether Mr. Ward's reliance on Dr. Schaefer's representations to him was reasonable, *see* Facts, ¶ 17, and resulted in his injuries, *see* Facts, ¶¶ 50, 59, 71. These material factual disputes precludes summary judgment. Accordingly, Defendant's motion for summary judgment should be denied as to Count I of the Complaint.

## 1. Dr. Schaefer falsely represented and failed to disclose material facts about the Protocol to Mr. Ward.

As an initial matter, Dr. Schaefer in his motion for summary judgment avoids the allegations of Mr. Ward's Complaint regarding Dr. Schaefer's conduct alleged to have fraudulently induced Mr. Ward. *See* Doc. 190-2 at 8-9. The Complaint alleges that Dr. Schaefer fraudulently induced Mr. Ward to participate and remain in the Protocol by: [1]

representing ACP-501 would effectively reverse his advanced kidney disease; [2] representing a lower dose of ACP-501 was optimal and AlphaCore Pharma, LLC would produce ACP-501 at a higher dose; [3] failing to disclose the Protocol was for research and was not therapeutic; [4] failing to disclose financial and professional motives and conflicts of interest for the Protocol. Facts, ¶ 1. Dr. Schaefer does not argue that there is no genuine dispute of material regarding these factual allegations of the Complaint, because he cannot. Accordingly, summary judgment must be denied.

### a. Misrepresentations

First, Dr. Schaefer represented to Mr. Ward in person that ACP-501 would effectively reverse Mr. Ward's advanced kidney disease, Facts, ¶ 32, and also represented the same in writing to Mr. Ward on the following dates: [1] use of recombinant LCAT may be a promising strategy "to prevent or reduce the renal insufficiency that can be observed in LCAT deficient patients," December 2011, Facts, ¶ 25; [2] "The therapy of choice is enzyme replacement," September 25, 2012, Facts, ¶ 30; [3] "this very important and potentially life-saving therapy for patients with documented homozygous familial LCAT deficiency." September 27, 2012, Facts, ¶ 34; and [4] "replacement therapy [] should help prevent [Mr. Ward's] kidneys from failing," Facts, ¶ 34. Mr. Ward also testified that Dr. Schaefer made this representation to him prior to his enrollment in the Protocol. Facts, ¶ 32.

Indeed, Dr. Schaefer continued to represent that recombinant LCAT would reverse Mr. Ward's advanced kidney disease after Mr. Ward enrolled in the Protocol. On July 15, 2013, when Mr. Ward was placed on a lower dose, Dr. Schaefer wrote Dr. Remaley and Mr. Ward, requesting an update on the status of manufacturing more enzyme at a higher dose, "otherwise Ed may end up on dialysis." *Id.* ¶ 37. On August 20, 2013, after Mr. Ward was placed on dialysis, Dr. Schaefer wrote Dr. Remaley and Mr. Ward again regarding new enzyme, "in order to see if we can get [Mr. Ward] off dialysis." *Id.* This continued even after

Mr. Ward had withdrawn from the Protocol. On August 14, 2014, Dr. Schaefer corresponded with Sotirios Karathanasis of MedImmune, LLC, the acquirer of AlphaCore Pharma, LLC and the manufacturer of the recombinant LCAT enzyme, and Mr. Ward, discussing infusing Mr. Ward with new enzyme at the low dose to "improve his kidney disease or have him be dialyzed less frequently." *Id.*, ¶ 82.

Second, Dr. Schaefer represented that new enzyme would be produced at a higher dose when he corresponded with Dr. Remaley and Mr. Ward on July 15, 2013 and August 20, 2013, and August 14, 2014, expressing that a higher dose could either prevent, remove, or reduce the need for dialysis, respectively. Facts, ¶¶ 37, 82.

Dr. Schaefer does not address these misrepresentations, and only addresses the misrepresentations contained within an affidavit filed by Mr. Ward in opposition to Dr. Schaefer's motion for a medical malpractice tribunal. Doc. 190-2 at 8-9, 12. Those statements concern certain of Dr. Schaefer's misrepresentations and omissions. *Id.* Dr. Schaefer purports to identify five representations to Mr. Ward from the affidavit, including:

> 1) he did not need to go on dialysis; 2) ACP-501 would reverse his kidney disease, 3) ACP-501 was "good-to-go" but was not yet widely available because of "bureaucratic entanglements"; 4) ACP-501 was only available at the NIH through a special protocol called compassionate use; and 5) Mr. Ward would have to travel to the NIH to begin ACP-501 treatment with NIH doctors until arrangements were completed to enable him to receive ACP-501 therapy by Dr. Schaefer in Massachusetts

Doc. 190-2 at 8-9.

As to (1), Mr. Ward actually testified in his affidavit: "Dr. Valerie Price recommended that dialysis treatments begin. Dr. Schaefer advised me not to go on dialysis," not that Mr. Ward did not need dialysis. Doc. 190-5 at 2. As to (2), Dr. Schaefer did make misrepresent that ACP-501 would reverse Mr. Ward's kidney disease. *See* § II(A) (1)(a), *supra*.  In spite of these written misrepresentations, Dr. Schaefer claims that he

"specifically asked the NIH providers to provide Ward with realistic expectations, as he did "**not want to raise any false hopes.**" Doc. 190-2 at 10. (emphasis original). However, Dr. Schaefer actually wrote, "please let us know **when** you think the recombinant LCAT therapy will become available for this patient. He is ready anytime. Please be realistic - I do not want to raise any false hopes." Facts, ¶ 32. Dr. Schaefer was inquiring as to **when** recombinant LCAT would be available for Mr. Ward, not whether it would be effective in reversing his kidney disease.  As to (3), ACP-501 was not "good-to-go," as Mr. Ward was the first human to receive more than one infusion and the first human with FLD to receive an infusion. *See* Doc. 190-13. As to (4), ACP-501 was not only available through the Protocol in which Mr. Ward enrolled; it was also available through a clinical trial for cardiovascular patients. Facts, ¶ 27. As to (5), there were no arrangements ever completed to enable Mr. Ward to receive ACP-501 therapy by Dr. Schaefer in Massachusetts. *See* Ex. 24 at 60.

**b. Omissions**

Third, Dr. Schaefer failed to disclose the Protocol was for research only and was not therapeutic. Mr. Ward was Dr. Schaefer's patient, and Dr. Schaefer repeatedly characterized Mr. Ward as his patient. Facts, ¶ 30, 59, 76. Dr. Schaefer accordingly owed him a duty to disclose in a reasonable manner all significant medical information that a physician possesses or reasonably should possess that is material to an intelligent decision by the patient whether to undergo a proposed procedure. *Harnish, supra* at 155. As set forth above, § II(A)(1), *supra* at 12, Dr. Schaefer knew that it was unlikely Mr. Ward's kidney disease would be reversed by recombinant LCAT and that it was therefore unlikely to be therapeutic for Mr. Ward. He did know, however, that Dr. Remaley and Bruce Auerbach of AlphaCore Pharma, LLC were researching applications of recombinant LCAT as a therapy after meeting them at the European Atherosclerosis Society Meeting.  Facts, ¶ 28.

Fourth, Dr. Schaefer failed to disclose financial and professional motives and conflicts of interest for the Protocol. Dr. Schaefer's case report of Mr. Ward's diagnosis disclosed NIH research funding. Facts, ¶ 8. AlphaCore Pharma, LLC, the original manufacturer of the enzyme, had entered into a Cooperative Research and Development Agreement with Dr. Remaley and the NHLBI. *Id.,* ¶ 23. Dr. Remaley knew that AlphaCore Pharma, LLC intended to be acquired by another company. *Id.*, ¶ 78. Dr. Schaefer intended to and attempted co-publication with Drs. Shamburek and Remaley regarding the Protocol. *Id.,* ¶ 76. MedImmune, LLC, the acquirer of AlphaCore Pharma, LLC, entered into a Clinical Research Agreement with Dr. Schaefer. *Id.,* ¶ 82. Dr. Schaefer attempted co-publication with Drs. Shamburek and Remaley, and co-published with MedImmune, LLC. *Id.* These facts were known to Dr. Schaefer, material to Mr. Ward's decision to enroll in the Protocol, and never disclosed to Mr. Ward. *See also* § II(B), *infra.*

Again, Dr. Schaefer only addresses the omissions set forth in Mr. Ward's Affidavit, rather than his complaint. He first argues, in misapprehension of *Kannavos v. Annino*, 356 Mass. 42, 46-8 (1969) that "Massachusetts law does not recognize liability for nondisclosure." Doc. 190-2 at 12-3. *Kannavos,* however, held that there was no liability for "bare nondisclosure," absent that "the plaintiff stood in a position of confidence toward or dependence upon the Defendant" or otherwise had "a peculiar duty to speak." *Kannavos, supra* at 47. As set forth in *Harnish, supra* at 155 and *Rohm*, *supra* at 119, there is liability for nondisclosure where there is a duty to disclose, as here in the doctor-patient relationship. Next, he argues that because Mr. Ward was aware he was one of the first individuals to receive recombinant LCAT, and because he signed the Informed Consent document Dr. Schaefer is not liable for nondisclosure. Doc. 190-2 at 13. As set forth in § II(B), *infra*, however, Dr. Schaefer does not address, because he cannot, that he failed to disclose to Mr. Ward that "1) ACP-501 was not designed or created to treat patients with

15

LCAT deficiency." *See id.* at 12-13.  Based on the foregoing disputed issues of material fact, summary judgment must be denied.

**2. Dr. Schaefer knew his representations about the Protocol to Mr. Ward were false.**

Dr. Schaefer knew it was false that recombinant LCAT would effectively reverse Mr. Ward's kidney disease. Despite repeatedly making that representation, Dr. Schaefer testified that, in his view, it was unlikely that this "would reverse his disease, but it might stabilize it." Doc. 190-6 at 19, lns. 69:22- 70:5. Dr. Schaefer testified that he "might have" discussed with Mr. Ward whether renal disease could be reversed by recombinant LCAT enzyme "once or twice, but I think his kidney doctors had already put a fistula in. So he is a smart guy. He knew what was going on." Doc. 190-7 at 12, lns. 265:5-11.

Further, Dr. Schaefer represented that new enzyme would be produced at a higher dose when he corresponded with Dr. Remaley and Mr. Ward on July 15, 2013 and August 20, 2013, and August 14, 2014, expressing that a higher dose could either prevent, remove or reduce the need for dialysis, respectively. Facts, ¶¶ 37, 82. Dr. Schaefer continued to make this representation despite the fact that Dr. Remaley, Dr. Shamburek and Sotirios Karathanasis of MedImmune LLC all expressed that they did not expect Mr. Ward's kidney damage could be reversed. *See* 190-13 at 11; *id.* ¶ 82. Dr. Schaefer knew that these representations were false. Accordingly, summary judgment must be denied.

**3. Dr. Schaefer misrepresented facts about the Protocol to induce Mr. Ward.**

To recover for fraud under Massachusetts law, a plaintiff must allege and prove that the Defendant misrepresented material facts "**for the purpose** of inducing the plaintiff to act on the representation." *Rodi,* at 15 (emphasis added). It does not require Mr. Ward to establish, as Dr. Schaefer argues, that Mr. Ward was induced by Dr. Schaefer to act. Doc. 190-2 at 11.

16

In any event, drawing all inferences in the light most favorable to Mr. Ward, a reasonable juror could find that Dr. Schaefer misrepresented that recombinant LCAT available at the NIH would reverse Mr. Ward's kidney disease, in order to induce Mr. Ward to enroll at the NIH in the Protocol and receive infusions of that recombinant LCAT. Equally, a reasonable juror could find that Dr. Schaefer misrepresented that AlphaCore Pharma, LLC would manufacture a higher dose of recombinant enzyme in order to induce Mr. Ward to continue participating in the Protocol. Summary judgment must be denied.

**4. Mr. Ward detrimentally relied on Dr. Schaefer's false representations.**

Mr. Ward testified that he relied on Dr. Schaefer's expert advice regarding treatment at the NIH. Facts, ¶17. Mr. Ward's reliance on Dr. Schaefer's advice and representations regarding treatment of Mr. Ward's lipid disorder was reasonable in view of Dr. Schaefer's extensive publications in the field of lipidology and his understanding of Dr. Schaefer as a foremost expert in Mr. Ward's condition. *Id.*

 Concerning the detriment to Mr. Ward, the article publishing the Protocol results stated that hemodialysis was delayed during the Protocol. Facts, ¶ 70. Dr. Schaefer wrote that Mr. Ward suffered "more and more problems with his veins because of all the venipunctures he had been subjected to at the NIH."[7] *Id.,* ¶ 50. Mr. Ward testified he was subjected to 731 venipunctures. *Id.* After participating in the Protocol, Mr. Ward suffered recurrent access failures, stenosis and thromboses in a series of hemodialysis fistulae that required surgical intervention. *Id.* Mr. Ward suffered atrial fibrillation during the Protocol after infusion, and under the Protocol that atrial fibrillation could not properly be classified as unrelated. *Id.,* ¶ 59. Mr. Ward further testified that under the Protocol, he spent 138 days at the NIH; experienced painful, extended blood draws interrupted by clotting; experienced and experiences depression and trauma; as well as the ongoing medical

_____

[7] This is admissible against Dr. Schaefer s an opposing party's statement. *See* F.R.E. 801(d)(2)(A).

interventions required to address atrial fibrillation and fistulae failures after his participation in the Protocol. *Id.*, ¶ 50.

Drawing all inferences in the light most favorable to Mr. Ward, a reasonable juror could find that the Dr. Schaefer falsely represented or failed to disclose material facts to Mr. Ward about the Protocol known to Dr. Schaefer to be false, to induce Mr. Ward to participate in the Protocol, and upon which Mr. Ward relied. Summary judgment should therefore be denied as to Count I of the Complaint. *Rodi, supra* at 15.

### B. Summary Judgment Must Be Denied on Count II Because There Are Numerous Issues of Material Fact Concerning Dr. Schaefer's Breach or Lack of Informed Consent

Mr. Ward alleges in Count II that Dr. Schaefer failed to reasonably and adequately disclose and explain the risks and complications of the Protocol, the unproven nature and effectiveness of the treatment, and the financial and professional interests and conflicts concerning the development of ACP-501, the unique nature of Mr. Ward's blood and tissue, and the inability to prove the effectiveness of ACP-501 without the use of Mr. Ward's tissue. Doc. 190-4 at 21-22.

Defendant misconstrues Massachusetts law regarding informed consent, which provides: a "physician owes to his patient the duty to disclose in a reasonable manner all significant medical information that physician possesses or reasonably should possess that is material to an intelligent decision by the patient whether to undergo a proposed procedure." *Harnish v. Children's Hospital Medical Center*, 387 Mass. 152, 155 (1982). For a plaintiff to prevail on a theory of informed consent, "(1) the physician must have a duty to disclose the information at issue to the patient, and (2) the breach of that duty must be causally related to the patient's injury." *Bradley v. Sugarbaker*, 809 F.3d 8, 16 (1st Cir. 2015) (*quoting Halley v. Birbiglia*, 390 Mass. 540, 458 (1983)). Under the duty inquiry, [1] a sufficiently close doctor-patient relationship must exist; [2] the doctor knows or reasonably

should know the information subject to disclosure; [3] the doctor should reasonably recognize that the information is material to the patient's decision; and [4] the doctor must fail to disclose the subject information to the patient. *Bradley, supra* at 16, *quoting Halley, supra* at 548.

Dr. Schaefer does not dispute that he failed to obtain informed consent from Mr. Ward, but argues that he had no duty to do so, as Dr. Shamburek did. Doc. 190-2 at 9-11. Examples of disputed issues of material fact concerning Count II therefore include: whether Dr. Schaefer, as Mr. Ward's doctor, *see* Facts ¶¶ 30, 59, 76, had a duty to disclose any information about the Protocol to Mr. Ward, and whether Mr. Ward otherwise provided informed consent to participation in the Protocol, *see* Facts ¶¶ 48-50. These material factual disputes preclude summary judgment. Accordingly, Defendant's motion for summary judgment should be denied as to Count II of the Complaint.

**1. Dr. Schaefer had a duty to obtain informed consent from Mr. Ward.**

Dr. Schaefer argues that he had no duty to obtain informed consent from Mr. Ward because it is "long settled in Massachusetts that only *one* physician is responsible for obtaining informed consent," citing *Harnish, supra* and *Grassis v. Retik,* 25 Mass. App. Ct. 595, 604, 521 N.E.2d 411, 416 (1988). Neither case so held. In *Harnish,* a plaintiff underwent tumor removal surgery and sued the surgeon, as well as two assistant surgeons that performed the surgery, one of whom discussed with the plaintiff the potential consequences, risks, and side effects of the surgery, *Harnish, supra* at 244-5. The Medical Malpractice Tribunal found that the plaintiff's offer of proof was insufficient to raise a question for judicial inquiry. *Id.,* at 153. On appeal, the Supreme Judicial Court reversed as to the surgeon and the assistant surgeon who discussed the risks of surgery with the patient, but affirmed as to the second assistant surgeon. *Id.* at 159. The Court focused on the scope of the second assistant surgeon's participation as an assistant and held: "It would

not be reasonable to require all of the individuals who only assist in the operating room to obtain the informed consent of the patient." *Harnish*, *supra* at 159. Similarly, in *Grassis,* the Court entered a directed verdict on informed consent for an assistant surgeon, who was "not shown to stand in such a relation to the parents [of the pediatric patient] that he would be bound to inform them of the risks." *Grassis, supra* at 604. Dr. Schaefer's relationship with Mr. Ward here was totally different.

Here, the Medical Malpractice Tribunal has already determined that Mr. Ward's allegations of lack of informed consent as to Dr. Schaefer were appropriate for judicial inquiry, and Dr. Schaefer was unquestionably more involved than the second assistant surgeon in *Harnish* or the assistant surgeon in *Grassis*. Mr. Ward was Dr. Schaefer's patient, Facts, ¶¶ 30, 59, 76; Dr. Schaefer diagnosed Mr. Ward with FLD, Facts, ¶ 18; Dr. Schaefer referred Mr. Ward to the NIH, Facts, ¶ 34; Dr. Schaefer was originally included in the Protocol, Facts, ¶ 37; Dr. Schaefer made all travel arrangements for Mr. Ward, Facts, ¶¶ 76, 80; Dr. Schaefer regularly communicated with Dr. Remaley regarding Mr. Ward's participation in the Protocol prior to and after Mr. Ward's enrollment, Facts, ¶ 30; Dr. Schaefer obtained blood samples from Mr. Ward without written informed consent or separate IRB approval and shared those results, Facts, ¶ 72; Dr. Schaefer used that information in an article he planned to publish, Facts, ¶ 76.

Dr. Schaefer does not contest that information about the Protocol was material to Mr. Ward's decision, or that he failed to disclose that information to Mr. Ward and obtain Mr. Ward's informed consent, because he only argues that Dr. Shamburek, not he, had a duty. Doc. 190-2 at 15. But, Dr. Schaefer had an extremely close doctor-patient relationship with Mr. Ward, and having received and revised the Protocol, he knew or reasonably should have known the information about the Protocol that should have been disclosed to Mr. Ward. Accordingly, Dr. Schaefer had a duty to disclose information about the Protocol to

Mr. Ward.

**2. In any event, Dr. Shamburek failed to obtain informed consent from Mr. Ward.**

Dr. Schaefer's only argument is that Dr. Shamburek obtained informed consent from Mr. Ward. First, Mr. Ward testified he did not remember reviewing the Informed Consent document with Dr. Shamburek. Facts, ¶ 52.

Second, the Informed Consent document failed on multiple counts to serve the required purpose of human subject protection. Facts, ¶ 48. The Informed Consent improperly made care contingent on research participation; it was not obtained before study-related procedures began; it included false hope and biased language, including "the hope that it will increase HDL and reverse the corneal opacities, anemia, and protein in the urine and/or kidney dysfunction" and the hypothesis that "that the clinical problems in FLD can be prevented or even reversed by replacing the defective enzyme." *Id.*

The Informed Consent further failed to explain clearly the details of the study conduct, including Dr. Schaefer's role as the home physician; failed to disclose the financial conflicts of interest between Dr. Remaley and AlphaCore Pharma, LLC; it failed to accurately describe compensation to Mr. Ward; it made the false promise of an extension study, although there was no plan in place; it inadequately discussed treatment alternatives, including hemodialysis; and it failed to include assessment of Mr. Ward's capacity to provide informed consent. *Id.*

The Informed Consent did not set out all the risks and discomforts of the Protocol to Mr. Ward. *Id.*, ¶ 50.  Nor did it set forth all the procedures that would be performed on Mr. Ward. *Id.*, ¶ 48-9.  "A doctor who proposes an experimental course of treatment must not only tell the patient about the treatment and its consequences, but must also inform the patient that he is conducting an experimental treatment and that the patient is part of a study." *Heinrich v. Sweet*, 308 F.3d 48, 69 (1st Cir. 2002). "The doctor must not only tell the

patient the known risks of the treatment, as he would in a conventional setting, but must also inform the patient that there may be unknown risks." *Id.[8]* A reasonable juror could find that Mr. Ward's informed consent was never obtained.  Accordingly, the motion for summary judgment should be denied as to Count II. *Bradley, supra* at 16.

**C. Summary Judgment Must Be Denied on Count III Because There Are Numerous Issues of Material Fact Concerning Dr. Schaefer's Unjust Enrichment**

In Count III of the Complaint, Mr. Ward alleges that his participation in the Protocol and its results conferred a significant benefit on Dr. Schaefer, who had knowledge of that benefit and unjustly retained it. Doc. 190-4 at 22-23.

To succeed on a claim for unjust enrichment, a plaintiff must show (1) a benefit conferred upon defendant by plaintiff, (2) an appreciation or knowledge by defendant of the benefit, and (3) that acceptance or retention of the benefit under the circumstances would be inequitable without payment for its value. *Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.,* 552 F.3d 47, 57 (1st Cir.2009).

Dr. Schaefer challenges the first element of a claim for unjust enrichment, arguing that Mr. Ward cannot prove that Dr. Schaefer received any benefit from Mr. Ward or his involvement in the NIH Protocol. Doc. 190-2 at 16.  Examples of disputed issues of material fact concerning Count III therefore include: whether Dr. Schaefer's publications about Mr. Ward and a research contract with MedImmune, LLC, to research conditions like Mr. Ward's, *see* Facts, ¶¶ 8, 82, 91, constituted benefits, and whether Dr. Schaefer knew they were benefits. These material factual disputes preclude summary judgment. Accordingly, Defendant's motion for summary judgment should be denied as to Count III of the

---

[8] *Heinrich, supra* at 69 (*citing Moore v. Regents of Univ. of Cal.*, 51 Cal.3d 120(1990)) (holding that in obtaining a patient's consent to a procedure, "a physician must disclose personal interests unrelated to the patient's health, whether research or economic, that may affect the physician's professional judgment"); 1 S.E. Pegalis & H.F. Wachsman, American Law of Medical Malpractice 2d § 4:1, at 185–86, 189 (1992) ( "When human research is being conducted, standards governing disclosure are considerably different from those in the therapeutic setting.")).

Complaint.

**1. Mr. Ward conferred benefits on Dr. Schaefer.**

**a. Publications.**

Dr. Schaefer testified that he "worshipped at the altar of science." Doc. 190-7 at 12, lns. 265:1-7. Mr. Ward conferred the benefit of multiple peer-reviewed publications on Dr. Schaefer. In December 2011 Mr. Ward first conferred on Dr. Schaefer the benefit of publishing the case report of Mr. Ward's FLD diagnosis in the Journal of Clinical Lipidology as " Homozygous lecithin:cholesterol acyltransferase (LCAT) deficiency due to a new loss of function mutation and review of the literature." Facts, ¶ 8.

In January 8, 2016, next, Mr. Ward conferred on Dr. Schaefer the benefit of publishing the outcomes of a funded research collaboration with MedImmune, LLC, the acquirer of AlphaCore Pharma, LLC that resulted from Mr. Ward's participation in the Protocol in the Journal of Lipid Research as "Genetic and secondary causes of severe HDL deficiency and cardiovascular disease". *Id.*, ¶ 91.

**b. Research funding.**

After Mr. Ward's withdrawal from the Protocol, with Dr. Schaefer's active participation in that decision, Dr. Schaefer corresponded with MedImmune, LLC regarding administration of new enzyme to Mr. Ward. Facts, ¶ 82. During that correspondence, Dr. Schaefer proposed a Collaborative Research Agreement to Sotirios Karathanasis of MedImmune, LLC; the Agreement that Dr. Schaefer ultimately executed provided that Boston Heart Diagnostics Corporation was due $ 150,000.00 in total milestone payments from MedImmune, LLC, and the Cardiovascular Nutrition Laboratory at Tufts University, where Dr. Schaefer is a Senior Scientist, was due $ 25,300.00 as a Subcontractor. *Id.*

**c. Testing development.**

Genetics testing is one of the principal income generators for the Boston Heart

Diagnostics Corporation; the highest income generator is the HDL Map. *Id.*, ¶ 82. Dr.

Schaefer, its Chief Medical Officer, and Boston Heart Diagnostics developed a genetics

panel that tested the LCAT gene. *Id.*, ¶ 91. Further, his collaboration with MedImmune,

LLC was a part of this development. The article *Genetic and secondary causes of severe*

*HDL deficiency and cardiovascular disease* was published under the Collaborative Research

Agreement with MedImmune. *Id.* That article reported that the definitive "diagnosis of the

various forms of severe HDL deficiency must rely on DNA sequencing"—like that included

in the genetics panel he developed for Boston Heart Diagnostics Corporation. *Id.* It also

included Mr. Ward's data gathered during the Boston Heart Diagnostics Corporation blood

draws. *Id.,* ¶ 77. All of this work is a part of Dr. Schaefer's annual performance review at

Boston Heart Diagnostics. Facts, ¶ 82. A reasonable juror could find that Mr. Ward did

confer benefits on Dr. Schaefer. Accordingly, the motion should be denied.

### D. Summary Judgment Must Be Denied on Count IV Because There Are Numerous Issues of Material Fact Concerning Dr. Schaefer's Violations of the Due Process Clauses of the United States Constitution and the Constitution and Declaration of Rights of the Commonwealth of Massachusetts

In Count IV of the Complaint, Mr. Ward alleges that Dr. Schaefer, acting in concert

by agreement with Dr. Remaley, Dr. Shamburek, and Bruce Auerbach to enroll Mr. Ward

in the Protocol, thereby deprived him of his right to bodily integrity. Doc. 190-4 at 23-24.

A claim that "medical experimentation conducted under false pretenses by

Government actors can rise to the level of a constitutional violation" of the "right to be free

from invasions of bodily integrity" by establishing the following elements: "(1) a

(government) actor, (2) without obtaining informed consent and utilizing false pretenses to

obtain participation, (3) conducted medical experiments known to have no therapeutic

value and indeed known to be possibly harmful to the subjects." *Heinrich ex rel. Heinrich v.*

*Sweet*, 62 F. Supp. 2d 282, 314 (D. Mass. 1999)(Young, C.J.).[9] A private defendant may be found to have acted under color of law absent direct government action where there is: "(1) an elaborate financial or regulatory nexus between the defendant and the government, (2) an assumption by the defendant of a traditional public function, or (3) a symbiotic relationship involving the sharing of profits." *Id.* at 309, (*citing Barrios–Velazquez v. Asociacion De Empleados Del Estado Libre Asociado De Puerto Rico*, 84 F.3d 487, 492–94 (1st Cir.1996)).

Examples of disputed issues of material fact concerning Count IV include: whether Dr. Schaefer has a symbiotic relationship with the government concerning the sharing of profits in view of his receipt of funding from the Government and MedImmune, LLC, the licensee of the Government-owned patent, *see* Facts, ¶¶ 8, 82; whether Dr. Schaefer failed to obtain informed consent, *see* § II(B), *supra*,  and made false representations to induce Mr. Ward to participate in the Protocol, *see* § II(A)(1)(a), *supra*; and whether Dr. Schaefer was involved in the Protocol and knew it was not therapeutic, *see* § II(A)(1)(b), *supra*. These material factual disputes preclude summary judgment. Accordingly, summary judgment should be denied as to Count IV.

## 1. Dr. Schaefer acted under color of law because there is a symbiotic relationship involving the sharing of profits.

Dr. Schaefer argues that he is not a Government actor because he is not employed by or in privity with the Government. Doc. 190-2 at 12-14. But, Dr. Schaefer is a Government actor because he acted under color of law under a symbiotic relationship between with the Government involving the Protocol profit sharing. *Heinrich, supra* at 315.

---

[9] There is no private right of action under the Nuremberg Code, but "[a]t the very least, the judgment of the Nuremberg Tribunal regarding fundamental legal principles of human subject experimentation served as an explicit international declaration that the conduct alleged in this case "shocked the conscience" within the meaning of Justice Frankfurter's words in *Rochin*." *Heinrich, supra* at, 321.

The patent for the manufacture of recombinant LCAT enzyme is held by the United States Department of Health and Human Services, of which the NIH is a part. Facts, ¶ 22. That patent was licensed originally to AlphaCore Pharma, LLC, now its acquirer, MedImmune, LLC. *Id.* Under the terms of that license, MedImmune, LLC is to pay royalties to the NIH for the sales of recombinant LCAT, when it is approved for sale. Doc. 20, ¶ 7. MedImmune, LLC also paid Dr. Schaefer's corporation and university laboratory under a Clinical Research Agreement. Facts, ¶ 82. It paid the NIH under a Cooperative Research and Development Agreement. *Id.,* ¶ 23. The NIH funded Dr. Schaefer's research as well. *Id.,* ¶ 8. Accordingly, there is a symbiotic relationship between Dr. Schaefer and the Government involving the sharing of profits. *Heinrich, supra* at 315.

Dr. Schaefer and the Government had a symbiotic relationship regarding the sharing of profits. As set forth above in  § II(B), *supra,* Dr. Schaefer did not obtain informed consent; made false representations to induce Mr. Ward to participate in the Protocol, § II(A)(1), *supra;* participated in the administration of the Protocol, which he knew was not therapeutic, § II (A)(1)(b), *supra;* and, as a result, shared in the profits through the benefits he and Boston Heart Diagnostics Corporation received, § II(C)(1). A reasonable juror could find that Dr. Schaefer deprived Mr. Ward of his right to bodily integrity.  Accordingly, the motion should be denied.

**E. Summary Judgment Must Be Denied on Count V Because There Are Numerous Issues of Material Fact Concerning Dr. Schaefer's Violation of the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws. ch. 12, § 11H, I.**

In Count V of the Complaint, Mr. Ward alleges that Dr. Schaefer, Dr. Remaley, Dr. Shamburek, and Bruce Auerbach, "three of whom were physicians, interfered by threats, intimidation and coercion, and attempted to do so repeatedly, with Mr. Ward's exercise and enjoyment of his due process rights." Doc. 190-4 at 25.

"[T]he MCRA contemplates a two-part sequence: [liability may be found where] (1)

the defendant threatens, intimidates, or coerces the plaintiff, in order to (2) cause the plaintiff to give up something that [she] has the constitutional right to do." *Thomas v. Harrington*, 909 F.3d 483, 492 (1st Cir. 2018) (quoting *Goddard, supra),* "[C]oercion" means "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done." *Id.* (citation omitted).

Examples of disputed issues of material fact concerning Count V include: whether Dr. Schaefer coerced Mr. Ward by committing clear boundary violations, and whether he did so in order to cause Mr. Ward to give up his constitutional right to bodily integrity and submit to the Protocol. These material factual disputes preclude summary judgment. Accordingly, summary judgment should be denied as to Count V.

**1. Dr. Schaefer interfered with Mr. Ward's constitutional rights by coercion.**

Dr. Schaefer exerted pressure on Mr. Ward to participate in the Protocol by engaging in boundary violations with him. "Committing boundary violations with a patient may constitute misconduct and/or gross misconduct in the practice of medicine." *Board of Registration in Medicine v. Julian Abbey,* RM-06-962 (Mass. Dept. Admin. Law App. Mar. 7, 2008) (citation omitted). "A physician's professional relationship is compromised when he fails to maintain proper objectivity and distance from his patients." *Id.* "A physician must take all steps necessary to avoid crossing the boundaries which separate reasonable and appropriate professional conduct from unacceptable personal relations." *Id.*

Dr. Schaefer engaged in boundary violations with Mr. Ward by: [1] co-publishing an article reporting Mr. Ward's FLD diagnosis that Mr. Ward testified he did not co-author; [2] paying Mr. Ward $500.00 a month to assist in, among other things, publishing a manuscript on corneal opacification; [3] appointing him the director of the Familial Dyslipidemia Foundation, which Dr. Schaefer serves as Medical Consultant and Boston Heart Diagnostics Corporation serves as the Sponsor, and which supports diagnosis and

research of dyslipidemias like FLD; [4] inviting him to his home for events. Facts, ¶ 53. By

crossing boundaries from separate reasonable and appropriate professional conduct to

unacceptable personal relations, Dr. Schaefer was able to exert control and a moral force on

Mr. Ward, who testified that Dr. Schaefer was a father figure to him. Doc. 190-9 at 17, lns.

65:9-17; s*ee Abbey, supra*. At the same time, Dr. Schaefer was advising Mr. Ward not to

proceed with hemodialysis, to obtain treatment with recombinant LCAT at the NIH,

constraining Mr. Ward to enroll in, and remain in, the Protocol.

A reasonable juror could accordingly find that Dr. Schaefer coerced Mr. Ward by

committing clear boundary violations in order to cause Mr. Ward to give up his

constitutional right to bodily integrity and submit to the Protocol. Accordingly, summary

judgment should be denied as to Count V.

## F. Summary Judgment Must Be Denied on Count VI Because There Are Numerous Issues of Material Fact Concerning Dr. Schaefer's Civil Conspiracy

In Count VI of the Complaint, Mr. Ward alleges that Dr. Schaefer, Dr. Remaley, Dr.

Shamburek, "through their peculiar power of coercion over Mr. Ward, as his physicians,

and ACP and its principal, had in enrolling him in the Protocol." Doc. 190-4 at 25.

Under the "common design" theory of civil conspiracy, a plaintiff must show: "first, a

common design or an agreement, although not necessarily express, between two or more

persons to do a wrongful act and, second, proof of some tortious act in furtherance of the

agreement." *Thomas v. Harrington*, 909 F.3d 483, 491–92 (1st Cir. 2018) "[A]n inference of

an implied agreement [can] properly be drawn from the conduct of two or more parties." *Id.*

(citation omitted). Under the "substantial assistance" theory of civil conspiracy, "a person

may be liable in tort if he knows that the conduct of another person constitutes a breach of

duty and gives substantial assistance or encouragement to the other so to conduct himself."

*Id.* (citations and alterations omitted).

Examples of disputed issues of material fact concerning Count VI include: whether Dr. Schaefer shared a common design to improperly enroll Mr. Ward in the Protocol and made misrepresentations in furtherance of that design, *see* § II(A), *supra*; whether Dr. Schaefer knew that his conduct and that of Dr. Remaley and Dr. Shamburek in enrolling Mr. Ward in the Protocol was a breach of their duties as doctors to obtain informed consent, *see* § II(B), *supra*; and whether Dr. Schaefer provided, by substantial assistance and encouragement to those doctors by his participation in the Protocol, including enrolling and maintaining Mr. Ward in the Protocol, *see* Facts, ¶¶ 18, 34, 37, 72, 80, 76. These material factual disputes preclude summary judgment. Accordingly, summary judgment should be denied as to Count VI.

**1. Dr. Schaefer acted in concert with Dr. Remaley, Dr. Shamburek, and Bruce Auerbach.**

Dr. Schaefer acted in concert with Dr. Remaley, Dr. Shamburek, and Bruce Auerbach, meeting with them in June 2010 at the annual European Atherosclerosis Meeting, Facts, ¶ 28; in November 2012 at the annual American Heart Association Meeting, Facts, ¶ 34; in January 2013 at the NIH, Facts, ¶ 56. Dr. Schaefer corresponded with them extensively regarding enrolling Mr. Ward in the Protocol, which originally designated Dr. Schaefer as a Physician Co-Investigator. Dr. Schaefer was not merely aware of, but also in agreement with, Dr. Remaley, Dr. Shamburek, and Bruce Auerbach's design to enroll Mr. Ward in the Protocol. *See* Doc. 190-2 at 19. Dr. Schaefer took active steps to enroll Mr. Ward and secure his ongoing participation in the Protocol, from revising the Protocol drafts to booking all of Mr. Ward's travel to the NIH. Facts, ¶¶ 36-8, 76. Evidence of an agreement can therefore properly be drawn from their conduct. *Thomas, supra* at 492.

Like Dr. Schaefer, *see* § II(A)(3), *supra*, Drs. Remaley and Shamburek both testified that they knew at the time Mr. Ward enrolled in the Protocol that damage to his kidney

cells was permanent, and therefore any reversal of Mr. Ward's kidney function loss was "unlikely," "very, very, very unlikely for the scenario." Doc. 190-10 at 7-8, lns 24:6-25:8; Doc. 190-11 at 10, lns. 36:13-37:21.

**2. Dr. Schaefer gave substantial assistance to Dr. Remaley, Dr. Shamburek and Bruce Auerbach.**

Dr. Schaefer diagnosed Mr. Ward with FLD Facts, ¶ 18; Dr. Schaefer referred Mr. Ward to the NIH, Facts, ¶ 34; Dr. Schaefer lobbied legislators and the FDA for approval of the Protocol, Facts, ¶ 34; Dr. Schaefer was originally included as a Physician-Co-Investigator and Medical Monitor in the Protocol, and in later drafts of the Protocol remained the "home physician", Facts, ¶ 37; Dr. Schaefer obtained blood samples from Mr. Ward without written informed consent or separate IRB approval and shared these results with Drs. Shamburek and Remaley and Bruce Auerbach of MedImmune LLC, Facts, ¶¶ 72, 80; Dr. Schaefer used that information in an article he planned to publish about the Protocol, Facts, ¶ 76. Dr. Schaefer gave substantial assistance to the Dr. Remaley, Dr. Shamburek and Bruce Auerbach in enrolling and maintaining Mr. Ward on the Protocol. He, like Dr. Remaley, Dr. Shamburek and Bruce Auerbach, knew that the Protocol was not therapeutic, but rather was intended to enroll Mr. Ward for the purpose of conducting research. *See* § II(A)(3), *supra;* Doc. 190-10 at 7-8, lns 24:6-25:8; Doc. 190-11 at 10, lns. 36:13-37:21. Dr. Schaefer knew of, and shared, Dr. Remaley, Dr. Shamburek and Bruce Auerbach's tortious purpose. *See* Doc. 190-2 at 19.

There is sufficient evidence for a reasonable jury to find the existence of a conspiracy between Dr. Schaefer, Dr. Remaley, Dr. Shamburek, and Bruce Auerbach. Accordingly, summary judgment should be denied as to Count VI.

**IV. CONCLUSION**

For the foregoing reasons, the Motion for Summary Judgment must be denied.

Respectfully submitted,

The Plaintiff,
EDMUND EDWARD WARD
By his attorney,

/s/ Patrick Clendenen
Patrick T. Clendenen, BBO #564165
Clendenen & Shea LLC
400 Orange Street
New Haven, CT 06511
(203) 787-1183
ptc@clenlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on the date below I electronically filed this document using the CM/ECF system which will automatically send email notification of such filing to the attorneys of record in this matter as identified on the Notice of Electronic Filing (NEF) May 4, 2020.

/s/ Patrick Clendenen
CLENDENEN & SHEA, LLC