UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EDMUND EDWARD WARD,                              ) | |
|                         Plaintiff                          ) | |
| V.                                                              ) | CIVIL ACTION NO. |
|                                                                 ) | 1:16-cv-12543-FDS |
| ERNST J. SCHAEFER, M.D.,                        ) | |
|                         Defendant.                       ) | June 1, 2020 |

**S<small>UR</small>-R<small>EPLY</small> M<small>EMORANDUM IN</small> O<small>PPOSITION TO</small> M<small>OTION FOR</small> S<small>UMMARY</small> J<small>UDGMENT</small>**

**Introduction**

      In Dr. Schaefer's Reply to the Opposition to his Motion for Summary Judgment, Doc. 195, he merely repeats the incantation that Mr. Ward has failed to establish any dispute of material fact, no matter how many of Dr. Schaefer's purportedly "undisputed" material facts are plainly contradicted by the record.

      For example, Dr. Schaefer claims he never agreed with, or substantially assisted, Dr. Shamburek and Dr. Remaley about enrolling Mr. Ward in the Protocol, when he admitted in a letter to the NIH that he had. Dr. Schaefer claims he never coerced and pressured Mr. Ward to enroll and remain in the Protocol, yet he compromised the doctor-patient relationship with boundary violations that constitute misconduct in the practice of medicine. Dr. Schaefer claims there is no evidence he told Mr. Ward that recombinant LCAT would reverse his kidney disease, when Mr. Ward testified to that fact. Dr. Schaefer claims he owed Mr. Ward no doctor-patient duty to obtain informed consent, although he stated repeatedly Mr. Ward was his patient. Dr. Schaefer claims he received no benefit from Mr. Ward, despite publishing two articles including data from his blood and signing a research contract resulting from the Protocol with the manufacturer of recombinant LCAT that would pay his company $150,000.00 and his University laboratory $25,300.00. Dr. Schaefer claims he had no symbiotic relationship with the NIH, even though it funded the publication of his case report on Mr. Ward. Dr. Schaefer has clearly failed to establish that

there is no genuine dispute of material fact. Summary judgment should be denied.

## I. ARGUMENT

### A. The Genuine Disputes of Material Fact Here Require Trial.

### 1. Dr. Schaefer agreed with Dr. Shamburek and Dr. Remaley to enroll Mr. Ward in the Protocol and assisted them in doing so.

Despite his extensive planning, participation, and involvement in the Protocol, Dr. Schaefer incredibly argues that he neither agreed with Dr. Shamburek and Dr. Remaley to wrongfully enroll Mr. Ward in the Protocol, nor assisted them in doing so. Doc. 195 at 12-13. Dr. Schaefer bases his argument on a misreading of *Thomas v. Harrington*, 909 F.3rd 483, 491 (1st Cir. 2018). In that case the Court did not find evidence of a "common design" between a commanding police officer and his subordinate to terminate another employee. Specifically, there was no evidence there that the commanding officer "controlled" or "directed" the subordinate in respect of the internal investigation the other employee and the conclusions to be drawn from that investigation. *Id* at 491. Accordingly, there was no evidence of an agreement nor substantial assistance. *Id.*

Here, based on at a minimum, Dr. Schaefer's own admissions, there is no such difficulty. Dr. Schaefer, reciting the circumstances of the Protocol to Dr. Michael Sack of the NIH, Dr. Shamburek's supervisor, wrote that he "heard that AlphaCore, a company in Ann Arbor, MI was conducting a study at the NIH with Dr. Alan Remaley giving single LCAT treatments to patients with established coronary artery disease." Doc. 191-38 at 3.[1] He continued, "I contacted Alan about getting compassionate use treatment for my patient. I met with Drs. Remaley and Shamburek along with Drs. Brian Krause and Bruce Auerbach of AlphaCore at the American Heart Association in November of 2012." *Id.* He then concluded: "At that time, based on my recollection, **it was agreed that we would all**

---

[1] This letter is one of the documents that Dr. Schaefer admittedly destroyed. It was produced by the Government in response to prolonged subpoena and motion practice in this Court.

**collaborate on a study to treat this patient with LCAT deficiency with LCAT**

**enzyme replacement**." *Id.* (emphasis added). On this basis alone summary judgment

should be denied; a civil conspiracy existed.

**2. Dr. Schaefer coerced Mr. Ward.**

      Dr. Schaefer argues that Mr. Ward was fond of him, and therefore Mr. Ward was not

intimidated, coerced, or threatened to participate in the Protocol. Doc. 195 at 11-12. But Dr.

Schaefer does not address the record facts that show Mr. Ward's fondness was the result of

Dr. Schaefer's failure to maintain proper professional objectivity and distance from his

patient, Mr. Ward. *See* Doc. 194 at 27. Dr. Schaefer compromised the doctor-patient

relationship with boundary violations that constitute misconduct in the practice of

medicine. *See Board of Registration in Medicine v. Julian Abbey,* 2008 WL 7540597, at *9

(Mass. Dept. Admin. Law App. Mar. 7, 2008) (citation omitted). By cultivating an

inappropriate, paternal relationship with Mr. Ward, rather than an appropriate doctor-

patient relationship, Dr. Schaefer was able to exert pressure and control on Mr. Ward to

participate in the Protocol.

      Dr. Schaefer then repeats the argument that he "played no role in the NIH Protocol."

But, Dr. Schaefer, at his request and insistence, was originally designated a Physician-Co

Investigator and Medical Monitor in the Protocol, and in later drafts of the Protocol

remained the "home physician." Doc. 191, ¶ 37. Indeed, Dr. Schaefer revised the draft

Protocol.[2] "It is undisputed that the protocol, whichever version was adopted, did call for

Dr. Schaefer to monitor Ward." *Ward v. Schaefer*, 2018 WL 1096829, at *2 (D. Mass. Feb.

27, 2018) (Saylor, C.J.). Dr. Schaefer actually did so, taking a dozen blood draws at Boston

_____

[2] *See* Doc. 191-26 (enclosing Mr. Ward's case report and revisions to the draft Protocol to Rebecca
Bakker-Arkema of AlphaCore Pharma, LLC, and requesting she "please go ahead and revise the
remainder of the document" and contact him with any questions).

Heart Diagnostics Corporation for "Research."[3] Doc. 191, ¶ 72. Dr. Schaefer also took active steps to enroll Mr. Ward and to secure his ongoing participation in the Protocol, from editing and revising the Protocol draft, to booking all of Mr. Ward's travel to the NIH, to attending his NIH admission, communicating regularly with Drs. Schaefer and Remaley, and drawing Mr. Ward's blood. Doc. 191, ¶¶ 4, 36-8, 72, 76. Under the record facts and by his own admissions, Dr. Schaefer was involved in the Protocol from its inception. Summary judgment should accordingly be denied.

**3. Dr. Schaefer misrepresented the Protocol to Mr. Ward.**

Dr. Schaefer argues that he did not represent to Mr. Ward that ACP-501 would effectively reverse Mr. Ward's kidney disease. As an initial matter, this fact is both material by Dr. Schaefer's own argument, Doc. 195 at 5, and disputed because Mr. Ward's testified to the contrary. *See* Doc. 191, ¶ 3, cited by Doc. 195 at 5 (Dr. Schaefer "represented to Mr. Ward that recombinant LCAT enzyme would effectively reverse his advanced kidney disease"). This alone precludes summary judgment.[4] *See* F.R.C.P. 56(a). Further, however, Dr. Schaefer concedes that he made the "several statements" to Mr. Ward concerning ACP-501, which were identified in the record by Mr. Ward, including, among others, that it was the "therapy of choice" and a "very important and potentially life-saving therapy" which "should help prevent [Mr. Ward's] kidneys from failing." Doc. 191 ¶¶ 30, 34.

Dr. Schaefer next claims that the record "overwhelmingly demonstrates that Mr. Ward was informed about ACP-501's availability and dosing plans." Doc. 195 at 5 (citing

---

[3] Dr. Schaefer also stated that, although he took eleven blood draws from Mr. Ward, he never provided the data from those draws to AlphaCore Pharma LLC, and he never published the data from those blood draws. Doc. 191, ¶¶ 72, 77, 80. But the record shows he took a dozen blood draws, for research; provided the data to AlphaCore Pharma LLC repeatedly, including eighteen days before it was acquired by MedImmune, LLC; and published Mr. Ward's data in an article he co-authored with Sotirios Karathanasis of MedImmune, LLC. *See id.*

[4] "The credibility of [Ward's] testimony is not to be evaluated at the summary judgment stage." *Carlson v. Univ. of New England*, 899 F.3d 36, 43 (1st Cir. 2018) (citation omitted).

Doc. 190-2 at 11). But neither the cited page nor any other section of Dr. Schaefer's Memorandum of Law in Support of his Motion for Summary Judgment addresses Mr. Ward's awareness of ACP-501's dosing plans. The preceding page discusses Mr. Ward's awareness that ACP-501 was available at the NIH—not how many doses would be available, or at which dosages it would be available and efficacious. *Id.* at 10. Dr. Schaefer then claims that because the Informed Consent document for the Protocol included information about limitations on the availability of ACP-501 drug supply, Mr. Ward was aware "he would require a lower dose before additional ACP-501 was expected to be produced." Doc. 195 at 5. But an anticipated hiatus in the available quantity of ACP-501 does not disclose the efficacious dose at which Mr. Ward was to be treated. Finally, whether Mr. Ward ever reviewed that Informed Consent document, and whether his consent was informed, remain matters in *material* dispute. Doc. 191, ¶¶ 48, 49. Finally, Dr. Schaefer tries to have it both ways.  He claims that, even if he misrepresented that a lower dose was optimal and a higher dose would be produced, he genuinely believed that a lower dose was optimal. Doc. 195 at 6. The record belies this claim. Dr. Schaefer wrote to Dr. Shamburek, Dr. Remaley, Sotirios Karathanasis of MedImmune, LLC and Mr. Ward that "I feel [Mr. Ward] was making progress on the higher dose with some improvement – but then deteriorated on the lower less frequent dose." Doc. 190-27.

Dr. Schaefer also argues that he is not liable for nondisclosure because "Massachusetts law does not consider nondisclosure a form of representation." Doc. 195 at 6. This is incorrect. "A failure to disclose material facts may constitute a false representation if a duty to disclose exists." *Rohm & Haas Elec. Materials, LLC v. Electrical Circuit Supplies, Inc.*, 759 F.Supp.2d 110, 119 (D. Mass. 2010) (Tauro, J.). Such a duty to disclose exists here, where Mr. Ward was Dr. Schaefer's patient. *See Harnish v. Children's Hospital Medical Center,* 387 Mass. 152, 155 (1982); Doc. 191 ¶¶ 30, 59, 76.

Dr. Schaefer finally claims Mr. Ward was "aware of the experimental nature of the protocol" and therefore that he did not fail to disclose that the Protocol was for research and not therapeutic. Doc. 195 at 6. After repeatedly saying to Mr. Ward and writing that ACP-501 was "the therapy of choice" and "potentially life-saving treatment," this argument misses the mark.

Ordinarily, "[t]he clinical investigation of a previously untested drug is divided into three phases." Doc. 191, ¶ 27, n 4 (citing 21 C.F.R. § 312.21). Such a clinical investigation constitutes "research." In contradistinction, "Expanded Access" to investigational new drugs is allowed only "when the primary purpose is to diagnose, monitor, or treat a patient's disease or condition." Doc. 191, ¶ 35 (citing 21 C.F.R. § 312.300). The "Expanded Access" "compassionate use" of ACP-501 for Mr. Ward was always communicated to him as treatment. Dr Schaefer again says so himself in his letter to Dr. Sack of the NIH. Doc. 191-38 at 3. And Mr. Ward had already been diagnosed. Dr. Schaefer simply wishes to avoid the legal consequences of recommending ACP-501 as the "therapy of choice" when it was not a therapy at all.  Dr. Schaefer also does not dispute that financial and professional motives and conflicts existed, only denying that he had the duty to disclose them. Doc. 195 at 7.

A reasonable jury could find that Dr. Schaefer's misrepresentations and omissions were made to induce Mr. Ward to enroll in the Protocol, requiring that summary judgment be denied. *See Carlson, supra* at 44.

## 4. Dr. Schaefer breached his duty to obtain informed consent.

Dr. Schaefer argues, without any authority, that Mr. Ward must show that Dr. Schaefer controlled the NIH's intake and informed consent process. Doc. 195 at 7. Neither of these facts are a necessary element of an informed consent claim, which only requires Mr. Ward to show that Dr. Schaefer had a duty to disclose information about the Protocol to

Mr. Ward, and that Dr. Schaefer's breach of that duty was causally related to Mr. Ward's injuries. *See Bradley v. Sugarbaker,* 809 F.3d 8, 16 (1st Cir.2015) (*quoting Halley v. Birbiglia,* 390 Mass. 540, 458 (1983)). Mr. Ward has shown that Dr. Schaefer had a duty to disclose information about the Protocol by virtue of Dr. Schaefer's doctor-patient relationship with Mr. Ward, *See* Doc. 194 at 19-20; *Bradley, supra* at 16 (quoting *Halley*, *supra* at 458). It bears repeating that Dr. Schaefer does not argue he ever obtained *any* informed consent from Mr. Ward, including for the blood draws at Dr. Schaefer's laboratory at Boston Heart Diagnostics Corporation that were denoted "Research." Doc. 191, ¶ 72.

Despite Dr. Schaefer's duty to obtain informed consent and his failure to discharge that duty, he insists that Mr. Ward's informed consent claim against him fails because Dr. Shamburek obtained informed consent from Mr. Ward. Doc. 195 at 8. Specifically, Dr. Schaefer argues that because Mr. Ward signed an NIH Informed Consent document for the Protocol, and because Dr. Shamburek testified that he reviewed it with Mr. Ward, Mr. Ward provided informed consent. This argument fails for three reasons.

First, Dr. Shamburek did not obtain informed consent. Mr. Ward has testified that he did not recognize the informed consent document and did not recall reviewing it with Dr. Shamburek. Doc. 191, ¶ 47. Even if he did so recall, the informed consent form that he signed was deficient in numerous respects.[5] Here, as in *Bradley, supra*, there was a failure to obtain informed consent, notwithstanding a signed consent document, because there was

---

[5] The Informed Consent document improperly made care contingent on research participation; it was not obtained before study-related procedures began; it included false hope and biased language, including "the hope that it will increase HDL and reverse the corneal opacities, anemia, and protein in the urine and/or kidney dysfunction" and the hypothesis that "that the clinical problems in FLD can be prevented or even reversed by replacing the defective enzyme." Doc. 191 at ¶ 48. It failed to explain clearly the details of the study conduct, including Dr. Schaefer's role as the home physician; failed to disclose the financial conflicts of interest between Dr. Remaley and AlphaCore Pharma, LLC; it failed to accurately describe compensation to Mr. Ward; it made the false promise of an extension study, although there was no plan in place; it inadequately discussed treatment alternatives, including hemodialysis; and it failed to include assessment of Mr. Ward's capacity to provide informed consent. *Id.* It failed to set out all the risks and discomforts of the Protocol to Mr. Ward. *id.*, ¶ 50, or the procedures that would be performed on Mr. Ward. *Id.*, ¶ 48-9.

a failure to "disclose in a reasonable manner all significant medical information."[6] *Bradley,*
*supra* at 21. Second, Dr. Shamburek's involvement does not relieve Dr. Schaefer of his own
duty. "A doctor who proposes an experimental course of treatment"—like Dr.
Schaefer—"must not only tell the patient about the treatment and its consequences, but
must also inform the patient that he is conducting an experimental treatment and that the
patient is part of a study." *Heinrich v. Sweet*, 308 F.3d 48, 69 (1st Cir. 2002); *see also Zeman*
*v. Williams,* 2014 WL 3058298, at *3 (D. Mass. July 7, 2014) (O'Toole, J.).[7] Dr. Schaefer did
not, and summary judgment should accordingly be denied.

## 5. Dr. Schaefer was unjustly enriched.

Dr. Schaefer claims he did not benefit from Mr. Ward, a claim that is belied by the
facts in the record. First, Dr. Schaefer claims he did not benefit from Mr. Ward's
participation in the Protocol because he was "not an author on the publication detailing the
Compassionate Use Protocol, and received no professional recognition relating to same."
Doc. 195 at 9. He did receive professional recognition; he was recognized and thanked by
the authors "for advice and referring the patient." Doc. 190-13 at 11. In any event, Dr.
Schaefer published journal articles including Mr. Ward's data twice: first, "Homozygous
lecithin:cholesterol acyltransferase (LCAT) deficiency due to a new loss of function
mutation and review of the literature,"  when Dr. Schaefer diagnosed Mr. Ward in 2011,
and again in 2016, "Genetic and secondary causes of severe HDL deficiency and

---

[6] This duty also extends to the disclosure of non-medical information, such as financial conflicts of
interest. *See Darke v. Isne*r, 17 Mass. L. Rptr. No. 30,689 (Super. Ct. 2004) (physician financial
interest in treatment recommended).

[7] "It is certainly true that the investigator has a major, if not the major, role in obtaining a properly
informed consent. But that does not foreclose the possibility that some other persons, including
particularly the trial's sponsor, might also have a responsibility to help assure that the investigator
actually gets a properly informed consent." *Zeman, supra* at 3. Dr. Schaefer was originally included
as a Physician-Co Investigator and Medical Monitor in the Protocol, and in later drafts of the
Protocol remained the "home physician." Doc. 191, ¶ 37. "It is undisputed that the protocol,
whichever version was adopted, did call for Dr. Schaefer to monitor Ward." *Ward v. Schaefer*, 2018
WL 1096829, at *2 (D. Mass. Feb. 27, 2018) (Saylor, C.J.);

cardiovascular disease," when Dr. Schaefer co-published with Sotirios Karathanasis of

MedImmune, LLC, pursuant to a Cooperative Research Agreement. Doc. 191 ¶¶ 8, 77, 91.

Second, Dr. Schaefer claims he did not benefit from Mr. Ward because "Boston Heart

Diagnostics entered into a CRADA with MedImmune to research the prevalence of LCAT

deficiency in the greater population, surveying hundreds of thousands of individuals." Doc.

195 at 9. But the Recitals of that Agreement state that it is "made and entered into between

MedImmune, LLC, having a place of business at One MedImmune Way, Gaithersburg,

Maryland 20878 ("MedImmune") and **Ernst J. Schaefer, MD**, having an office at Boston

Heart Diagnostics Corporation, 175 Crossing Boulevard, Framingham, MA, 01702

("Company")". Doc. 191-73 at 2 (emphasis added). It is signed by Dr. Schaefer as Chief

Medical Officer of Boston Heart Diagnostics Corporation, and it provides for payment of

$150,000.00 in total milestone payments to Boston Heart Diagnostics Corporation, and the

Cardiovascular Nutrition Laboratory at Tufts University, where Dr. Schaefer is a Senior

Scientist, was due $25,300.00 as a Subcontractor. Doc. 191, ¶ 82.

Third, Dr. Schaefer claims it is undisputed that he received a salary from Boston

Heart Diagnostics Corporation and was not compensated based on any research he

conducts. Doc. 195 at 9. The cited paragraph of Dr. Schaefer's Statement of Undisputed

Facts, however, only states that he was an employee of Boston Heart Diagnostics

Corporation. Doc. 190-1, ¶ 7. In fact, the record demonstrates that Dr. Schaefer's research

was an integral part of his annual performance reviews by the Chief Executive Officer.

Doc. 191, ¶ 82.

Finally, Dr. Schaefer claims he did not benefit from Mr. Ward because the

the "HDL Map" test at Boston Heart Diagnostics Corporation was designed before Mr.

Ward met Dr. Schaefer. Doc. 195 at 9-10. This claim omits the fact that Dr. Schaefer used

the biochemical diagnosis of Mr. Ward's familial LCAT deficiency as the basis for a

memorandum to provide to insurers, justifying the medical necessity of the HDL Map test. Doc. 191, ¶ 90. Summary judgment should accordingly be denied.

**6. Dr. Schaefer profited under a symbiotic relationship with the Government.**

Dr. Schaefer claims that, in order to survive summary judgment, Mr. Ward "must provide facts that Dr. Schaefer was contracted by the federal government and state government to get Mr. Ward to participate in the Compassionate Use Protocol." Doc. 195 at 10. But the law is clear that Dr. Schaefer is a government actor because he acted under color of law under a symbiotic relationship between with the Government involving the Protocol profit sharing. *Heinrich ex rel. Heinrich v. Sweet*, 62 F. Supp. 2d 282, 314, 315 (D. Mass. 1999)(Young, C.J.).

Dr. Schaefer first repeats the claim that he "was not awarded compensation based on research grants obtained or the outcomes of any research." Doc. 195 at 10. But, as set forth in § I(A)(5), *supra*, the cited paragraph of Dr. Schaefer's Statement of Undisputed Facts, however, only states that he was an employee of Boston Heart Diagnostics Corporation; the record shows that Dr. Schaefer's research was an integral part of his annual performance reviews by the Chief Executive Officer. Doc. 190-1, ¶ 7; Doc. 191, ¶ 82.

Second, Dr. Schaefer claims that he ceased all panel and membership positions at the NIH by 2008[8], before he ever met Mr. Ward. Doc. 195 at 10-11. But Dr. Schaefer testified that, in January 2013, he met at the NIH with Dr. Remaley, Dr. Shamburek, and Mr. Ward during Mr. Ward's evaluation for participation in the Protocol; discussed Mr. Ward's evaluation; and gave a seminar on HDL deficiency. Doc. 190-6 at 31-2, lns: 120:22-123:16. Further, even if Dr. Schaefer had only been working at the NIH as recently as 2008, he would have been working there at the time the NIH licensed the patent to

---

[8] Dr. Schaefer initially claimed that it was an undisputed material fact that he "has not worked at the NIH since 1982." Doc. 190-1, ¶ 3.

manufacture recombinant enzyme to AlphaCore Pharma, LLC and awarded it $ 240,129.00 in grants. Doc. 191, ¶ 23.

Third, Dr. Schaefer admits that he "has received research grants from the NIH throughout his long and distinguished career, it is also undisputed that those grants are unrelated to Mr. Ward's participation in the Protocol." Doc. 195 at 11. But Dr. Schaefer's publication of his case report diagnosing Mr. Ward, Doc. 190-8, which was incorporated into the Protocol, *see* 191-26, at 2, and cited in the subsequent publication of the Protocol results, *see* Doc. 190-13 at 11, was **funded by the NIH**. *See* Docs. 190-8 at 6; 191-4 at 8. Summary judgment should accordingly be denied.

## II. CONCLUSION

For the foregoing reasons, Dr. Schaefer's Motion for Summary Judgment should be denied.

Respectfully Submitted,
EDMUND EDWARD WARD,
By his attorneys,

/s/ Patrick Clendenen
Patrick T. Clendenen, BBO #564165
Clendenen & Shea LLC
400 Orange Street
New Haven, CT 06511
(203) 787-1183
ptc@clenlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 1, 2020.

/s/ Patrick T. Clendenen
Patrick T. Clendenen